1   Roderick A. McLeod (State Bar No. 104694)
    rmcleod@jonesday.com
2   Gidon M. Caine (State Bar No. 188110)
    gcaine@jonesday.com
3   Thomas A. Rector (State Bar No. 199175)
    tarecotr@jonesday.com
4   Jessica L. Repa (State Bar No. 240801)
    jlrepa@jonesday.com
5   JONES DAY
    555 California Avenue, Suite 2600
6   San Francisco, California
    Telephone:  415-626-3939
7   Facsimile:   415-875-5700

8   Attorneys for Plaintiff
    INNOFONE.COM, INCORPORATED
9

10                  UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12                          CV-07-1793-DDP(FMOx)

13  INNOFONE.COM, INCORPORATED,        Case No.
    a Nevada Corporation,
14
                Plaintiff,             COMPLAINT FOR:
15
         v.                            (1) VIOLATION OF SECTION
16                                     10(B) OF THE SECURITIES
    COGENT CAPITAL FINANCIAL,          EXCHANGE ACT OF 1934 AND
17  LLC, a Delaware Limited Liability  SECURITIES EXCHANGE
    Company, COGENT CAPITAL            COMMISSION RULE 10B-5
18  INVESTMENTS, LLC, a Delaware
    Limited Liability Company, COGENT  (2) RESCISSION BASED UPON
19  CAPITAL GROUP, LLC, a Delaware     ILLEGALITY
    Limited Liability Company,
20  GREGORY L. KOFFORD, an             (3) RESCISSION BASED UPON
    individual, and MARK W. HOLDEN,    FRAUD OR MISTAKE
21  an individual, INVESTORS BANK &
    TRUST COMPANY, a Massachusetts     (4) NEGLIGENT
22  Trust Company,                     MISREPRESENTATION

23              Defendants.            (5) DECLARATORY RELIEF

24

25

26                                     DEMAND FOR JURY TRIAL

27

28

                                -1-

1   Plaintiff Innofone.com, Incorporated complains against defendants Cogent
2   Capital Financial, LLC, Cogent Capital Investments, LLC, Cogent Capital Group,
3   LLC (collectively, the "Cogent Capital Defendants"), Gregory L. Kofford, Mark W.
4   Holden (collectively, the "Cogent Parties"), and Investors Bank & Trust Company,
5   as follows:

## JURISDICTION – CIV. L.R. 8-1 STATEMENT

7   1.   This Court has subject-matter jurisdiction over the First Claim for
8   Relief under section 27 of the Securities Exchange Act of 1934 ("Exchange Act"),
9   codified at 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. It is a civil action arising under
10  section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78j(b), and Securities
11  and Exchange Commission Rule 10b-5 promulgated thereunder, codified at 17
12  C.F.R. 240.10b-5. This Court has supplemental jurisdiction over the Second
13  through Fifth Claims for Relief under 28 U.S.C. § 1367. They are so related to the
14  First Claim for Relief that they form part of the same case or controversy under
15  Article III of the United States Constitution.

16  2.   Alternatively, this Court has subject-matter jurisdiction over the
17  Second through Fifth Claims for Relief under 28 U.S.C. § 1332. This is a civil
18  action between citizens of different states, where the amount in controversy exceeds
19  the sum of $75,000, exclusive of interest and costs. Plaintiff Innofone is a Nevada
20  corporation with its principal place of business in Santa Monica, California. The
21  Cogent Capital Defendants are Delaware limited liability companies with their
22  principal places of business in either New York, New York or Sandy, Utah.
23  Defendant Investors Bank & Trust Company is a Massachusetts trust company with
24  its principal place of business in Boston, Massachusetts. Defendant Kofford is a
25  citizen, resident and domiciliary of Utah. Defendant Holden is a citizen, resident,
26  and domiciliary of New York.

## NATURE OF THE ACTION

3. This is an action to rescind a $50 million financing transaction dated as of June 2, 2006, and related ancillary agreements, and amendments. Innofone entered into this transaction because it is a start-up and planned to use the money as working capital to grow its business. Under the terms of the transaction, Innofone sold a portion of its unregistered common and preferred stock to the Cogent Capital Defendants for $50 million in United States Treasury bonds. Concurrent with that private sale of stock, the parties deposited the stock and bonds in escrow, and entered into an equity swap transaction whereby Innofone could draw down the $50 million in bonds in return for the release of the shares to the Cogent Capital Defendants. In other words, Innofone would swap shares for bonds. This transaction would provide Innofone with substantially all its financing needs for the next few years.

