3.37 No person has the right, which right has not been waived, to require the Company or its subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Registration Statement with the Commission or the issuance and sale of the Securities.

3.38 The Company shall file with the SEC a current report on Form 8-K under the Exchange Act describing the transactions contemplated hereby and attaching as exhibits thereto all material documents relating to the transactions contemplated hereby.

Section 4. <u>Representations, Warranties And Covenants Of the Purchaser</u>.

Each of the Purchaser and CCF hereby represents and warrants to, and covenants with, the Company as of the Closing Date (or the other date specified below) as follows:

4.1. <u>Organization</u>. Each of the Purchaser and CCF is an entity duly organized and validly existing in good standing (to the extent such concepts are applicable) under the laws of its jurisdiction of organization. Each of the Purchaser and CCF has all requisite corporate power and authority and all necessary governmental approvals to carry on its business as now being conducted, except as would not result in a Material Adverse Effect on the Purchaser's or CCF's ability to consummate the transactions contemplated by this Agreement.

4.2. <u>Authorization, Enforcement, and Validity</u>. Each of the Purchaser and CCF has the requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. Each of the Purchaser and CCF has taken all necessary action to authorize the execution, delivery and performance of this Agreement. Upon the execution and delivery of this Agreement, this Agreement shall constitute a valid and binding obligation of the Purchaser and CCF enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' and contracting parties' rights generally and except as enforceability may be subject to general principles of equity.

4.3. <u>Consents and Approvals; No Violation</u>. The execution, delivery and performance of this Agreement by the Purchaser and CCF and the consummation by the Purchaser and CCF of the transactions contemplated hereby will not (i) result in a violation of the Purchaser's and CCF's organizational documents; (ii) conflict with, or constitute a default or give to others any rights of termination, amendment, acceleration or cancellation of, any material agreement, indenture or instrument to which the Purchaser or CCF is a party (except for the conflicts, defaults, terminations, amendments, accelerations, cancellations and

violations as would not, individually or in the aggregate, result in a Material Adverse Effect on the Purchaser's or CCF's ability to consummate the transactions contemplated by this Agreement); or (iii) result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Purchaser or CCF or any of their its Subsidiaries, except for the violations as would not, individually or in the aggregate, result in a Material Adverse Effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement. Each of the Purchaser and CCF is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency or any regulatory or self-regulatory agency in order for it to execute, deliver or perform any of its obligations under or contemplated by this Agreement, except where the failure to obtain such consents, authorization or orders or to make such filings or registrations would not, individually or in the aggregate, result in a Material Adverse Effect on the Purchaser's or CCF's ability to consummate the transactions contemplated by this Agreement.

4.4. Investment Experience. Each of the Purchaser and CCF is an accredited investor within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, is knowledgeable, sophisticated and experienced in making, and is qualified to make, decisions with respect to investments in shares representing an investment decision like that involved in the purchase of the Securities.

4.5. Investment Intent And Limitation On Dispositions. Each of the Purchaser and CCF is acquiring Securities for its own account for investment only and has no intention of selling or distributing any of the Securities or any arrangement or understanding with any other Persons regarding the sale or distribution of the Securities except in accordance with the provisions of Section 4.7 and except as would not result in a violation of the Securities Act. The Purchaser and CCF will not, directly or indirectly, offer, sell, pledge, transfer or otherwise dispose of (or solicit any offers to buy, purchase or otherwise acquire or take a pledge of) any of the Securities except in accordance with the provisions of Section 4.7 or pursuant to and in accordance with the Securities Act.

4.6. Information And Risk. Each of the Purchaser and CCF acknowledges that each of the Purchaser and CCF is a sophisticated investor, has such knowledge and experience in financial and business matters in general and has full familiarity with the current business and future business prospects of the Company and the financial and other affairs of the Company and acknowledges that it has had access to and has received sufficient information about the Company, including any and all such information requested by the Purchaser and CCF in order to make an informed decision as to the sale of the Securities to the Purchaser and CCF and the transactions contemplated hereby. In addition, the Purchaser and CCF acknowledge that each has had access to the officers, directors and employees of the

Company to discuss the business, affairs and prospects of the Company and has had the opportunity to obtain additional information necessary to evaluate the merits and the risks of engaging in the transactions contemplated by this Agreement.

