UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

Cogent Capital Financial LLC and Cogent Capital
Investments LLC,                                    :

                         Plaintiffs,              :

                - against -              :

Innofone.com, Incorporated,                         :

                    Defendant.               :

**ECF CASE**

No. 07 Civ. 2701 (JSR)

------------------------------------------------------------- x

Innofone.com, Incorporated,                         :

                    Plaintiff,               :

                - against -              :

Cogent Capital Financial LLC, Cogent Capital     :
Investments LLC, Cogent Capital Group LLC,
Gregory L. Kofford, Mark W. Holden, and Investors :
Bank & Trust Company,

                    Defendants.              :

**ECF CASE**

No. 07 Civ. 3966 (JSR)

------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF INNOFONE.COM, INCORPORATED'S MOTION FOR SUMMARY JUDGMENT

Jones Day
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  415-626-3939
Facsimile:  415-875-5700

*Attorneys for Plaintiff*
*Innofone.com, Incorporated*

*Of Counsel:*
    *Roderick A. McLeod*
    *Gidon M. Caine*
    *Jessica L. Repa*
    *Joanna Rosen*

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................ 1

    A.  THE PARTIES.......................................................................................... 1

    B.  APPLICABLE MATERIAL UNDISPUTED FACTS ........................... 2

        1.  Cogent Lures Innofone Into The Financing Arrangement........................ 2

        2.  How the Deal Was Premised on Effective Registration ........................... 4

        3.  The Tortuous Path To Obtain Approval ................................... 5

        4.  The SEC Refuses To Approve The Financing Arrangement.................... 6

        5.  The Harm Caused By The Deal ................................................ 7

III.  SUMMARY JUDGMENT STANDARD....................................................... 8

IV.  ARGUMENT .................................................................................................... 8

    A.  THIS COURT SHOULD RESCIND THE TRANSACTION DOCUMENTS FOR ILLEGALITY ..................................................... 9

        1.  The Transaction Is Void Under Federal Law ............................ 9

        2.  The Transaction Is Void Under New York Law..................................... 14

    B.  INNOFONE IS ENTITLED TO RESCISSION BASED UPON MUTUAL MISTAKE BECAUSE ALL PARTIES BELIEVED THE SHARES WOULD HAVE AN EFFECTIVE RESALE REGISTRATION STATEMENT ....................................................................................... 15

        1.  All Parties Believed The SEC Would Approve Registration Of The Shares. .................................................................................... 16

        2.  The Parties Were Mistaken From The Beginning ................................. 17

        3.  Rescission Is The Appropriate Remedy................................................. 18

    C.  THIS COURT SHOULD DECLARE THE CONTRACT UNENFORCEABLE BECAUSE THE SEC'S REFUSAL TO REGISTER THE SHARES MAKES MUTUAL PERFORMANCE IMPOSSIBLE ............. 19

        1.  The Financing Arrangement Is Objectively Impossible To Perform....... 20

        2.  The SEC's Refusal To Register The Shares  Was An Unforeseeable Intervening Event........................................................... 22

        3.  No Party Bore The Risk of the Failure of Registration ........................... 22

    D.  THIS COURT SHOULD DECLARE THE CONTRACT UNENFORCEABLE BECAUSE OF FAILURE OF CONSIDERATION ........ 24

V.  CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
  850 F. Supp. 1199 (S.D.N.Y. 1994),
  *aff'd*, 57 F.3d 146 (2d Cir. 1995) ........................................................................ 15

*Benjamin v. Koeppel*,
  650 N.E.2d 829 (N.Y. 1995) ................................................................................ 14

*Callanan v. Keeseville*,
  199 N.Y. 268 (1910) ............................................................................... 15, 19, 24

*Cont'l Energy Corp. v. Cornell Capital Partners L.P.*,
  04 Civ. 260 (GEL) 2005 U.S. Dist. LEXIS 38120 (S.D.N.Y. Dec. 28, 2005) ............. 21, 22, 23

*Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*,
  212 U.S. 227 (1909) .............................................................................................. 9

*County of Orange v. Grier*,
  817 N.Y.S.2d 146 (App. Div. 2006) ......................................................... 15, 17, 18

*Gould v. Board of Educ. of Sewanhaka Cent. High School Dist.*,
  616 N.E.2d 142 (N.Y. 1993) ........................................................................... 16, 17

*Gutfreund v. DeMian*,
  642 N.Y.S.2d 294 (App. Div. 1996) ...................................................................... 14

*In re Martin Paint Stores*,
  199 B.R. 258 (S.D.N.Y. 1996) ......................................................... 20, 21, 22, 23

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
  263 B.R. 406 (S.D.N.Y. 2001) ............................................................................. 14

*Kaiser Steel Corp. v. Mullins*,
  455 U.S. 72 (1972) ................................................................................................ 9

*Kaiser-Frazer Corp. v. Otis & Co.*,
  195 F.2d 838 (2d Cir. 1952) ............................................................................ 9, 10

*LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*,
  185 F.3d 61 (2d Cir. 1999) .................................................................................... 8

*Luckenbach S.S. Co. v. U.S.*,
  312 F.2d 545 (2d Cir. 1963) ............................................................................... 19

## TABLE OF AUTHORITIES
### (continued)

Page

*Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co.*,
  147 F.2d 399 (2d Cir. 1945) ................................................................. 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)............................................................................. 8

*McMullen v. Hoffman*,
  174 U.S. 639 (1899).............................................................................. 9

*MG Ref. & Mktg, Inc. v. Knight Enter., Inc.*,
  25 F. Supp. 2d 175 (1998) ................................................................. 23

*N.Y. State Energy Research & Dev. Authority v. Nuclear Fuel Services, Inc.*,
  561 F. Supp. 954 (E.D.N.Y. 1983) ...................................................... 8

*U.S. v. Rubinson*,
  543 F.2d 951 (2d Cir. 1976) ............................................................. 13

*Village of Upper Nyack v. Christian and Missionary Alliance*,
  540 N.Y.S.2d 125 (Sup. Ct. 1988)...................................................... 15

*Walters v. Fullwood*,
  675 F. Supp. 155 (S.D.N.Y. 1987) .................................................... 14

### Statutes

15 U.S.C. § 77(e) (2007)................................................................................ 13

15 U.S.C. § 77(x) (2007) ............................................................................... 13

17 C.F.R. 230.415(a)(1)(i) (2007) ................................................................ 11

### Other Authorities

14-76 CORBIN ON CONTRACTS § 76.10 .......................................................... 20

N.Y. JUR. 2D CONTRACTS § 365...................................................................... 24

Restatement (Second) of Contracts § 261 (1981)......................................... 20

Restatement (Second) of Contracts § 264 (1981)......................................... 20

Revision of Rule 144, Rule 145 and Form 144,
  Securities Act Release No. 33-7391 (Feb. 20, 1997)........................ 12

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

RICHARD A. LORD, 3 WILLISTON ON CONTRACTS § 7:11 (4th ed. 2007)......................................... 24

## <u>Rules</u>

Fed. R. Civ. P. 56(c) (2007)................................................................................................ 8

Fed. R. Civ. P. 56(d) (2007)............................................................................................... 8

Fed. R. Civ. P. 56(f) (2007) ............................................................................................... 1

Rule 415(a)(1)(i) (2007) ................................................................................................... 11

## I.    INTRODUCTION

This case hinges on one incontrovertible fact, already admitted by Cogent:  the shares underlying the transaction were required to be registered.  Summary judgment is thus ripe at this early stage because the SEC refuses to allow registration of the shares, despite four proposed registration statements (one original followed by three amendments) and nine months of trying by both Innofone and Cogent.[1]  Since Innofone has received nothing that it bargained for in the transaction, and only suffered detriment, rescission is the only just remedy available to it.  Rescission is solidly founded on any one of four theories set forth below:  illegality, mutual mistake, impossibility or failure of consideration.

