UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
Cogent Capital Financial LLC and Cogent Capital
Investments LLC,                                          :

                    Plaintiffs,           :   **ECF CASE**

               - against -              :   No. 07 Civ. 2701 (JSR)

Innofone.com, Incorporated,                         :

                    Defendant.           :
------------------------------------------------------------------ x

Innofone.com, Incorporated,                         :

                    Plaintiff,            :   **ECF CASE**

               - against -              :   No. 07 Civ. 3966 (JSR)

Cogent Capital Financial LLC, Cogent Capital     :   DECLARATION OF ALEX
Investments LLC, Cogent Capital Group LLC,           LIGHTMAN IN SUPPORT OF
Gregory L. Kofford, Mark W. Holden, and Investors  :   PLAINTIFF INNOFONE.COM,
Bank & Trust Company,                                INCORPORATED'S MOTION FOR
                                     :   SUMMARY JUDGMENT
                    Defendants.
------------------------------------------------------------------ x

      I, Alex Lightman, declare under penalty of perjury as follows:

      1.      I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify to them.

      2.      I am currently the Chief Executive Officer, President, and a director of Plaintiff Innofone.com, Incorporated. ("Innofone").

      3.      Innofone is the first public company to focus exclusively on Internet Protocol version 6 ("IPv6").

4.  Innofone is an early entrant in IPv6, and derives revenue from sponsorships, attendee fees, training, consulting, and mobile software for applications such as messaging and alerts.

5.  Part of Innofone's strategic business goal is to acquire businesses engaged in IPv6 technology development and products manufacturing to expand its IPv6 business. All investors know that the survival and growth of Innofone's business requires cash because the company must spend more than it takes in to create and acquire products in anticipation of the market for IPv6 that is just starting in the US and other countries.

### The Courting Begins

6.  In late April 2006, I met Gregory L. Kofford ("Kofford") and Mark W. Holden ("Holden") at the RedChip conference in New York. Kofford is co-founder and senior principal of Cogent Capital Group LLC ("Cogent Capital Group"), as well as a senior principal of Cogent Capital Financial LLC ("Cogent Capital Financial"), and Cogent Capital Investments LLC ("Cogent Capital Investments). Holden is co-founder and senior principal of Cogent Capital Group (collectively "Cogent").

7.  Very soon after the meeting in April, Kofford and Holden proposed making a significant investment in Innofone. On May 2, 2006, Kofford sent me an e-mail ("May 2, 2006 Kofford email") in which Kofford outlined a financing arrangement known as an equity swap. The email states, in part:

> [O]ur typical investment provides for a partial valuation of the equity swap and release of collateral as soon as 90 days from effectiveness of registration

> \*\*\*

> These indicative prices also assume that [Innofone] will be in a position to move from the bulletin board to Amex prior to or concurrent with the **effectiveness of the registration of the shares underlying our investment**.

> \*\*\*

> [T]he private placement amount would roughly match the
> Company's cash needs over the next two years or so…
> (May 2, 2006 Kofford e-mail) (emphasis added).

A true and correct copy of the May 2, 2006 email from Kofford is attached as Exhibit A to this Declaration.

8. On May 5, I executed and returned to Kofford and Holden a letter agreement by which Innofone and Cogent Capital Group agreed to move forward with a proposed investment of between $15 and $50 million. ("May 5 Letter Agreement"). Cogent Capital Group received $25,000 for due diligence fees and $3,000 in advance escrow fees to start the process. A true and correct copy of the May 5 Letter Agreement is attached as Exhibit B to this Declaration.

9. After that letter, the deal came together quickly. Kofford and Holden visited Innofone's offices in Santa Monica, California on May 11, 2006 to meet with key individuals as part of its due diligence process. By the end of May, the parties had completed the due diligence process and had reached agreement on the term of the financing that Cogent was offering.

10. Cogent's proposed financing arrangement was appealing to Innofone. Cogent's proposal appeared to be a win-win situation for all parties. The potential amount of the funding available from the Equity Swap met Innofone's capital needs for the next two years. The benefit of securing capital for that period of time meant that the Innofone executive team could focus on implementing its business strategy instead of devoting substantial efforts to fund raising.

