# INNOFONE COM INC (INFN)

1431 OCEAN AVE #1100
SANTA MONICA, CA 90401
310–458–3233

# 10QSB

**Filed on 04/26/2006 – Period: 03/31/2006**
File Number 000–31949



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

FORM 10–QSB
——————————

SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

(Mark One)
☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2006

OR
☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period

from ————————— to —————————————

Commission File Number 0–31949

INNOFONE.COM, INCORPORATED
——————————————
(Exact name of registrant as specified in its charter)

| Nevada | 98–0202313 |
|---|---|
| ——————————————————————— | ——————————— |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1431 Ocean Avenue, Suite 1100, Santa Monica, CA | 90401 |
| ————————————————————————————————— | ——————————— |
| (Address of principal executive office) | (Zip Code) |

(310) 458–3233
————————————
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No   ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Securities Exchange Act of 1934) Yes   ☐ No   ☒

The number of shares outstanding of each of Issuer's classes of common equity as of April 19, 2006

| Common Stock at Par Value $0.001 | 61,780,084 |
|---|---|
| ——————————————————————————— | ———————————————————— |
| Title of Class | Number of Shares |

Transitional Small Business Disclosure format (check one): Yes   ☐ No   ☒

INNOFONE.COM, INCORPORATED
TABLE OF CONTENTS

Part I

Item 1   Financial Statements

  Consolidated Balance Sheet                                    3

  Consolidated Statements of Operations                         4

  Consolidated Statement of Stockholders' Equity                5

  Consolidated Statements of Cash Flows                         6

  Notes to Consolidated Financial Statements                    7

Item 2   Management's Discussion and Analysis                  16

Part II

Items 1–6.  Other Information                                  23

  Signatures                                                   24

INNOFONE.COM, INCORPORATED
CONSOLIDATED BALANCE SHEET
(UNAUDITED)

March 31, 2006

## ASSETS

| | | |
|---|---|---:|
| **Current assets** | | |
| Cash | $ | 707,277 |
| Accounts receivable | | 87,500 |
| Prepaid expenses and other assets | | 78,927 |
| Total current assets | | 873,704 |
| | | |
| Fixed assets, net | | 1,525 |
| Deposit for purchase of Digital Presence, Inc. | | 50,000 |
| Other assets | | 25,000 |
| | | |
| **Total assets** | $ | 950,229 |

## LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---:|
| **Current liabilities** | | |
| Accounts payable and accrued liabilities | | 194,849 |
| Deferred revenues | | 36,117 |
| Due to related parties | | 500,000 |
| Total current liabilities | | 730,966 |
| | | |
| **Long–term liabilities** | | |
| Derivative liability | | 7,838,497 |
| Warrant liability | | 227,408 |
| Convertible debenture, net of unaccreted principal of $2,247,944 | | 1,491,782 |
| Total long–term liabilities | | 9,557,687 |
| | | |
| **Total liabilities** | | 10,288,653 |
| | | |
| **Stockholders' equity** | | |
| Common stock; $0.001 par value; 950,000,000 shares authorized, 61,780,084 issued and outstanding | | 61,780 |
| Additional paid–in capital | | 235,896 |
| Accumulated deficit | | (9,636,100) |
| Total stockholders' equity | | (9,338,424) |
| | | |
| **Total liabilities and stockholders' equity** | $ | 950,229 |

See accompanying notes to consolidated financial statements.

3

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENTS OF OPERATIONS
(UNAUDITED)

| | For the three months ended March 31, 2006 | For the three months ended March 31, 2005 | For the nine months ended March 31, 2006 | For the nine months ended March 31, 2005 |
|---|---|---|---|---|
| Revenues | $ 63,003 | $ 127,926 | $ 467,693 | $ 364,727 |
| Cost of revenues | 8,634 | 32,171 | 85,592 | 57,500 |
| Gross profit | 54,369 | 95,755 | 382,101 | 307,227 |
| Operating expenses | | | | |
| Depreciation and amortization | 2,200 | 735 | 6,600 | 2,205 |
| Selling, general and administrative | 945,648 | 93,131 | 2,470,164 | 303,178 |
| Total operating expenses | 947,848 | 93,866 | 2,476,764 | 305,383 |
| Income (loss) from operations | (893,479) | 1,889 | (2,094,663) | 1,844 |
| Other income (expense) | | | | |
| Interest income | 8,092 | — | 19,940 | 1 |
| Unrealized gain (loss) on adjustment of derivative and warrant liability to fair value of underlying securities | (4,245,479) | — | (5,065,905) | — |
| Interest expense | (1,655,883) | — | (1,626,422) | — |
| Other expense | (10,414) | (104) | (21,542) | (5,812) |
| Total other income (expense) | (5,903,684) | (104) | (6,693,929) | (5,811) |
| Net income (loss) before provision for income taxes | (6,797,163) | 1,785 | (8,788,592) | (3,967) |
| Provision for income taxes | — | — | — | — |
| Net income (loss) | $ (6,797,163) | $ 1,785 | $ (8,788,592) | $ (3,967) |
| Net income (loss) per common share – basic and diluted | $ (0.11) | $ 0.00 | $ (0.16) | $ (0.00) |
| Weighted average common shares outstanding – basic and diluted | 60,848,622 | 33,333,333 | 56,193,242 | 33,333,333 |

See accompanying notes to consolidated financial statements.

4

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY
(UNAUDITED)

| | Common Stock | | Additional | Accumulated | Total Stockholders' |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Paid–in Capital | Deficit | Equity |
| Balance, June 30, 2005 | 33,333,000 | $ 33,333 | $ (31,333) | $ 19,607 | $ 21,607 |
| Issuance of stock related to reverse–merger with Innofone.com, Inc. | 28,005,270 | 28,005 | –– | –– | 28,005 |
| Distribution related to reverse–merger | –– | –– | (132,885) | (867,115) | (1,000,000) |
| Issuance of stock for services | 441,814 | 442 | 298,346 | –– | 298,784 |
| Issuance of warrants for services | –– | –– | 101,768 | –– | 101,768 |
| Net income (loss) | –– | –– | –– | (8,788,592) | (8,788,592) |
| Balance, March 31, 2006 | 61,780,084 | $ 61,780 | $ 235,896 | $ (9,636,100) | $ (9,338,424) |

See accompanying notes to consolidated financial statements.

