**Westlaw Download Summary Report for BILIK,SHIRI R 5840161**

| | |
|---|---|
| Date/Time of Request: | Tuesday, May 29, 2007 08:44:00 Central |
| Client Identifier: | 58694-0000004-11515: |
| Database: | DCT |
| Citation Text: | Slip Copy |
| Lines: | 574 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Slip Copy                                                                                                Page 1
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Kirton v. Northwestern Mut. Life Ins. Co.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Lawrence KIRTON, Plaintiff,
v.
NORTHWESTERN MUTUAL LIFE INSURANCE CO., Defendant.
**No. 00-CV-7646 (JS)(AKT).**

Oct. 24, 2006.

Lawrence Kirton, pro se, Westbury, NY, for Plaintiff.
Jeanne O. Marino, Esq., White & Williams LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*
SEYBERT, District Judge.

### INTRODUCTION

*1 Pending before this Court are Magistrate Judge James Orenstein's Report and Recommendation, dated January 17, 2006 ("Report"), and objections to the Report, filed pursuant to FED. R. CIV. P. 72. For the reasons below, the Court ADOPTS the Report in its entirety.

### LEGAL STANDARD

A district court reviews a magistrate judge's report under the standards established in 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). The district judge makes a *de novo* determination of those parts of the Report to which a timely written objection has been made by any party but may adopt the uncontested portions of the Report unless they show clear error. See Thomas v. Arn, 474 U.S. 140, 151-52, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Grassia v. Scully, 892 F.2d 16, 19 (2d Cir.1989); Tapia-Garcia v. United States, 53 F.Supp.2d 370, 373 (S.D. N. Y.1999). Such *de novo* review does not entirely replace the Report.

### BACKGROUND

The facts of this case are stated in this Court's order, dated August 11, 2004, partially granting Defendant's summary judgment motion ("August 2004 Order"). The Magistrate also summarized the relevant facts in his Report. (Report at 1-3.) To the extent that Plaintiff Lawrence Kirton ("Plaintiff") objects to matters already decided in the August 2004 Order, this Court rejects such objections as improperly brought at this time. Furthermore, the Court considered Plaintiff's arguments regarding the factual background three times and has rejected them three times: first, in the August 2004 Order, again in this Court's Order, dated October 27, 2004, denying Plaintiff's motion for reconsideration, and a third time in this Court's Order, dated April 28, 2005, denying Plaintiff's Rule 60 motion.

### DISCUSSION

In his Report, the Magistrate recommended that the Court enter judgment in favor of Defendant Northwestern Mutual Life Insurance Company ("Defendant") and against Plaintiff in the amount of $135,403.24. The Magistrate found that Defendant was entitled to a judgment of rescission, which would restore the parties to the position they were in prior to the transaction that gave rise to this legal dispute. (Report at 4.)

The Magistrate found that Defendant was entitled to a judgment for the total amount of $135,403.24. The principal amount due Defendant is $90,242.39. The Magistrate arrived at this figure by subtracting $14,096.87-the amount Plaintiff paid in premiums to Defendant-from $104,339.26-the amount Defendant paid to Plaintiff in benefits. The interest amount due Defendant is $45,160.85. The Magistrate arrived at this number by subtracting $5,640.12-the interest on premiums Plaintiff paid Defendant-from $50,800.97-the interest on benefits Defendant paid to Plaintiff. (Report at 7-16.)

Plaintiff first objects to the amount of the principal the Magistrate recommended. Plaintiff, however, appears confused. Plaintiff argues that Defendant "should only be entitled to a judgment reflecting $104,339.26 in benefits paid. The premiums paid by [Plaintiff] should not decrease the principal amount of the award since there are issues based on the ... replacement policy." (Pl.'s Objections at 4.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                Page 2
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

**\*2** If this Court agreed with Plaintiff, then the principal amount would be *greater* than the recommended principal amount of $90,242.39. Because it appears to the Court that Plaintiff's objection is not in his best interest, the Court rejects it. As for Plaintiff's objection that the principal amount should reflect premiums Plaintiff paid to Defendant up until April 1, 2006, the Court rejects this as unsupported and unsubstantiated by the Plaintiff.