4. The entire agreement was premised on the Securities and Exchange Commission approving an effective registration statement for the Innofone stock, thereby allowing the transaction, called an "equity swap," to occur according to its terms. In essence, unless the stock was registered, Innofone could never draw on the $50 million in bonds, and would be stuck paying monthly interest and fees on money it would never be able to access in the time and amounts it needed.

5. The Cogent Capital Defendants, and their principals, emphatically assured Innofone that the Securities and Exchange Commission had approved these types of transactions before, that they had the experience to structure this transaction so that the Securities and Exchange Commission would approve the registration of the shares, and that in fact, they had been successful on prior occasions. Nine months later, however, the Securities and Exchange Commission has repeatedly refused to approve the registration of these securities, and has made clear that it never will do so, because it has serious questions about the fundamentally flawed structure and substance of the transaction.

- 3 -

6. Although Innofone has faced this reality, the Cogent Parties refuse to do so, and insist on Innofone continuing to pay interest and fees on bonds it can never access in the manner contemplated by the agreements.

7. Enough is enough. It is time to rescind the transaction and return the parties to the status quo ante because the transaction was invalid from its inception for a number of reasons as more fully described below.

## THE PARTIES

8. Plaintiff Innofone.com, Incorporated ("Innofone") is a Nevada corporation with its principal place of business in Santa Monica, California. Innofone, with its wholly owned subsidiaries, is currently the first public company to focus exclusively on Internet Protocol version 6 ("IPv6"). It supplies cutting-edge services for wireless transactions, messaging and content delivery, and organizes world-class conferences and offers training and consulting related to IPv6 for government and commercial information technology customers. Innofone's common stock is traded on the over-the-counter bulletin board under the ticker symbol IMEN.OB. It has a market capitalization of approximately $26.9 million, and has approximately 74.65 million shares of its common stock outstanding.

9. Defendant Cogent Capital Financial, LLC is a Delaware limited liability company with its principal place of business in either New York or Utah.

10. Defendant Cogent Capital Investments, LLC is a Delaware limited liability company with its principal place of business in New York or Utah.

11. Defendant Cogent Capital Group, LLC is a Delaware limited liability company with its principal places of business in New York or Utah. It maintains a web site, located at http://www.cogent-capital.com. ("Cogent Capital Web Site"). According to this web site, "Cogent provides a full range of services including direct investments." It then lists seven hyperlinks: (a) "[d]irect investment in equity and debt[;]" (b) "[s]tep-up AMEX or NASDAQ NMS transition services[;]" (c) "[r]oll-up AMEX based consolidation services[;]" (d) "NASDAQ and AMEX

listing advisory services[;]" (e) "[f]inancial consulting services related to mergers and acquisitions[;]" (g) "[a]sset-based loans[;]" and (h) "[b]lock equity purchases." However, six of these seven links lead to blank pages, or pages that do not exist.

12.   Defendant Gregory L. Kofford is co-founder and senior principal of Cogent Capital Group, as well as a senior principal of Cogent Capital Financial, and Cogent Capital Investments. According to the Cogent Capital Web Site, he "is involved in all phases of the firm's development and approves all capital commitments by the firm." On the web site, Kofford touts his "20 years of extensive experience in the capital markets, hedge fund and private family office investing[.]" Kofford is a resident, domiciliary, and citizen of Utah.

13.   Defendant Mark W. Holden is co-founder and senior principal of Cogent Capital Group. According to the Cogent Capital Web Site, like Kofford, Holden "is involved in all phases of the firm's development and approves all capital commitments by the firm." On this web site, Holden boasts that he is "[a]n experienced investor, [who] previously founded and led (2000-2004) one of the principal private equity investment practices at JPMorgan Partners, LLC . . . a global private equity firm with approximately $13 billion under management." He further stresses that he "has served as a [director] of a number of companies including Strongwood Holdings, USI Holdings (NASDAQ: USIH), ERisk, and Axis Specialty (NYSE: AXS - board observer)." Kofford is a resident, domiciliary, and citizen of New York.