4.7. Restricted Securities. Each of the Purchaser and CCF understands and acknowledges that the sale of the Shares has not been registered under the Act, or the securities laws of any state or any analogous securities laws of any applicable foreign jurisdiction (collectively, "Applicable Laws") and have been issued in reliance upon an exemption from the Act for non-public or limited offerings. Each of the Purchaser and CCF understands that the Shares are "restricted securities" and must be held indefinitely unless the sale or other transfer thereof is subsequently registered pursuant to any Applicable Laws or an exemption from such registration is available at that time, and each of the Purchaser and CCF agrees to comply with all Applicable Laws in connection with listing or qualification of the Shares thereunder.

4.8. Legends. Certificates for the Securities shall contain a restrictive legend substantially in the following form:

> THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER APPLICABLE SECURITIES LAWS, INCLUDING THE SECURITIES LAWS OF ANY APPLICABLE FOREIGN JURISDICTION, AND HAVE BEEN ISSUED IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND SUCH OTHER SECURITIES LAWS, IF APPLICABLE. NEITHER THESE SECURITIES NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED, HYPOTHECATED OR OTHERWISE DISPOSED OF, EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OR SUCH OTHER SECURITIES LAWS OR PURSUANT TO A TRANSACTION THAT IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

4.9. Brokers or Finders. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Purchaser.

4.10. <u>Confidential Treatment.</u> The Purchaser and CCF shall hold in strict confidence all information concerning this Agreement and the offering of the Securities until the earlier of the time as the Company has made a public announcement concerning this Agreement or the offering of the Securities.

4.11. The Purchaser and CCF or any other person associated with or acting on behalf of the Purchaser and CCF including, without limitation, any director, officer, agent or employee of the Purchaser and CCF or their subsidiaries, has not, directly or indirectly, while acting on behalf of the Purchaser and CCF or their subsidiaries (i) used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity; (ii) made any unlawful payment to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns from corporate funds; (iii) violated any provision of the Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any other unlawful payment.

4.12. The operations of the Purchaser and CCF and their subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations hereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Purchaser or CCF or any of it subsidiaries with respect to the Money Laundering Laws is pending, or to the best knowledge of the Purchasers or CCF, threatened.

4.13. The Purchaser and CCF and any of their subsidiaries, to the knowledge of the Purchaser and CCF, any director, officer, agent, employee or affiliate of the Purchasers and CCF or any of their subsidiaries is not currently subject to any U.S. sanctions administered by OFAC.

Section 5. <u>Survival of Representations and Warranties</u>.

Notwithstanding any investigation made by any party to this Agreement, all representations and warranties made by the Company and the Purchaser and CCF herein shall survive for a period of one (1) year following the Closing Date.

Section 6. <u>Indemnification</u>.

(a) For purposes of this Section 6:

(i) the term "Purchaser" shall include the Purchaser and any affiliate (as the term is defined pursuant to Rule 12b-2 promulgated under the Exchange Act) of the Purchaser, including CCF;

(ii) the term "Prospectus" shall mean the prospectus and any amendment or supplement thereto in the form first filed with the Commission pursuant to Rule 424(b) promulgated under the Securities Act or, if no Rule 424(b) filing is required, filed as part of the Registration Statement at the time of effectiveness, as supplemented or amended from time to time; and

(iii) the term "Registration Statement" shall include any final prospectus, exhibit, supplement or amendment included in or relating to the Registration Statement.