## II.    FACTUAL BACKGROUND

### A.    THE PARTIES

Innofone is a Nevada corporation located in Santa Monica, California and is the first public company to focus exclusively on Internet Protocol version 6 ("IPv6"), a major upgrade of the internet (IMEN.OB in the over-the-counter bulletin board).  The current version of the internet, Internet Protocol version 4 ("IPv4"), is based on decades old technology and was not created with a robust infrastructure to support the Internet's explosive growth.  Innofone is an early entrant in IPv6, a critical emerging technology with enormous development opportunities.  IPv6 embraces major enhancements to increase access to the Internet from multiple sources such as mobile wireless, Internet television, internet-based telecommunications.  IPv6 also strives to increase security, and streamline the tracking of inventory and products.  Innofone derives revenue from sponsorships, attendee fees, training, consulting, and mobile software for applications such as messaging and alerts.  The market for IPv6 is poised to expand

---

[1] Cogent will argue this motion is premature and discovery pursuant to Fed. R. Civ. P. 56(f) is required.  The Statement of Material Undisputed Facts will demonstrate that facts sufficient for summary judgment are indeed present and no amount of discovery will change them.

exponentially as major government entities within the federal government, such as the Department of Defense and Office of Management and Budget, have mandated transition to IPv6. Declaration of Alex Lightman ¶¶ 1-5 ("Lightman Decl.").

The financing transaction at issue was proposed by defendants Cogent Capital Financial LLC, Cogent Capital Investments LLC, Cogent Capital Group LLC, and their principals Gregory L. Kofford ("Kofford"), and Mark W. Holden ("Holden") (collectively, "Cogent"). Before taking down its website, Cogent described itself as a full service investment banking firm focused on small public companies.[2] Defendant Investors Bank & Trust Co. ("IB&T") has worked with Cogent on deals and acted as escrow agent in the instant transaction.

### B.    APPLICABLE MATERIAL UNDISPUTED FACTS[3]

#### 1.    Cogent Lures Innofone Into The Financing Arrangement.

Cogent principals Kofford and Holden met Alex Lightman, Innofone's President and Chief Executive Officer, at a technology conference in April 2006 and soon after proposed making a significant investment in Innofone. Lightman Decl. ¶¶ 6-7.

On May 2, 2006, Cogent proposed providing capital to Innofone in an "amount [that] would roughly match [Innofone's] cash needs over the next two years or so," allowing Innofone to focus on implementing its business strategy to acquire businesses engaged in IPv6 technology development and products manufacturing to expand its IPv6 business. *Id.* at ¶ 7, Ex. A.[4] Cogent principal Kofford proposed an equity swap where Innofone would essentially sell Innofone stock to Cogent in exchange for Cogent bonds to be "swapped" for the stock. The financing arrangement was premised on the Securities and Exchange Commission ("SEC") allowing

---

[2] Cogent apparently took down its website sometime after Innofone filed its complaint.

[3] The Material Undisputed Facts are referred to as "UF." In total, there are only twenty discrete Undisputed Facts among the four rescission claims which are the subject of this motion.

[4] All exhibits referred to are authenticated and attached to the Declaration of Alex Lightman, the CEO of Innofone, who was intimately involved with the Transaction.

Innofone to register the stock.  Thus, obtaining an effective registration statement was the keystone to the viability of the financing arrangement.

On May 5, 2006, Alex Lightman sent Kofford and Holden an executed letter in which Innofone and Cogent Capital Group LLC agreed to move forward with a proposed investment of between $15 and $50 million.  [UF 1, 13, 25, 39].[5]  To start the process, Cogent Capital Group asked for and received $25,000 for due diligence fees and $3,000 for an escrow fee. *Id*.

On June 2, 2006, Innofone, Cogent Capital Financial LLC and Cogent Capital Investments LLC entered into a financing arrangement in which Cogent was to provide Innofone with up to $50 million in Treasury bonds in exchange for Innofone stock.  [UF 2, 14, 26, 40]. The financing arrangement involved the purchase of shares and a simultaneous Equity Swap transaction by which Cogent Capital Investments bought 1.85 million shares of Innofone common stock and 4.815 million shares of Innofone's Series A convertible preferred stock (at a conversion ratio of 10:1) for $50 million in U.S. Treasury Bonds.  *Id*.; Lightman Decl. ¶¶ 13-16. This was a private investment in public equity ("PIPE") with an equity swap derivative. Innofone never received payment for the shares sold to Cogent because the bonds constituting payment for the shares were immediately placed in escrow until the Equity Swap could be triggered.  *Id.* at ¶21.  Innofone also paid a fee (an "Initial Exchange Amount") for the Equity Swap to Cogent Capital Financial consisting of 5 million shares of Innofone common stock, a warrant to purchase another 5 million shares of common stock, and $1.375 million (hereafter "Transaction").  *Id*.  A major reason Innofone entered into the deal with Cogent was to secure its financing needs for the thirty month period while the Equity Swap was in force.  *Id.* at ¶ 13.

---

[5] As will be readily seen in the Statement of Material Undisputed Facts, UF 1 is the same as UF 13, UF 25 and UF 39.  The Undisputed Facts applicable to each claim have been set forth separately for completeness and hence many of them are restated.

Ten contract documents comprise the Transaction.[6]  [UF 3, 15, 27, 41].  To secure the parties' respective performance, Innofone deposited with defendant Investors Bank & Trust (the escrow agent) the common and preferred shares underlying the Transaction.[7]  [UF 4, 28, 42].  Innofone also deposited other fees as a part of the Initial Exchange Amount.[8]  Cogent Capital Investments deposited with the escrow agent the $50 million in U.S. Treasury bonds.  [UF 5, 29, 43].  Cogent did not pay any fees to Innofone to enter into the financing arrangement.  Lightman Decl. ¶ 19.

## 2.  How the Deal Was Premised on Effective Registration.

The financing arrangement was expressly conditioned on registration of the underlying shares.[9]  Lightman Decl. ¶ 24, Exs. C, K, F, J; [UF 18, 34, 46].  Innofone, Cogent Capital Financial, and Cogent Capital Investments entered into the Transaction with the understanding that the shares underlying the Transaction required an effective resale registration statement.  [UF 16].  For example, Cogent principal Holden stated on June 13, 2006 that Innofone's "access to the $50 mm in T-bonds . . . takes place through a defined schedule over 30 months . . . beginning 30 days after a registration of the shares we purchased is effective . . . with timing intended to coordinate with [Innofone's] cash requirements."  Lightman Decl. ¶ 27, Ex. N;

---

[6] The Transaction documents include:  1) Securities Purchase Agreement; 2) Escrow Agreement; 3) Master Agreement; 4) Schedule to the Master Agreement; 5) June 2, 2006 Equity Swap Transaction Confirmation; 6) Credit Support Annex; 7) Registration Rights Agreement; 8) Warrant; 9) November 1, 2006 Equity Swap Transaction Confirmation; and 10) November 1, 2006 Interest Rate Swap Transaction.  [UF 3, 15, 27, 41].