11. Although Innofone had never entered into the kind of financing proposed by Cogent, Innofone felt comfortable with it because of the representations which Kofford and Holden had made during negotiations about their experience with such transactions. Among other things, they made clear they had entered into similar transactions with other technology companies and that the SEC had approved this type of financing before. They also were confident that the deal was structured in a way that would meet with SEC approval. Kofford and Holden both told me that it would be a short time until the shares underlying the transaction could be registered with and approved by the SEC. Very specifically, Kofford told me that one of

Cogent's deals with an identical structure had been approved by the SEC within a month, with no comments. Unfortunately, I learned after the transaction documents were signed that Kofford had lied, and it turned out the deal Kofford referred to was neither Cogent's deal, nor was it structurally similar enough to Innofone's Cogent deal to be relevant. Cogent told other people close to Innofone that Cogent had gotten this same deal structure approved by the SEC.

### Overview of the Financing Arrangement

12. Although complicated by virtue of the numerous transaction documents and the process required for Innofone to obtain the financing offered by Cogent, the concept of the deal can be simplified as follows.

13. Cogent was willing to provide Innofone with up to $50 million in Treasury bonds that, through the mechanism of an "equity swap" whereby Innofone stock was essentially exchanged for Cogent bonds (hereafter the "Transaction"), would lead to Innofone getting $50 million in cash, or more if Innofone's stock went up, less if it went down, but in any case, getting cash every month. The swap was to take place over a thirty month period with monthly "swaps". At a reference price of $1.33 a share, the current price on the day Innofone and Cogent struck the deal, Innofone was promised "$1 million a month for six months, $2 million a month for six months, $3 million a month for six months, $2 million a month for six months, and then $1 million a month for six months," according to Kofford. Importantly, if Innofone's stock was higher during a ten day period, then Innofone would get more cash for that month. For example, again according to Kofford, if Innofone's stock was $2.66 a share, then all the numbers just quoted would be doubled. The ability to get cash, and to get more cash if the stock was higher than the $1.33 reference price per share, was a major reason Innofone accepted the Cogent offer. With respect to the case that Innofone's stock would be lower than $1.33, Cogent represented that Innofone could simply use the funds to buy its own stock. Conceptually, at the end of the 30 month period the Innofone stock sold to Cogent would have been exchanged for up to $50 million of the Cogent bonds, plus or minus a percentage proportionate to the Innofone stock

price.  As security for performance, the parties respectively escrowed the Innofone stock and the Cogent bonds.

14.     The fundamental requirement of the transaction was that the Innofone shares which had been sold to Cogent and were an integral part of the "swap" had to be shares subject to an approved and effective registration statement.  This was the *sine qua non* of the entire deal.  The equity swap could not begin until an effective registration was in place, and Innofone was supposed to keep paying Cogent until the SEC allowed the registration statement to go effective.

### The Transaction Details and Documents

15.     The Transaction documents were all executed on June 2, 2006 at the Los Angeles offices of Morrison and Foerster, Cogent's attorneys.  The Transaction documents are more fully described below.  As described in the Transaction documents, Innofone, Cogent Capital Financial and Cogent Capital Investments entered into a financing arrangement which involved the purchase of shares and an Equity Swap transaction by which Cogent Capital Investment bought 1.85 million shares of Innofone common stock and 4.815 million shares of its Series A convertible preferred stock for $50 million in U.S. Treasury Bonds.  Each share of the Innofone Preferred Stock was convertible into ten (10) shares of Common Stock, subject to certain adjustments.  This was a private placement PIPE (private investment in public equity) with an equity swap derivative.

16.     Simultaneously, and as part of the overall transaction, Innofone entered into an Equity Swap with Cogent Capital Financial. Only through the Equity Swap was Innofone going to be able to access the $50 million in bonds that would fuel its growth over the next few years.

17.     The Equity Swap was expected to provide for periodic settlements and reductions over a 30 month period.  Settlements under the Equity Swap (i.e. the exchange of stock for bonds) could not commence until after a resale registration statement pursuant to Securities and Exchange Commission ("SEC") Rules and Regulations had become effective.

18.     The fee for the Equity Swap was called an "Initial Exchange Amount" ("IEA"). The amount of the fee was based on the calculated value of the Equity Swap. The following was the IEA paid by Innofone:

        a. $1,375,000 ($568,750 of which was due on closing with the remainder deferred with interest);

        b. 5 million shares of Innofone Common;

        c. a Warrant to purchase 5 million shares of Innofone Common.