5

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

| | For the nine months ended March 31, 2006 | For the nine months ended March 31, 2005 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net income (loss) | $ (8,788,592) | $ (3,967) |
| Adjustments to reconcile net income (loss) to net cash used by operating activities: | | |
| Depreciation and amortization | 6,600 | 2,205 |
| Accretion of principal related to convertible debenture | 1,491,782 | --- |
| Unrealized gain on adjustment of derivative and warrant liabilities to fair value of underlying securities | 5,065,905 | --- |
| Stock based expenses | 428,561 | --- |
| Changes in operating assets and liabilities: | | |
| Change in accounts receivable | (40,520) | 89,250 |
| Change in prepaid expenses | (66,198) | (1,050) |
| Changes in other assets | (25,000) | --- |
| Change in accounts payable and accrued liabilities | 134,067 | (65,253) |
| Change in deferred revenues | 36,117 | --- |
| Change in due to related parties | (500,000) | (16,234) |
| Net cash provided (used) by operating activities | (2,257,278) | 4,951 |
| | | |
| Cash flows from investing activities: | | |
| Purchase of fixed assets | (3,285) | (2,559) |
| Deposit for purchase of Digital Presence, Inc. | (50,000) | --- |
| Net cash used by investing activities | (53,285) | (2,559) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from convertible debenture borrowing | 3,000,000 | --- |
| Net cash provided by financing activities | 3,000,000 | --- |
| | | |
| Net change in cash | 689,437 | 2,392 |
| | | |
| Cash, beginning of period | 17,840 | 59,750 |
| | | |
| Cash, end of period | $ 707,277 | $ 62,142 |
| | | |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ --- | $ --- |
| | | |
| Schedule of non-cash financing and investing activities: | | |
| Issuance of $1,000,000 note payable to Alex Lightman related to reverse–merger and accounted for as a distribution | $ 1,000,000 | $ --- |
| Debt discount related to beneficial conversion feature of convertible debt | $ 1,893,526 | $ --- |
| Finance cost related to warrants issued associated with convertible debt | $ 664,125 | $ --- |

See accompanying notes to consolidated financial statements

6

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

1. __DESCRIPTION OF BUSINESS, HISTORY AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES__

Description of business – Innofone.com, Inc. (the "Company") incorporated on December 19, 1995. On August 19, 2005, the Company consummated an Stock Purchase Agreement (the "Agreement") with Alexander Lightman to acquire 100% of the outstanding capital stock of IPv6 Summit, Inc. ("IPv6"). The fundamental terms of the purchase agreement provide for the Company to deliver a promissory note in the sum of $1,000,000 as partial consideration of the purchase price and to issue 33,333,000 shares of restricted common stock of the Company to satisfy the balance of the purchase price in full (the "IPv6 Transaction"). As a result, IPv6 has become a wholly owned subsidiary of the Company. Prior to the IPv6 Transaction, the Company was non–operating public company with no operations or assets; 28,005,270 shares of common stock issued and outstanding; and IPv6 was a privately held operating company. The IPv6 Transaction is considered to be a capital transaction in substance, rather than a business combination. Inasmuch, the IPv6 Transaction is equivalent to the issuance of shares by a private company (IPv6) for the non–monetary assets of a non–operational public company, accompanied by a recapitalization. The accounting for IPv6 Transaction is similar to that resulting from a reverse acquisition, except goodwill is not recorded. Accordingly, the historical financial information of the accompany financial statements are that of IPv6 which the 33,333,000 shares issued by the Company are considered the historical outstanding shares of IPv6 for accounting purposes. The partial consideration of $1,000,000 promissory note has been accounted for as a distribution as if IPv6 had returned capital to its previous sole shareholder in the form of a distribution. The Company's operating activities are conducted through its wholly owned subsidiary, IPv6 Summit, Inc.

` IPv6 Summit, Inc., a Nevada corporation located in Santa Monica, California was incorporated on July 9, 2003. The Company is among the leading organizers of IPv6 conference events in the world. IPv6 stands for Internet Protocol version 6 and is the successor protocol to the current Internet, Internet Protocol version 4, which was introduced in June 1973 and turned 32 years old this summer. IPv4 is a 32–bit protocol, while IPv6 is a 128–bit protocol allowing for 3.4 x 10 to the 38th power new IP addresses, and thus allowing for a vast increase in connecting people, places, and things to the Internet.

The Company derives revenue from Sponsorships, Conference Attendee Fees, Training Fees, and Consulting to Governments. New sources of revenue during the 2006–2007 will be derived from Consulting to Corporations, software and related product sales Revenue, training Revenue and Information technology management and services Revenue.

Year end – The Company's year end is June 30.

7

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

<u>Use of estimates</u> – The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

<u>Revenue and expense recognition</u> – The Company recognizes revenue from services provided once all of the following criteria for revenue recognition have been met: 1) pervasive evidence of an agreement exists, 2) the services have been delivered, 3) the price is fixed and determinable and not subject to refund or adjustment and 4) collection of the amounts due is reasonably. Overhead and administrative costs are recognized when incurred and direct event costs and expenses are recognized during the period in which the event they are associated with occurs.

<u>Fixed assets</u> – Fixed assets are stated at cost less accumulated depreciation. Depreciation is provided principally on the straight–line method over the estimated useful lives of the assets, which are generally 3 years. The cost of repairs and maintenance is charged to expense as incurred. Expenditures for property betterments and renewals are capitalized. Upon sale or other disposition of a depreciable asset, cost and accumulated depreciation are removed from the accounts and any gain or loss is reflected in other income (expense).

The Company periodically evaluates whether events and circumstances have occurred that may warrant revision of the estimated useful life of fixed assets or whether the remaining balance of fixed assets should be evaluated for possible impairment. The Company uses an estimate of the related undiscounted cash flows over the remaining life of the fixed assets in measuring their recoverability.