Plaintiff also objects to the way in which the Magistrate arrived at the amount of interest. Plaintiff suggests that an interest rate between 4.1-4.3 percent replace the rate of 9 percent. The Magistrate, however, expressed his concern that the statutory default interest rate of 9 percent was unfairly high. (Report at 14.) The Magistrate instead recommended a 6 percent interest rate. (Report at 15.)

Plaintiff claims that an interest rate of 4.1-4.3 percent "reflects the average rate over the entire period of fourteen years at issue in this case...." (Pl.'s Objections at 4.) However, Plaintiff does not demonstrate how he arrived at this number nor how it is accurate. The only rationale Plaintiff provides for such an interest rate is that the award financially impacts Plaintiff greater than Defendant, which is a multi-billion dollar insurer. Plaintiff argues that he only receives disability income. The Court rejects this rationale. The fact that Defendant may be a multi-billion dollar insurer is no reason to deny Defendant the right to money it never had to pay Plaintiff in benefits. Accordingly, the Court rejects this argument.

*CONCLUSION*

The Court ADOPTS the Magistrate's Report in its entirety. The Court awards Defendant a judgment in the amount of $135,403.24, which is comprised of a principal amount of $90,242.39 and interest in the amount of $45,160.85. The Clerk of the Court is ordered to enter a judgment in the amount of $135,403.24.

SO ORDERED.
JAMES ORENSTEIN, Magistrate Judge.

**REPORT AND RECOMMENDATION**

On August 11, 2004, the court granted summary judgment in favor of defendant NorthWestern Mutual Life Insurance Company ("Northwestern") and found that plaintiff Lawrence Kirton ("Kirton") had made a fraudulent misrepresentation on his application for the insurance policy at issue. *See* Docket Entry ("DE") 101. After denying Kirton's motion for reconsideration of that decision, DE 111, the Honorable Joanna Seybert, United States District Judge, referred the matter to me for a report and recommendation as to the amount of judgment to be awarded Northwestern on its counterclaim against Kirton. DE 112. While that referral was pending, Kirton sought relief pursuant to Rule 60 of the Federal Rules of Civil Procedure. Judge Seybert denied that request on April 28, 2005, and renewed the referral to me. DE 126. I now make that report and, for the reasons set forth below, respectfully recommend that the court enter judgment in favor of Northwestern and against Kirton in the amount of $135,403.24.

I. *Background*

**\*3** I assume the reader's familiarity with Judge Seybert's previous orders in this case, which set forth much of the relevant background. *See* DE 101 (containing a thorough chronicle of the procedural history and factual background of the instant matter from the time of Kirton's initial complaint through the summary judgment motion decided in Northwestern's favor); DE 126 (updating the procedural history through the filing of Kirton's Rule 60 motion). As a matter of convenience, I summarize the following facts and procedural history relevant to the matter now before me.

On July 5, 1991, Northwestern issued Disability Insurance Policy number D834252 (the "Policy"), which provided for Kirton to receive benefits in the amount of $2,100 per month should he become totally disabled. On October 6, 1995, Kirton fell on a wet stairwell landing and sustained serious injuries. Kirton was examined, diagnosed with a variety of ailments, and ultimately found to be "severely disabled." Kirton applied for and received disability benefits under the Policy. Northwestern continued making those payments until November 1999, when it determined that Kirton was no longer even partially disabled and closed his case. On December 28, 2000, Kirton filed a complaint in this court seeking declaratory relief on the ground that Northwestern's termination of benefit payments breached the Policy's terms. DE 101 at 1-7.