14.   Defendant Investors Bank & Trust Company is a Massachusetts trust company with its principal place of business in Boston, Massachusetts. At this time it is sued solely in order to be able to obtain complete relief in this action, because as escrow agent, it has possession of portions of the stock and bonds which the parties deposited with it pursuant to an escrow agreement.

## VENUE

15. Venue is proper in this district, pursuant to section 27 of the Exchange Act, codified at 15 U.S.C. § 78aa. This is an action to enforce a liability or duty created by the Exchange Act, and the rules and regulations promulgated thereunder. It therefore may be brought in this district because (a) an act or transaction constituting the violation occurred in this district; or (b) each defendant is found, inhabits, or transacts business in this district.

16. Alternatively, venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district, or because any defendant may be found in this district.

17. Alternatively, venue for the Second through Fifth Claims for Relief is proper in this district, pursuant to 28 U.S.C. § 1391(a). A substantial part of the events or omissions giving rise to the claim occurred in this district, a substantial part of the property that is the subject of this action is situated in this district, and because at least one of the defendants is subject to personal jurisdiction in this district. In this regard, a substantial amount of the negotiations took place in Santa Monica, California, and the transaction documents were executed in the Los Angeles offices of counsel for the Cogent Capital Defendants.

## BACKGROUND TO THE ACTION

18. In late April 2006, Kofford and Holden met Alex Lightman, Innofone's President, Chief Financial Officer, and a director, at a conference regarding IPv6.

19. The Internet is currently based on a decades-old addressing and routing scheme known as Internet Protocol version 4 (IPv4). IPv4 and, more generally, the Internet were started and planned for communication between the United States Government research agencies and universities. The planners did not

anticipate the exponential worldwide interest and commercial growth of the Internet.

20. With this growth came more hosts that required Internet Protocol (IP) addresses, lessening the pool of available addresses. By 1989, there were approximately 100,000 hosts connected to the Internet worldwide. That figure jumped to approximately 1 million by 1992. Those figures were dwarfed starting in 1993 with the release of browsers like Netscape that helped make the Internet a powerful commercial and interpersonal tool. As the Internet and email became more focused on the consumer, Internet connectivity moved from its focus on universities and research institutes to millions of businesses and homes.

21. This increasing demand has outpaced the growth capabilities of the current IPv4 Internet. In particular, there is a shortfall of available IPv4 addresses (e.g., 125.12.3.65) to adequately service users, particularly in Europe and Asia. Contributing to the shortfall is the expansion of wireless technologies from cellular phones, laptops and PDAs to even new refrigerators that utilize wireless communication. For example, it is estimated that there were over 1 billion cellular phones sold by 2005 and approximately fifteen percent of new automobiles sold by 2010 will have an IP-based device. Each of these devices requires an address. The demand on the IPv4 Internet only increases as access to free wireless "hot spots" grows (e.g., on city streets and in hotels, airports, businesses and coffee houses).

22. The Internet is beginning to receive a major upgrade to IPv6. "The new Internet," as IPv6 is called, offers major enhancements over the existing Internet Protocols including (a) expansion into the trillions and beyond the number of available separate addresses; (b) enhanced security over wireless communications; (c) increased mobile wireless access; (d) increased Internet television access; (e) increased internet-based telecommunications (e.g., Voice over Internet Protocol or VoIP); (f) online connection to many wireless devices such as

security cameras; and (g) online connection of "smart tags" for more efficient tracking of inventories and products.

23. IPv6 is thus a critical emerging technology with enormous development possibilities. For example, the Department of Defense has mandated a transition within the Department that would make it "IPv6-capable" by 2008. The Office of Management and Budget, on behalf of the federal government, has also recently mandated transition to IPv6. This, in turn, affects the hundreds of large companies that supply these two entities. Many major technology companies have also appointed IPv6 points of contact and developed IPv6-related marketing messages, including Microsoft, Cisco, Juniper, Nokia, Hewlett-Packard and others.

24. Innofone is an industry leader in IPv6, including but not limited to, training, consulting, conferencing and testing. Part of Innofone's business strategy is to grow aggressively its IPv6 business through acquisitions of businesses engaged in IPv6 technology development and products manufacture. Hence, Innofone has a great need for capital to grow its business.