(b) The Company agrees to indemnify and hold harmless each of the Purchaser and each Person, if any, who controls the Purchaser within the meaning of the Securities Act, against any losses, claims, damages, liabilities or expenses, joint or several, to which the Purchaser or the controlling Person may become subject, under the Securities Act, the Exchange Act, or any other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if the settlement is effected with the written consent of the Company), insofar as the losses, claims, damages, liabilities or expenses (or actions in respect thereof as contemplated below) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement or Prospectus, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or arise out of or are based in whole or in part on any inaccuracy in the representations and warranties of the Company contained in this Agreement, or any failure of the Company to perform its obligations hereunder, and will reimburse the Purchaser and each such controlling Person for any legal and other expenses reasonably incurred as the expenses are reasonably incurred by the Purchaser or the controlling Person in connection with investigating, defending, settling, compromising or paying any such loss, claim, damage, liability, expense or action; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon (i) an untrue statement or alleged untrue statement or omission or alleged omission made in the Registration Statement or Prospectus in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Purchaser expressly for use therein, (ii) the failure of the Purchaser to comply with the covenants and agreements contained in Section 4.7 above respecting sale of the Securities, (iii) the inaccuracy of any representations made by the Purchaser herein

or (iv) any statement or omission in any Prospectus that is corrected in any subsequent Prospectus that was delivered to the Purchaser a reasonable time prior to the pertinent sale or sales by the Purchaser, and provided that the Purchaser has been notified by the Company that the earlier Prospectus should no longer be delivered by the Purchaser.

(c) Each Purchaser will severally, and not jointly, indemnify and hold harmless the Company, each of its directors, each of its officers who signed the Registration Statement and each Person, if any, who controls the Company within the meaning of the Securities Act, against any losses, claims, damages, liabilities or expenses to which the Company, each of its directors, each of its officers who signed the Registration Statement or controlling Person may become subject, under the Securities Act, the Exchange Act, or any other federal or state statutory law or regulation, or at common law or otherwise (including in settlement of any litigation, if the settlement is effected with the written consent of the Purchaser) insofar as the losses, claims, damages, liabilities or expenses (or actions in respect thereof as contemplated below) arise out of or are based upon (i) any failure by the Purchaser to comply with the covenants and agreements contained in Section 4.7 above respecting the sale of the Securities, (ii) the inaccuracy of any representation made by the Purchaser herein or (iii) any untrue or alleged untrue statement of any material fact contained in the Registration Statement or the Prospectus, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, in each case to the extent, but only to the extent, that the untrue statement or alleged untrue statement or omission or alleged omission was made in the Registration Statement or Prospectus in reliance upon and in conformity with written information furnished to the Company by or on behalf of the Purchaser expressly for use therein, and will reimburse the Company, each of its directors, each of its officers who signed the Registration Statement or controlling Person for any legal and other expense reasonably incurred, as the expenses are reasonably incurred by the Company, each of its directors, each of its officers who signed the Registration Statement or controlling Person in connection with investigating, defending, settling, compromising or paying any the loss, claim, damage, liability, expense or action; provided, however, that the aggregate liability of any Purchaser hereunder shall not exceed the Purchase Price paid by the Purchaser to the Company on the Closing Date. No Purchaser shall be liable for the indemnification obligations of any other Purchaser.

(d) Promptly after receipt by an indemnified party under this Section 6 of notice of the threat or commencement of any action, the indemnified party will, if a claim in respect thereof is to be made against an indemnifying party under this Section 6, promptly notify the indemnifying party in writing thereof, but the omission so to notify the indemnifying party will not relieve it from any liability

which it may have to any indemnified party hereunder or otherwise to the extent it is not prejudiced as a result of the failure. In case any the action is brought against any indemnified party and the indemnified party seeks or intends to seek indemnity from an indemnifying party, the indemnifying party will be entitled to participate in, and, to the extent that it may wish, jointly with all other indemnifying parties similarly notified, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be a conflict between the positions of the indemnifying party and the indemnified party in conducting the defense of any such action or that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assume the legal defenses and to otherwise participate in the defense of the action on behalf of the indemnified party or parties. Upon receipt of notice from the indemnifying party to the indemnified party of its election to assume the defense of the action and approval by the indemnified party of counsel, the indemnifying party will not be liable to the indemnified party under this Section 6 for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof unless (i) the indemnified party shall have employed the counsel in connection with the assumption of legal defenses in accordance with the proviso to the preceding sentence (it being understood, however, that the indemnifying party shall not be liable for the expenses of more than one separate counsel, reasonably satisfactory to the indemnifying party, representing the indemnified parties who are parties to the action) or (ii) the indemnified party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of action, in each of which cases the reasonable fees and expenses of counsel shall be at the expense of the indemnifying party.