[7] Defendant Investors Bank, based on information to date, is named in this litigation primarily because of its role as escrow agent.  It is unclear which items the parties originally placed in escrow still remain in escrow or have been taken out of escrow but remain at Investors Bank.  Rescissionary relief therefore will require its involvement.

[8] Fees included $568,750 of the $1,375,000 IEA total cash fee and $181,250 in prepaid interest.  Lightman Decl. ¶ 22, Ex. D.

[9] See, e.g., November 1, 2006 Equity Swap Transaction Confirmation, Lightman Decl. ¶ 24, Ex. K at 2 § 1 (requiring that the Transaction comply with the law); Schedule to the Master Agreement, § 8, attached as Ex. F ("No consent, approval, authorization . . . is required . . . except as may be required under the Securities Act or . . . under the state securities or blue sky laws governing the purchase and distribution of the Shares in connection with the purchase and sale of the Shares.").

[UF 6, 7]. There can be no dispute that Innofone, Cogent Capital Financial and Cogent Capital Investments all believed that the SEC would approve the Innofone common stock underlying the Transaction. [UF 19]. In fact, Innofone made it one of its highest priorities to "get the SB-2 registering [Cogent's] shares approved." Lightman Decl., ¶ 26, Ex. M; [UF 16]. Cogent itself promised that the SEC would allow the SB-2 registration to go effective. Lightman Decl. ¶ 25.

The exchange of Innofone stock for the Cogent bonds, i.e. the Equity Swap portion of the Transaction, could not begin until after a resale registration statement had become effective for at least 10 million Innofone shares and an effective registration statement maintained for the full amount of the shares, pursuant to SEC Rules and Regulations. [UF 6, 17, 30, 44]. As the SEC recognized in its November 7, 2006 SEC Letter, the "release of bonds . . . is subject to the condition that you obtain an effective resale registration statement. . . ." Lightman Decl., ¶ 39, Ex. X ¶ 7.

Once the shares were registered, the Equity Swap would be triggered, commencing the exchange of Innofone stock for the bonds over a 30 month period. [UF 7, 31, 45].

### 3. **The Tortuous Path To Obtain Approval.**

For nine months, Innofone, working closely with Cogent, sought approval of the Transaction from the SEC. Lightman Decl. ¶¶ 29 - 43. Beginning on July 19, 2006 Innofone filed its first SB-2 registration statement with the SEC for the purpose of registering 48,150,000 shares of common stock underlying the Transaction. [UF 8, 32, 48]. In the July 19, 2006 SB-2 Registration Statement, Innofone noted:

> Partial settlements of the **equity swap and related collateral releases** (together the "Swap Settlements") **commence 30 days subsequent to the effective date of this registration statement** . . . we may sell a fixed percentage of the Treasury Bonds against a fixed reference price for our common stock shares at any time thereafter, and **use any cash proceeds from such sales for working capital purposes**.

Lightman Decl. Ex. R at 12 (emphasis added).

Innofone amended its SB-2 three times (on August 28, October 24, and December 8, 2006) in response to continuing SEC questions about the validity of the Transaction. [UF 9, 33, 49]. On August 11, 2007 the SEC questioned the July 19, 2006 SB-2 registration statement. Lightman Decl. Ex. S. In response to these SEC comments, on August 28, 2006, Innofone filed its first amended SB-2. *Id.* at Ex. T. On Sept. 14, 2006, the SEC sent another letter to Innofone, again questioning the transaction. *Id.* at Ex. U. On September 27, 2006, Innofone responded to the SEC. *Id.* at Ex. V. On October 24, 2006, Innofone sent another response letter to the SEC. *Id.* at Ex. W. Again on Nov. 7, 2006, the SEC sent Innofone a letter further questioning the Transaction. *Id.* at Ex. X. In response to SEC comments, on December 8, 2006, Innofone sent a letter to the SEC. *Id.* at Ex. Y. After these multiple attempts to seek approval, on December 28, 2006 the SEC sent Innofone a letter advising: "[t]herefore, we do not agree with your conclusion that the private placement is complete . . . [a]s a result **you may not register the resale of the shares of common stock** issued in the private placement to Cogent until that private placement has been completed . . ." *Id.* at Ex. Z ¶ 1 (emphasis added); [UF 10, 21, 37, 50].

Each of the SB-2's filed by Innofone underscored an essential condition of the financing arrangement: the deal required registration of the underlying shares. Lightman Decl. ¶¶ 23, 35, 38, 40, Exs. R, T, W, and Y. In its comment letters responding to each filing, the SEC repeatedly questioned how Cogent bore any risk in the financing arrangement. *Id.* at ¶ 34.

### 4.   The SEC Refuses To Approve The Financing Arrangement.

The SEC refused to approve registration on each of the four separate occasions Innofone sought approval. [UF 36]. Succinctly put, the position of the SEC was that Innofone could not register the shares underlying the Transaction. The SEC considered the financing arrangement invalid. As early as its August 11, 2006 SEC Letter, the SEC probed whether there was a "valid

PIPE transaction" given the conditions governing the release of the funds begins with the "effectiveness of the resale registration statement."  Lightman Decl. ¶ 33, Ex. S ¶¶ 1, 2, 7.  This was a recurrent theme which appeared throughout the SEC's letters.

Cogent's own attorneys understood the SEC would not allow registration.  Toward the end of the process, Cogent took the unusual step of writing directly to the SEC and begging it not to unwind the deal, stating in its January 18, 2007 letter "[w]e ask that the [SEC] permit the Company to proceed . . . and not require an **unwind of the transaction**."  *Id.* at ¶ 42, Ex. AA at 6 (emphasis added).

Even after Cogent wrote directly to the SEC acquiescing to the SEC's characterization of the financing arrangement as a primary offering and agreeing that Cogent could be named as a statutory underwriter, the SEC still refused to allow registration of the shares.  *Id.*  At a minimum, the parties were thus mistaken that the SEC would approve registration of the shares. [UF 20].

**5.  <u>The Harm Caused By The Deal.</u>**

After the SEC's most recent rejection on March 9, 2007 of Innofone's proposed SB-2 registration, Innofone sought rescission without delay.  [UF 12, 24, 38, 54].  Innofone has not received any benefit from the Transaction.  [UF 22, 52].  The Transaction continues to be a detriment to Innofone since Innofone is obligated to pay monthly interest on the bonds.  [UF 23, 53].  Interest is owed on the bonds as long as there remain bonds which have not been exchanged for the Innofone shares.  Lightman Decl. ¶ 50.  But in a Catch-22 situation, Innofone is unable to access the U.S. Treasury Bonds because the SEC refuses to approve the registration of the Innofone common stock that was at the heart of the Transaction.  [UF 51].