*See* June 2, 2006 Equity Swap Transaction Confirmation, at p. 5, § 2, Counterparty Initial Exchange Amount. A true and correct copy of the June 2, 2006 Equity Swap Transaction Confirmation is attached as Exhibit G to this Declaration.

19.     Needless to say, the Cogent Parties were not obligated to pay any fees to Innofone to enter into the Transaction.

20.     The Transaction consists of ten Transaction Documents.[1] There are eight contract documents executed as part of the financing arrangement that are listed in the Securities Purchase Agreement §§ 1.2(a) –(g). The Equity Swap Transaction dated June 2, 2006[2] was superseded by two other Confirmations dated November 1, 2006 and entitled respectively November 1, 2006 Equity Swap Transaction Confirmation and November 1, 2006 Interest Rate Swap Transaction. These two additional contract documents also comprise the transaction documents. A true and correct copy of the ten Transaction Documents is attached as Exhibits C to L to this Declaration:

---

[1] Eight of the documents are described in the Securities Purchase Agreement: (1) the Securities Purchase Agreement; (2) the Escrow Agreement; (3) the Master Agreement; (4) the Schedule to the Master Agreement; (5) the June 2, 2006 Equity Swap Transaction Confirmation; (6) the Credit Support Annex; (7) the Registration Rights Agreement; and (8) the Warrant. Securities Purchase Agreement § 1.2. One of the documents listed as part of the "Transaction Documents," § 1.2(h), "the certificate of designations for the Preferred Stock," did not need to be executed by the parties since Innofone filed the certificate of designations for the Preferred Stock with the Nevada Secretary of State, with regard to the Series A convertible preferred stock. Innofone can withdraw the certificate of designations for the Preferred Stock once this Court orders rescission of the other transaction documents. Therefore the certificate of designations for the Preferred Stock document is not included in the list of transaction documents executed that require rescission.

[2] Securities Purchase Agreement § 1.2(d) refers to "the Equity Swap Confirmation, dated June 2, 2006" as one of the Transaction Documents ("June 2, 2006 Equity Swap Transaction Confirmation").

    a.  **Securities Purchase Agreement** - Exhibit C.

    b.  **Escrow Agreement** - Exhibit D.

    c.  **Master Agreement** - Exhibit E.

    d.  **Schedule to the Master Agreement** - Exhibit F.

    e.  **June 2, 2006 Equity Swap Transaction Confirmation** - Exhibit G.

    f.  **Credit Support Annex** - Exhibit H.

    g.  **Registration Rights Agreement** – Exhibit I.

    h.  **Warrant** - Exhibit J.

    i.  **November 1, 2006 Equity Swap Transaction Confirmation** - Exhibit K.

    j.  **November 1, 2006 Interest Rate Swap Transaction** - Exhibit L.

### Bonds and Shares Deposited In Escrow

21.    To secure the parties' performance, the parties placed into escrow with Investors Bank & Trust Company (the escrow agent) their respective consideration. Thus, Cogent Capital Investments placed its $50 million in U.S. Treasury bonds in escrow. *See* Escrow Agreement § 1(a), attached as Ex. D. Innofone never received nor was actually paid the bonds because those bonds were immediately placed in escrow to be held there as security for when the swap was triggered by the registration of the shares involved in the transaction.

22.    Innofone deposited with the escrow agent 1.85 million shares of Innofone common stock and 4.815 million shares of its Series A convertible preferred stock in the name of Cogent Capital Investments. *See* Escrow Agreement §§ 1(b)(i), 1(b)(ii), attached as Ex. D. Innofone also deposited in escrow 5 million shares of Innofone common stock and a warrant to purchase another 5 million shares of common stock in the name of Cogent Capital Financial. *See* Escrow Agreement § 1(b)(iii), attached as Ex. D. Innofone also deposited in escrow the IEA of $568,750 of the $1,375,000 total cash fee, as well as $181,250 in prepaid interest. *See* Escrow Agreement §§ 1(b)(iii), 1(b)(iv), attached as Ex. D.