<u>Goodwill and intangible assets</u> – In July 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141, "Business Combinations" and No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires all business combinations initiated after June 30, 2001 to be accounted for using the purchase method. Under SFAS No. 142, goodwill and intangible assets with indefinite lives are no longer amortized but are reviewed annually (or more frequently if impairment indicators arise) for impairment.

According to this statement, goodwill and intangible assets with indefinite lives are no longer subject to amortization, but rather an annual assessment of impairment by applying a fair–value based test. Fair value for goodwill is based on discounted cash flows, market multiples and/or appraised values as appropriate. Under SFAS No. 142, the carrying value of assets are calculated at the lowest level for which there are identifiable cash flows.

The Company has no Goodwill or Intangible Assets and thus the Company did not record any amortization expense related to goodwill or intangibles as of March 31, 2006.

8

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

SFAS 142 requires the Company to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than its carrying value.

Recent Accounting Pronouncements

In December 2004, the Financial Accounting Standards Board issued SFAS 123 (R), "Share–Based Payment." This Statement is a revision to SFAS 123, "Accounting for Stock–Based Compensation", and supersedes APB Opinion No. 25, "Accounting for Stock Issued to Employees." SFAS 123(R) requires the measurement of the cost of employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award. No compensation cost is recognized for equity instruments for which employees do not render service. We have adopted SFAS 123(R) effective on July 1, 2005, requiring compensation cost to be recognized as expense for the portion of outstanding unvested awards, and any new awards made thereafter, based on the grant–date fair value of those awards.

In May 2003, the FASB issued SFAS No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" ("SFAS 150"). This statement requires that certain financial instruments that, under previous guidance, issuers could account for as equity, be classified as liabilities in statements of financial position. Most of the guidance in SFAS 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Company's adoption of SFAS 150 did not have a material effect on the results of operations or financial position.

Income taxes – The Company accounts for its income taxes in accordance with Statement of Financial Accounting Standards No. 109, which requires recognition of deferred tax assets and liabilities for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and tax credit carry–forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in operations in the period that includes the enactment date.

Advertising costs – The Company recognizes advertising expenses in accordance with Statement of Position 93–7 "Reporting on Advertising Costs." Accordingly, the Company expenses the costs of producing advertisements at the time production occurs, and expenses the costs of communicating advertisements in the period in which the advertising space or airtime is used. The Company has recorded approximately $148,000 and $63,000 of advertising costs for the nine months ended March 31, 2006 and 2005, respectively.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

<u>Research and development costs</u> – Research and development costs are charged to expense as incurred.

<u>Earnings (loss) per share</u>

The Company reports earnings (loss) per share in accordance with SFAS No. 128, "Earnings per Share." Basic earnings (loss) per share is computed by dividing income (loss) available to common shareholders by the weighted average number of common shares available. Diluted earnings (loss) per share is computed similar to basic earnings (loss) per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares were dilutive. Diluted earnings (loss) per share has not been presented since the effect of the assumed exercise of options and warrants to purchase common shares would have an anti–dilutive effect.

2.  <u>FIXED ASSETS</u>

Fixed assets consist of the following as of March 31, 2006:

| | | |
|---|---|---:|
| Equipment | $ | 12,290 |
| Less: accumulated depreciation | | 10,765 |
| Fixed assets, net | $ | 1,525 |

3.  <u>DUE TO RELATED PARTIES</u>

Due to related parties as of March 31, 2006 are comprised of the following:

| | | |
|---|---|---:|
| Note payable to Alex Lightman related to Stock Purchase Agreement (see Note 1 for detailed discussion), interest rate at 4%, payable in monthly installment payments of $83,333 (principal only) for each successive month starting on the date of execution of the note contingent upon certain conditions having been met, and ending October 17, 2006 which any unpaid principal and interest would be due at that date | $ | 500,000 |
| | $ | 500,000 |

10

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

4.    CONVERTIBLE DEBENTURE

On August 31, 2005, the Company entered into a Securities Purchase Agreement, dated as of August 31, 2005 ("Agreement"), by and among the Company, AJW Partners, LLC ("Partners"), AJW Offshore, Ltd. ("Offshore"), AJW Qualified Partners ("Qualified") and New Millenium Capital Partners, II, LLC ("Millenium"). Partners, Offshore, Qualified and Millenium are collectively referred to as the "Purchasers". The Agreement provides for the sale by the Company to the Purchasers of Secured Convertible Term Notes (the "Notes") issued by the Company in the aggregate principal amount of $4,500,000 ("Principal Amount"). The Principal Amount is to be funded by the Purchasers in three tranches $1,500,000 on September 1, 2005, $1.5 million upon filing the Registration Statement and $1.5 million upon effectiveness of the Registration Statement. The offering of Notes under the Agreement was made pursuant to Section 4(2) of the Securities Act of 1933, as amended. The Notes matures August 31, 2008, bear interest at 8% per annum, unless the common stock of the Company is greater than $3.50 per share for each trading day of a month, in which event no interest is payable during such month, and principal and interest due at maturity . The Notes are convertible into common stock of the Company at the lesser of $3.50 or a 30% discount to the average of the three lowest trading prices of the common stock during the 20 trading day period prior to conversion. In connection with the subject offering, the Company issued an aggregate of 1,000,000 warrants (333,333 upon each tranche of financing) to purchase common stock at a price of $5.00 per share. The warrants are exercisable for a period of five years. The Company has the right to redeem the Notes under certain circumstances and the right to prevent conversions in any month where the stock price is less than $3.50 per share. The conversion of the Notes are subject to an effective Registration Statement to be filed by the Company. In the event the Company is unable to have the Registration Statement declared effective within the timeframe of the Agreement, we may be required to pay to the Note Holders an amount equal to the then outstanding principal amount of the Notes multiplied by two hundredths (.02) times the sum of: (a) the number of months (prorated for partial months) after the filing date or the end of the one hundred and eighty day period and prior to the date the Registration Statement is declared effective, (b) the number of months (prorated for partial months) that sales of all of the shares registered cannot be made after the Registration Statements is declared effective and (c) the number of months (prorated for partial months) that the common stock is not listed or included for quotation or the OTCBB, NASDAQ Small Cap, NYSE or AMEX or that trading has been halted after the Registration has been declared effective. If thereafter, sales could not be made pursuant to the Registration Statement, for an additional period of one month, the Company shall pay an additional $5,000 for each $250,000 of outstanding principal under the Notes. Further, any amounts owing to the investors shall be paid in cash or, at the Company's option, shares of common stock priced at the lesser of $3.50 per share or 30% discount to the market price.