On April 8, 2002, Kirton amended his complaint to add additional grounds for seeking declaratory relief

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)  
**(Cite as: Slip Copy)**

Page 3

and an allegation that Northwestern breached the implied covenant of good faith and fair dealing. On October 29, 2002, Northwestern filed a counterclaim alleging that Kirton made a fraudulent misrepresentation on his insurance application, breached the covenant of good faith and fair dealings, and was unjustly enriched. On May 21, 2003, Northwestern moved for partial summary judgment on Kirton's claims. On November 12, 2003, Northwestern moved for partial summary judgment on its Counterclaim. *Id.* at 1-2.

Judge Seybert granted Northwestern's motion for partial summary judgment in an order entered on August 11, 2004. *Id.* at 18. In particular, Judge Seybert found that the record dispositively demonstrated that Kirton had made a fraudulent misrepresentation on his insurance application when he reported that he had never been treated for or had symptoms of a spinal disorder-a statement proved false by Kirton's deposition testimony that he had been diagnosed with a herniated disk in 1985. *Id.* at 18.

Kirton sought reconsideration of the latter decision pursuant to Local Civil Rule 6.3. Judge Seybert denied that application in an order entered on October 27, 2004. DE 126 at 1-2. On November 8, 2004, Judge Seybert first referred the matter to me for a Report and Recommendation on the amount of judgment to be issued against Kirton. DE 112. Before I had made a report, however, Judge Seybert granted Kirton permission to file a motion for reconsideration of the summary judgment decision pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. DE 118. On January 5, 2005, I issued an order holding in abeyance my Report and Recommendation until after Judge Seybert ruled on Kirton's motion. DE 121. On April 28, 2005, Judge Seybert denied that motion and renewed her prior referral to me of the issue of the amount of judgment to be issued against Kirton. *See* DE 126 at 5.

**\*4** In his submissions on the matter that has been referred to me, Kirton continues to deny his liability. *See e.g.,* DE 136. Notwithstanding his apparent unwillingness to accept the judgment of the tribunal that he selected for the resolution of his claim against Northwestern-a recalcitrance he would undoubtedly find intolerable were his position and Northwestern's reversed-I have no reason to revisit the issue of liability that Judge Seybert has now thrice decided against Kirton. *See* DE 101; DE 111; DE 126. I therefore address only the merits of the issue relating to the amount of judgment, and Kirton's liability on the counterclaim as given.

II. *Discussion*

A. *Northwestern Is Entitled To A Judgment Of Rescission*

The Policy specified that Northwestern could "rescind the policy or deny a claim due to a misstatement in the application" with the qualification that after two years only a "fraudulent misrepresentation ... may be used to rescind the policy." DE 101 at 15. Judge Seybert found as a matter of law that Kirton's failure to disclose the herniated disc on his insurance application constituted a fraudulent misrepresentation. *Id.* at 20.

This dispute arises under the law of New York. *See* DE 101 at 17. That law provides that even an innocent misrepresentation, if material, suffices " 'to allow the insurer to avoid the contract of insurance or defeat recovery thereunder.' " *Mutual Ben. Life Ins. Co. v. JMR Electronics Corp.,* 848 F.2d 30, 32 (2d Cir.1988). Rescission of the insurance contract is the proper remedy where an applicant has committed a material misrepresentation. *Id.* at 32, 34 (affirming the district court's rescission of a life insurance policy based on the applicant's misrepresentation that he was a non-smoker). Judge Seybert expressly held that Kirton's misstatement was material: "[T]his court finds that the evidence of materiality is 'clear and substantially uncontradicted.' " DE 101 at 20. Northwestern is therefore entitled to rescind the disability contract it issued to Kirton based on his misrepresentation about his medical history.