25. Very soon after the meeting in April, Kofford and Holden proposed making a significant investment in Innofone and to provide the capital that Innofone would need for the next two years, thus allowing Innofone's executive team to focus on implementing its business strategy instead of devoting substantial efforts to fund raising.

26. In a May 2, 2006 email, Kofford described a transaction known as an equity swap. Although the details of the transaction are immensely complex, in essence it is simple. The Cogent Capital Defendants would place United States Treasury bonds in escrow, and require Innofone to pay interest on those bonds at the London Interbank Offered Rate ("LIBOR") plus 1.45 percentage points. (LIBOR is a rate used in England and the European Common Market as a benchmark interest rate.) At the same time, Innofone issues the Cogent Capital Defendants an enormous block of common stock, in effect more than doubling the

current issued and outstanding common stock. Once an effective registration statement was obtained from the Securities and Exchange Commission, the bonds would be released to Innofone, and the Innofone shares purchased by the Cogent Capital Defendants would be covered in increasing amounts by the effective registration statement, such that the amount of their saleable stock would correspondingly increase.

27.  Thus, one of the absolutely essential elements of the transaction is the Cogent Capital Defendants' ability to sell the Innofone common stock it had purchased from Innofone in a private placement. In the United States, however, such sales of securities are tightly regulated by the Securities and Exchange Commission. The Securities and Exchange Commission requires issuers to file extensive disclosures, or registration statements, and if it is not satisfied with those disclosures, to modify or amend them. If a party tries to sell securities to the investing public (and not to sophisticated institutions) before a registration is approved (or "declared effective," as practitioners before the Securities and Exchange Commission call it), the Securities and Exchange Commission can sue to enjoin the offering. In fact the sale of such unapproved securities to the investing public is illegal and violates the securities laws.

28.  Kofford's May 2 email thus stressed that one of the key elements of any deal would be the Securities and Exchange Commission approving the registration of Innofone stock issued as part of the transaction. He explained that: "our typical investment provides for a partial valuation of the equity swap and release of collateral as soon as 90 days *from effectiveness of registration.*" (Emphasis added.) It then laid out a proposed transaction, but stressed that: "These indicative prices also assume that [Innofone] will be in a position to move from the bulletin board to Amex prior to or concurrent with *the effectiveness of the registration of the shares* underlying our investment." (Emphasis added.)

29. On May 5, Innofone sent Cogent Capital Group an executed letter in which the parties agreed to move forward with a proposed investment of between $15 and $50 million (the "May 5 Letter Agreement" attached as Exhibit A). In the letter, Cogent Capital Group also received $25,000 in "due diligence" fees and $3,000 in "bank fees."

30. During the month of May 2006, while they were negotiating the terms of the equity swap, both Kofford and Holden, acting on behalf of the Cogent Capital Defendants, as well as themselves, represented to Lightman, among others, that the Securities and Exchange Commission had approved this type of financing before, and thus it would not be a problem to get the Securities and Exchange Commission to approve this transaction. Kofford and Holden, acting on behalf of the Cogent Capital Defendants, as well as themselves, further represented to Lightman that the transaction structure they proposed was specifically designed to meet the requirements of the Securities and Exchange Commission. In this regard, they stressed that they had particular and specialized information on how to structure the deal so that it would be approved.

31. These statements were material statements of fact to Innofone. Innofone could only access the United States Treasury bonds if they could register the shares to be issued to the Cogent Capital Defendants.

32. At the time the Cogent Parties made these statements, they knew that they were false. In this regard, the Securities and Exchange Commission has not approved a transaction of the type proposed by the Cogent Parties, and the statements by the Cogent Parties to the contrary showed a high degree of recklessness which is the equivalent of intent. Moreover, as the numerous rejections of Innofone's registration statement have made clear, the deal was not structured to meet the requirements of the Securities and Exchange Commission. The Cogent Parties' subsequent attempts to assist Innofone obtain registration make clear that they knew all along that the structure was anything but a sure bet before

the Securities and Exchange Commission. Indeed, in a series of emails sent in December 2006, the Cogent Parties admitted that none of their other similar investments had ever successfully registered their shares with the Securities and Exchange Commission.

33.  Innofone reasonably and justifiably relied on the Cogent Parties' statements. Those statements caused Innofone to agree to enter into the transaction. Those statements also caused Innofone's damage, because it is precisely the failure to obtain registration of the Innofone common stock which has damaged Innofone.