Section 7. Notices.

    (a) All notices, requests, consents and other communications hereunder shall be in writing, shall be mailed by first-class registered or certified airmail, confirmed facsimile or nationally recognized overnight express courier postage prepaid, and shall be as addressed as follows:

    if to the Company, to:

        Alex Lightman
        CEO
        Innofone.com, Incorporated
        1431 Ocean Avenue, Suite 1500

19

EXHIBIT B
PAGE 51

Santa Monica, CA 90401

Telephone No.: (310) 458-3233
Telecopy No.: (310) 458-2844

with a copy to:

Gersten Savage LLP
600 Lexington Avenue
9th Floor
New York, New York, 10022
Attention: Arthur Marcus

Telephone No.: (212) 752-9700
Telecopy No.: (212) 980-5192

and if to the Purchaser or CCF, at its address as set forth in Escrow Agreement, or at the other address or addresses as may have been previously furnished to the Company in writing in accordance with this Section 7.

(b) The notices or other communications shall be deemed delivered upon receipt, in the case of overnight delivery, personal delivery, facsimile transmission (as evidenced by the confirmation thereof), or mail.

Section 8.  Miscellaneous.

8.1. Amendments. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company, the Purchaser or CCF. Any amendment or waiver effected in accordance with this Section 8.1 shall be binding upon each holder of any securities purchased under this Agreement at the time outstanding (including securities into which the securities are convertible), each future holder of all the securities, and the Company.

8.2. Headings. The headings of the various sections of this Agreement are for convenience of reference only and shall not be deemed to be part of this Agreement.

8.3. Severability. In the event that any provision in this Agreement is held to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

8.4. <u>Governing Law And Forum</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein. The parties hereto agree to submit to the exclusive jurisdiction of the federal and state courts of the State of New York with respect to the interpretation of this Agreement or for the purposes of any action arising out of or related to this Agreement.

8.5. <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, and all of which together shall constitute one and the same instrument. In the event that any signature is delivered via facsimile transmission, the signature shall create a valid and binding obligation of the party executing (or on whose behalf the signature is executed) the same with the same force and effect as if the facsimile signature page were an original hereof.

8.6. <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties with respect to the matters covered herein, supersede all prior agreements and understandings with respect to the matters and executed by and among the Company and any of the Purchasers, and, except as specifically set forth herein or therein, neither the Company nor the Purchasers make any representation, warranty, covenant or undertaking with respect to the matters.

8.7. <u>Expenses</u>. Each party hereto shall pay all costs and expenses incurred by it in connection with the execution and delivery of this Agreement, and all the transactions contemplated thereby, including fees of legal counsel.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their duly authorized representatives as of the day and year first above written.

INNOFONE.COM, INCORPORATED

By: /s/ Alex Lightman
Name: Alex Lightman
Title: Chief Executive Officer

COGENT CAPITAL INVESTMENTS LLC

By: /s/ GLK
Name: Greg Kofford
Title: Senior Principal

COGENT CAPITAL FINANCIAL LLC

By: /s/ GLK
Name: Greg Kofford
Title: Senior Principal

# APPENDIX A

## FORM OF CERTIFICATE OF DESIGNATIONS



**DEAN HELLER**
Secretary of State
204 North Carson Street, Suite 1
Carson City, Nevada 89701-4299
(775) 684-5708
Website: secretaryofstate.biz

Entity #
C22258-1995
Document Number
20060349756-52

Date Filed:
6/1/2006 2:48:05 PM
In the office of

Dean Heller
Secretary of State

---

## Amended Certificate of Designation Before Issuance of Class or Series
(PURSUANT TO NRS 78.1955)

ABOVE SPACE IS FOR OFFICE USE ONLY

### Certificate of Amendment to Certificate of Designation For Nevada Profit Corporations
(Pursuant to NRS 78.1955 - Before Issuance of Class or Series)