This is the classic case which calls for the remedy of rescission.

### III.    SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be entered where the moving party demonstrates that "there is no **genuine** issue as to any material facts and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2007)  (emphasis added); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (finding "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue as to any material facts).  The court may consider exhibits, such as letters, that are properly identified by affidavit or declaration to evaluate the merits of the case.  Fed. R. Civ. P. 56(c); *Madeirense do Brasil S/A v. Stulman-Emrick Lumber Co.*, 147 F.2d 399, 404 (2d Cir. 1945) (finding use of letter submitted by plaintiff proper to use as basis of summary judgment under FRCP 56 to show there are no genuine issues of fact); *accord LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61 (2d Cir. 1999).  If the facts are not in dispute, then the Court determines whether the moving party is entitled to judgment as a matter of law.

Further, where summary judgment is not proper on the entire claim, under Rule 56(d) the Court may grant partial summary judgment on discrete elements of the claim.  Fed. R. Civ. P. 56(d) (2007).  *See*, *e.g.*, *N.Y. State Energy Research & Dev. Auth. v. Nuclear Fuel Servs., Inc.*, 561 F. Supp. 954, 964 (E.D.N.Y. 1983) (granting partial summary judgment and recognizing that Fed. R. Civ. P. Rule 56 "provides a salutary mechanism for avoiding useless trials and should be so employed when such inutility has been made to appear clearly.").

### IV.    ARGUMENT

The financing arrangement cannot proceed as contemplated.  Innofone has not received any benefit from the Transaction.  Innofone has demonstrated all of the factual requirements to obtain 1) rescission based upon illegality; 2) rescission based upon mutual mistake;

3) declaratory relief that the financing arrangement is invalid and unenforceable based upon impossibility; and 4) declaratory relief that the financing arrangement is invalid and unenforceable based upon failure of consideration.  Based on the Undisputed Facts, no reasonable trier of fact could find for Defendants on these claims.

     **A.     THIS COURT SHOULD RESCIND THE TRANSACTION DOCUMENTS FOR ILLEGALITY.**

        **1.   <u>The Transaction Is Void Under Federal Law.</u>**

Over a century ago, the United States Supreme Court stressed that "no court will lend its assistance in any way towards carrying out the terms of an illegal contract.  In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it. . . ." *McMullen v. Hoffman*, 174 U.S. 639, 654 (1899).  The Court has thus emphasized that "our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law."  *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77 (1972) (collecting authority); *accord Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 262 (1909) (refusing to enforce a promise to pay for purchased goods where the promise was part of a bargain that was illegal under the antitrust laws).

Instructive in this regard is *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838 (2d Cir. 1952).  There, a group of underwriters agreed to purchase Kaiser-Frazer's stock and resell it to the public pursuant to a registration statement and prospectus which Kaiser-Frazer filed with the SEC.  One underwriter then refused to honor the agreement, claiming that the registration statement and prospectus were false.  Kaiser-Frazer sued, and recovered a judgment for over $3 million against the one underwriter.  The Second Circuit, in an opinion written by Judge Augustus Hand, reversed, and remanded with directions to enter judgment in favor of the one underwriter who had refused to honor the agreement even though Judge Hand acknowledged

there was evidence such underwriter knowingly helped prepare the false SEC filing. Judge Hand noted that a sale to the public by means of a false prospectus would have violated the Securities Act. He explained, however, that "whatever the rules of estoppel or waiver may be in the case of an ordinary contract of sale, nevertheless it is clear that a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable." *Kaiser Frazer*, 195 F.3d at 843 (footnote and citations omitted). He emphasized that "[t]his is so regardless of the equities as between the parties. . . ." *Id*. at 844 (citation omitted). *Kaiser-Frazer* thus makes clear that even in the extreme situation where the party seeking rescission arguably may be at fault, an agreement that violates the securities laws should still be rescinded. In the instant case, *Kaiser-Frazer's* teaching applies with greater force: not only was Innofone not at fault (this was a deal structure devised by Cogent, after all), it has expended near-Herculean efforts to get the shares registered only to see its efforts rejected by the SEC.

As the Complaint explains, the Transaction "explicitly contemplated the shares issued by Innofone to Cogent Capital Financial would be registered with the [SEC], and after that registration was declared effective, Innofone would be able to commence the draw-down period on the $50 million in bonds." Complaint ¶ 57; [UF 1, 2, 3]. The Complaint stresses that "[w]ithout the ability to draw on the bonds, the very object of the Swap Agreement Documents has been defeated because there is simply no way for Innofone to obtain the benefit of its bargain." Complaint ¶ 57; [UF 4, 5, 6, 7].

The Complaint alleges that Innofone and the Cogent Parties have devoted *nine months* to having the SEC approve registration of the Innofone securities, and the SEC has "repeatedly and emphatically refused to allow Innofone to declare its registration statement effective[,]" because it questions not just the disclosures, but "the underlying integrity and structure of the

transaction." Complaint ¶ 58; [UF 9, 10, 11, 12]. The SEC determined "that the transaction violates [SEC] rules." Complaint ¶ 58; [UF 11]. Indeed, the SEC warned, it is "illegal for the Cogent Parties to offer the securities for sale to the public without an effective registration statement." Complaint ¶ 59; [UF 6, 11]. Innofone is therefore entitled to rescission and restitution because, as structured, contemplated and described by the Transaction, the transaction is illegal.

The incontrovertible documentary evidence fully supports rescission. On July 11, 2006, Innofone filed a registration statement with the SEC on Form SB-2, seeking to register the shares issued to Cogent. [UF 8]. On August 11, the SEC issued a lengthy comment letter, asking Innofone to explain why this transaction complied with Rule 415(a)(1)(i), codified at 17 C.F.R. 230.415(a)(1)(i), which regulates the delayed or continuous offering and sale of securities. Almost immediately, the SEC zeroed in on the transaction itself, asking Innofone to explain "why you believe that the issuance of convertible notes to Cogent was a valid PIPE transaction in light of the fact the funds will be disbursed to the company long after the closing of the transaction." Aug. 11, 2006 SEC Letter, Lightman Decl. Ex. S ¶¶ 1, 2; [UF 9].

On September 14, 2006, the SEC asked for further explanation as to why Innofone believed that the private placement was completed, and also asked for "an analysis of how Cogent is at risk regarding its investment in light of the fact that Cogent's risk appears to be mitigated by the Equity Swap Agreement." Sept. 14, 2006 SEC Letter, Lightman Decl. Ex. U ¶ 3; [UF 9]. Again on December 28, 2006, the SEC made its objection more pointed:

> We do not agree with your conclusion that the private placement is complete in light of the fact that the total consideration you will receive for the private placement will not be determined until the equity swap has been completed. As a result, **you may not register the resale of the shares of common stock issued in the private placement to Cogent** until that private placement has been

completed.  December 28, 2006 SEC Letter, Lightman Decl. Ex. Z ¶1 (emphasis added);  [UF 10].