## The Financing Arrangement Required Effective Registration

23.     Cogent's promise was that the SEC would allow the SB-2 registration statement to go effective and that after the shares had an effective registration statement, the shares would be exchanged for the bonds in monthly amounts based on the market price of Innofone shares. As was later set forth in Innofone's July 19, 2006 SB-2 Registration Statement, the following describes how the equity swap would occur:

> The Common Stock, Preferred Stock and Bonds are to be delivered pursuant to that certain escrow agreement between Innofone and Cogent. Partial settlements of the equity swap and related collateral releases (together the "Swap Settlements") commence 30 days subsequent to the effective date of this registration statement. Through the Swap Settlements, we may sell a fixed percentage of the Treasury Bonds against a fixed reference price for our common stock shares at any time thereafter, and use any cash proceeds from such sales for working capital purposes. (July 19, 2006 SB-2 Registration Statement, at p. 12)

A true and correct copy of the July 19, 2006 SB-2 Registration Statement is attached as Exhibit R to this Declaration.

24.     Effective registration is an essential element of the agreement. The Innofone shares to be exchanged, per the November 1, 2006 Equity Swap Transaction Confirmation, at p. 2, § 1 required that the shares be registered in accordance with Securities and Exchange Commission ("SEC") Rules and Regulations. November 1, 2006 Equity Swap Transaction Confirmation, § 1, attached as Exhibit K to this Declaration.

25.     Innofone, Cogent Capital Financial and Cogent Capital Investments entered into the agreement with the understanding that the Transaction required the shares sold to Cogent be covered by an effective registration statement. Both parties believed the transaction shares could be registered. Innofone had tried and failed to get a previous SB-2 approved with a previous investor, and pulling that registration statement was a prerequisite for the Cogent deal. Cogent said, in effect, "The SEC would not approve the SB-2 with the previous investor because of all the problems with those sort of structures, but will approve ours. If we weren't sure, we

wouldn't have gotten the backing to do twenty deals of this size each year." Directly and through their attorneys, Cogent led us to believe that they knew that this structure would be approved.

26. My understanding and Innofone's understanding was that the financing arrangement required an effective registration statement. This is reflected in my email dated June 1, 2006 which I sent to Kofford and Holden ("June 1, 2006 Lightman email") in which I stated: "[a]fter the closing our highest priorities will be to get the SB-2 registering your shares approved." A true and correct copy of the June 1, 2006 email from Lightman is attached as Exhibit M to this Declaration.

27. Cogent understood that the financing arrangement required an effective registration. In fact, in the May 2, 2006 email from Kofford, attached as Exhibit A, Kofford stated: "[t]hese indicative prices also assume that [Innofone] will be in a position to move from the bulletin board to Amex prior to or concurrent with the effectiveness of the registration of the shares underlying our investment." In an email dated June 13, 2006 that I received from Holden ("June 13, 2006 Holden email"), Holden wrote, "[t]he receipt of any additional funds via the equity swap, (and also access to the $50 mm in T-bonds from the private placement) takes place through a defined schedule over 30 months (as Gerard noted, beginning 30 days after a registration of the shares we purchased is effective) which schedule has been designed with timing intended to coordinate with INFN's cash requirements." (NOTE: INFN was Innofone's stock symbol at the time. It has since changed to IMEN). This Holden email confirmed the parties' mutual understanding regarding the requirement of effective registration of the shares. A true and correct copy of the June 13, 2006 Holden email is attached as Exhibit N to this Declaration.

28. Eliminating any doubt about the share registration being a condition of the Transaction is the admission in ¶21 of Cogent's New York Complaint: "[a]mong the conditions is a requirement that Innofone maintain an effective registration statement…." A true and

correct copy of the April 5, 2007 Cogent Complaint which was filed against Innofone in New York ("April 5, 2007 Cogent Complaint (SDNY)") is attached as Exhibit O to this Declaration.

**Innofone Repeatedly Sought Approval of the Registration Statement**

29.     Working closely with Kofford, Holden and their attorneys at Morrison and Foerster, we embarked on what turned into a long and tortuous road of trying to get approval from the SEC of the Registration Statement of the shares underlying the Transaction which spanned nine months and four filings with the SEC. Innofone has persistently sought approval by the SEC of the registration of the Innofone common stock that underlay the financing arrangement. Each of the four SB-2's filed by Innofone emphasized the requirement that the effective resale registration of the underlying shares was a condition of the Transaction.