11

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

The Company has determined the convertible debenture represents an embedded derivative due to the indeterminate number of shares that may be issued as part of the conversion feature of the host debt which would be required to be bifurcated from the underlying debt as derivative liability in accordance SFAS No. 133. Additionally, the warrants related to the convertible debenture are considered tainted due to the indeterminate number of shares associated with the conversion feature of the host debt which would be accounted for as a derivative instrument ("warrant liability"). As a result, the entire principal balance of the convertible debenture has been allocated to derivative and warrant liability when initially recording this transaction. Both embedded derivative and warrant liability will be adjusted to the fair value of the underlying securities at end of each period. The recorded fair values of both the derivative and warrant liability can fluctuate significantly based upon the fluctuations in the market value of the underlying securities, as well as the volatility of the stock price during the term used for observation and the term remaining for the warrants. The adjustment to fair value for both the derivative and warrant liability will result in either a unrealized gain or loss and recorded in the income statement as a component of Other Income (Expense).

The estimated fair value of the warrant liability has been determined using Black–Scholes option pricing model using the following assumptions: exercise price of $5.00, historical stock price volatility, risk free interest rate of 3.5%; dividend yield of 0% and 1.5 year term. The estimated fair value of the derivative liability was determined by taking the total amount advanced from the host debt and determined the potential number of shares to be converted based upon the terms of the debt agreement and arriving at an intrinsic value based upon the closing price of the underlying securities which was then allocated on a pro rate basis along with the estimated fair value of the warrant liability. The Company will accrete principal over the term of the convertible debenture since the entire principal balance of the convertible debenture has been allocated between the derivative and warrant liability. As of March 31, 2006, the Company has accreted principal of $1,491,781 with unaccreted principal of $1,508,219. In connection with the loan, Alex Lightman the Company's President pledged 3,000,000 shares of his common stock as additional security. Additionally, the Company has agreed to pay a finder's fee to an unrelated third party related to this convertible debenture at a rate of 8% of the gross proceeds plus warrant for common stock totaling 34,286 shares. As of March 31, 2006, the Company had paid a total of $240,000 in cash and $102,000 in stock warrants as a finder's fee which had been expensed and reflected as part of selling, general and administrative expense in the accompanying statements of operations for the nine months ended March 31, 2006.

12

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

The following table summarizes the various components of the convertible debentures as of March 31, 2006:

| | | |
|---|---|---:|
| Convertible debenture | $ | 1,491,781 |
| Derivative liability | | 7,838,797 |
| Warrant liability | | 227,408 |
| | | 9,557,986 |
| Cumulative unrealized gain from adjustment of derivative and warrant liabilities to fair value of underlying securities | | (5,066,205) |
| Accretion of principal related to convertible debenture | | (1,491,781) |
| | | |
| Total convertible debenture | $ | 3,000,000 |

5. STOCKHOLDERS' EQUITY

In August 2005, the Company had issued warrants for 34,286 shares of common stock with an exercise price of $3.50 to an entity for services provided. The warrants have been valued at $102,000 using the Black–Scholes option pricing model and the following assumptions: term of 3 years, a risk free interest rate of 3.5%, a dividend yield of 0% and volatility of 162%. The entire amount of $102,000 has been expensed as of March 31, 2006.

In September 2005, the Company had issued 50,000 shares of common stock for services provided with a total value of $62,500 which had been expensed as of March 31, 2006.

In November 2005 , the Company had issued 100,000 shares of common stock for services provided with a total value of $89,250 which had been expensed as of March 31, 2006.

In January 2006, the Company had issued 18,814 shares of common stock for services provided with a total value of $4,200 which had been expensed as of March 31, 2006.

In February 2006, the Company had issued 173,000 shares of common stock for services provided with a total value of $53,500, which had been expensed as of March 31, 2006.

In February 2006, the Company had issued 100,000 shares of common stock for services provided with a total value of $89,250 which had been expensed as of March 31, 2006.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

6.   BUSINESS ACQUISITIONS

On March 7, 2006, the Company entered into a Common Stock Purchase Agreement to purchase a total of 66.67% of the outstanding common stock of Digital Presence, Inc. in consideration of cash totaling $300,000 made in installment payments. The payment terms for the purchase are as follow: (a) $50,000 which was due on the initial closing on March 7, 2006; (b) $125,000 due on second closing of May 15, 2006; and (c) $125,000 due on third closing of June 15, 2006. As of March 31, 2006, the Company has paid the initial closing payment of $50,000 and has reflected such amount as a deposit on the accompanying balance sheet.

7.   SUBSEQUENT EVENTS

On April 3, 2006, the Company entered into a consulting agreement with Aurelius Consulting Group, Inc. for investor relationship in consideration of $7,500 and 12,000 shares of the Company common stock (value at $9,600) on a monthly basis which the agreement may be terminated at any time upon thirty days written notice.

On April 12, 2006, the Company entered into an Amended Non–Binding Term Sheet to acquire all of the outstanding capital stock of a company dedicated to the development and sale of IPv6 Internet applications, including secured e–mails and servers. The Amended Non–Binding Term Sheet provides that the Company pay $50,000 in cash plus shares of the Company's common stock equal in value of $8,500,000. The Company made a non–refundable payment of $10,000 on execution of the original Non–Binding Term Sheet on or about February 20, 2006. The Company will be required to make a non–refundable deposit payments totaling $40,000 upon certain approvals of contingencies which shall be made at the Company's sole discretion. This acquisition term sheet automatically terminates on July 1, 2006 and may be extended or terminated earlier only upon written consent of the parties. On April 18, 2006, the Company had provided an interim loan totaling $40,000 to this company maturing April 18, 2007, unsecured and with interest of 5% annually.

On April 17, 2006, the Company entered into a consulting agreement with Endeavor Capital Partners for public relations services for a three month term in consideration of a one time payment of $70,000, $20,000 per month and 100,000 shares of the Company's common stock per month (valued at $80,000).