Rescission is a remedy that endeavors to return parties "to the status that existed before the transaction was executed." *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1212 (S.D.N.Y.1994). To accomplish this result in the present case I must enter a judgment that returns the parties to the status that existed in July 1991 before they entered into the insurance contract at issue. This is best achieved by returning to Northwestern the interest-adjusted amount of benefits it paid to Kirton under the contract minus the interest-adjusted amount of premiums Kirton paid to Northwestern. This task is rendered considerably easier by the fact that, as discussed below, the relevant sums are not in dispute.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Northwestern first filed an application for judgment on November 19, 2004. DE 114 ("Nov.2004 Application"). In that application, and in several subsequent submissions, Northwestern has consistently sought judgment for an amount that reflects the benefits it paid under the vitiated disability contract ($104,339.26) minus the premiums paid by Kirton ($14,096.87), plus interest. *See* Nov. 2004 Application; DE 127; DE 135. In support of the judgment sought, Northwestern has submitted the testimony of a certified public accountant and payment records covering the entire duration of the Policy. *See* Nov. 2004 Application (Affidavit of Tom Mattocks in Support of Motion for Judgment) ("Mattocks Aff. I"); DE 135 (Supplemental Affidavit of Tom Mattocks in Support of Motion for Judgment and payment records) ("Mattocks Aff. II"). Northwestern has twice modified the judgment it seeks so as to include additional pre-judgment interest. *See* DE 127; DE 135. On May 5, 2005 and again on November 9, 2005 Northwestern revised its initial application to include prejudgment interest through those respective dates. *Id.*

**\*5** Kirton has never challenged Northwestern's figures regarding the amount of benefits or premiums paid. Kirton has, however, continued to challenge the judgment Northwestern seeks on substantive grounds. In his initial opposition to Northwestern's application for a judgment Kirton argued that Northwestern's fraudulent misrepresentation counterclaim was time-barred. *See* DE 119 (Affirmation of Lawrence Kirton) ¶ 9. That issue was definitively resolved by Judge Seybert's order of April 28, 2005: "[T]o the extent that the Court has not directly rejected Plaintiff's statue of limitations position, it does so now." DE 126 at 4.

Kirton's second argument, raised in three separate submissions, is that he is entitled to a credit for payments due him under a hypothetical replacement policy. *See* DE 131 ("Kirton Opp.") at 1-3; DE 134; DE 136. In essence, Kirton argues that even if he had disclosed his earlier spinal problem on his application, Northwestern would still have issued him a disability insurance policy (albeit one with an appropriate rider) that would have been essentially identical to the Policy at issue here. As a result, Kirton asserts he is entitled to the insurance benefits he would have received under the policy for which he never applied and that was never issued. *See* Kirton Opp. ¶ ¶ 5, 6. The argument appears to have significant flaws as a matter of both law and logic. Not least among those problems is the fact that New York law does not allow the "anomalous result" of allowing a misrepresenting party the benefit of "the coverage that he might have contracted for had the necessary information been accurately disclosed at the outset." *Mutual Ben. Life Ins. Co. v. JMR Electronics Corp.,* 848 F.2d at 34.

The substantive shortcomings of Kirton's theory, however, are of considerably less concern to me than is that theory's total irrelevance to my assigned task: namely, determining the contours of a judgment that will return the parties to their respective positions before they entered into the actual disability contract which Northwestern is now entitled to rescind as a result of Kirton's fraudulent misstatement. Kirton has had ample opportunity to litigate the merits of this case and, at least in this court, his window of opportunity for raising additional arguments is now shut.

B. *The Amount Of The Award: Principal*

With regard to the judgment for the actual contract that he was found to have fraudulently induced, Kirton appears to concur with the calculations offered by Northwestern as to the amount owed to it for benefits paid to him and the amount owed to him by Northwestern for premiums paid. *See* Kirton Opp. ¶ ¶ 1, 8. The parties thus agree that Northwestern paid $104,339.26 in benefits and Kirton paid $14,096.87 in premiums. *See* Mattocks Aff. II at 3; Kirton Opp. ¶ ¶ 1, 8. I have independently reviewed 71 pages of payment records covering the entire duration of the rescinded policy that corroborate these figures. *See* DE 135, Affirmation of Anthony Lucas, Exhibit A (benefit payment history); Mattocks Aff. II, Exhibit A (premium payment history). Having paid more benefits under the contract than it received in premiums from Kirton, Northwestern is entitled to a judgment in its favor reflecting the $90,242.39 difference between the two amounts.