## THE TRANSACTION

34.  By agreement dated as of June 2, 2006, between Innofone on the one hand, and Cogent Capital Investments and Cogent Capital Financial on the other (the "Securities Purchase Agreement," attached as Exhibit B), Innofone sold 1.85 million shares of its common stock and 4.815 million shares of its Series A convertible preferred stock to Cogent Capital Investments for $50 million in U.S. Treasury Bonds.

35.  The Securities Purchase Agreement specifically contemplated that the parties would be required to file documents with the Securities and Exchange Commission to register the Innofone common stock, and that the registration be declared effective. *E.g.*, Securities Purchase Agreement §§ 3.2(a), 6.

36.  As part of the Securities Purchase Agreement, Innofone filed a Certificate of Designations (attached as Exhibit C) with the Nevada Secretary of State, with regard to the Series A convertible preferred stock. Under the terms of the Certificate of Designation, each share of the Series A convertible preferred stock was convertible into ten shares of Innofone common stock, "upon the earlier of (i) 60 days after the date on which a registration statement . . . covering the resale of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock and filed with the Securities and Exchange Commission, has been declared or becomes effective or (ii) June 3, 2008." Certificate of Designation § 3(a). Thus it

1  too explicitly contemplated that a valid and effective registration statement would
2  be filed with respect to Innofone's common stock. The only manner in which
3  Innofone could redeem the Series A convertible preferred stock was to buy it all
4  back at once, exactly two years after the stock was issued, for a price of 48.15
5  million times the market price of Innofone common stock. Certificate of
6  Designation §§ 6(a), (f).

7  37. Under the terms of the Securities Purchase Agreement, Innofone also
8  issued Cogent Capital Financial 5 million shares of common stock and a warrant to
9  purchase an additional 5 million shares of its common stock at $1.20 per share
10 ("Warrant," attached as Exhibit D), subject to downward adjustment if Innofone
11 sold stock for less than $1.00 per share. Under a separate registration rights
12 agreement between Innofone and Cogent Capital Financial ("Registration Rights
13 Agreement," attached as Exhibit E), Innofone agreed to register with the Securities
14 and Exchange Commission both the 5 million shares of common stock, as well as
15 the common stock underlying the Warrant, and to use its best efforts to have that
16 registration declared effective, thereby allowing the shares to trade freely.

17 38. Innofone, Cogent Capital Investments, Cogent Capital Financial, also
18 executed an escrow agreement with Investors Bank & Trust Company ("Escrow
19 Agreement," attached as Exhibit F). Pursuant to that agreement, Cogent Capital
20 Investments deposited into escrow the $50 million in Treasury bonds. Innofone
21 deposited in escrow 1.850 million shares of its common stock and 4.185 million
22 shares of Series A convertible preferred stock, issued to Cogent Capital
23 Investments. It also deposited the 5 million shares of its common stock, and the
24 Warrant to purchase an additional 5 million shares common stock issued to Cogent
25 Capital Financial. It also deposited $568,750 in cash, as well as $181,250 in
26 prepaid interest. Pursuant to the Escrow Agreement, Innofone must pay Investors
27 Bank & Trust Company a $3,000 annual escrow fee. The purpose of these deposits
28 into escrow was to secure the parties' respective performance.

39. Additionally, Innofone and Cogent Capital Financial entered into a series of related agreements dated as of June 2, 2006. Those agreements are: (a) the International Swaps and Derivatives Association, Inc. 2002 Master Agreement ("Master Agreement," attached as Exhibit G); (b) the Schedule thereto (attached as Exhibit H); (c) the Equity Swap Confirmation (attached as Exhibit I); and (d) the Credit Support Annex (attached as Exhibit J). The Equity Swap Confirmation of June 2, 2006 was superseded by two other Confirmations dated November 1, 2006 and entitled respectively Equity Swap Transaction and Interest Rate Swap Transaction (the "November Confirmations" attached as Exhibits K and L, respectively). Exhibits A, B, and D-L are referred to as the "Swap Agreement Documents."[1]

40. In general, under the equity swap documents, as amended, every month, Innofone owes Cogent Capital Financial interest on the $50 million of bonds in escrow at LIBOR plus 2.45 percentage points. That interest is owed for as long as there remain bonds which have not been exchanged for Innofone shares.