**1. Name of corporation:**
INNOFONE.COM, INCORPORATED

**2. The original class or series of stock set forth:**
Series A Convertible Preferred Stock

**3. By a resolution of the board of directors the original class or series is amended as follows:**
Innofone.com, Incorporated, a corporation organized and existing under the Nevada Revised Statutes (hereinafter called the "Corporation"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation as required by NRS 78.1955 at a meeting duly called and held on May 31, 2006:
RESOLVED, that pursuant to the authority granted to and vested in the board of directors of the Corporation (the "Board") in accordance with the provisions of the certificate of incorporation of the Corporation, as currently in effect, the Board hereby creates a series of Preferred Stock, par value $0.01 per share, of the Corporation (the "Preferred Stock") and hereby states the designation and number of shares, and fixes the relative rights, preferences, and limitations thereof as follows:

**4. As of the date of this certificate no shares of the class or series of stock have been issued.**

**5. Effective date of filing (optional):** _____
(must not be later than 90 days after the certificate is filed)

**6. Officer Signature (Required):** _____

**IMPORTANT:** Failure to include any of the above information and submit the proper fees may cause this filing to be rejected.

**Filing Fee:** $175.00

*This form must be accompanied by appropriate fees.*

Nevada Secretary of State AM 78.1955 Before Issue 2003
Revised on 08/29/05

# AMENDED AND RESTATED

## CERTIFICATE OF DESIGNATION

of

## SERIES A CONVERTIBLE PREFERRED STOCK

of

## INNOFONE.COM, INCORPORATED

(Pursuant to NRS 78.1955)

Innofone.com, Incorporated, a corporation organized and existing under the Nevada Revised Statutes (hereinafter called the "*Corporation*"), hereby certifies that the following resolution was adopted by the board of directors of the Corporation as required by NRS 78.1955 at a meeting duly called and held on May 31, 2006:

RESOLVED, that pursuant to the authority granted to and vested in the board of directors of the Corporation (the "*Board*") in accordance with the provisions of the certificate of incorporation of the Corporation, as currently in effect, the Board hereby creates a series of Preferred Stock, par value $0.01 per share, of the Corporation (the "*Preferred Stock*") and hereby states the designation and number of shares, and fixes the relative rights, preferences, and limitations thereof as follows:

Series A Convertible Preferred Stock:

Section 1. *Designation and Amount*. The shares of such series shall be designated as "Series A Convertible Preferred Stock" (the "*Series A Preferred Stock*") and the number of shares constituting the Series A Preferred Stock shall be 4,185,000. Such number of shares may be increased by resolution of the Board of Directors.

Section 2. *Voting Rights*. Except as otherwise required by law, the holders of shares of Series A Preferred Stock (the "Series A Convertible Preferred Stock") shall have no voting rights unless and until such shares are converted into shares of common stock, par value $.001 per share, of the Corporation (the "*Common Stock*").

NY2-623164 v3                           1

Section 3. *Conversion.*

(a) Subject to the limitations in Section 8 below, each share of Series A Preferred Stock shall be convertible into a number of shares of Common Stock equal to the Conversion Ratio (as defined below) upon the earlier of (i) 60 days after the date on which a registration statement prepared by the Corporation covering the resale of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock and filed with the Securities and Exchange Commission, has been declared or becomes effective or (II) June 3, 2008.

(b) The "Conversion Ratio" shall initially equal 10 shares of Common Stock and shall be subject to adjustment, from time to time, pursuant to Section 4 below. As used herein, a "business day" means any day that is not a Saturday or Sunday, and that is a day on which the New York Stock Exchange, the American Stock Exchange, the Nasdaq National Market and the Nasdaq Capital Market are open for business.