On January 11 and 18, 2007, the SEC, counsel for Innofone, and counsel for the Cogent parties participated in lengthy conference calls regarding the registration statement.  During those conference calls, it became clear that the SEC viewed this as a primary offering by Cogent, and therefore not eligible for registration as a resale offering, where the regulations are less restrictive.  *See* Declaration of Arthur Marcus ¶¶ 12-16 ("Marcus Decl.").

In an unusual letter sent directly to the SEC after the January 11 conference call trying to salvage the Transaction, Cogent accurately described that "it is the Staff's view that the private placement of securities to Cogent is not complete and as such the Company cannot register the resale of the shares of common stock issued in the private placement by Cogent until the private placement has been completed."  January 18, 2007 Cogent Response Letter to SEC, Lightman Decl. Ex. AA at 1; [UF 11].  The letter further explained that "[t]hrough the Staff's comments and discussions, it would appear that the Staff is taking the position that the mere existence of the Equity Swap Agreement suggests that Cogent did not bear 'market risk' and would vitiate the otherwise available private placement exemption."  Lightman Decl. Ex. AA at 4; *see* Revision of Rule 144, Rule 145 and Form 144, Securities Act Release No. 33-7391, at 13-14 (Feb. 20, 1997) (explaining that lack of market risk may make Rule 144 resale exemption unavailable); [UF 11].  Cogent's letter conceded that "the Staff does not agree" that the sale of Innofone stock to Cogent was a completed private placement, or that Cogent Capital Investment purchased the shares of Innofone stock with an investment intent and without a view toward distributing the stock.  Lightman Decl. Ex. AA at 4; [UF 11].  In a move of desperation, Cogent agreed to be named a statutory underwriter, and to have the Transaction characterized as a primary offering, if that would assist moving the transaction forward.  Lightman Decl. Ex. AA at 6.  Sensing this was

their last chance, Cogent then pleaded with the SEC not to make them rescind the transaction:

> We believe that given the considerable length of time that has elapsed since the execution of the transaction, there is no public policy interest to be served *in requiring the transaction to be unwound*. *Id*. (emphasis added)

The SEC was unmoved. In a letter dated January 24, 2007 the SEC bore in on Innofone, and asked if the shares issued to Cogent "are legally outstanding . . . ." Lightman Decl. Ex. DD ¶1. It asked Innofone to confirm that the $50 million in Treasury bonds "have been transferred to you." *Id*. at ¶ 2. It asked Innofone to "confirm that the equity swap transaction is currently a legally valid and enforceable contract between Cogent and Innofone." *Id*. at ¶ 3. It then repeated these comments in its March 9, 2007 letter, commenting on Innofone's FY 2006 Form 10-KSB/A. *See* Lightman Decl Ex. BB ¶¶ 5-7; [UF 12]. Even with Cogent's concession, the SEC was simply not going to allow the registration to go forward. 15 U.S.C. § 77(e) (2007) (sale of securities without an effective registration statement illegal). In other words, just as Cogent had feared, the SEC was "*requiring the transaction to be unwound*."

In this case, the SEC has made abundantly clear that the contemplated resale of Innofone common stock to the public cannot be registered. Without such a registration, any proposed resale would be illegal – indeed criminal. *See* 15 U.S.C. § 77(e) (2007) (registration requirement); 15 U.S.C. § 77(x) (2007) (willful violation of Securities Act or regulations promulgated thereunder punishable by fine of up to $10,000 and five years in prison); *U.S. v. Rubinson*, 543 F.2d 951 (2d Cir. 1976) (affirming conviction for selling unregistered securities in violation of 15 U.S.C. §§ 77(e), (x)).

As for the other elements needed for rescission,[10] Innofone has acted without delay and, in fact, never received any consideration from Cogent. [UF 12]; Lightman Decl. ¶ 21. Innofone cannot access any of the money it has been promised by the Cogent Parties. Thus, it bears all of

---

[10] *See also* Section B.3 *infra*.

the burden and receives none of the benefit. Clearly, Innofone has no adequate remedy at law given the impossibility of calculating damages based on, *inter alia,* fluctuating and uncertain share prices inherent in an equity swap. The agreement therefore should be rescinded.

### 2.  <u>The Transaction Is Void Under New York Law.</u>

The New York Court of Appeals has held that "[i]llegal contracts are, as a general rule, unenforceable." *Benjamin v. Koeppel*, 650 N.E.2d 829, 830 (N.Y. 1995). The Court of Appeals has provided for certain narrow exceptions to this rule. Thus, relief *might* be granted from this rule where the contract merely violates a statute that is malum prohibitum. *Id*. Similarly, where a statute does not expressly deprive parties of the right to sue, and "the denial of relief is wholly out of proportion to the requirements of public policy," a contract may be enforced. *Id.*

The current case does not fit within these exceptions. Instructive in this regard is *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406 (S.D.N.Y. 2001). In *Jackson*, a broker engaged in trades that violated federal and state securities laws. *Id*. at 492-94. The customers, claiming they were the innocent victims of third-party conduct, claimed that invalidating the trades was improper. *Id*. In disagreeing with this conclusion, the District Court held that "[t]he statutory framework of these laws encompasses criminal prohibitions intended to punish and discourage precisely the wrongs [the] brokers committed." *Id*. at 494.

As in *Jackson*, the agreement here violates the federal securities laws, including criminal prohibitions designed precisely to avoid the wrong that would be committed here if Innofone's stock were sold without an effective registration statement. Therefore, as in *Jackson*, the contract should be invalidated and rescinded. *See Walters v. Fullwood*, 675 F. Supp. 155, 161-64 (S.D.N.Y. 1987) (holding unenforceable under New York law an agreement in violation of National Collegiate Athletic Association regulations); *Gutfreund v. DeMian*, 642 N.Y.S.2d 234, 235 (App. Div. 1996) (mem. op.) (unlicensed insurance broker cannot enforce oral agreement for

commissions); *Village of Upper Nyack v. Christian and Missionary Alliance*, 540 N.Y.S.2d 125 (Sup. Ct. 1988) (transactions in violation of public policy are void); [UF 12].

To sum up, the incontrovertible facts [UF 1-12] demonstrate that the Transaction should be rescinded for illegality.

### B.     INNOFONE IS ENTITLED TO RESCISSION BASED UPON MUTUAL MISTAKE BECAUSE ALL PARTIES BELIEVED THE SHARES WOULD HAVE AN EFFECTIVE RESALE REGISTRATION STATEMENT.

Innofone's third claim for relief is rescission based upon mutual mistake. The mistaken belief must be 1) mutual; 2) "substantial" and material as to defeat the contract, and 3) exist at the time the contract was entered into. *County of Orange v. Grier*, 817 N.Y.S.2d 146 (App. Div. 2006) (granting summary judgment and "rescinding the subject deeds" since "**both the County and the appellants mistakenly believed** that the County owned the two purported tax lots at issue, but that the lots actually were, in fact, parts of neighboring properties") (emphasis added). Furthermore, the conditions for rescission must be met. Innofone must show that it promptly rescinded, the status quo is restorable, and there is no adequate remedy at law. *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994) (requiring for "rescission to be effective [it] must be announced without unreasonable delay," concluding assignee promptly raised rescission claim), *aff'd,* 57 F.3d 146 (2d Cir. 1995); *County of Orange v. Grier*, 817 N.Y.S.2d at 147 (App. Div.) (finding rescission where it is possible "to put or restore the parties to status quo") (citations omitted); *Callanan v. Keesville*, 199 N.Y. 268, 269 (1910) (requiring that "unless the damages can be ascertained with reasonable certainty, rescission is a matter of right.")