30.     Cogent, as well as its attorneys, has been heavily involved in the process of seeking approval from the SEC of the resale registration statement. Innofone and Cogent exchanged multiple drafts of letters sent in response to SEC Comment Letters. In an email dated August 24, 2006, Cogent emphasized language regarding registration as a condition to the release of the bonds ("August 24, 2006 Kaufman email") and states "the principal condition to the release of the U.S. Treasury Bonds relates to the issuer's maintenance of an effective and current registration statement covering the resale from time to time by Cogent of the common stock **purchased by Cogent or** underlying the preferred stock **purchased by Cogent**." (emphasis in original). A true and correct copy of the August 24, 2006 Kaufman email is attached as Exhibit P to this Declaration. Furthermore, in an email dated August 25, 2006 ("August 25, 2006 Kaufman email"), Cogent suggested language regarding the condition of "effectiveness and maintenance of this registration statement" to be included in the SB-2 registration statement. A true and correct copy of August 25, 2006 Kaufman email is attached as Exhibit Q to this Declaration.

**The Four Registration Statements**

31.     On July 19, 2006 Innofone commenced registration of its SB-2 for the purpose of registering 48,150,000 shares of the common stock underlying the Transaction (the "July 19, 2006 SB-2 Registration Statement"). The July 19, 2006 SB-2 Registration Statement, attached as Exhibit R to this Declaration, stated under the Cogent Transaction Summary:

> Partial settlements of the equity swap and related collateral releases (together the "Swap Settlements") commence 30 days subsequent to the effective date of this registration statement. (July 19, 2006 SB-2 Registration Statement, at p. 12, Cogent Transaction Summary)

32.     After Innofone filed its original registration statement, the SEC responded on August 11, 2006 and showed its understanding of the financing arrangement. The SEC understood that release of the securities began with "the effectiveness of the resale registration statement." SEC Comments Dated August 11, 2006 Regarding Form SB-2 Filed on July 19, 2006 ¶ 2 ("August 11, 2006 SEC Letter"). A true and correct copy of the August 11, 2006 SEC Letter is attached as Exhibit S to this Declaration.

33.     The August 11, 2006 SEC Letter raised questions including: 1) whether the transaction was appropriately characterized given the "nature and size of the transaction being registered"; 2) whether there was a "valid PIPE transaction" given the conditions governing the release of the funds begins with the "effectiveness of the resale registration statement"; and 3) what was the consideration Innofone received in exchange and in connection with the equity swap. August 11, 2006 SEC Letter, ¶¶ 1, 2, 7, attached as Exhibit S to this Declaration.

34.     The SEC repeatedly asked Innofone in subsequent SEC Comment Letters to explain how the Cogent Capital Defendants bore any risk in the transaction. In response to comments received from the SEC continuing to question the validity of the Transaction, Innofone amended its SB-2 three times: on August 28, 2006, October 24, 2006 and December 8,

2006. Despite nine months of wordsmithing and explanations, no one at the SEC was persuaded that Cogent was at risk of loss in this Transaction.

35. On August 28, 2006, Innofone responded to the August 11, 2006 SEC Letter by filing its first amended SB-2 ("Aug. 28, 2006 First Amended SB-2"), which stated the following registration requirement under the Cogent Transaction Summary to further clarify the terms of the financing arrangement:

> Among these conditions is a **requirement that Innofone maintain an effective registration statement** with respect to specified portions of the Common Stock purchased by CCI and the Common Stock into which the Preferred Stock purchased by CCI is convertible. The portion of such Common Stock to be covered by the registration statement increases over a 30 month period to a maximum of 55,000,000 shares. This **registration statement is being provided by Innofone to satisfy, on an initial basis, this condition of the Equity Swap**. Continued satisfaction of this condition will depend on the **maintenance of this registration statement** and the provision at later dates of one or more additional registration statements.
> (Aug. 28, 2006 First Amended SB-2, Cogent Transaction Summary, at p. 11) (emphasis added)

A true and correct copy of the Aug. 28, 2006 First Amended SB-2 is attached as Exhibit T to this Declaration.