On April 17, 2006, the Company entered into a promissory note with its Alex Lightman, the Company's President, to borrow $400,000. The promissory note has a maturity date of the earlier of April 17, 2007 or closing of the Company's financing subsequent to the next and final traunche installment due under the Notes defined hereinbove, interest rate of 5% annually, unsecured and 800,000 restricted shares of the Company's common stock. The 800,000 shares is valued at $544,000 which will be expensed as financing cost over the life of the note.

14

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2006

On April 21, 2006, the Company entered into a Non–binding Term Sheet to acquire all the outstanding capital of  a company that provides mobile messaging and electronic transactions platform built to provide SMS and MMS mobile messages to replace direct mail as well as deploy existing mobile electronic transaction platform for mobile ticketing, coupons and payments.The Term Sheet provides for the Company to pay $7,500 in cash payable on execution and to issue a number of shares of the Company's common stock equal in value to $1,500,000. This acquisition term sheet automatically terminates on June 30, 2006 and may be extended or terminated earlier only upon written consent of the parties.

### ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

#### Forward–Looking Statements

The information set forth in this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") contains certain "forward–looking statements" including, among others (i) expected changes in the Company's revenues and profitability, (ii) prospective business opportunities and (iii) the Company's strategy for financing its business. Forward–looking statements are statements other than historical information or statements of current condition. Some forward–looking statements may be identified by use of terms such as "believes", "anticipates", "intends" or "expects". These forward–looking statements relate to the plans, objectives and expectations of the Company for future operations. Although the Company believes that its expectations with respect to the forward–looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business and operations, in light of the risks and uncertainties inherent in all future projections, the inclusion of forward–looking statements in this report should not be regarded as a representation by the Company or any other person that the objectives or plans of the Company will be achieved.

### 1. Overview

You should read the following MD&A in conjunction with the Consolidated Financial Statements and Notes thereto, and the other financial data appearing elsewhere in this Quarterly Report on Form 10–QSB.

The Company's revenues and results of operations could differ materially from those projected in the forward–looking statements as a result of numerous factors, including, but not limited to, the following: the risk of significant natural disaster, the inability of the Company to insure against certain risks, inflationary and deflationary conditions and cycles, currency exchange rates, changing government regulations domestically and internationally affecting the Internet, including various taxing authorities, VAT, OSHA, and general market conditions, competition and pricing, changes in external competitive market factors, termination of certain agreements, protocol, or inability to enter into strategic agreements, inability to satisfy anticipated working capital or other cash shortage requirements, changes in or developments under domestic or foreign laws, regulations, governmental requirements or in the IT industry, changes in the Company's business strategy or an inability to execute its strategy due to unanticipated changes in the market. In light of these risks and uncertainties, there can be no assurance that actual results, performance or achievements of the Company will not differ materially from any future results, performance or achievements expressed or implied by such forward–looking statements.

The Internet as we know it today is based on Internet Protocol version 4, more commonly referred to as IPv4, a 32–year–old protocol. The IPv4 based Internet is beginning to receive a major upgrade, with a new format established in computer operating systems for packets of data called Internet Protocol version 6, or IPv6 (also called the "New Internet" when referring to a fully implemented IPv6 network environment). Simply put, one of the limitations of today's Internet is a shortage of addresses, so that the hardware or software equivalents of "middle men" are put into the system to let many people use one address, not unlike the old telephone party lines, where many people had the same "number," and everyone could listen in. The party line system had the advantage that a lot of people could be connected with few switched lines, but led to problems, such as lack of security. There was no way to assure that one person would be speaking with only one person at the other end. When every phone user received their own address, it led to many great new capabilities – such as enhanced privacy, the ability to deliver new services such as telefax messages to a particular person, and the ability to go mobile with cell phones, and caller ID, which enabled people to screen their calls, accepting only those they wanted to at that moment.

The advantages of IPv6 over the existing IPv4 are significant and can be summarized as that which provides greater security, mobility, and *ad hoc* networking capability which is a temporary network link initiated for a particular purpose. These advantages are described further at our website at http://www.usipv6.com and briefly as follows. IPv6 will give everyone his or her personal address (or thousands of them, as needed), which enables the potential for "end–to–end" connectivity. Each individual can know for certain who the specific receiver at the other end is which in turn allows the system to check for service quality and much easier mobile use and roaming. Furthermore, this connectivity facilitates multiple layers of individual security measures rather than today's firewalls or Network Address Translation, which offer little protection once a hacker has broken through the protective wall.

One new feature of IPv6 is the vast increase of trillions of Internet addresses, resulting in what will seem to be almost unlimited Internet Protocol (IP) address availability and which will enable each customer to have many such addresses for each cell phone, game console, home appliance, consumer electronics and automobiles in the household and/or at the office. Doing this today in the IPv4 environment is difficult and costly.

IPv6 is also more secure for wired and wireless communications in part because greater identity is possible with more addresses and in part because currently there are no known cases of spoofing an IPv6 address as occurs in IPv4. While being more secure, IPv6 will also provide greater access to mobile wireless online service, television and voice over Internet protocol (or "VoIP") given its structure resulting in more mobile online users with greater overall trust in a secure network. Ultimately, even advanced online connections such as smart tags which utilize Radio Frequency Identification (RFID) to enable real–time inventory tracking will be able to be deployed in IPv6 efficiently and broadly. To do so under an IPv4 system would not be practical from a cost perspective.

We believe that IPv6 will present many new business opportunities in roughly the same manner that the existing Internet did when it first reached the mainstream in the mid–1990s. We intend to start addressing such business opportunities by initially focusing on training, consulting, testing and conference management, all related specifically to IPv6. By developing expertise and leadership in each of these areas, Innofone will gain the credibility needed in a newly developing IPv6 environment to allow later rapid growth in areas such as product development, services and strategic acquisitions. We are currently filling a void in our areas of expertise related to IPv6 in the United States. There are few competitors providing services to American businesses seeking advice on how to transition from IPv4 to IPv6. There are few competitors which understand the U.S. government's role in supporting IPv6. There are few competitors providing credible testing facilities for IPv6 enabled products. There are few competitors providing training to employees in American businesses on the IPv6 environment and its advantages, product possibilities and/or network solutions. By doing business in these areas with sparse competition and by holding regular summit conferences throughout the country, the Company intends to take and maintain the lead in all business specifically related to IPv6.