C. *The Amount Of The Award: Interest*

**\*6** The figure of $90,242.39 is the principal amount of the judgment that the court should award Northwestern as a consequence of the rescission of the Policy to which it is entitled. To receive the benefit of that rescission, however, Northwestern should also be awarded interest on the principal amount-or more precisely, its total award should represent the interest adjusted total of benefits paid minus the interest-adjusted total of premiums received. I next address the proper method for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                              Page 5
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

calculating such interest.

### 1. *Because Northwestern Seeks The Equitable Remedy Of Rescission, The Statutory Rate Of Nine Percent Is Not Mandatory*

Northwestern asserts that under the relevant provisions of New York law, it is entitled to prejudgment interest at the rate of nine percent per annum. *See* Mattocks Aff. I ¶ 3. Northwestern's starts from a correct premise: unless a different rate is mandated or authorized by another statute, New York law does mandate the award of prejudgment interest at the nine percent rate on any sum awarded for a contract breach or for the deprivation or interference with property. *See* N.Y. C.P.L.R. § § 5001(a), 5004 (McKinney 2005). I disagree, however, that that provision ends the analysis because the law also provides that in an action seeking equitable relief, "interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(c); *see Valle Joint Plumbing Industry Board,* 623 F.2d 196, 206-207 (2d Cir.1980); *Shubert v. Lawrence,* 27 A.D.2d 292, 297-298 (N.Y.App.Div.1967). The question is thus whether the court should apply the statutory rate of nine percent or some other rate based on the exercise of its discretion.

A district court has no discretion to deviate from the mandatory rate and computation rules of § 5001(a) if a case is not clearly and predominantly equitable in nature, *See Action S.A. v. Mark Rich & Co., Inc.,* 951 F.2d 504, 508 (2d Cir.1991) (admonishing courts not to use the "equity clause" of § 5001(a) as an end-run around the statute where the relief sought is limited to damages); *Spector v. Marmelstein,* 485 F.2d 474, 482 (2d Cir.1973) (reversing the district court's denial of prejudgment interest where the action sought "no traditional form of equitable relief"). As explained below, this case is indeed clearly and predominantly equitable in nature-or, more precisely, it has become so.

This case unquestionably began as a breach of contract action, in that it was initiated by Kirton's claim for declaratory relief under the Policy. *See* DE 1 (Complaint). It retained its contractual nature when Northwestern asserted a counterclaim that initially sought compensatory damages as a consequence of Kirton's alleged breach of the implied covenant of good faith and fair dealing. *See* DE 48 (Counterclaim) at 7. However, neither Kirton's claim nor Northwestern's contract-based counterclaim is the basis for the judgment at issue; instead, the only legal claim for which judgment is to be entered is Northwestern's fraudulent misrepresentation counterclaim, for which Northwestern seeks only the remedies of rescission and restitution. *See* DE 48; DE 101; Nov.2004 Application.

**\*7** Northwestern is entitled to judgment only on an affirmative counterclaim that seeks rescission-a remedy that effectively treats the Policy as if it had never existed and returns the parties to the positions they occupied before they purported to enter that contract. The law is clear that such a remedy is equitable in nature. *See Alden Auto Parts Warehouse, Inc. v. Dolphin Equipment Leasing Corp.,* 682 F.2d 330, 333 (2d Cir.1982) (citing *Abner M. Harper, Inc. v. City of Newburgh,* 159 A.D. 695, 699-700 (N.Y.App.Div.1913)); *U.S. Postal Service v. Phelps Dodge Refining Corp.,* 950 F.Supp. 504, 517-519 (E.D.N.Y.1997).