41. Once the registration statement for the stock sold to Cogent Capital Financial became effective, Innofone could draw on the Treasury bonds over a thirty-month period. The scheduled monthly draw-down could range from $750,000 to $1.75 million, or higher, depending on the price of Innofone stock at the time of the draw-down. These substantial amounts corresponded to Innofone's anticipated operating capital requirements. As the bonds were released from escrow, Cogent Capital Financial would be able to sell a proportionate amount of Innofone stock. (This is often called a "swap transaction," since Innofone gets the

---

[1] The Swap Agreement Documents consist of the transaction documents, with the exception of the Certificate of Designation (Exhibit C). Innofone filed the Certificate of Designation with the Nevada Secretary of State, and can withdraw it once this Court orders rescission of the other transaction documents. Put differently, the Swap Agreement Documents are those documents executed with Defendants, and which Innofone respectfully prays will be rescinded.

- 13 -

1  bonds, and the Cogent Capital Defendants get interest, fees, and Innofone stock.)
2  The release of the bonds to Innofone will also have the effect of reducing the
3  amount of interest Innofone has to pay the following month since the amount of
4  bonds has been reduced.

5      42.    This can only happen, however, if the Innofone common stock is
6  registered with the Securities and Exchange Commission and if that registration
7  statement is declared effective. Thus, the only way that Innofone can stop
8  hemorrhaging monthly interest is by being able to register the stock sold to Cogent
9  Capital Financial with the Securities and Exchange Commission and have that
10 registration statement declared effective. Without an effective registration
11 statement, Innofone will receive no benefits whatsoever from the transaction.

12     43.    Over the course of the next nine months, Innofone, with the assistance
13 of the Cogent Parties, repeatedly tried to get the Securities and Exchange
14 Commission to approve the registration of the Innofone common stock that was
15 issued pursuant to these agreements. The Securities and Exchange Commission
16 repeatedly and emphatically has refused to approve this registration, and has made
17 it clear that it will never do so.

18     44.    For example, the Securities and Exchange Commission believed that
19 in light of the size of the transaction and its terms, Cogent Capital Financial was in
20 essence an underwriter of Innofone's securities and as a result should take on the
21 statutory responsibilities of an underwriter. In a move of desperation, Cogent
22 Capital Financial agreed to do so. It was not enough.

23     45.    The Securities and Exchange Commission also repeatedly asked
24 Innofone to explain how the Cogent Capital Defendants bore any risk in the
25 transaction. This comment was particularly pertinent since Innofone's stock price
26 has been trading at or below $1.00 per share since July, and would need to more
27 than double before it would see any profit on the transaction. The Securities and
28 Exchange Commission apparently sees this transaction as a "toxic convertible

offering" or a "death spiral financing," and has decided that it is inappropriate for the public marketplace. Indeed, in a letter dated March 9, 2007 regarding Innofone's recent filing of its annual financial statements, the Securities and Exchange Commission again questioned the economic basis for the transaction, and asked Innofone to confirm, yet again, that the Swap Agreement Documents form a legally valid and enforceable contract between Innofone and the Cogent Capital Defendants. This was the fourth letter from the Securities and Exchange Commission questioning the validity of the transaction in increasingly emphatic terms.

46.  This turn of events has been particularly surprising to Innofone. The Cogent Parties had represented to Innofone throughout the process of negotiating the transaction, and even thereafter, that they had engaged in similar transactions, and that it was a viable financing transaction which would have no problems obtaining approval from the Securities and Exchange Commission for the registration of the shares underlying the transaction. When making these representations, the Cogent Parties leaned heavily on their experience with complex financial products in general, and this type of transaction in particular, and their experience with the Securities and Exchange Commission. Innofone, which had no experience with these types of transactions, justifiably and reasonably believed and relied on these representations to its detriment. Indeed, it was only later, in a series of emails sent in December 2006, that the Cogent Parties admitted that none of their other similar investments had ever successfully registered their shares with the Securities and Exchange Commission.

47.  When it became clear, however, that the Securities and Exchange Commission would not budge, Innofone asked to rescind the Swap Agreement Documents. Innofone pointed out that at this point, it has all of the detriment in the transaction and none of the benefit. It must pay upwards of $60,000 to $80,000 a month in interest, and it can never access the United States Treasury bonds in the