(c) In order to convert any shares of Series A Preferred Stock, in whole or in part, into full shares of Common Stock, the applicable Holder shall give written notice in the form of Exhibit 1 (the "Conversion Notice") by facsimile (with the original of such notice forwarded via overnight courier) to the Corporation at its principal offices to the effect that such Holder elects to have converted the number of shares of Series A Preferred Stock specified therein (such notice and election shall be irrevocable by the Holder). If fewer than all the shares held by such Holder are to be converted, the Corporation shall, within three (3) business days of receipt of such Conversion Notice, issue and deliver to or on the order of the Holder thereof (and indicate the existence on its books and records), at the expense of the Corporation, a new certificate or certificates representing the unconverted shares, to the same extent as if the certificate theretofore representing such unconverted shares had been surrendered on conversion. The effective date of conversion (the "Holder Conversion Date") shall be deemed to be the date on which the Corporation receives by facsimile the Conversion Notice.

(d) The Corporation shall issue and deliver on or prior to the third business day (the "Required Delivery Date") after receipt by the Corporation of such Conversion Notice by facsimile, (A) a certificate or certificates which shall be free of restrictive legends and trading restrictions (other than those required by the Subscription Agreement pursuant to which the Series A Preferred Stock was originally issued) representing the number of shares of Common Stock being acquired upon the conversion of shares of Series A Preferred Stock (subject to reduction pursuant to Section 8 below), and (B) one or more certificates representing the number of shares of Series A Preferred Stock not converted. The person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares of Common Stock on the Holder Conversion Date. Notwithstanding anything to the contrary contained herein and without limiting any other rights and remedies available to a Holder, if the Corporation shall have failed to timely convert the Series A Preferred Stock in accordance with the provisions of this Section 3, the Holder may revoke such Conversion Notice by delivering written notice to the Corporation, and

NY2-623164 v3                         2

the Corporation promptly shall return such Holder's stock certificate(s) submitted for conversion. Each Holder that elects to convert its Series A Preferred Stock will submit to the Corporation, within 30 days of the Holder Conversion Date, such shares of Series A Preferred Stock to be converted.

(e) Each certificate representing shares of Series A Preferred Stock surrendered to the Corporation for conversion pursuant to this Section 3 shall, on the Holder Conversion Date and subject to issuance of the shares of Common Stock issuable upon conversion thereof, be canceled and retired by the Corporation. Upon issuance of the shares of Common Stock issuable upon conversion of the Series A Preferred Stock pursuant to this Section 3, the shares of Series A Preferred Stock formerly represented thereby shall be deemed to be canceled and shall no longer be considered to be issued and outstanding for any purpose, including, without limitation, for purposes of accumulating dividends thereon.

(f) Subject to the provisions of this Section 3 and the other provisions of this Certificate of Designation, the Corporation's obligation to effect conversions pursuant to this Section 3 is absolute and unconditional, irrespective of any action or inaction by any Holder of Series A Preferred Stock, or any violation or alleged violation of law by such Holder.

(g) In the event of a liquidation of the Corporation, the conversion rights shall terminate at the close of business on the first full day preceding the date fixed for the payment of any amounts distributable on liquidation to the holders of Series A Preferred Stock.

Section 4. *Adjustments; Reorganizations.*

(a) <u>Adjustment for Splits and Combinations</u>. (i) In the event the Corporation at any time or from time to time after June 2, 2006 (the "Issuance Date") makes, or fixes a record date for the effectuation of a split or subdivision of the outstanding shares of Common Stock without payment of any consideration, or to effect a dividend of Common Stock to the holders of Common Stock, then as of such record date (or the date of such split or subdivision, dividend or distribution if no record date is fixed), the Conversion Ratio shall be increased so that the number of shares of Common Stock issuable on conversion of each share of Series A Preferred Stock shall be increased in proportion to such increase of the aggregate shares of Common Stock outstanding.

(ii) If the number of shares of Common Stock outstanding at any time after the Issuance Date is decreased by a combination of the outstanding shares of Common Stock, then, following the record date of such combination (or the date of such combination if no record date is fixed), the Conversion Ratio shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of each share of Series A Preferred Stock shall be decreased in proportion to such decrease in of the aggregate shares of Common Stock outstanding.

NY2-623164 v3                3

**EXHIBIT B**
**PAGE 59**