The undisputed facts [UF 13 to 24] establish Innofone's right to rescission where both parties entered into the financing arrangement under the mistaken belief that the shares underlying the Transaction would have an effective resale registration statement but where the

SEC has rejected the underlying structure of the Transaction.

### 1.  All Parties Believed The SEC Would Approve Registration Of The Shares.

Here, as in the classic New York case, *Gould v. Board of Educ. of Sewanhaka Cent. High School Dist.*, "a contract entered into under a mutual mistake of fact is voidable and subject to rescission" since the contract does not represent the "meeting of the minds" of the parties.  616 N.E.2d 142, 145-6 (N.Y. 1993) (citations omitted).  In *Gould*, earlier discussions between petitioner and the Superintendent that eventually led petitioner to agree to resign her position "were all premised on a mutual mistake of fact as to a critical element: that petitioner was only a probationary employee." *Id.* at 146

Here, Innofone has demonstrated the first element of rescission based on mutual mistake: a mistaken belief by all parties that an effective registration statement would be obtained.  As in *Gould*, all parties confirmed that they were mutually mistaken regarding a critical element of the agreement: SEC approval of the registration of the shares underlying the Transaction.  *See* 616 N.E.2d at 146; [UF 19, 20].  Innofone entered into the deal with the mistaken belief that the deal would be approved by the SEC. [UF 16]; *see* June 1, 2006 Lightman email, Lightman Decl. Ex. M (stating "[a]fter closing our highest priorities will be to get the SB-2 registering your shares approved.").  Cogent also entered into the deal with the mistaken belief that the deal would be approved by the SEC.  [UF 16]; *see e.g.*, May 2, 2006 Kofford email, Lightman Decl. Ex. A (noting "[t]hese indicative prices also assume that the company will be in a position to move from the bulletin board to Amex prior to or concurrent with the effectiveness of the registration of the shares underlying our investment") and June 13, 2006 Holden email, Lightman Decl. Ex. N (recognizing "[t]he receipt of any additional funds via the equity swap (and also access to the $50 mm in T-bonds from the private placement) takes place through a defined schedule over 30 months (as Gerard [Innofone's General Counsel] noted, beginning 30

days after a registration of the shares we purchased is effective) which schedule has been designed with timing intended to coordinate with INFN's cash requirements."). The deal was not approved. Like the petitioner and Superintendent in *Gould*, here Cogent and Innofone both had the misconception that the deal would be approved, a mutual mistake which pervaded the entire transaction from its inception. *See* 616 N.E.2d at 145-146.

The underlying premise of the Transaction – registration of the shares at issue – establishes the second element: that the mistake materially defeats the contract. [UF 13, 14, 15, 18]. Innofone entered into the financing arrangement with Cogent so that it could access the Cogent bonds to meet its capital needs. [UF 17]. It is undisputed that "settlements under the Equity Swap do not commence until after the resale registration statement becomes effective." October 24, 2006 Innofone Response Letter to SEC, Lightman Decl. Ex. W at 1. Like the mistaken assumption in *Gould* that petitioner was probationary, Innofone and Cogent mistakenly assumed that the stock at issue could lawfully be registered and therefore serve the purpose of providing funds for Innofone's capital needs. *See* 616 N.E.2d at 145-146. Innofone has demonstrated a material condition has not been met since it has no benefit and only detriment from the financing arrangement. [UF 22, 23]; Lightman Decl. ¶ 50 (noting Innofone is "required to pay monthly interest on bonds it can never access…over $1.1 million in fees and interest payments…issued millions of shares of common and preferred stock…[and] has had to delay its plans for growth.").

## 2. The Parties Were Mistaken From The Beginning.

New York law requires that the mutual mistake exist from the beginning of the agreement. *County of Orange*, 817 N.Y.S.2d at 147 (holding that the mutual mistake must "exist at the time the contract is entered into") (*citing Gould*). In *County of Orange*, the County established by documentary evidence and affidavits "that both the County and the appellants

mistakenly believed that the County owned the two purported tax lots at issue, but that the lots actually were, in fact, parts of neighboring properties." *Id.*

Here, it is undisputed the parties were mistaken from the beginning. The parties entered into the Transaction with the mistaken belief that the shares underlying the Transaction would have an effective resale registration statement. [UF 13, 14, 15, 16, 19]. As previously described above, Cogent's statements prior to the Transaction execution manifest its mistaken belief from inception. *See* Kofford's May 2, 2006 email, Lightman Decl. Ex. A. Holden's June 13, 2006 email after the deal was signed on June 2, 2006 confirms Cogent's belief when it entered into the Transaction. Lightman Decl. Ex. N. There can be no doubt that only *after* the efforts to register the stock did the parties learn they were mistaken: that the SEC would not approve the registration of the Innofone shares. [UF 21, 24].

### 3.  Rescission Is The Appropriate Remedy.[11]

Innofone undoubtedly establishes all the other conditions necessary for rescission. First, Innofone sought rescission without delay. Lightman Decl. ¶ 47 Ex. CC ¶ 48; [UF 24]. When Innofone learned that the SEC would never approve the resale registration of the shares underlying the Transaction, Innofone repeatedly asked the Cogent parties to rescind the transaction. Lightman Decl. ¶¶ 46-47. Cogent refused. Only then did it file suit.

Second, the status quo ought and can be restored. Presumably, everything is in escrow. Innofone deposited the common and preferred shares underlying the Transaction with the escrow agent. [UF 14, 15]; *see* Escrow Agreement, Lightman Decl. Ex. D ¶ 1(b). Cogent Capital Investments deposited with the escrow agent the $50 million in U.S. Treasury bonds. *Id.* at ¶ 1(a). The monies paid to Cogent as the Initial Exchange Amount are easily returned.

---

[11] For brevity, this section applies to and is incorporated in Sections A, C and D of this brief.

Rescission will thus put the parties in the position they occupied prior to entering into the financing arrangement.  Lightman Decl. at ¶¶ 50-51.  Innofone has all of the detriment of the deal and none of the benefits.  [UF 22, 23].

Likewise Innofone has established there is no adequate remedy at law since damages cannot be ascertained with reasonable certainty because of the unique nature of the financing arrangement and inability to calculate damages.  Here, as in *Callanan*, damages are impossible of being accurately measured because the amount to be exchanged pursuant to the Equity Swap changes depending on the value of the stock on the day of the swap.  *See* 199 N.Y. at 269; Lightman Decl. ¶ 13; [UF 14, 15, 17].  While Innofone could receive as much as $50 million in Treasury bonds.  Innofone conceivably could gain access to more cash if the stock price increased and less cash if the stock price decreased from the $1.33 reference price per share.  *Id*.  Clearly money damages in these circumstances are highly speculative, if not impossible to measure.

In summary, rescission and restitution is the just remedy for the parties' mutual mistake involving an integral part of the transaction.