36. On September 14, 2006, the SEC responded to the First Amended SB-2 filed on August 28, 2006 ("September 14, 2006 SEC Letter") by raising the same concerns as in the August 11, 2006 SEC Letter about 1) the characterization of the transaction since "this offering may, in fact, constitute an indirect primary offering" ; 2) what condition "needs to occur in order for funds to be released"; 3) what are the risks given that Innofone appears to have "more exposure under the Equity Swap"; and 4) how was "consideration" evaluated for the Equity Swap since a "significant amount of consideration [was] issued" to Cogent Capital Financial. September 14, 2006 SEC Letter, ¶¶ 1, 2, 9, 11. The SEC questioned whether there was any consideration exchanged in the financing arrangement and noted:

> Please revise your disclosure to clearly explain [Innofone's obligations and CCF's] obligations … in connection with the Equity Swap [regarding consideration exchanged]
> (September 14, 2006 SEC Letter, at p. 3, ¶9)

A true and correct copy of the September 14, 2006 SEC Letter is attached as Exhibit U to this Declaration.

37. On September 27, 2006, Innofone responded to the September 14, 2006 SEC Letter ("September 27, 2006 Innofone Response Letter to SEC") by confirming that "[t]he release of the Bonds is not subject to Cogent's discretion and **is not subject to any substantive condition other than the continued effectiveness of the resale registration statement**." September 27, 2006 Innofone Response Letter to SEC, Response 2 (emphasis added). Furthermore, Innofone noted to the SEC that it revised its disclosure to address the SEC's concerns about risk and consideration. September 27, 2006 Innofone Response Letter to SEC, Response 7, 11. A true and correct copy of the September 27, 2006 Innofone Response Letter to SEC is attached as Exhibit V to this Declaration.

38. On October 24, 2006, Innofone filed the second amended SB-2 ("October 24, 2006 Second Amended SB-2") in response to the September 14, 2006 SEC Letter. Furthermore, on October 24, 2006, Innofone responded to September 14, 2006 SEC Letter ("October 24, 2006 Innofone Response Letter to SEC") and confirmed the effective resale registration requirement. Innofone stated:

> [S]ettlements under the Equity Swap do not commence until after the **resale registration statement becomes effective**. [Response 1].
>
> ***
>
> Cogent has agreed to … release the appropriate portion of the Bonds upon receipt of specified correspondence from us and our counsel **confirming the then effective status of the registration statement**...[and] the release of the Bonds is not subject to Cogent's discretion and is not subject to any substantive condition other than the continued **effectiveness of the resale registration statement**. [Response 2].

*** 

> The total number of shares of common stock to be registered for Cogent under the Registration Statement is 48, 150, 000. The Company and Cogent **agreed to register** at this time 41,300,000 shares of common stock underlying the Company's Series A Preferred Stock and a total of 6,850,000 shares of common stock [Response 5].
> (October 24, 2006 Innofone Response Letter to SEC, at pp. 1-3) (emphasis added).

A true and correct copy of the October 24, 2006 Innofone Response Letter to SEC is attached as Exhibit W to this Declaration. A true and correct copy of the October 24, 2006 Second Amended SB-2 is attached as Exhibit EE to this Declaration.

39. On November 7, 2006, in response to our October 24, 2006 Second Amended SB-2, the SEC raised the same concerns as expressed in prior SEC Letters. In SEC Comments Dated November 7, 2006 Regarding Amendment No. 2 to Form SB-2 Filed on October 24, 2006 ("November 7, 2006 SEC Letter"), the SEC staff questioned the risks and consequences of:

> (1) not being able to obtain an **initial effective registration statement** covering at least 10.0 million shares, (2) **not being able to obtain an effective registration statement** over the 30-month amortization period covering the entire 55.0 million shares and (3) **not being able to maintain the effectiveness of such registration statements.**
> (November 7, 2006 SEC Letter, ¶ 7) (emphasis added)

The SEC also noted:

> [The] Trigger Date [of the Equity Swap] will not occur until [Innofone is] **able to obtain an effective registration statement** covering the resale of at least 10.0 million shares previously issued to Cogent in the form of common stock and convertible preferred stock …[and] the release of bonds … is subject to the condition that you obtain an effective resale registration statement…
> (November 7, 2006 SEC Letter, ¶ 7) (emphasis added)

A true and correct copy of November 7, 2006 SEC Letter is attached as Exhibit X to this Declaration.