The Company currently offers and manages these services from two corporate centers: our corporate headquarters offices in Santa Monica, California and virtually through our Eastern seaboard based employees located in Northern Virginia. We intend to launch a Virginia office in the first quarter of 2006.

*2. Business Combination*

 On August 8, 2005, the Innofone.com entered into a stock purchase agreement with Mr. Alex Lightman, our Chief Executive Officer and President, to purchase 100% of the issued and outstanding shares of IPv6 Summit Inc. ("IPv6 Summit"), an entity engaged in providing conference management services related to Internet Protocol version 6 or IPv6. At the time of the Agreement, Mr. Lightman was the President, Treasurer, Director and sole shareholder of IPv6 Summit, and was neither an officer nor a director of the Company. Pursuant to the Agreement, on October 12, 2005, which was amended on October 17, 2005, we issued to Mr. Lightman a promissory note in the principal face amount of $1,000,000 with interest at the rate of 4% per annum. Further, we issued to Mr. Lightman approximately 33,333,000 shares of our restricted common stock. As a result of the stock purchase agreement, IPv6 Summit became a wholly–owned subsidiary of the Company. IPv6 has been accounted for as the accounting acquirer similar to a reverse merger transaction and the historical accounting information of IPv6 is now that of Innofone. As of March 31, 2006, we had made payments against Mr. Lightman's promissory note totaling $500,000 accordingly, our current balance owed to him totals $500,000.

17

*3. Current Business Operations*

 We currently employ nine individuals in our Santa Monica, California headquarters offices located at 1431 Ocean Avenue, Suite 1100, Santa Monica, California 90401 and employ three individuals on the Eastern seaboard in and around the Northern Virginia area.

The Company currently operates one wholly owned subsidiary, IPv6 Summit, Inc., based in Santa Monica, California and one division styled as "v6 Transition" which is based in Clifton, Virginia and managed by Dale Geesey our Vice President of Consulting.

The Company anticipates seeking certain other strategic acquisitions and investments over the next twelve months in an effort to increase overall operations. Our ability to execute this goal will be largely based upon whether we can raise adequate capital to successfully close such acquisitions.

IPv6 Summit, Inc. is currently our primary source of revenue and focus of operations. IPv6 Summit, Inc. organizes and produces conference events related to IPv6 technology and the transition from IPv4 to IPv6.

v6 Transition has begun organizing trainings, workshops, and consulting services related to IPv6. v6 Transition has announced a three–year series of Federal Chief Information Officer IPv6 Workshops with the first event having taken place in Arlington, Virginia on October 11, 2005 and our next event, the Federal IPv6 Summit to take place May 17, 2006 through May 19, 2006 in Reston, Virginia. v6 Transition completed the three consulting projects it initiated last quarter and has added an additional six consulting and/or training projects with Juniper Networks, Microsoft and Avocent.

We continue to increase the total staff of the Eastern Office and have hired Michael Rousey as Director of Account Management for our v6 Transition consulting division as of January 16, 2006. We terminated an Employment Agreement with Leah Thompson, VP of Operations for IPv6 Summit, Inc. and entered into a Settlement and Release Agreement with Ms. Thompson on or about March 3, 2006 whereby Ms. Thompson released any and all claims against the Company and received 53,000 restricted common stock shares. Our Secretary, Paul Shephard, has since agreed to serve as our VP of Operations for both IPv6 Summit, Inc. and for Innofone.com, Incorporated.

A final core activity of this quarter was planning and research related to further development of our strategy for potential mergers and acquisitions of technology companies. We made one substantial investment in the current quarter in Digital Presence, Inc., a Delaware start–up corporation,  recently formed for the purpose of creating a scalable addressable IPv6 identity registry. On March 7, 2006, the Company entered into a Common Stock Purchase Agreement to purchase a total of 66.67% of the outstanding common stock of Digital Presence, Inc. in consideration of cash totaling $300,000 made in installment payments. The payment terms for the purchase are as follow: (a) $50,000 which was due on the initial closing on March 7, 2006; (b) $125,000 due on second closing of May 15, 2006; and (c) $125,000 due on third closing of June 15, 2006. As of March 31, 2006, the Company has paid the initial closing payment of $50,000 and has reflected such amount as a deposit on the accompanying balance sheet.

18

*4. Future Business Operations*

We anticipate that our principal business activities for the coming months will include the refinement of our strategic approach to realizing the potential of the IPv6 industry and as such intend to focus on the following areas of business growth:

1.  Organic growth, via our existing business divisions:

   A.  Conferences, including the U.S. IPv6 Summit, Coalition Summit for IPv6, as well as anticipated events in Asia and/or Europe starting in 2006/2007.

   B.  Training, including the one day Federal Chief Information Officer IPv6 Transition Workshops and anticipated five day and customized trainings for both technology and business aspects of IPv6.

   C.  Consulting, including IPv6 Transition Plans, Project Plans and approximately a dozen other possible types of IPv6 related consulting engagements.

   D.  Testing, including the proposed establishment of what could become the first for–profit IPv6 test business in the US, in association with a leading test equipment manufacturer.

2. Product Development and new Organic Growth Areas. The Company has initiated the development of an internal research and development capability that we anticipate will generate a new product at regular intervals starting in mid–2006. The Company also intends to develop new centers for revenue in the second quarter of 2006 related to IPv6 for mobile applications and Internet applications.

3. Strategic Mergers and Acquisitions: The Company is considering several potential private companies which Management believes could lead to the consummation of certain transactions that could result in the positioning of the Company for accelerated growth in specific areas, such as secure Internet applications, video–over–IPv6, search engine marketing and optimization, and mobile phone applications that will be potentially enhanced by using IPv6.

*5. Results of Operations*

On August 8, 2005, Innofone.com purchased 100% of the issued and outstanding shares of IPv6 Summit, Inc. As a result, IPv6 has been accounted for as the accounting acquirer similar to a reverse merger in that the historical accounting information is that of IPv6. Accordingly, the results of operation discussion for the three and nine months ended March 31, 2006 and 2005 are that of IPv6.