As a result, the matter that has been referred to me falls squarely within the New York remedial statute's equity clause. *See Bank of St. Louis v. Morrissey,* 597 F.2d 1131, 1138 (8th Cir.1979) (holding that a case was within the equity clause of § 5001(a) despite the fact that it was initiated as a breach of contract claim because the sole remedy imposed was equitable). The court must therefore exercise its discretion in calculating interest and must also document its reasoning sufficiently to justify the outcome. *See Valle v. Joint Plumbing Industry Bd.,* 623 F.2d 196, 206-207 (2d Cir.1980) (remanding a case for the district court to specify "whether, at what rate, and from what date to award prejudgment interest" where the judgment was based on equitable principles and the court without explanation awarded interest at the rate of nine percent).

### 2. *Determining An Equitable Interest Award*

Having determined that the award of interest is within the court's discretion, I must next recommend what award of interest, if any, is equitable on the particular facts of this case. *See Shubert v. Lawrence,* 27 A.D.2d. 292, 297 (App.Div.1967). As a preliminary matter, I note that the rationale of awarding prejudgment interest-compensating a party for the deprivation of the use of its money-is particularly apt in this case. *See U.S. Postal Service v. Phelps Dodge Refining Corp.,* 950 F.Supp. 504, 517-519 (E.D.N.Y.1997) (citations omitted). Northwestern has been deprived for several years of funds that it paid Kirton to which he was not entitled.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                              Page 6
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Further, "public policy favors the award of interest in equity actions." *Id.* at 518. I therefore conclude that some award of interest is appropriate and turn next to recommendations as to the date from which such interest should be calculated and an appropriate rate, both of which are matters within the court's discretion.

a. *The Date From Which To Calculate Interest*

Where interest is mandated, § 5001(a) dictates that interest is to be computed "from the earliest ascertainable date" that the cause of action existed. N.Y. C.P.L.R. § 5001(b). Where damages are incurred on various dates, interest can be itemized or awarded from "a single reasonable intermediate date." *Id.* Northwestern's application seeks a judgment that includes interest on each payment from the date the payment was made through November 2005, the date of its last application. *See* Mattocks Aff. II. I infer that it does so because all of the payments at issue occurred after the cause of action accrued on July 5, 1991 when the Policy was issued. I agree than an award of interest from the date of payment is the appropriate way to restore the status quo ante. This is not a case in which the prevailing party has been dilatory in pursuing relief to which it has long been entitled. *See Phelps Dodge,* 950 F.Supp. at 519 (awarding interest from the date the lawsuit was commenced rather than the payment date on the basis of the rescinding party's nearly six years of inactivity with regard to the claim at issue). Northwestern only became aware of Kirton's misrepresentation after Kirton initiated the instant suit and admitted in deposition testimony that he had lied on his insurance application. Furthermore, the record indicates that Northwestern diligently reviewed Kirton's claim and promptly closed his case when presented with evidence that he was no longer disabled. *See* DE 101 at 5-6. Finally, I note that Judge Seybert rejected Kirton's claim that Northwestern was on notice of Kirton's pre-existing spinal condition. *See* DE 126 at 4.

b. *The Rate At Which To Calculate Interest*

**\*8** It has been relatively easy to determine that the court should exercise its discretion rather than automatically embrace an interest rate prescribed by an inapposite statutory provision. It has proved considerably more difficult to come up with a recommendation as to how the court should exercise the discretion I believe it has. My survey (or more precisely, my law clerk's survey) of the uneven landscape of discretionary pre-judgment interest awards reveals many possibilities but offers little guidance. For the reasons that follow, after considering several benchmark interest rates I have concluded that it would be most appropriate to award Northwestern interest at the rate of six percent per year.