### C.   THIS COURT SHOULD DECLARE THE CONTRACT UNENFORCEABLE BECAUSE THE SEC'S REFUSAL TO REGISTER THE SHARES MAKES MUTUAL PERFORMANCE IMPOSSIBLE.

The Declaratory Judgment Act empowers the Court to grant declaratory relief to "avoid accrual of avoidable damages to one not certain of his rights and to afford [a litigant] an early adjudication without waiting until his adversary should see fit to begin suit."  *Luckenbach S.S. Co. v. U.S.*, 312 F.2d 545, 548 (2d Cir. 1963) (internal citations omitted).  Innofone is entitled to rescission for impossibility because "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his duty to render performance is

discharged. . ." *In re Martin Paint Stores*, 199 B.R. 258, 265-66 (S.D.N.Y. 1996) (*citing*

Restatement (Second) of Contracts § 261 (1981)) (judicial action constituted impossibility

excusing party's breach).

Innofone will prevail on its claim for relief based on impossibility because the SEC's

refusal to register the shares has made it impossible for Innofone to complete performance.

Furthermore, neither party assumed the risk of this impossibility.

### 1.   The Financing Arrangement Is Objectively Impossible To Perform.

It is clear that after four separate attempts to register the Innofone shares and four

separate denials by the SEC that Innofone will not be able to register its shares.  [UF 35, 37].

Over a nine month period, Innofone submitted SB-2 registration statements to the SEC four

times, first on July 19, 2006, and then on August 28, 2006, and October 24, 2006 and lastly on

December 6, 2006.  [UF 32, 33].  Despite repeatedly amending its registration statement to

address the SEC's continued concerns, Innofone was ultimately unable to register its shares.

[UF 37].

In short, performance of the Transaction has been rendered impossible by the SEC's

position.  *See Martin*, 199 B.R. at 265-66; [UF 37].  Where an intervening action such as an act

of state, domestic regulation or order makes performance impossible, the breaching party is not

liable.  *See Martin*, 199B.R. at 266; 14-76 CORBIN ON CONTRACTS § 76.10 (doctrine of

impossibility implicated where "performance is forbidden or prevented by law or decree or

administrative action in that location."); Restatement (Second) of Contracts § 264 (1981)

(domestic governmental order or regulation making performance impossible excuses

performance).  In *Martin*, the parties had agreed to an exclusive lease and included language of

exclusivity in their agreement.  199 B.R. at 260-62.  The court found its previous decision

approving the assumption and assignment of the lease to a third party constituted governmental

action making it impossible for the parties to comply with the exclusivity agreement. *Id.* at 266. The SEC's December 28, 2006 letter is proof-positive that intervening administrative action excused the parties' performance.

Innofone and Cogent are fundamentally unable to consummate the Transaction. The SEC requires effective registration prior to the sale of securities to the public. [UF 35]. Without this effective resale registration statement, Innofone is unable to draw on the bonds for its capital needs. Had the SEC approved the registration, Innofone would have been able to draw on the bonds over a 30 month period for its capital needs by exchanging shares for bonds. [UF 28, 29, 30, 31]. But Innofone can *only* access the bonds if it obtains an effective registration of the shares issued to the Cogent parties. Consequently, Innofone cannot access the bonds and it is objectively and actually impossible for Innofone to perform as promised.

It is anticipated that Cogent may rely on *Cont'l Energy Corp. v. Cornell Capital Partners L.P.*, 04 Civ. 260 (GEL) 2005 U.S. Dist. LEXIS 38120, *10 (S.D.N.Y. Dec. 28, 2005) to argue that the impossibility defense does not apply here. *Continental* involved a convertible debt financing agreement where Continental was required to file a registration statement with the SEC. *Id.* Continental specifically agreed to be the party responsible for registering the shares with the SEC but never actually filed a registration statement. Thus, the court declined to excuse Continental's performance because Continental had not attempted to register its shares, and had not offered any evidence that, had it done so, the SEC would have rejected its application. *Id.*

That is decidedly not the case here. On the contrary, the factual dissimilarities distinguish *Continental* and compel the opposite conclusion. It is beyond dispute that Innofone attempted to register the shares. *Cf. id.* at *8-9; [UF 32, 33]. In fact, it attempted to register its shares on four separate occasions. [UF 36]. Each time, the SEC rejected Innofone's registration

statements and insisted it would not approve the deal as structured.  [UF 35, 36, 37, 38].  Thus, non-registration prevents the parties from performing the Agreement and undermines the fundamental purpose of the contract:  the exchange of registered securities for Cogent bonds. [UF 34].

Also unlike Continental, Innofone submits the Declaration of Arthur Marcus, the securities lawyer retained by Innofone to obtain SEC approval.  Marcus Decl. ¶¶ 2, 6.  His declaration makes crystal clear that the SEC's decision not to register the shares made Innofone's performance impossible.  *Id.* at ¶¶ 9, 10, 13, 14, 16, 17.  Innofone, unlike Continental, does not need to guess as to the outcome of the SEC action since the SEC has time and again rejected the registration of the shares.  [UF 36, 37, 38]; *Cf. Cont'l* 2005 U.S. Dist. LEXIS at 8-9.

### 2. The SEC's Refusal To Register The Shares Was An Unforeseeable Intervening Event.

The SEC's refusal to register the shares was an intervening event, occurring after the parties executed the contract.  [UF 30, 31, 32, 33, 34].  When they executed the contract, the parties could not foresee, and never contemplated, the SEC not registering the stock.  [UF 25, 26, 27]; *see In re Martin Paint Stores*, 199 B.R. at 266 (no evidence that parties contemplated the intervening event at the time of contract).  To the contrary, the deal was predicated upon the effective registration of the Innofone shares.  [UF 30, 34].  The statements of Innofone and Mr. Kofford, before and after the Transaction was executed, unambiguously demonstrated that effective registration was the keystone of the deal.  Lightman Decl. ¶¶ 7, 14, 23-30.

### 3. No Party Bore The Risk of the Failure of Registration.

It is apparent that neither party bore the risk of non-registration in the Transaction.  The Transaction Documents acknowledge that the shares must be registered and Innofone was required to file the necessary registration statements.  However, nothing else in the Transaction

documents allocates the risk of non-registration to either party.  The Transaction documents are simply silent on this point.[12]  [UF  27].  If anything, it was Cogent who represented to Innofone that it had done these deals before and that the SEC had approved this type of financing. Lightman Decl. ¶ 11.

Not only did Innofone not assume the risk of the impossibility, it did everything it possibly could to avoid this outcome.  *See Cont'l*, 2005 U.S. Dist. LEXIS 38120 at *9 ("So long as the contracting party is acting in good faith, it is discharged from duty when the performance could not be effected pursuant to [sic] law.") (internal citations omitted).  Impossibilities caused by governmental orders will excuse a party's performance only when the party owing performance "did not cause or fail to prevent" the order.  *Martin*, 199 B.R. at 266.  A party claiming impossibility because of a government action must challenge that action; it may not sit idly in the face of impossibility and later ask the Court to excuse its performance.  *MG Ref. & Mktg, Inc. v. Knight Enter., Inc.*, 25 F. Supp. 2d 175, 188 (1998)[13] ("parties who fail to challenge vigorously a governmental action or who still have some chance of controlling its outcome will be unable to cite the resulting order as grounds for a successful impossibility defense").