40. On December 8, 2006, Innofone filed its third amended SB-2 (the "December 8, 2006 Third Amended SB-2") in response to the November 7, 2006 SEC Letter. A true and correct copy of the December 8, 2006 Third Amended SB-2 is attached as Exhibit FF to this Declaration. Furthermore, on December 8, 2006, Innofone responded to the November 7, 2006 SEC Letter ("December 8, 2006 Innofone Response Letter to SEC") and noted the revisions made in response to SEC concerns about risks and consequences. Innofone thus added a "risk factor" in its disclosure. December 8, 2006 Innofone Response Letter to SEC, at p. 4, Response 7. A true and correct copy of the December 8, 2006 Innofone Response Letter to SEC is attached as Exhibit Y to this Declaration.

41. Finally, on December 28, the SEC disagreed with the conclusion that the private placement was complete and made clear that Innofone could not register the resale of the shares of common stock issued to Cogent. The SEC again questioned the economic basis for the transaction, and asked Innofone to confirm, yet again, that the documents evidenced a legally valid and enforceable contract between Innofone and the Cogent Capital Defendants. This was the fourth letter from the SEC questioning the validity of the transaction. In the SEC Comments Dated December 28, 2006 Regarding Amendment No. 3 to Form SB-2 Filed on December 8, 2006 ("December 28, 2006 SEC Letter"), the SEC Staff required Innofone to revise its registration statement and advised:

> Therefore, we do not agree with your conclusion that the private placement is complete in light of the fact that the total consideration you will receive for the private placement will not be determined until the equity swap has been completed. As a result **you may not register the resale of the shares of common stock** issued in the private placement to Cogent until that private placement has been completed. Please revise your registration statement accordingly.
> (December 28, 2006 SEC Letter, at p. 1, ¶ 1) (emphasis added).

A true and correct copy of the December 28, 2006 SEC Letter is attached as Exhibit Z to this Declaration.

- 15 -

42.     In a move of desperation, Cogent (through its attorneys at Morrison and Foerster) wrote directly to the SEC on January 18, 2007 ("January 18, 2007 Cogent Response Letter to SEC") to respond to the SEC's position that in light of the size of the transaction and its terms, the sale of shares to Cogent was a primary offering and not a secondary one, and thus Cogent Capital Financial had to be considered an underwriter of the securities. A true and correct copy of the January 18, 2007 Cogent Response Letter to SEC is attached as Exhibit AA to this Declaration. Cogent thus agreed: 1) that the financing arrangement was a "primary offering" and 2) that Cogent could be named as a "statutory underwriter" in Innofone's registration statement. Even after Cogent acquiesced to the SEC on these two issues, the SEC still refused to approve registration of the shares. Cogent further pleaded with the SEC that the deal not be unwound:

> We ask that the [SEC] permit the Company to proceed with the filing of an amendment to the Registration Statement recharacterizing the transaction as a primary offering and not require an **unwind of the transaction**. We believe that given the considerable length of time that has elapsed since the execution of the transaction, there is no public policy interest to be served in requiring the transaction to be unwound. (January 18, 2007 Cogent Response Letter to SEC, at p. 6) (emphasis added).

43.     Cogent's own attorneys understood the position of the SEC that Innofone could not register the shares. In the January 18, 2007 Cogent Response Letter to SEC, attached as Ex. AA to this Declaration, attorneys for Cogent Capital Investments and Cogent Capital Financial stated:

> [I]t is the Staff's view that the private placement of securities to Cogent is not complete and as such the Company **cannot register the resale of the shares of common stock issued in the private placement by Cogent** until the private placement has been completed.
> (January 18, 2007 Cogent Response Letter to SEC, at p. 1) (emphasis added).

**After Nine Months of Trying, The SEC Refuses to Allow Registration**

44.     The SEC has made clear that it will not approve an offering structured in the manner devised by Cogent.  The SEC refused to approve the registration each of the four separate occasions Innofone sought approval of the financing arrangement, repeatedly questioning the legality, validity, enforceability, and consideration exchanged in the financing arrangement.  The SEC had taken the position that the private placement had not been completed because it questioned whether, among other things, Cogent had really parted with its bonds and was at risk in the Transaction.  In a letter dated January 24, 2007 ("January 24, 2007 SEC Letter") the SEC bore in on Innofone, and asked if the shares issued to Cogent "are legally outstanding . . . ."  A true and correct copy of the January 24, 2007 SEC Letter is attached as Exhibit DD to this Declaration.  Furthermore, the SEC asked Innofone to confirm that the $50 million in treasury bonds "have been transferred to you" and to "confirm that the equity swap transaction is currently a legally valid and enforceable contract between Cogent and Innofone." Id. at ¶¶ 2-3.