Revenues and Cost of Revenues
The Company derives revenues primarily from attendance fees of summit conferences held, corporate sponsorships related to such summits, and consulting fees. Attendance fees are recognized when the conference has been held. Cost of revenues primarily relate to summit conference room rentals, food accommodations and advertising. Additional contracts were signed for workshops and consulting engagements. For the three and nine months ended March 31, 2006, the revenues were $63,003 and $467,693 compared to the prior year's same periods of $127,926 and $364,727. The decrease in revenues compared to the prior year for the three months ended March 31, 2005 related to the timing of the conferences in the prior year. The increase in revenues in the nine months ended March 31, 2006 primarily related to an increase of $104,000 in consulting revenues.

The Company held a major conference in the second quarter of 2006. The Company plans to hold approximately 3 summit conferences in the next 12 months. Additionally in the next 12 months, the Company plans on holding four Federal CIO IPv6 transitional workshops, training bootcamps for network engineers and provide IPv6 consulting to private companies and federal government agencies.

The Company believes the IPv6 consulting services will become a significant part of the Company's overall revenues in the future, with revenues derived from corporate and government clients. The revenues in the first quarter are from such consulting contracts.

Selling, General and Administrative Expenses
Selling, general and administrative expenses totaled $945,648 and $2,470,164 for the three and nine months ended March 31, 2006, an increase of $852,517 and $2,166,986 compared to the same periods in the prior year. The increase primarily related to costs incurred to secure new debt financing, legal fees associated with the acquisition, and increased salary, promotion and consulting expense.

Net Loss

Net loss totaling $6,797,163 and $8,788,592 for the three and nine months ended March 31, 2006, increased by $6,798,948 and $8,784,625 compared to the same periods of the prior year as result of the factors previously mentioned above and the costs related to the convertible debt..

### 6. Liquidity and Capital Resources

As of March 31, 2006, we had total current assets of approximately $873,704 and total current liabilities of $730,966, resulting in a working capital surplus of $142,728. Our cash balance as of March 31, 2006 totaled $707,277. Net Cash used in operating activities for the nine months ended March 31, 2006 resulted in a deficit of $2,257,278.

The Company's primary needs for liquidity and capital resources are the funding of salaries, other administrative expenses related to the management of the Company and retirement of certain debts.

We entered into a Securities Purchase Agreement (the "NIR Agreement") with four accredited investors on August 31, 2005 for the sale of (i) $4,500,000 in callable secured convertible notes (the "Notes") and (ii) warrants to buy 1,000,000 shares of our Common Stock (the "Warrants"). Pursuant to the NIR Agreement, the investors are obligated to provide us with an aggregate of $4,500,000 in tranches as follows: (a) $1,500,000 was disbursed on September 1, 2005; (b) $1,500,000 was disbursed upon the filing of the Registration Statement covering the shares of common stock underlying the Notes and Warrants; and (c) $1,500,000 will be disbursed upon the effectiveness of the Registration Statement. As of March 31, 2006, we have received a total of $3,000,000 related to the NIR Agreement.

In the event that the Company receives the full amount of the remaining $1,500,000 final traunche under the NIR Agreement, such funds will sustain our operations for an additional 7 months. The Company may be required to seek additional financing regardless of the amount of funds received pursuant to the NIR Agreement.

On October 17, 2005 we amended and restated our promissory note issued to Mr. Alex Lightman, our Chief Executive Officer and President, dated October 12, 2005, in connection with our Stock Purchase Agreement dated August 8, 2005 ("Acquisition Note"). The principal face amount of the "Acquisition Note" is $1,000,000 and bears interest at the rate of four percent (4%) per annum. The Acquisition Note was amended and restated to provide for a repayment schedule that is to coincide with the timing that the Company receives the tranches. Specifically, we will make monthly installment payments equal to $83,333.33 for each successive month starting on the date of execution of the note and ending January 17, 2006. As of March 31, 2006, the remaining balance related to the Acquisition Note with Mr. Lightman totaled $500,000. On or about April 1, 2006, Mr. Lightman agreed to a forbearance of the Acquisition Note until further notice.

On April 18, 2006, Company has entered a second Promissory Note with its CEO, Alex Lightman, in connection with Mr. Lightman's loan of $400,000 ("Lightman Note") to the Company. The Lightman Note principal is to be repaid at the earlier of either the next financing after the closing of the NIR final payment or April 18, 2007 as is to be repaid with interest at the rate of 5% simple interest per annum plus the issuance of 800,000 restricted shares of common stock of the Company. The proceeds of the Lightman Note will assist us in our liquidity needs and need for operating capital going forward.

### 7. Critical Accounting Policies and Estimates

The preparation of our financial statements requires our management to make estimates and assumptions that affect the reported amounts on our financial statements. Management bases its estimates and judgments on historical experience and on various other factors that are believed to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions.

The Notes to the consolidated financial statements included in this filing contain a discussion of our significant accounting policies and recent accounting pronouncements applicable to us.

### 8. Recent Accounting Pronouncements

In April 2003, the FASB issued SFAS No. 149, "Amendment of Statement 133 on Derivative Instruments and Hedging Activities." The Statement amends and clarifies accounting for derivative instruments, including certain derivative instruments embedded in other contracts entered into or modified after June 30, 2003. The guidance should be applied prospectively. The provisions of this Statement that relate to SFAS 133 Implementation Issues that have been effective for fiscal quarters that began prior to June 15, 2003, should continue to be applied in accordance with respective effective dates. In addition, certain provisions relating to forward purchases or sales of when–issued securities or other securities that do not yet exist, should be applied to existing contracts as well as new contracts entered into after June 30, 2003. The adoption of SFAS No. 149 is not expected to have an impact on the Company's financial statements.

In May 2003, the FASB issued Statement of Accounting Standards No. 150 "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" (SFAS No. 150). SFAS No. 150 establishes standards for classification and measurement in the statement of financial position of certain financial instruments with characteristics of both liabilities and equity. It requires classification of a financial instrument that is within its scope as a liability (or an asset in some circumstances). SFAS No. 150 is effective for financial instruments entered into or modified after May 31, 2003, and otherwise is effective at the beginning of the first interim period beginning after June 15, 2003. The Company's adoption of SFAS 150 did not have a material effect on the results of operations or financial position.