i. *Benchmarks From New York Cases And Statutes*

The statutory command under § 5001(a) to award interest in a manner equitable to the specific facts has, not surprisingly, produced a wide array of results. Some courts have denied interest altogether. *See Carvel v. Davis,* 255 A.D.2d 315, 315-316 (N.Y.App.Div.1998) (affirming the denial of prejudgment interest on the award of unpaid commissions to a trustee); *Bank of St. Louis v.. Morrissey,* 597 F.2d 1131, 1138 (8th Cir.1979). Others have, as a matter of discretion, awarded interest at the nine percent rate mandated by § 5001(a) for non-equitable actions. *See, e.g., Phelps Dodge,* 950 F.Supp. at 519 (noting that the rate was justified by the circumstances of the case and "general conditions of fairness"). Still other courts have awarded interest below the statutory default rate based on general notions of fairness and pragmatic factors like market trends. *See Arnold Herstand & Co. v. Gallery: Gertrude Stein, Inc., N.Y.L.J.,* January 21, 1993 at 25 (N.Y.Sup.Ct. Jan. 21, 1993) (noting that the statutory rate of nine percent would amount to "a charge for the use of money"); *Shubert v. Lawrence,* 27 A.D.2d 292, 298 (N.Y.App.Div.1967). On the other hand, some courts have exercised their discretion to awarded interest at a rate *higher* than the nine percent default rate where the relevant interest rate exceeded that amount. *See Matter of Dissolution of Gift Pax, Inc.,* 123 Misc.2d 830, 837 (N.Y .Sup.1984) (awarding interest at the rate of twelve percent on a minority share purchase).

Moreover, the statute that sets the nine percent rate as the default for non-equitable remedies is not the only statutory interest rate: other statutes set other benchmarks. New York state's usury law, for example, provides a default rate of six percent and a maximum rate of sixteen percent. *See* N.Y. Gen. Oblig. Law § 5-501(1); N.Y. Banking Law § 14-a(1).

ii. *Benchmarks From Federal Cases And Statutes*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 7

Federal law on prejudgment interest is similar to the equity provision of § 5001(a). Where permitted, the award and rate of prejudgment interest is within the discretion of the district court. *See Commercial Union Assur. Co. v. Milken,* 17 F.3d 608, 613 (2d Cir.1994). By contrast, the award and rate of postjudgment interest is statutorily prescribed. *See* 28 U.S.C. § 1961 (requiring that interest be awarded at the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar weekend preceding [judgment]"). District courts in this circuit frequently use this rate in prejudgment interest awards, and the Second Circuit has expressed its approval of that practice. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 314 F.Supp.2d 201, 203 (S.D.N.Y.2003) (citing the unreported decision *Jones v. UNUM Life Ins. Co.,* 14 Fed. Appx. 44, 46 (2d Cir.2001)).

**\*9** The rationale for using a rate adopted by Congress is self-evident: "it is reasonable to accept the considered judgment of Congress as to a fair interest rate." *Id.* Most significantly, the interest rates on short-term, risk free obligations such as treasury bills are considered an inherently reasonable measure of the value of the use of money. *See New York Marine & General Ins. Co. v. Tradeline,* 266 F.3d 112, 131 (2d Cir.2001) (citations omitted). On the other hand, there is an important difference between the federal law discussed here and the potentially relevant provisions of New York law discussed above: u but the prejudgment interest awarded under federal law is compounded. *See Epstein v. Kalvin-Miller Intern., Inc.,* 139 F.Supp.2d 469, 486 (S.D.N.Y.2001); *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 145 (2d Cir.1993).

Notwithstanding the obvious difference between simple and compound interest, it is useful to determine the actual rates that would be relevant under the federal practice. For the fourteen years at issue in this case, this interest rate ranged from a low of 1.2 percent in 1991 to a high of 5.9 percent in 1991 and 1995. The average rate over the entire period was 4.3 percent. *See* Federal Reserve Statistical Release, Selected Interest Rates ("Federal Reserve Statistics") (available at http://www.federalreserve.gov/releases/h15/data.htm).