Innofone did not take the SEC's refusal to register lying down.  Even after the SEC expressed doubt regarding the Transaction, Innofone continued its attempts to register its shares. Cogent was intimately involved in those attempts to convince the SEC.  Lightman Decl. ¶¶ 30,

---

[12] Although Cogent, in Section 4.7 of the Securities Purchase Agreement, expressly acknowledges that the shares had to be registered, nowhere in the Transaction Documents does either party assume the risk of non-registration.  In Section 4.7, Cogent warrants it "understands that the Shares are 'restricted securities' and must be held indefinitely unless the sale or other transfer thereof is subsequently registered pursuant to any Applicable Laws or an exemption from such registration is available at that time…." A limited Rule 144 exemption would never have resulted in the sale of 50 million shares over the 30 months contemplated by the Transaction, thus demonstrating that none of the parties provided or planned that failure to achieve registration would fall on one party rather than the other.

[13] In *MG*, the court declined to rescind the contract because it concluded that the party invoking the impossibility defense could not show that it had not done everything to overcome the impossibility.  The facts of this case are different and hence would warrant the opposite conclusion.

43.  In total, Innofone amended its registration statement *three times* and submitted copious

correspondence defending its position.  [UF 33].  Even Cogent's January 18, 2007 letter to the

SEC in which it agreed the Transaction was a "primary offering" for which it was an underwriter

was unable to sway the SEC.  [UF 36, 37, 38].  Despite Innofone's good faith efforts to complete

registration, the SEC still refused to approve the Transaction as structured.  [UF 36, 37].  What

more could Innofone have possibly done?  Continued attempts would have been futile.

### D.    THIS COURT SHOULD DECLARE THE CONTRACT UNENFORCEABLE BECAUSE OF FAILURE OF CONSIDERATION.

Rescission "is permitted for failure of consideration. . . . failure to perform in every

aspect is not essential, but a failure which leaves the subject of the contract substantially different

from what was contracted for is sufficient." *Callanan v. Keeseville*, 199 N.Y. at 284.

Failure of consideration occurs where either the promisor fails to receive the benefit of

his bargain or where the promisee stands to lose nothing.  RICHARD A. LORD, 3 WILLISTON ON

CONTRACTS § 7:11 (4th ed. 2007).  A failure of consideration occurs "whenever one who has

promised to give some performance fails without his fault to receive in some material aspect the

agreed exchange for that performance."  *See id.*

Undisputed Facts 39 to 54 demonstrate the Transaction is unenforceable because

Innofone has "[gotten] nothing for what [it] bargained for."  N.Y. JUR. 2D CONTRACTS § 365;

[UF 39, 40, 41].  Undisputed Facts 40-45 outline the scope of the Transaction.  Bear in mind that

Innofone never received payment for the shares it "sold" to Cogent because those shares were

placed in escrow to be held there until the Equity Swap portion of the Transaction could be

implemented.  [UF 43]; Lightman Decl. ¶ 21.  Innofone bargained for a right which it cannot get

and cannot enjoy:  access to the bonds.  [UF 47, 48, 49, 50, 51, 52].  Worse yet, after not

receiving a penny from the deal, Innofone continues to be obligated to pay monthly interest on

the bonds.  [UF 53].  The irony is that Innofone has paid monies and given stock on a contract it entered into to solve its financing needs.  Moreover, not only has it failed to obtain financing from Cogent, but the Transaction has also deterred other investors from investing in Innofone securities.  Lightman Decl. ¶ 50.

The central cause for the failure of consideration was Cogent.  Cogent designed and structured the financing agreement; it implemented a plan by which, as the SEC observed, it stood little to lose.  [UF 39, 46, 50].  Though Cogent deposited the bonds into escrow, it never paid them to Innofone.  [UF 42, 43].  Cogent never parted with the bonds.  Innofone received nothing from the Cogent parties except the opportunity to file a registration statement which ultimately the SEC rejected four times.  Cogent, not Innofone, has access to the Treasury Bonds because presumably they remain under Cogent's control at Investor's Bank, the escrow agent.  However, it is Innofone, not Cogent, who must pay interest on the bonds.  [UF 53].  Cogent stands in the envious position of finding itself richer each day the underlying shares are not registered, but knowing that if the contract is unenforceable it will be in no worse position than when it entered the contract.  Consequently, this case warrants the Court's exercise of its equitable powers to return the parties to their respective positions prior to entering into the Transaction.

## V.    CONCLUSION

For the reasons set forth above, justice requires that the Transaction be rescinded in its entirety and restitution ordered so that all monies and other consideration given by Innofone be returned to it.

Dated: San Francisco, California
       June 4, 2007

Of Counsel:                                    JONES DAY

Gidon M. Caine (GC 9923)
JONES DAY                              By:    /s/
1755 Embarcadero Road                         _____
Palo Alto, California  94303                  Roderick A. McLeod (RM 4936)
Telephone:  (650) 739-3939
Facsimile:  (650) 739-3900                    JONES DAY
                                              555 California Avenue
Jessica L. Repa                               Suite 2600
Joanna Rosen                                  San Francisco, California  94104
JONES DAY                                     Telephone: (415) 626-3939
555 California Avenue                         Facsimile: (415) 875-5700
Suite 2600
San Francisco, California  94104              Attorneys for Plaintiff
Telephone: (415) 626-3939                     Innofone.com, Incorporated
Facsimile: (415) 875-5700

## CERTIFICATE OF SERVICE

I, Pamela Walter, declare:  I am employed in San Francisco County, State of California; I

am over the age of eighteen years and not a party to the within entitled action; my business

address is:  555 California Street, 26th Floor, San Francisco, California  94104-1500.  On June 4,

2007, I served true and correct copies of

(1) PLAINTIFF INNOFONE.COM, INCORPORATED'S NOTICE OF MOTION FOR
    SUMMARY JUDGMENT;

(2) MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF INNOFONE.COM,
    INCORPORATED'S MOTION FOR SUMMARY JUDGMENT;

(3) DECLARATION OF ALEX LIGHTMAN IN SUPPORT OF PLAINTIFF
    INNOFONE.COM INCORPORATED'S MOTION FOR SUMMARY [excluding
    exhibits which are being filed and served manually];

(4) DECLARATION OF ARTHUR S. MARCUS IN SUPPORT OF PLAINTIFF
    INNOFONE.COM, INCORPORATED'S MOTION FOR SUMMARY JUDGMENT
    JUDGMENT,

(5) PLAINTIFF'S STATEMENT OF MATERIAL UNDISPUTED FACTS IN
    SUPPORT OF PLAINTIFF INNOFONE.COM, INCORPORATED'S MOTION
    FOR SUMMARY JUDGMENT

**via ecf filing** on all counsel so registered, as well as by e-mail to jhaims@mofo.com and

pbagger@ccg-law.com per stipulation of the parties.

I declare that I am employed within the office of a member of the bar of this Court at

whose direction the service was made.

Dated: San Francisco, California
       June 4, 2007

SFI-565218v5

Pamela Walter