45.     In addition to the comment letters in response to the four SB-2 filings where the SEC refused to approve the registration statement, the SEC made it clear to me that they would never approve the financing arrangement. On March 9, 2007, the SEC sent a letter to me ("March 9, 2007 SEC Letter") that made clear it will *never* approve the Innofone shares.  In the letter, the SEC questioned the enforceability and validity of the financing arrangement and asked whether "the legal nature of the equity swap is dependent on the consummation of the transfer of common and preferred shares to Cogent and the Treasury Bonds to Innofone." March 9, 2007 SEC Letter, at p. 3, ¶ 7(a).  A true and correct copy of the March 9, 2007 SEC Letter is attached as Exhibit BB to this Declaration.  Furthermore, the SEC sought confirmation in the letter that the "$50.0 million of Treasury Bonds have been legally transferred to [Innofone]." March 9, 2007 SEC Letter, at p. 3, ¶ 6.  As a final blow, the SEC stated: "[s]hould you **choose not to continue with such registration statement**, the following financial statement comments must

still be addressed." March 9, 2007 SEC Letter, at p. 1 (emphasis added).  This was a signal to me that the SEC would never approve the registration statement.

### The Harm to Innofone

46.     When it became clear that the SEC would never approve the resale registration of the shares underlying the Transaction, Innofone asked the Cogent parties to rescind the transaction.  That request, presented a number of times prior to filing the present lawsuit, fell on deaf ears, even though Innofone has all of the detriment in the transaction and none of the benefit.

47.     After the SEC's most recent rejection on March 9, 2007 of Innofone's proposed SB-2 registration and having failed to convince the Cogent parties to agree to rescind the Transaction, Innofone sought rescission without delay.  *See* Innofone Complaint, ¶ 48.  A true and correct copy of the Innofone Complaint containing Innofone's notice of rescission is attached as Exhibit CC to this Declaration.

48.     The parties at a minimum were mistaken that the SEC would approve registration of the shares.  Innofone mistakenly believed that the shares could be registered based on the representation of the Cogent parties.  The Cogent parties also assumed the shares could be registered as reflected in their many statements to that effect as set forth above.  However, the SEC will never approve the registration of the Innofone shares required by the financing arrangement.  Thus, the resale registration statement will never be effective.

49.     Innofone is unable to access the U.S. Treasury Bonds because the SEC refuses to approve the registration of the Innofone common stock that was issued pursuant to the agreements. Cogent's financing arrangement entered into for mutual benefit has failed to provide Innofone with any benefit whatsoever.

50.     The financing arrangement is creating great havoc and injury to Innofone.  Innofone is required to pay monthly interest on bonds it can never access.  Innofone owes interest on the $50 million of bonds in escrow for as long as there remain bonds which have not

been exchanged for Innofone shares. Innofone must pay upwards of $60,000 to $80,000 a month in interest. In fact, Cogent continues to send Innofone monthly dunning statements about the interest owed. Because the SEC refused to approve the registration of the Innofone common stock issued pursuant to the Transaction, Innofone is unable to access the bonds. As part of the initial exchange amount, Innofone deposited $568,750 in cash as well as $181,250 in prepaid interest as part of a payment of a $1.375 million cash fee. The balance of the payment of $831,250 has been deferred. Furthermore, Innofone also paid $25,000 in due diligence fees and $3,000 in escrow fees. To date, Innofone has paid over $1.1 million in fees and interest payments in this Transaction. It has issued millions of shares of common and preferred stock. Moreover, Innofone has had to delay its plans for growth. Innofone is unable to get other investors to invest because of the roadblock presented by the Cogent deal. Innofone has all of the detriment and none of the benefit from the financing arrangement. -

51. This deal with Cogent is dead. Innofone requests that all of the consideration it gave to Cogent (i.e. the fees, interest payments and shares as referenced in paragraph 51 above) be returned to it.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct of my personal knowledge.

Executed this 31 day of May, 2007 at Santa Monica, California.

_____
ALEX LIGHTMAN

SFI-564768v1

## **Notice Regarding Exhibits**

With the permission of the Court, Exhibits to this Declaration are being manually filed due to size.