In May 2003, the consensus on EITF Issue No. 01–08, "Determining Whether an Arrangement Contains a Lease," was issued. The guidance in the consensus applies to the purchase or sale of goods and services under various types of contracts, including outsourcing arrangements. Based on the criteria in the consensus, both parties to an arrangement are required to determine whether the arrangement includes a lease within the scope of SFAS No. 13, "Accounting for Leases." The new requirement applies prospectively to new or modified arrangements for reporting periods beginning after May 28, 2003. Accordingly, as of August 1, 2003, the Company accounted for new or modified arrangements based on this guidance. Adoption of this standard did not have an impact on our financial statements.

On December 18, 2003 the SEC issued Staff Accounting Bulletin No. 104, Revenue Recognition ("SAB 104"), which supersedes SAB 101, Revenue Recognition in Financial Statements. SAB 104's primary purpose is to rescind accounting guidance contained in SAB 101 related to multiple element revenue arrangements, which was superseded as a result of the issuance of EITF 00–21, Accounting for Revenue Arrangements with Multiple Deliverables. The adoption of SAB 104 did not have a material impact on our financial position or results of operations.

In December 2004, the FASB issued SFAS No. 123 (revised 2004), Share–Based Payment, which is an amendment to SFAS No. 123, Accounting for Stock–Based Compensation and supersedes APB Opinion No. 25, Accounting for Stock Issued to Employees. SFAS 123(R) requires the measurement of the cost of employee services received in exchange for an award of equity instruments based on the grant–date fair value of the award. No compensation cost is recognized for equity instruments for which employees do not render service. We will adopt SFAS 123(R) effective on July 1, 2005, requiring compensation cost to be recognized as expense for the portion of outstanding unvested awards, and any new awards made thereafter, based on the grant–date fair value of those awards.

In December 2004, the FASB issued SFAS No. 153, Exchange of Non–monetary Assets. SFAS No. 153 amends APB Opinion No. 29, Accounting for Non–monetary Transactions, to eliminate the exception for non–monetary exchanges of similar productive assets. The Company will be required to apply this statement to non–monetary exchanges after December 31, 2005. The adoption of this standard is not expected to have a material effect on the Company's financial position or results of operations.

*Item 3. Evaluation of Disclosure Controls and Procedures*

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's Exchange Act reports is recorded, processed and summarized and is reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Principal Financial Officer to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure control procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost–benefit relationship of possible controls and procedures.

As of the end of the period covered by this report, the Company's management carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a–14.  Based upon the evaluation, the Company's President (principal executive officer) and Principal Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting him to material information required to be included in the Company's periodic SEC filings.

PART II– OTHER INFORMATION.

Item 1. Legal Proceedings.

There are currently no legal proceedings against the Company at this time.

Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.

In January 2006, the Company had issued 18,814 shares of common stock to an individual for services provided with a total value of $4,200.

In February 2006, the Company had issued 173,000 shares of common stock to an individual for services provided with a total value of $53,500.

In February 2006, the Company had issued 100,000 shares of common stock to an individual for services provided with a total value of $89,250.

Item 3. Defaults Upon Senior Securities.

None.

Item 4. Submission of Matters to a Vote of Security Holders.

There were no matters requiring a vote of security holders during this period.

Item 5. Other Information.

None.

Item 6.  Exhibits

    A. Exhibits:

31.1 Certification Pursuant to Section 302 of the Sarbanes–Oxley Act.*

32.1 Certification Pursuant to Section 906 of the Sarbanes–Oxley Act.*

_____
*Filed herewith.

SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INNOFONE.COM, INCORPORATED

Date: April 26, 2006                    By:  /s/ Alex Lightman
                                             _____

                                             Alex Lightman
                                             Title Chief Executive Officer, President, Principal Financial Officer and Director

24

# INNOFONE COM INC (INFN)

1431 OCEAN AVE #1100
SANTA MONICA, CA 90401
310–458–3233

# EX–31.1

**10QSB Filed on 04/26/2006 – Period: 03/31/2006**
File Number 000–31949



*EXHIBIT 31.1*

*CERTIFICATIONS*

I, Alex Lightman, certify that:

1. I have reviewed this Quarterly Report on Form 10–QSB (the "Report") of Innofone.com, Incorporated (the "Registrant");

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, any financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Report;

4. I am responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the Registrant and I have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the small business issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being provided;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

d) disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of Registrant's board of directors (or persons performing the equivalent function);

a) all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Date: April 26, 2006                              By:              /s/ Alex Lightman
                                                                   Alex Lightman
                                                                   President, Chief Executive Officer and Principal Financial Officer

# INNOFONE COM INC (INFN)

1431 OCEAN AVE #1100
SANTA MONICA, CA 90401
310–458–3233

# EX–32.1

**10QSB Filed on 04/26/2006 – Period: 03/31/2006**
File Number 000–31949



**LIVEDGAR**[®] Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

***Exhibit 32.1***

***CERTIFICATION PURSUANT TO***
***18 U.S.C. SECTION 1350,***
***AS ADOPTED PURSUANT TO***
***SECTION 906 OF THE SARBANES–OXLEY ACT OF 2002***

In connection with the Quarterly Report on Form 10–QSB ("Quarterly Report") of Innofone.com, Incorporated (the "Registrant") for the fiscal quarter ended March 31, 2006 as filed with the Securities and Exchange Commission on the date hereof, I, Alex Lightman, President, Chief Executive Officer and Principal Financial Officer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes–Oxley Act of 2002, that, to the best of our knowledge and belief:

(1) The Quarterly Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Quarterly Report fairly presents, in all material respects, the financial condition and result of operations of the Registrant.


Date: April 26, 2006                                    By:              /s/ Alex Lightman
                                                                          Alex Lightman
                                                                          Chief Executive Officer, President  and Principal Financial Officer


A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906 has been provided to the Registrant and will be retained by the Registrant and furnished to the Securities and Exchange Commission or its staff upon request.