Another commonly used proxy for the market rate, the use of which has been approved by the Second Circuit, is the adjusted prime rate established by the Secretary of the Treasury. *See, e.g., E.E.O. C. v. County of Erie,* 751 F.2d 79, 82 (2d Cir.1984). For the period relevant to this case, as set forth in the Federal Reserve Statistics, this rate ranged from a low of 4.1 percent to a high of 9.2 percent and had an average of 7.1 percent.

### iii. *Simple Interest At The Rate Of Six Percent Is Equitable*

Given the preceding review of various benchmark interest rates, the statutory default rate of nine percent appears unfairly high. That rate was last modified in 1981, when interest rates were at record highs. *See* N.Y. C.P.L.R. § 5004. Of significance to my assessment of the fairness of the state default rate in comparison to other benchmarks is that fact that when the nine percent rate was fixed in the statute in 1981, it was set quite a bit *lower* than other benchmarks: the short-term T-bill rate at that time was 14.8 percent and the Adjusted Prime Rate was 18.9 percent. *See* Federal Reserve Statistics. By contrast, during the period for which interest must be calculated in this case, the statutory nine percent rate was rather *higher* than the short-term T-bill rate, and somewhat comparable to (though generally higher than) the Adjusted Prime Rate. That fact-even accounting for the difference between simple and compound interest-strongly suggests that a rate of nine percent is higher than necessary to achieve a result comparable to that intended by the legislature in achieving a just remedy in non-equitable cases.

**\*10** Based on the preceding considerations, I recommend an award of simple interest at the rate of six percent per year. Such a rate takes advantage of the comparative ease of calculation associated with simple rather than compound interest, and produces a result that (compared to other benchmark rates) is very roughly similar to what a litigant entitled to the statutory rate of nine percent might have received when that standard was enacted in 1981. More importantly, a six percent simple interest rate seems well calibrated to the goal of restoring the status quo ante without getting bogged down in further litigation.

Applying this rate of interest to the benefits and premiums paid under the Policy from the date of payment through January 2006 is a relatively simple matter. My calculations are based on those submitted by Northwestern in its most recent application, DE 135. I have determined that in that submission, Northwestern accurately calculated simple annual interest at the rate of nine percent. Because it proposed a simple interest rate, replacing that rate

Slip Copy
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 8

with a simple interest rate of six percent requires nothing more than reducing the result of Northwestern's calculations by one-third. The only other alteration that is appropriate is to account for the fact that two months have passed since Northwestern submitted its calculation of interest through November, 2005. Reducing the proposed amount by one-third to reflect the six percent rate I believe to be appropriate, and adding an additional two months of interest at the latter rate results in a total recommended award of interest in the amount of $5,640.12 on the premiums that Kirton paid and $50,800.97 on the benefits that Northwestern paid. The difference between these amounts is $45,160.85, representing the total amount of prejudgment interest to which I believe Northwestern is entitled.

### III. *Recommendation*

For the reasons set forth above, I respectfully recommend that the Court enter judgment awarding defendant Northwestern a total of **$135,403.24.** That total represents the following:

| | |
|---|---|
| Benefits paid by Northwestern to Kirton: | $104,339.26 |
| Interest on benefits paid by Northwestern to Kirton: | $50,800.97 |
| Premiums paid by Kirton to Northwestern: | ($14,096.87) |
| Interest on premiums paid by Kirton to Northwestern: | ($5,640.12) |
| Total: | $135,403.24 |

### IV. *Objections*

This Report and Recommendation will be electronically filed on the court's ECF system. Counsel for defendant Northwestern is directed to serve a copy of this Report and Recommendation on plaintiff Kirton by certified mail, and to file proof of service with the court. Any objection to this Report and Recommendation must be filed with the Clerk of the Court within 10 days of service. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker,* 118 F.3d 900 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.2d 52, 60 (2d Cir.1996).

*11 SO ORDERED.

E.D.N.Y.,2006.
Kirton v. Northwestern Mut. Life Ins. Co.
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.