UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
Cogent Capital Financial LLC and Cogent Capital
Investments LLC,                                             :

                Plaintiffs,          :

         - against -                :

Innofone.com, Incorporated,                                 :

             Defendant.              :
------------------------------------------------------------- x

Innofone.com, Incorporated,                                 :

            Plaintiff,               :

         - against -                :

Cogent Capital Financial LLC, Cogent Capital           :
Investments LLC, Cogent Capital Group LLC,
Gregory L. Kofford, Mark W. Holden, and Investors     :
Bank & Trust Company,
                                                            :
            Defendants.             :
------------------------------------------------------------- x

**ECF CASE**

No. 07 Civ. 2701 (JSR)

**ECF CASE**

No. 07 Civ. 3966 (JSR)

**APPENDIX OF UNREPORTED
AUTHORITIES IN SUPPORT OF
PLAINTIFF INNOFONE.COM,
INCORPORATED'S
MEMORANDUM OF LAW IN
OPPOSITION TO THE COGENT
PARTIES' MOTION TO DISMISS**

# TABLE OF UNREPORTED AUTHORITIES

**Tab**

*Dafofin Holdings S.A. v. Hotelworks.com, Inc.*,
   No. 00 Civ. 7861 (LAP), 2001 WL 940632 (S.D.N.Y. Aug. 17, 2001)......................................1

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of N.Y.*,
   No. 02 Civ.1312 (LMM), 2002 WL 31426310 (S.D.N.Y. Oct. 29, 2002)..................................2

*Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,*
   No. 01 Civ. 6600 (RLC), 2005 WL 3370542 (S.D.N.Y. Dec. 12, 2005) ...................................3

*Kirton v. Northwestern Mutual Life Insurance Co.,*
   No. 00-CV-7646 (JS)(AKT), 2006 WL 3051772 (E.D.N.Y. Oct. 24, 2006) ...........................4

*Maalouf v. Salomon Smith Barney, Inc.,*
   No. 02 Civ. 4770 (SAS), 2003 U.S. Dist. LEXIS 5913(S.D.N.Y. Apr. 10, 2003)....................5

*Waxman v. Envipco Pick Up & Processing Services, Inc.,*
   No. 02 Civ. 10132 (GEL), 2003 WL 22439796 (S.D.N.Y. Oct. 28, 2003)................................6

# TAB 1

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529
(Cite as: Not Reported in F.Supp.2d)

C

Dafofin Holdings S.A. v. Hotelworks.com, Inc.
S.D.N.Y.,2001.

United States District Court, S.D. New York.
DAFOFIN HOLDINGS S.A., Findim Investments,
S.A. and Omabuild Corp., Plaintiffs,
v.
HOTELWORKS.COM, INC., formerly known as
Hospitality Worldwide Services, Inc. and Douglas
Parker, Defendants.
**No. 00 CIV. 7861(LAP).**

Aug. 17, 2001.

MEMORANDUM AND ORDER
PRESKA, District J.
**\*1** Plaintiffs Dafofin Holdings S.A. (" Dafofin" ),
Findim Investments, S.A. (" Findim" ) and Omabuild
Corporation (" Omabuild" ) (collectively the
" plaintiffs" ) bring this action alleging fraud in
violation of Sections 12(a)(2) and 17(a) of the
Securities Exchange Act of 1933, 15 U.S.C. §§ 77l(2)
and 77q(a), fraud in violation of Section 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)
and Rule 10b-5 promulgated thereunder by the
Securities and Exchange Commission, 17 C.F.R. §
240.10b-5, and fraud, breach of contract, and
conversion under state law. Defendants
Hotelworks.com, Inc., formerly known as Hospitality
Worldwide Services, Inc. (" HWS" ), and Douglas
Parker (" Parker" ) (collectively the " defendants" )
move to dismiss the complaint pursuant to Federal
Rules of Civil Procedure 12(b)(1) and (6). For the
reasons set forth below, the motion is granted.

BACKGROUND

The following facts are taken from allegations in the
complaint, which I must accept as true for purposes of
the motion to dismiss. Dafofin, Findim and Omabuild
are corporations organized under the laws of
Luxembourg, Switzerland and New York respectively.
(Compl.¶ 1). HWS is a corporation organized under
the laws of New York. (Id. ¶ 2). Parker is HWS's
President and Chief Executive Officer.

As of May 29, 1998, HWS owned 100% of the
membership interest in HWS Holdings, LLC (" HWS

Member" ), HWS Member owned a 26.56%
membership interest in HWS/IRP Manneheim
Property, LLC (" HWS/IRP" ), and the remaining
73.44% interest in HWS/IRP was owned by IRP
Manneheim, LLC (" IRP" ). HWS and IRP were
parties to a March 30, 1998 Amended and Restated
Limited Liability Company Operating Agreement of
HWS/IRP (the " Operating Agreement" ). HWS/IRP
owned a full service hotel known as the
Clarion/Quality Inn, Rosemont, Illinois (the " Hotel" ).
(Id. ¶¶ 6-8).

On May 29, 1998, Dafofin and HWS entered into an
Assignment and Investment Agreement (the
" Agreement" ).FN1 (Id. ¶ 12). Under the terms of the
Agreement, Dafofin was to invest $1,000,000 in HWS
and " receive a preferential return on its Equity
Investment," (id. ¶ 13), and HWS was to assign to
Dafofin 31.9% of its " economic interest in connection
with its membership interest in HWS Member," (id. ¶
14).

> FN1. Although plaintiffs refer to the
> Agreement throughout the complaint, they
> have not attached a copy to the complaint.
> Defendants have attached a copy of the
> Agreement to the Declaration of Peter Yu, Jr.,
> (" Yu Decl." ). Because " the complaint is
> deemed to include any written instrument
> attached to it as an exhibit or any statements
> or documents incorporated in it by
> reference," *International Audiotext Network,
> Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d
> Cir.1995) (quoting *Cortec Indus., Inc. v. Sum
> Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)),
> I have considered the Agreement on
> defendants' motion to dismiss.

Following the Agreement and with HWS's consent,
Dafofin assigned all of its " rights, preferential returns
and economic interests" in the Agreement to Findim,
and Findim assigned such " rights, preferential returns
and economic interests" to Omabuild. (Id. ¶ 16).
Plaintiffs have paid $1,000,000 to HWS, but have not
received any distributions. (Id. ¶¶ 17-18). Plaintiffs
filed their complaint on October 16, 2000 alleging
fraud under federal securities laws and state law.

Dafofin claims that in deciding to invest in HWS, it
relied on the following false and misleading

Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529

**(Cite as: Not Reported in F.Supp.2d)**

statements made by HWS:
• IRP, the majority member in HWS/IRP, the owner of the Hotel, knew that Dafofin was to take a minority interest in the hotel;

**\*2** • IRP favored Dafofin's proposed investment and was interested in pursuing an independent business relationship with Findim;

• Dafofin's investment in the Hotel would have a " preferred position relative to both HWS and IRP;"

• the Hotel was a ' ' great' investment" and would make Dafofin " ' quick' money;"

• HWS would " buy Dafofin's investment for ' any reason;" ' and

• Dafofin could " always sell its interest in HWS to IRP as an exit strategy."

(*Id.* ¶ 10).

Plaintiffs further allege that HWS refused to provide Dafofin with the Operating Agreement before the parties entered into the Agreement. (*Id.* ¶ 11). Plaintiffs allegedly received a copy of the Operating Agreement on August 21, 2000. (Affidavit of Nicholas C. Biase (" Biase Aff." ) ¶ 28).[FN2] According to the Operating Agreement, HWS is prohibited from selling, transferring or encumbering its interest in HWS Member, IRP is entitled to preferential distributions from HWS/IRP, and HWS has a financial interest in the Hotel beyond its interest as a member in HWS/IRP. (Compl.¶ 11).

> [FN2.] I note that in resolving this motion I have not considered the Affidavit of Nicholas C. Biase submitted with plaintiffs' opposition papers. Plaintiffs' affidavit contains a number of factual allegations not pled in the original complaint such as the financial history between the parties. This is a Rule 12(b)(6) motion, filed in lieu of an answer and prior to commencement of discovery. Under the circumstances, I have two options, either consider the affidavit and convert this motion into one for summary judgment or disregard the affidavit and treat this motion as a 12(b)(6) motion. *See Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). Here, I do not believe that conversion is appropriate, and no notice to that effect was given to the parties. At the time the motion was submitted, an answer had not been filed, and discovery had not commenced. *See Old Republic Ins. Co. v., Hansa World Cargo Serv., Inc.,* 170 F.R.D. 361, 366 (S.D.N.Y.1997) (declining to

convert motion because, *inter alia,* the parties had not undertaken discovery). Accordingly, I have not relied upon the Biase affidavit for additional factual material, and this motion remains a motion under Fed.R.Civ.P. 12(b)(6). *See Alba v. Ansonia Bd. of Educ.,* 999 F.Supp. 687, 691 n. 1 (D.Conn.1998). Nonetheless, in resolving defendants' motion to dismiss, I have relied on the affidavit to clarify allegations made in the complaint. *See Albany Ins. Co. v. Banco Mexicano, S.A.,* 98 Civ. 9531, 1999 WL 533792, at \*3 (2d Cir. July 2, 1999) (holding that where reply papers did not " change grounds for motion to dismiss, but rather simply clarified the location of [documents]" and did not prejudice the opposing party, district court did not improperly rely on reply memorandum and corresponding affidavit on motion to dismiss.)

Since signing the Agreement, plaintiffs have learned that IRP did not know of Dafofin's proposed investment. (*Id.*). Plaintiffs have also learned that HWS Member, by its President and Chief Executive Officer, Douglas Parker, transferred its membership interest in HWS/IRP to IRP. (*Id.* ¶ 19). Plaintiffs have not received any distribution and allege that their equity interest is worthless. (*Id.*). Defendants argue that plaintiffs have failed to state a valid federal securities claim and that plaintiffs' state law claims should therefore be dismissed for lack of subject matter jurisdiction.

ANALYSIS

I. Standard Applicable to Motion to Dismiss for Failure to State a Claim

When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *See City of Los Angeles v. Preferred Communications, Inc.,* 476 U .S. 488, 493 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2 (1977) (referring to " well-pleaded allegations" ); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). " ' [T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." ' *International Audiotext Network, Inc. v. American Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d

Not Reported in F.Supp.2d                                                                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529

**(Cite as: Not Reported in F.Supp.2d)**

Cir.1991)). In order to avoid dismissal, plaintiffs must do more than plead mere " [c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (quoting 2 James Wm. Moore, Moore's Federal Practice ¶ 12.34[a] [b] (3d ed.1997)). Dismissal is proper only when " it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *accord Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

II. Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder

**\*3** Plaintiffs' first claim alleges a violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs' claims under Section 10(b) of the 1934 Act and Rule 10b-5 are subject to the one-year/three-year limitations structure in Section 9(e) of that Act. 15 U.S.C. § 78i(e). [FN3] *See Siemens Solar Indus. v. Atlantic Richfield Co.,* 93 Civ. 1126, 1994 WL 86368, at *1 (S.D.N.Y. Mar. 16, 1994) (detailing importance of statute of limitations). *See generally, Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364 (1991); *Ceres Partners v. GEL Assoc.,* 918 F.2d 349, 361 (2d Cir.1990). Defendants contend that plaintiffs failed to bring their Section 10(b) and Rule 10-b5 claims in a timely manner because plaintiffs were on inquiry notice of the fraud on May 29, 1998, the day the parties signed the Agreement, and waited over two years to file suit, well past the one year statute of limitations period.

> FN3. Section 9(e) of the 1934 Act provides in pertinent part:
> No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation. 15 U.S.C. § 78i(e).

The statutory periods for claims under Section 10(b) and Rule 10b-5 begin to run " when the claim accrued or upon discovery of facts constituting the alleged fraud." *Dodds v. Cigna Sec.,* 12 F.3d 346, 350 (2d Cir.1993). Discovery under this standard " includes constructive and inquiry notice as well as actual notice." *Id.; see also Menowitz v. Brown,* 991 F.2d 36, 41-42 (2d Cir.1993). A plaintiff " will be deemed to

have discovered fraud for purposes of triggering the one-year statute of limitations when a reasonable investor of ordinary intelligence would have discovered the fraud." *Dodds,* 12 F.3d at 350 (internal citations omitted). A duty of inquiry arises where circumstances would suggest to a reasonable investor with conservative instincts the probability of fraud. *Dodds,* 12 F.3d at 352; *In re Integrated Res. Real Estate Sec. Ltd. Litig.,* 815 F.Supp. 620, 639 (S.D.N.Y.1993).

Inquiry notice is triggered by " financial, legal or other data available to plaintiff providing ... sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]." *Addeo v. Braver,* 956 F.Supp. 443, 449 (S.D.N.Y.1997) (quoting *Lenz v. Associated Inns & Rests. Co. of Am.,* 833 F.Supp. 362, 370 (S.D.N.Y.1997)) (change in original). Where the materials suggest that there are *any* material representations, plaintiffs have a duty to inquire into the reliability of defendant's representations. *See Addeo,* 956 F.Supp. at 450. " An investor [is] not [required] to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds,* 12 F.3d at 352; *see Arneil,* 550 F.2d at 780 (" [T]he statutory period ... [does] not await appellant's leisurely discovery of the full details of the alleged scheme." ) (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970) (change in original).

**\*4** In deciding to enter the Agreement with HWS, Dafofin alleges that it relied on defendants' misrepresentations that Dafofin would have a preferred position in the hotel relative to both HWS and IRP. (Compl. ¶¶ 10, 11; *see also* Biase Aff.) (explaining that Dafofin believed that it had a senior position vis-a-vis HWS and IRP)).[FN4] However, Paragraph 1.3 of the Agreement provides in pertinent part:

> FN4. Again, I note that although I have not have considered the Biase affidavit in resolving defendants' motion to dismiss, I have relied on the affidavit to clarify allegations made in the complaint. *See Albany Ins. Co. v. Banco Mexicano, S.A.,* 98 Civ. 9531, 1999 WL 533792, at *3 (2d Cir. July 2, 1999).

(a) DAFOFIN shall receive a preferential rate of return up to 12% on its Equity Investments from proceeds distributed from Owner to its Members (pari passu)

Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529

**(Cite as: Not Reported in F.Supp.2d)**

*who are also receiving a preferential return* on their equity contributions.

(Agreement ¶ 1.3) (emphasis added). Although Paragraph 1.3(a) provides that Dafofin is entitled to a preferential rate of return, it also clearly states that other " Members ... are also receiving a preferential return." (*Id.*). According to this provision of the Agreement, there are at least two other parties, in addition to Dafofin, who are receiving a preferential return. Paragraph 1.3(a) clearly does not provide that Dafofin is in a superior position relative to these other " Members." The remainder of the Agreement is also silent as to which preferential rate, if any, is superior. Significantly, the Agreement does not define " Members," and it does not explicitly address Dafofin's position vis-a-vis HWS or IRP. Dafofin, however, was well aware that IRP was a " majority member" in the Hotel, (Compl.¶ 10), and that HWS held a 26.56% " membership interest" in HWS/IRP, the owner of the Hotel, (Agreement). Moreover, Plaintiffs do not allege that they believed that there was a third party with interest in the Hotel or that they knew the identity of the " other Members." Thus, the Agreement clearly provides that other parties besides Dafofin were granted a preferential return and that Dafofin did not hold a superior position vis-a-vis HWS, IRP or these other unidentified members.

Plaintiffs also claim that they relied on Defendants' false and misleading representation that HWS would buy Dafofin's investment for " any reason" and that Dafofin " could always sell its interest to IRP as an " exit strategy." (Compl.¶ 10). The Agreement does not address Dafofin's ability to sell its interest to HWS or IRP. The only portion of the Agreement which deals with Dafofin's ability to transfer its interest is Paragraph 2.1 which requires Dafofin to obtain permission from HWS before transferring or assigning its interest.[FN5]

> [FN5.] The full text of Paragraph 2.1 reads as follows:
> Agreement Not Assignable. This Agreement and the rights hereunder shall not be assignable or transferable by operation of law or otherwise by any party without the prior written consent of each party hereto, which consent may be withheld for any reason or no reason.

The Agreement also contains a merger clause stating that: " [t]his Agreement supersedes all prior oral or written agreements made between the parties relating to this subject matter. There are no other

understandings or agreements between them." (Agreement ¶ 2.3). The merger clause makes clear that there are no other agreements between the parties. *See Harsco Corp. v. Segui,* 91 F.3d 337, 343 (2d Cir.1996) (finding that where there was a merger clause in " a detailed writing developed via negotiations among sophisticated business entities," the agreement " defines the boundaries of the transaction" ). Thus, any and all arrangements regarding Dafofin's preferential rate of return and its ability to sell its 31.9% interest are included in the Agreement. Because Paragraph 1.3(a) clearly provides that Dafofin's preferential rate of return is neither exclusive nor superior to IRP or HWS, and the merger clause forecloses the possibility of any contrary or additional arrangement, the Agreement contradicts any representation that Dafofin's investment in the Hotel would have a preferred position relative to both HWS and IRP. Similarly, the omission of any provision addressing Dafofin's ability to sell its interest to HWS or IRP coupled with the merger clause contradicts any representations that there was a particular arrangement under which Dafofin could sell its interest to HWS or IRP. Accordingly, the Agreement constitutes a " storm warning" that should have alerted the plaintiffs that there was a " [probability] that there were either misleading statements or significant omissions involved in the sale." *Addeo,* 956 F.Supp. at 449 (internal citations omitted) (change in original); *see Dodds,* 956 F.3d at 352 (finding conflict between conversation with investment advisor and prospectus constitutes " storm warning" sufficient to create inquiry notice). Although plaintiffs might not have discovered the full extent of defendants' alleged fraud until plaintiffs reviewed the Operating Agreement, the Agreement suggested a contradiction of defendants' earlier representations regarding Dafofin's preferred rate of return and its ability to sell its interest to HWS or IRP. Dafofin was thereby placed on notice that there was a probability that defendants made at least one misrepresentation.[FN6] Because plaintiffs need not have " notice of the entire fraud being perpetrated to be on inquiry notice," *Dodds,* 12 F.3d at 352, plaintiffs were placed on notice when they signed the Agreement on May 29, 1998, over two years before they filed suit. *See Addeo,* 956 F.Supp. at 449 (requiring plaintiff to read materials provided in connection with investments); *see also Dodds,* 956 F.3d at 350, (" [P]laintiff[s] ' cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put [them] on inquiry notice" ' ) (internal citations omitted).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529
(Cite as: Not Reported in F.Supp.2d)

Page 5

FN6. I also note that the remaining allegations of false and misleading statements do not appear to be actionable. Defendants' alleged assurance that the Hotel was a " great" investment for Dafofin which would make " quick" money are mere puffery. See *Novak v. Kasaks,* 216 F.3d 300, 315 (2d Cir.2000) (defining puffery to include " statements containing simple economic projections, [and] expressions of optimism" ); *Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (holding that statement in annual report that business strategies would lead to " continued prosperity" are puffery and therefore immaterial). Statements regarding IRP's interest in Finim and its purported knowledge of and enthusiasm for Dafofin's participation in the Hotel are non-material misrepresentations. *See generally Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161-162 (2d Cir.2000) (" At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions.... It is not sufficient to allege that the investor might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made.... Therefore, ... material[ity] necessarily depends on all relevant circumstances of the particular case." ) (internal citations omitted).

**\*5** Finally, Plaintiffs argue that defendants purposefully hindered plaintiffs' discovery of the alleged fraud thereby tolling the running of the statute of limitations. Under the doctrine of equitable tolling, " if the defendant actively prevented plaintiff from discovering the basis of the claim, then the statute of limitations will be tolled for the period of concealment." *Dodds,* 12 F.3d at 352. Plaintiffs argue that because HWS delayed delivery of the Operating Agreement, (Compl.¶ 11), until August 21, 2000, (Pl. Opp. Br. at 9), the triggering date for the statute of limitations should be tolled until August 21, 2000.

The Supreme Court addressed the applicability of the equitable tolling doctrine in *Lampf* where it stated: ' [t]ime requirements in law suits ... are customarily subject to " equitable tolling." ' ... Notwithstanding this venerable principle, it is evident that the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure [of the federal securities laws]. The 1-year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary.

501 U.S. at 363 (internal citations omitted). If a defendant actively conceals the fraud, it follows that plaintiffs will not discover the facts constituting the violation, and the statute of limitations will not begin to run. See *Cohen v. Prudential-Bache Sec.,* 777 F.Supp. 276, 279 (S.D.N.Y.1991) (" [w]hereas equitable tolling generally applies in fraud cases, the doctrine does not apply to claims for securities fraud under section 10(b)" ); *Manning v. Maloney,* 787 F.Supp. 433, 436 (M.D.Pa.1992) ( " [e]quitable tolling under the doctrine of fraudulent concealment does not apply to [Securities Exchange Act] actions" ), *aff'd without opinion,* 980 F.2d 722 (3d Cir.). Thus, where a plaintiff is on inquiry notice, the statutory period is tolled only so long as plaintiff has " exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Dodds,* 12 F.3d at 350 (citing *Arneil,* 550 F.2d at 781); see *Tregenza v. Great Am. Communications Co.,* 823 F.Supp. 1409, 1415 (N.D.Ill.1993) (" [a] party cannot both have inquiry notice and merit equitable tolling" ); *but see Seidman & Seidman,* 609 F.2d at 593 (" active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he actually knew of the fraudulent conduct" ).

Plaintiffs failed to " exercise[ ] reasonable care and diligence in seeking to learn facts [that] would [have] disclose[d the] fraud." *Dodds,* 12 F.3d at 351-52. Defendants' mere refusal to provide plaintiffs with the Operating Agreement, (Compl.¶ 11), did not relieve plaintiffs of their duty to undertake reasonable inquiry into contradictions between the defendants' oral representations and the Agreement. *See In re Integrated Res. Real Estate Ltd. P'ship Sec. Litig.,* 850 F.Supp. 1105, 1132 (S.D.N.Y.1993) (" [N]either reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place relieves the plaintiff of his [ ] duty to undertake reasonable inquiry or tolls the statute of limitations." ) (quoting *In re Integrated Res.,* 815 F.Supp. at 640).[FN7] Accordingly, plaintiffs' Section 10(b) and Rule 10b-5 claims are untimely and barred by the applicable one-year statute of limitations.

FN7. Similarly, plaintiffs' arguments in their

Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529
**(Cite as: Not Reported in F.Supp.2d)**

Memorandum (but not contained in the complaint) requested the HWS/IRP Operating Agreement, but did not receive the document until August 2000, (Pl. Opp. Br. at 9), are of no assistance to plaintiffs once they were on inquiry notice. Having been placed on inquiry notice when plaintiffs signed the Agreement on May 29, 1998, they were not justified in waiting for defendants to deliver the Operating Agreement.

### III. Section 12(a)(2) of the Securities Exchange Act of 1933

**\*6** Plaintiffs' second claim alleges a violation of Section 12(a)(2), formerly Section 12(2), of the Securities Act of 1933, 15 U.S.C. § 77l(2). (Compl.¶¶ 23-25). Plaintiffs have conceded that in the Second Circuit, Section 12(a)(2) claims are limited to misrepresentations that " (for the most part) appear in prospectuses (or similar disclosure documents) that are published as part of a public offering." (Pl. Opp. Br. at 11). Plaintiffs have requested that if the Court dismisses this claim, it do so without prejudice to allow plaintiffs an opportunity to replead this claim. (*Id.*). Plaintiffs allege that discovery may produce information to support a Section 12(a)(2) claim in accordance with the requirements of this Circuit. (*Id.*).

Under Section 12(a)(2),[FN8] purchasers of securities may bring a claim against sellers who make material misstatements or omissions " by means of a prospectus." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 563 (1995). Section 12(a)(2) liability attaches to violations of registration and disclosure obligations of an initial public offering, but not to secondary private offerings, which are not burdened by such disclosure and registration obligations. *Id.* at 577. Purchasers in private market offerings do not have standing to bring actions under Section 12(a)(2). *See Saslaw v. Al Askari,* 95 Civ. 7641, 1997 WL 221208, at *6 (S.D.N.Y. Apr. 25, 1997) (citing cases). *See also id.* at *5 (detailing purpose of Securities Act of 1933). Courts within this circuit have consistently interpreted *Gustafson* to exclude purchasers in private or secondary market offerings from bringing actions under Section 12(a)(2). *See e.g., Baxter v. A.R. Baron & Co., Inc.,* 1995 Fed. Sec. L. Rep. P 98,923, 94 Civ. 3913, 1995 WL 600720 (S.D.N.Y. Oct. 12, 1995)); *Glamorgan Coal Corp. v. Ratner's Group PLC,* 93 Civ. 7581, 1995 WL 406167, at * 2 (S.D.N.Y. July 10, 1995) (" Every court since *Gustafson,* including this

district, has held in light of *Gustafson,* that § 12(2) applies only to initial public offerings." ) (citing *In re U .S.A. Classic Sec. Litig.,* 93 Civ. 6667, 1995 WL 363841, at *3 (S.D .N.Y. June 14, 1995); *Pollack v. Laidlaw Holdings, Inc.,* 90 Civ. 5788, 1995 WL 261518, at * 14 (S.D.N.Y. May 3, 1995); *Komanoff v. Mabon, Nugent & Co.,* 884 F.Supp. 848, 857 (S.D.N.Y.1995)).

> FN8. Section 12(a) provides as follows: Any person who-...
> (2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable ... to the person purchasing such security from him....
> 15 U.S.C. § 77l.

It is clear that there is no way in which Plaintiffs' Section 12(a)(2) claim can possibly conform to the requirements of *Gustafson.* Dafofin's million dollar investment in HWS was made pursuant to a private transaction between the parties. (Compl.¶¶ 12, 13, 17.) No amount of discovery can transform this private agreement into a public offering. Because Plaintiffs cannot present a viable claim, their Section 12(a)(2) claim is dismissed with prejudice.

### IV. Section 17(a) of the Securities Act of 1933

Plaintiffs' third claim alleges a violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a). (Compl.¶¶ 26-28). Plaintiffs, however, have conceded that the Second Circuit does not recognize a private right of action under Section 17(a). (Pl. Opp. Br. at 10). Plaintiffs have requested that if the Court dismisses this claim, it do so without prejudice to allow plaintiffs an opportunity to replead this claim in the event that the Supreme Court reverses the Second Circuit's position on Section 17(a) claims while this case is pending. (*Id.* at 10-11).

**\*7** The Second Circuit has clearly held that " there is no private right of action under Section 17(a)." *Finkel v. Stratton Corp.,* 962 F.2d 169, 175 (2d Cir.1992).

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2001 WL 940632 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,529

**(Cite as: Not Reported in F.Supp.2d)**

The position of the Second Circuit is based, in large part, on Supreme Court decisions. *See id.* at 175 (stating that recent Supreme Court cases have " fatally undercut"    Second Circuit's previous position recognizing private right of action under Section 17(a)). Although the Supreme Court has recently declined to express a view " as to whether a private right of action exists under Section 17(a)," *Bateman Eichler, Hill Richard, Inc. v. Berner,* 472 U.S. 299, 304 n. 9 (1985), *Finkel* is clear precedent in the Second Circuit. Accordingly, Plaintiffs' third claim is dismissed with prejudice.

### V. Jurisdiction of State Law Claims

Finally, Plaintiffs assert state law claims of fraud, breach of contract, and conversion. Defendants argue that if Plaintiffs' federal claims are dismissed the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.[FN9] As set forth above, Plaintiffs' federal securities law claims are dismissed, and there is no federal question to be adjudicated. " [P]endant jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966). Where " federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726. Accordingly, I decline to exercise supplemental jurisdiction,[FN10] and Plaintiffs' state law claims are dismissed without prejudice.

> FN9. Because defendant HWS and at least one of the plaintiffs, Omabuild, are both New York Corporations, (Compl.¶¶ 1-2), there is no diversity jurisdiction.

> FN10. Because I decline to exercise supplemental jurisdiction, I need not consider whether plaintiffs' conversion claim duplicates their breach of contract claim.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

S.D.N.Y.,2001.
Dafofin Holdings S.A. v. Hotelworks.com, Inc.
Not Reported in F.Supp.2d, 2001 WL 940632

(S.D.N.Y.), Fed. Sec. L. Rep. P 91,529

END OF DOCUMENT

# TAB 2

Westlaw.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**



Eternity Global Master Fund Limited v. Morgan Guar.
Trust Co. of New York
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
        United States District Court,S.D. New York.
    ETERNITY GLOBAL MASTER FUND LIMITED,
                        Plaintiff,
                            v.
  MORGAN GUARANTY TRUST COMPANY OF
    NEW YORK and JP Morgan Chase Bank,
                     Defendants.
              **No. 02 Civ.1312 (LMM).**

                    Oct. 29, 2002.

Buyer of credit protection from bank in connection
with credit swap transactions entered into between the
parties sued bank, alleging breach of contract, breach
of the obligation of good faith and fair dealing, fraud
and negligent misrepresentation. On motion to dismiss,
the District Court, McKenna, J., held that: (1) there
had been a " restructuring" credit event as defined in
the agreement governing the transactions, thus
obligating bank to settle the swaps; (2) company failed
to state a cause of action for fraud; (3) fraud claim, if
sufficiently replead, was collateral or extraneous to
alleged breach of contract; (4) disclaimers in contract
were too general to bar the company from reasonably
relying on bank's oral statements; (5) complaint
alleged a " special relationship" sufficient to support a
negligent misrepresentation claim, though that claim
was otherwise insufficient; (6) company failed to state
a claim for punitive damages; and (7) company was
not entitled to consequential damages for its claim for
breach of contract.

Motion granted in part with leave to replead.
West Headnotes
**[1] Contracts 95 ☞193**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k193 k. Money, Investments, and
Securities. Most Cited Cases
Argentina's " voluntary debt exchange" with respect
to its bonds constituted a " restructuring" credit event
as defined in the agreement governing credit swap

transactions between investment company and bank,
thus obligating bank to settle the swaps by accepting
the Argentine debt to in exchange for a payment of the
full principal amount, as there was an agreed-upon
indefinite deferral of interest and/or principal
payments under the obligations.

**[2] Federal Civil Procedure 170A ☞675.1**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak675 Alternate, Hypothetical and
Inconsistent Claims
                    170Ak675.1 k. In General. Most Cited
Cases
Under New York law, cause of action alleging a
breach of good faith was duplicative of cause of action
alleging breach of contract.

**[3] Banks and Banking 52 ☞100**

52 Banks and Banking
    52III Functions and Dealings
        52III(A) Banking Franchises and Powers, and
Their Exercise in General
            52k100 k. Torts. Most Cited Cases

**Banks and Banking 52 ☞226**

52 Banks and Banking
    52III Functions and Dealings
        52III(H) Actions
            52k226 k. Pleading. Most Cited Cases
Investment company which had entered into credit
swap transactions with bank failed to state a cause of
action for fraud against bank, in alleging that bank
" provided assurances that [company] would have a
liquid secondary market for [the] credit swaps and that
[bank] would provide [company] with a continuing
flow and supply of secondary market pricing to offset
[company'] risks of investment," as company failed to
allege that it needed or wanted to sell in the secondary
market or that bank refused such a request, there was
no specific allegation that bank had already
formulated an intent not to perform when the alleged
misrepresentation was made, and company did not
detail the speaker of the alleged misrepresentation or
when or where the alleged fraudulent conduct took

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 2

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

place. Fed.Rules Civ.Proc. Rule 9(b), 28 U.S.C.A.

**[4]** Banks and Banking 52 ☜100

52 Banks and Banking
    52III Functions and Dealings
        52III(A) Banking Franchises and Powers, and Their Exercise in General
            52k100 k. Torts. Most Cited Cases
Fraud claim by investment company against bank with which it had entered into credit swap transactions, if sufficiently repled, was collateral or extraneous to alleged breach of contract, and thus could be asserted as separate claim, where the fraud claim was not based on a commitment by bank to " unwind" the swap transaction itself, but rather, alleged representations regarding the existence and availability of a secondary market in which company could sell or otherwise transfer its positions to third parties, and it was possible that bank was implicitly representing that the consent required by contract in order to transfer the transactions would, if necessary, be granted by bank.

**[5]** Banks and Banking 52 ☜100

52 Banks and Banking
    52III Functions and Dealings
        52III(A) Banking Franchises and Powers, and Their Exercise in General
            52k100 k. Torts. Most Cited Cases
Within agreement governing credit swap transactions between investment company and bank, integration clause and representations that neither party was relying on any advice of the other party, that company had the capacity to evaluate the transaction and made its own decision to enter it, that bank was neither acting as a fiduciary or financial advisor for company nor giving any representation as to the merits of any transaction, and that neither party had " committed to unwind" any transaction, were too general to bar the company from reasonably relying on bank's oral statements, for purposes of a fraud claim, since the disclaimer provisions fell well short of tracking the particular misrepresentations alleged by the company, regarding the existence and availability of a secondary market for the swaps.

**[6]** Banks and Banking 52 ☜100

52 Banks and Banking
    52III Functions and Dealings
        52III(A) Banking Franchises and Powers, and Their Exercise in General

            52k100 k. Torts. Most Cited Cases

Banks and Banking 52 ☜226

52 Banks and Banking
    52III Functions and Dealings
        52III(H) Actions
            52k226 k. Pleading. Most Cited Cases
Complaint by investment company against bank with which it had entered into credit swap transaction sufficiently alleged a " special relationship" to support a negligent misrepresentation claim, though the complaint seemed to lack any allegation of a " special relationship of trust," this appeared to have been a typical arm's length business transaction, and company expressly disclaimed any reliance on bank for advice in entering the transactions, where the complaint contained a great number of details regarding bank's unique or special expertise in swap transactions and emerging market debt, as well as allegations that bank was aware of the use to which the information would be put.

**[7]** Banks and Banking 52 ☜100

52 Banks and Banking
    52III Functions and Dealings
        52III(A) Banking Franchises and Powers, and Their Exercise in General
            52k100 k. Torts. Most Cited Cases

Banks and Banking 52 ☜226

52 Banks and Banking
    52III Functions and Dealings
        52III(H) Actions
            52k226 k. Pleading. Most Cited Cases
Investment company which had entered into credit swap transactions with bank failed to state a claim for punitive damages, even if there was a fraud tort independent of the parties' contract, where there was no allegation that bank's behavior was part of a pattern directed at the public generally, and where the behavior described did not necessitate imposing punitive damages in order to deter defendant and others like it from engaging in conduct that may be characterized as " gross" and " morally reprehensible," and of such wanton dishonesty as to imply a criminal indifference to civil obligations.

**[8]** Damages 115 ☜22

115 Damages

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

115III Grounds and Subjects of Compensatory Damages
  115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
   115III(A)1 In General
    115k21 Natural and Probable Consequences of Breaches of Contract
     115k22 k. In General. Most Cited Cases

**Damages 115 🔑68**

115 Damages
  115III Grounds and Subjects of Compensatory Damages
   115III(C) Interest
    115k66 Interest
     115k68 k. Breaches of Contract. Most Cited Cases

Investment company which had entered into credit swap transactions with bank was not entitled to consequential damages for its claim for breach of contract, where its essential claim was one for payment of money withheld although due, as the law assumes that interest is the measure of all such damages.

> FN1. However, it does not appear that Eternity ever filed the First Amended Complaint with the Clerk of Court.

*MEMORANDUM AND ORDER*

MCKENNA, J.

**\*1** Plaintiff Eternity Global Master Fund Limited (" Eternity" ) commenced this action against Morgan Guaranty Trust Company of New York and JP Morgan Chase Bank (" Morgan" ) alleging breach of contract, breach of the obligation of good faith and fair dealing, fraud and negligent misrepresentation. Presently before the Court is a motion brought by Morgan to dismiss the First Amended Complaint. For the reasons set forth below, the motion to dismiss is granted regarding: 1) breach of the obligation of good faith and fair dealing; 2) fraud and negligent misrepresentation; 3) punitive damages and consequential damages; 4) declaratory judgment; and 5) jury demand.

Background

I. The Parties

Eternity invests in global bonds, equities and currencies to achieve capital appreciation while minimizing portfolio volatility through hedging techniques. (First Am. Compl. ¶ 7). Morgan has developed a reputation in the research and trading of emerging market debt. (*Id.* ¶ 12). Morgan's " Emerging Market Bond Index" is a leading indicator of the debt of emerging market countries and Morgan has achieved a commanding market for its underwriting activities in sovereign foreign debt, especially that of Argentina, which is the largest single issuer of emerging market debt. (*Id.*) Eternity and Morgan entered into a series of transactions pursuant to which Eternity purchased emerging market bonds and hedged the attendant risk with Argentine credit default swaps. (*Id.* ¶ 20).

II. The Parties' Agreement

This action arises out of three credit swap transactions entered into between Eternity and Morgan in October 2001. (*Id.* ¶ 22.) A credit swap is a transaction in which one party promises (the " Seller" ), in exchange for an agreed payment, that if a specified " Credit Event" occurs with respect to a " Reference Entity" (the issuer of a bond or other debt obligation) in the specified timeframe (and certain other conditions are satisfied), the other party (the " Buyer" ) has the right to deliver to the Seller certain debt obligations of that Reference Entity in exchange for payment by Seller of the face amount of those obligations. (*Id.* ¶¶ 27-30; Schwarzkopf Aff. Exh. D § 3.1). In each of the three transactions at issue, Eternity was the Buyer of credit protection from Morgan (the Seller) with the Republic of Argentina as the Reference Entity.

The terms and provisions of each of the three swaps were set forth and memorialized in separate letter agreements (the " Confirmations" ). (First Am. Compl. ¶ 23). The Confirmations expressly incorporated both the " 1999 ISDA Credit Derivatives Definitions" published by the International Swaps and Derivatives Association, Inc., (" ISDA" ) as well as an " ISDA Master Agreement" entered into by the parties in October 1999. (*Id.;* Schwarzkopf Aff. Exhs. B & C). The Confirmations list four categories of applicable " Credit Events" with respect to certain Argentine " Obligations" including " Repudiation/Moratorium" and " Restructuring" . (First Am. Compl. ¶¶ 31, 32). Upon the occurrence of a Credit Event, the Confirmations permitted Eternity to deliver Argentine debt to Morgan in exchange for a payment of the full principal amount. (*Id.* ¶ 76).

III. The Financial Crisis in Argentina

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

*2 On November 1, 2001, Argentina's President issued Decree 1387/2001, pursuant to which the Ministry of Economy was instructed " to offer on voluntary terms the possibility of exchanging Argentine government debt for Secured Loans or Secured Argentine Government Bonds, provided that the collateral offered or the change in debtor allows the Argentine Government to obtain lower interest rates for the Argentine or Provincial Government Sector." (Schwarzkopf Aff. Exh. E, Art. 17; First Am. Compl. ¶ 35). On November 19, 2001, Argentina officially announced a " voluntary debt exchange" which provided for domestic debtholders to " exchange their debt for loan instruments with lower yields and longer maturities." (First Am. Compl. ¶¶ 37, 38). On November 28, 2001, the Argentine Ministry of Economy issued Resolution No. 767/2001 establishing the securities eligible for the " transaction," setting forth its procedures, and approving forms of a trust agreement and secured loan agreement. (Schwarzkopf Aff. Exh. G). The tendered debt would be held in trust, and new secured debt obligations would be issued to tendering debtholders. (First Am. Compl. ¶ 62). The bonds placed in trust were " required to be released and returned to the bondholders upon a default by Argentina in the payment of those obligations." (*Id.*) By early December 2001, investors had tendered over $40 billion in debt. (*Id.* ¶ 48).

### IV. Morgan's Rejection of Eternity's Demands to Settle the Swaps

On November 2, 2001, Eternity notified Morgan that it desired to unwind the three transactions due to Argentina's " rapidly-deteriorating financial condition" and the Government's " restructuring" announcements. (*Id.* ¶ 39). This was followed by a wire to Morgan, dated November 8, 2001. (*Id.*) Morgan refused to accept Eternity's tender of the obligations and settle the three transactions. (*Id.* ¶ 40). By a letter dated November 8, 2001, Morgan advised Eternity that the " debt exchange announced by the Republic of Argentina did not constitute a Credit Event" and that " the parties currently have no obligations in respect to the Transaction's Settlement Terms." (*Id.*)

On November 30, 2001, Eternity made another demand upon Morgan stating that the Argentine government's " restructuring" constituted a Credit Event. (*Id.* ¶ 41). Morgan refused to settle the three swaps and by letter dated December 3, 2001, Morgan informed Eternity that the Argentine Government's

actions did not constitute a " Restructuring" pursuant to the ISDA Definitions. (*Id.* ¶ 42). Eternity delivered a third notice to Morgan dated December 12, 2001, and Morgan responded on December 14, 2001 simply stating that no Credit Event had occurred. (*Id.* ¶ 63).

On December 24, 2001, Argentina announced that it was suspending payment on its debt obligations. (*Id.* ¶ 66). On December 27, 2001, Morgan declared a " Repudiation/Moratorium" Credit Event as to two of the transactions and made payment to Eternity. (*Id.* ¶¶ 67-68). Eternity agreed to settle these two swaps without waiver of its rights and claims with respect to the alleged Restructuring Credit Event that had occurred prior to December 17, 2001. (*Id.* ¶ 68).

### V. Eternity Files Suit

*3 On February 19, 2002, Eternity filed this action against Morgan. On April 22, 2002, Morgan filed a motion to dismiss the complaint and its jury demand. In lieu of filing an opposition to Morgan's motion, Eternity served Morgan with a First Amended Complaint on May 22, 2002. [FN1] (Schwarzkopf Aff. Exh. A). In early June 2002, Morgan withdrew its motion to dismiss without prejudice to its right to move with respect to the First Amended Complaint.

As a result of alleged damages sustained by Eternity due to the foregoing facts, it brings the following claims: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; (3) common law fraud; and (4) negligent misrepresentation. Morgan now moves to dismiss the First Amended Complaint.

### Standard of Review

Under Rule 12(b)(6), a complaint will be dismissed if there is a failure " to state a claim upon which relief can be granted." *Fed.R.Civ.P. 12(b)(6)*. The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from well-pleaded factual allegations. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993). " A court should only dismiss a suit under *Rule 12(b)(6)* if ' it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

On a Rule 12(b)(6) motion, courts may consider " any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d Cir.2000) (citations omitted).

Discussion

I. Breach of Contract

Eternity alleges that by refusing to recognize the Restructuring Credit Event and failing to settle all three swaps immediately, Morgan caused Eternity substantial consequential damages. (First Am. Compl. ¶ 84). In addition, Eternity seeks compensatory and consequential damages for Morgan's refusal to settle the third outstanding swap. (*Id.*)

[1] The key issue boils down to whether or not Argentina's " voluntary debt exchange" constituted a " restructuring" as defined in the agreement between the parties. Both sides agree that the Court needs to interpret the definition of " Restructuring" provided in Section 4.7(a) of the 1999 ISDA Credit Derivatives Definitions:
" Restructuring" means that, with respect to one or more Obligations, including as a result of an Obligation Exchange ... any one or more of the following events occurs, is agreed between the Reference Entity or a Governmental Authority and the holder or holders of such Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that is binding upon a Reference Entity, and such event is not provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such obligation is issued or incurred:
**\*4** (i) a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;
(ii) a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;
(iii) a postponement or other deferral of a date or dates for either: (A) the payment or accrual of interest or (B) the payment of principal or premium;
(iv) a change in the ranking in priority of payment of any Obligation, causing the subordination of such Obligation; or
(v) any change in the currency or composition of any payment of interest or principal.

(Schwarzkopf Aff. Exh. D § 4.7(a)). In sum, in order to constitute a Restructuring Credit Event, certain defined events (those listed in subsections i through v,

such as a postponement or other deferral of a date for the payment of principal or interest) had to have occurred, be agreed between Argentina and the holders, or be announced " with respect to one or more Obligations, including as a result of an Obligation Exchange...." (*Id.*)

Morgan argues that Argentina's " voluntary debt exchange" constituted an Obligation Exchange and, according to the definition of the term " Obligation Exchange" in section 4.9 of the 1999 ISDA Credit Derivatives Definitions, " Obligation Exchange" is limited to " mandatory" transfers. (Schwarzkopf Aff. Exh. D, § 4.9). Morgan maintains that because this was a voluntary exchange, an Obligation Exchange did not occur and thus, a Restructuring Credit Event did not occur. The Court disagrees.

It is not necessary to even examine the definition of the term " Obligation Exchange" to find that a restructuring took place. Section 4.7(a) makes it clear that a Restructuring Credit Event takes place in a number of circumstances, " including" an Obligation Exchange. (*Id.* § 4.7(a)). The Court agrees with Eternity that the exchange satisfies § 4.7(a)(iii)-there has been an agreed-upon indefinite deferral of interest and/or principal payments under the Obligations-because Argentina's payments on bonds tendered into the trust were " suspended" or " deferred" indefinitely until such time as the Argentine Government defaulted. (Opp. at 8-9, 12, 18). Motion denied.

II. Breach of Implied Duty of Good Faith and Fair Dealing

[2] Morgan argues that " Eternity's claim for breach of the duty of good faith implied in contracts is nothing more than a restatement of its breach of contract claim." (Dfs. Memo. at 21). Eternity does not address this argument in its Opposition and thus, the motion is granted.[FN2]

III. Fraud and/or Negligent Misrepresentation

Eternity's fraud and negligent misrepresentation claims are based on Morgan's alleged misrepresentations and omissions for the purpose of inducing Eternity to enter into the three swap transactions. (*Id.* ¶ 94). Morgan allegedly " provided assurances that Eternity would have a liquid secondary market for [the three] credit swaps and that Morgan would provide Eternity with a continuing flow and supply of secondary market pricing to offset

Eternity's risks of investment." (*Id.*) In the alternative, Eternity alleges that " Morgan failed to disclose to Eternity its intent not to provide a liquid, secondary market in which Eternity could sell its positions in the Three Swaps." (*Id.* ¶ 95).

### A) Fraud

**\*5** To prove fraud under New York law, " ' a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." ' *Bridgestone/Firestone, Inc., v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir.1996) (quotation omitted). Furthermore, for a fraud claim to survive alongside a breach of contract claim the plaintiff must either: " (i) demonstrate a legal duty separate from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20; *see also* Canelle v. *Russian Tea Room Realty LLC,* No. 01 Civ. 0616(DAB), 2002 WL 287750, at \*5 n. 11 (S.D.N.Y. Feb.27, 2002).

Plaintiff's fraud claim is also subject to the heightened pleading requirement of Fed. R. Civ. P. 9(b), which requires fraud to be alleged with particularity. Fed.R.Civ.P. 9(b) (" In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." ) " [W]hen a complaint charges fraud, it must (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui,* 91 F.3d 337, 347 (2d Cir.1996) (citations omitted).

### 1. Material False Representation, Preconceived Intent and Rule 9(b) Particularity

[3] Morgan argues that Eternity fails to sufficiently allege how the statements were fraudulent. (Defs. Memo. at 22-25, 27-28). The Court agrees. Nowhere does Eternity allege that it needed or wanted to sell in the secondary market or that Morgan refused such a request. There is also no specific allegation that Morgan had already formulated an intent not to perform when the alleged misrepresentation was made. The complaint simply states that: " Morgan's

misrepresentations and omissions were material, knowing, and intentional." (¶ 96). This conclusory allegation is not sufficient to allege preconceived intent. Plus, Eternity admits that " for a time, Morgan accommodated those strategies-until October 2001." (*Id.* ¶ 21). This appears to preclude any argument that Morgan had a pre-conceived intent not to honor its promise.

Furthermore, Eternity does not detail the speaker of the alleged misrepresentation. The complaint refers only to " one or more representatives of Morgan." (*Id.* ¶ 18). There is also no detail provided as to when or where the alleged fraudulent conduct took place. *See Canelle,* 2002 WL 287750, at \*5 (dismissing fraud claim because, *inter alia,* statements alleged to have been made " sometime before" agreement was signed provided an inadequate " level of temporal specificity" ). Motion granted.

### 2. Fraud Claim Independent of Breach of Contract

**\*6** [4] The Court agrees with Eternity that its fraud claim, should Eternity be able to sufficiently replead it, is " collateral" or " extraneous" to the contract. Morgan argues that the ISDA Master Agreement deals explicitly with parties wishing to transfer obligations to third parties and to " unwind" transactions. (Schwarzkopf Exh. B § 7; Schedule, Part 5(g)(ii)(3)). However, the fraud claim is not based on a commitment by Morgan to " unwind" the swap transaction itself, but rather, alleged representations regarding the existence and availability of a secondary market in which Eternity could sell or otherwise transfer its positions to third parties. Furthermore, it is possible that Morgan was implicitly representing that the consent required by section 7 in order to transfer the transactions would, if necessary, be granted by Morgan.[FN3]

### 3. Contractual Disclaimer of Reliance

[5] Morgan argues that certain disclaimers contained in the ISDA Master Agreement preclude a claim of reliance on any alleged contrary oral misrepresentation. (Defs. Memo. at 26-27). Morgan points to the integration clause;[FN4] representations that neither party is relying on any advice of the other party, that Eternity has the capacity to evaluate the transaction and has made its own decision to enter it, that Morgan is neither acting as a fiduciary or financial advisor for Eternity nor giving any representation as to the merits of any transaction; and that neither party has " committed to unwind" any transaction.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

(Schwarzkopf Aff. Exh. B, Schedule, Part 5(g)).

ISDA disclaimers that were virtually identical to those at issue in this case were recently discussed by the Second Circuit which was " not persuaded that these disclaimers barred [the plaintiff] from relying on [the defendant's] oral statements." *Caiola v. Citibank, N.A., New York,* 295 F.3d 312, 330 (2d Cir.2002). A disclaimer is generally enforceable only if it ' tracks the substance of the alleged misrepresentation." ' *Id.* (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 735 (2d Cir.1984)). As the Second Circuit stated in *Caiola,* the disclaimer provisions cited by Morgan " fall well short of tracking the particular misrepresentations alleged by [the plaintiff]." *Id* . (citations omitted). Eternity's fraud claim is based on alleged representations and/or omissions made by Morgan regarding the existence and availability of a secondary market for the swaps. The disclaimers relied upon by Morgan are general, not specific, and say nothing about the existence or availability of a secondary market.

**B) Negligent Misrepresentation**

Under New York law, the requisite elements for a negligent misrepresentation claim are that: " (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000) (citations omitted). The alleged misrepresentation must also be " factual in nature and not promissory or relating to future events that might never come to fruition." *Id.* (citation omitted).

**\*7** [6] First, Morgan contends that Eternity has not sufficiently alleged a " special relationship" between the parties that would give rise to a duty for Morgan to provide correct information. As both the Second Circuit and the New York Court of Appeals have stated, whether a special relationship exists between two parties is an issue of fact, to be governed by weighing three factors: 1) whether the person making the representation held or appeared to hold unique or special expertise; 2) whether a special relationship of trust or confidence existed between the parties; and, 3) whether the speaker was aware of the use to which the

information would be put and supplied it for that purpose. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 103 (2d Cir.2001); *Kimmell v. Schaefer,* 89 N.Y.2d 257, 264, 652 N.Y.S.2d 715, 675 N.E.2d 450 (1996).

In *Suez,* the Second Circuit reversed the district court's decision to dismiss a plaintiff's negligent misrepresentation claim for failure to adequately allege a special relationship of trust between the two parties. [FN5] *Suez,* 250 F.3d at 104. One of the reasons given was that " to the extent that a ' special relationship of trust' is sparsely pled, the complaint emphatically alleges the other two factors enunciated [by the New York Court of Appeals] in *Kimmell.*" *Id.* at 103. The court concluded: " [g]iven that a determination of whether a special relationship exists is essentially a factual inquiry, these allegations are sufficient to overcome a motion to dismiss." *Id.* at 104. This same reasoning applies here.

The complaint does indeed seem to lack any allegation of a " special relationship of trust" between the parties. It appears to have been a typical arm's length business transaction. In fact, Eternity expressly disclaimed any reliance on Morgan for advice in entering the transactions. (Schwarzkopf Aff. Exh. B, Schedule, Part 5(g)(i)). However, the complaint does contain a great number of details regarding Morgan's unique or special expertise in swap transactions and emerging market debt (*see* ¶¶ 12-13, 17, 20) as well as allegations that Morgan aware of the use to which the information would be put. (¶ 19-20). This is sufficient to survive a motion to dismiss.

However, as discussed in the above section relating to Eternity's claim for fraud, the Court agrees with Morgan that the complaint does not sufficiently allege how the representation was false or that Morgan knew or should have known it to be false at the time it was made.[FN6] Motion granted.

**C) Punitive Damages**

[7] Eternity also sought to recover punitive damages for Morgan's alleged fraud and/or negligent misrepresentation. Defendants argue that Eternity's request for punitive damages based solely on a lawsuit that has its genesis in the contractual relationship between the parties should be dismissed. The Court agrees.

In *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995), the Court

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

of Appeals clarified " the pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim arises from a breach of contract." 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763. The four prongs are as follows: 1) defendant's conduct must be actionable as an independent tort; 2) the tortious conduct must be of the egregious nature set forth in *Walker v. Sheldon,* 10 N.Y.2d 401, 404-405, 223 N.Y.S.2d 488, 179 N.E.2d 497 (1961); 3) the egregious conduct must be directed to plaintiff; and 4) it must be part of a pattern directed at the public generally. *New York Univ.,* 87 N.Y.2d at 316, 639 N.Y.S.2d 283, 662 N.E.2d 763 (citing *Rocanova v. Equitable Life Assurance Soc'y,* 83 N.Y.2d 603, 612 N.Y.S.2d 339, 634 N.E.2d 940 (1994)).

**\*8** If upon repleading, Eternity is able to adequately plead fraudulent inducement, then, as stated above, there is a tort independent of contract and the first prong is met. However, there is no allegation that Morgan's behavior was part of a pattern directed at the public generally. In addition, the behavior described does not necessitate imposing punitive damages in order " to deter defendant and others like it from engaging in conduct that may be characterized as ' gross' and ' morally reprehensible,' and of " ' such wanton dishonesty as to imply a criminal indifference to civil obligations." " ' *New York Univ.,* 87 N.Y.2d at 315-16, 639 N.Y.S.2d 283, 662 N.E.2d 763 (citation and quotation omitted). The claim for punitive damages is accordingly dismissed.

### IV. Consequential Damages for Breach of Contract Claim

[8] Eternity is not entitled to consequential damages for its surviving claim for breach of contract. Eternity alleges that due to Morgan's refusal to recognize a Restructuring Credit Event and settle all three transactions, Eternity suffered and continues to suffer " substantial consequential damages." (*First Am. Compl.* ¶¶ 77). Yet, Eternity's essential claim is one for payment withheld although due, and the consequential damages stemming from such a claim are not compensable. " [W]here the alleged breach of contract consists only of a failure to pay money, remedy for the breach is limited to the principal owed plus damages in the form of interest at the prevailing legal rate." *Meinrath v. Singer Co.,* 87 F.R.D. 422, 426 (S.D.N.Y.1980) (Weinfeld, J.). As the United States Supreme Court stated over a hundred years ago in *Loudon v. Taxing Dist.,* 104 U.S. 771, 26 L.Ed. 923 (1881): " [A]ll damages for delay in the payment of

money owing upon contract are provided for in the allowance of interest, which is in the nature of damages for withholding money that is due. The law assumes that interest is the measure of all such damages." 104 U.S. at 771. " The rule set forth in *Loudon* is also the law of New York." *Morse/Diesel, Inc. v. Fidelity and Deposit Co. of Maryland,* No. 86 Civ. 1494(DLC), 1995 WL 358627, at *9 (S.D.N.Y. June 15, 1995) (citing *Parkway Windows, Inc. v. River Tower Assocs.,* 108 A.D.2d 660, 485 N.Y.S.2d 755, 759 (App.Div.1985); *Meinrath,* 87 F.R.D. at 426 n. 8). As a result, Eternity's claim for consequential damages resulting from Morgan's alleged breach of contract is dismissed.

### V. Declaratory Judgment

Because Eternity does not address Morgan's argument in its Opposition that the claim for declaratory relief should be dismissed, the Court grants Morgan's motion.

### VI. Jury Demand

Morgan argues that Eternity contractually waived its right to demand a jury for all of its claims. (Defs. Memo. at 33-34; Exh. B, Schedule, Part 5(c)). Eternity does not appear to oppose the argument as it relates to the breach of contract claim. Because the breach of contract claim is the only one to survive this motion to dismiss, the jury demand is stricken.

### Conclusion

**\*9** For the foregoing reasons, the Court grants the defendants' motion to dismiss in part with leave for plaintiff to replead within 45 days of the date of this Memorandum and Order.

> FN2. In any event, a review of New York law reveals that Morgan's analysis appears correct. *See Apfel v. Prudential-Basche Sec. Inc.,* 183 A.D.2d 439, 439, 583 N.Y.S.2d 386 (App.Div.1992), *aff'd as modified,* 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993) (" The cause of action alleging a breach of good faith is duplicative of a cause of action alleging breach of contract, since every contract contains an implied covenant of good faith and fair dealing.") (citation omitted); *Fasolino Foods Co. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992) (" Under New York law, parties to an express contract are bound by an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

implied duty of good faith, ' but breach of that duty is merely a breach of the underlying contract." ' ) (citation omitted); *see also Crossroads Mortgage Corp., Inc. T/A v. Columbia Equities, Ltd.,* No. 97 Civ. 1117(LMM), 1997 WL 363809, at *6 n. 1 (S.D.N.Y. July 1, 1997). As agreed between the parties, the transactions are governed by the law of the State of New York. (Schwarzkopf Aff. Exh. B, Schedule, Part 4(g)).

FN3. Section 7 of the ISDA Master Agreement states that, subject to limited exceptions, no obligation may be transferred " by either without the prior written consent of the other party...." (Schwarzkopf Aff. Exh. B § 7).

FN4. " This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto." (Schwarzkopf Aff. Exh. B § 9(a)).

FN5. The court did uphold the dismissal of the negligent misrepresentation claim against two of the eight defendants in the case because plaintiffs made only " conclusory allegations" against them. *Suez,* 250 F.3d at 104.

FN6. The Court also reiterates that the contractual disclaimers are too general to preclude Eternity's reasonable reliance on the material misrepresentations for the purposes of this motion to dismiss.

S.D.N.Y.,2002.

Eternity Global Master Fund Limited v. Morgan Guar. Trust Co. of New York

Not Reported in F.Supp.2d, 2002 WL 31426310 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

Internet Law Library, Inc. v. Southridge Capital
Management, LLC
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
INTERNET LAW LIBRARY, INC. and Hunter M.A.
Carr, Plaintiffs,
v.
SOUTHRIDGE CAPITAL MANAGEMENT, LLC,
et al., Defendants.
COOTES DRIVE, LLC., Defendant,
Counterclaim-Plaintiff,
v.
INTERNET LAW LIBRARY, INC., Plaintiff,
Counterclaim-Defendant.
Jack TOMPKINS, Kerwin Drouet, et al., Plaintiffs,
v.
SOUTHRIDGE CAPITAL MANAGEMENT, et al.,
Defendants.
**No. 01 Civ. 6600(RLC).**

Dec. 12, 2005.

Koerner Silberberg & Weiner, LLP, New York, NY,
for Internet Law Library, Inc.
Maryann Peroni, of counsel.
Christian, Smith & Jewell, Houston, TX, for Internet
Law Library, Inc.
Gary M. Jewell, James W. Christian, of counsel.
Tate & Associates, Richmond, TX, for Internet Law
Library, Inc.
Richard L. Tate, James W. Christian, of counsel.
Dla Piper Rudnick Gray Cary U.S. LLP, New York,
NY, for Southridge Capital Management LLC, Cootes
Drive LLC, Stephen Hicks, Daniel Pickett, Christy
Constabile, David Sims, and Navigator Mangement
Ltd.
Perrie M. Weiner, Caryn G. Mazin, Palmina M. Fava,
of counsel.
Kramer Levin Naftalis & Frankel LLP, New York,
NY, for Citco Group Limited.
Michael J. Dell, of counsel.
Law Offices of Michael S. Rosenblum, Los Angeles,
CA, for Southridge Capital Management LLC, Cootes
Drive LLC, Stephen Hicks, Daniel Pickett, Christy
Constabile, David Sims, and Navigator Management
Ltd.
Michael S. Rosenblum, Amy M. Caves, of counsel.

Hanley Conroy Bierstein & Sheridan LLP, New York,
NY, for Kirwin Drouet, Jack Thompkins and Hunter
M.A. Carr.
Thomas I. Sheridan, III, of counsel.
Morrison & Foerster LLP, New York, NY, for Mark
Valentine.
Carl H. Loewenson, Jr., James E. Johnson, Joel C.
Haims, of counsel.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione,
PC, New York, NY, for Thomson Kernaghan & Co,
Ltd., and TK Holdings, Inc.
Debra A. Clifford, of counsel.

OPINION

CARTER, J.

BACKGROUND

*1 This case is the result of several actions arising out
of a set of related financing transactions.[FN1] The court
consolidated these cases and named ITIS Holdings Inc.
(" INL" ) (f/k/a ITIS Inc. and Internet Law Library),
Hunter Carr, Kerwin Drouet, and Jack Tompkins the
plaintiffs. *Internet Law Library, Inc. v. South Ridge
Capital Mgmt., LLC,* 208 F.R.D. 59 (S.D.N.Y.2002)
(Carter, J). Accordingly, Southridge Capital
Management LLC, Stephen Hicks, Daniel Pickett,
Christy Constabile, David Sims, Navigator
Management Ltd., The Citco Group Limited, Citco
Trustees (Cayman) Limited and Cootes Drive, LLC
(" Cootes Drive" ) were named defendants and Cootes
Drive's claims against INL became counterclaims. *Id.*

> FN1. On January 12, 2001, INL, its Chief
> Executive Officer, Hunter M .A. Carr, and
> several shareholders filed suit against
> Southridge and a number of its
> representatives in the Southern District of
> Texas claiming, among other things, fraud,
> misrepresentation of material facts,
> manipulation of INL's stock and breach of
> contract. *See Internet Law Library, Inc., et al.
> v. South Ridge Capital Mgmt., LLC et al,* 01
> Civ. 660(RLC). Later, some additional
> shareholders of INL brought suit in the
> Southern District of Texas alleging much the
> same facts. *See Brewer, et al. v. South Ridge
> Capital Mgmt ., LLC, et al.,* 0202 Civ.
> 0138(RLC). Finally, Cootes Drive LLC, a
> Southridge affiliate, brought suit in this court

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

against INL and several of its directors asserting claims for breach of contract and fraud. *See Cootes Drive, LLC v. Internet Law Library, Inc.,* 01 Civ. 0877(RLC).

Over the years the court has dealt with various issues, (*see e.g., Internet Law Library Inc. v. South Ridge Capital Mgmt., LLC,* 223 F.Supp.2d 474 (S.D.N.Y.2002) (Carter, J) (hereinafter " *Internet Law I*" )) with which familiarity is assumed. Most importantly, the court dismissed the plaintiffs' claims with prejudice in *Internet Law Library Inc. v. South Ridge Capital Mgmt ., LLC,* 2003 WL 21537782 (S.D.N.Y.2003) (Carter, J.) (hereinafter *Internet Law II* ).

In the instant matter, defendant Cootes Drive moves for partial summary judgment against INL on its third counterclaim for breach of contract for failure to redeem preferred stock pursuant to a stock purchase agreement. Defendant Cootes Drive also seeks partial summary judgment against INL on its fourth counterclaim for breach of contract for failure to honor a promissory note. The plaintiffs cross move to dismiss defendants' counterclaims pursuant to Rule 37(b)(2)(C), F.R. Civ. P., due to alleged abuses of discovery procedures, and move for the court to reconsider its judgment entered July 8, 2005 dismissing plaintiffs' claims with prejudice. Under separate covers, plaintiffs have twice moved to supplement the record of the aforementioned motions and defendants have moved to strike some of plaintiffs' supporting affidavits. We consolidate the former motions with the latter and resolve them all in this opinion. Because of the nature of the issues raised in plaintiffs' motions, we reach them first.

DISCUSSION

I PLAINTIFFS' MOTION FOR RECONSIDERATION

Plaintiffs' motion for reconsideration brought pursuant to U.S. Dist. Ct. S.D.N.Y. Local Civil Rule 6.3 is based on the court's possible oversight of two matters: (a) the *res judiciata* effect of its June 8, 2003 decision, specifically whether plaintiffs' affirmative defenses are barred, and (b) because Rule 37(b)(2)(C), Fed. R. Civ. P ( " Rule 37" ) allegedly does not authorize sanctions. The parties have also made a request for the to court clarify these two issues, especially as they pertain to the order entered on July 8, 2003.

Under Rule 37, if a party " fails to obey an order

entered under Rule 26(f) ... the court in which the action is pending may ... (C) ... strike [ ] out pleadings or parts thereof ... or dismiss[ ] the action or proceeding or any part thereof, or render judgment by default against the disobedient party." Plaintiffs' attempt to read the rule as only being applicable to parties who fail to participate in discovery is inapposite to the plain meaning of the statute. Moreover, the court has the inherent authority to dismiss a case when a party disobeys any of its orders. *See Chambers v. Nasco, Inc.,* 501 U.S. 32, 45 (1991). Plaintiffs flagrantly disregarded the discovery instructions of this court. As a result the court, acting well within its explicit and implicit authority, dismissed the plaintiffs' complaint. The court did not, however, dismiss the defendants' counterclaims or the plaintiffs' affirmative defenses to those counterclaims.

**\*2** Cootes Drive argues that because the claims in plaintiffs' dismissed complaint form the basis for their affirmative defenses, plaintiffs' affirmative defenses are now barred by claim preclusion. Under the doctrine of claim preclusion, once a judgment has been made on the merits, the parties are prohibited from bringing a second suit based upon the same claims. *Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 757 F. Supp 283, 291 (S.D.N.Y.1991) (Conner, J.). Cootes Drive would be correct to assert that plaintiffs are precluded from bringing another complaint based upon the same claims found in their dismissed complaint.[FN2] However, that issue is not before the court. The court mindfully chose not to dismiss the plaintiffs' affirmative defenses. Thus, these affirmative defenses have not been adjudicated and there is no logic or fairness to treating them as if they have.

FN2. A dismissal under Rule 37 is an adjudication on the merits. *See* Rule 41(b), F.R. Civ P.; *Nasser v. Isthmian Lines,* 331 F .2d 124 (2d Cir.1964).

We confirm that the court was within its authority in dismissing plaintiffs' complaint and that plaintiffs' affirmative defenses still stand. The court did not overlook these subjects. Accordingly, the motion for reconsideration is denied.

II PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

While arguing that the court lacked the authority to dismiss their claims pursuant to Rule 37, the plaintiffs have the audacity to request that we now dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

Cootes Drive's counterclaims pursuant to the same rule and for the same alleged conduct. Without delving into the sophistical reasoning that allows them to entertain these contradictory propositions, it bears repeating that plaintiffs flagrantly defied the court's order. The plaintiffs and not Cootes Drive disrespected the court. If Cootes Drive had done so, or if they ever do, the court would not hesitate to impose sanctions. The motion is denied.

### III PLAINTIFFS' MOTIONS TO SUPPLEMENT THE RECORD

On February 12, 2004 and on April 6, 2004, plaintiffs filed motions to supplement the record. The documents that are the subject of these motions were produced in connection with an action pending in Georgia. The documents themselves are the organizational documents and various agreements between companies affiliated with Cootes Drive. There are also letters and memoranda sent to and from these affiliated companies and the law firm of Dorsey & Whitney LLP, their transactional counsel. Plaintiffs assert that these documents demonstrate that the defendants operated their businesses in a tiered structure in order to limit liability. Even if true, this assertion does not make the documents relevant to Cootes Drive's claims of breach or plaintiffs' motions to dismiss and for reconsideration. Indeed, many of the documents predate the note and agreement by several years. Because plaintiffs have not sufficiently demonstrated the relevance of the documents to the motions that they seek to supplement, plaintiffs' two motions to supplement the record are denied.

### IV MOTIONS TO STRIKE PLAINTIFFS' AFFIDAVITS

**\*3** Cootes Drive moves to strike portions of the affidavit of Hunter M. Carr, dated September 19, 2003 (the " Carr Affidavit" ) and the affidavit of Richard L. Tate, dated September 22, 2003 (the " First Tate Affidavit" ) based on evidentiary objections. The court finds that these affidavits comport with Rule 56(e). Cootes Drive's motions to strike the Carr Affidavit and the First Tate Affidavit are denied.

The Citco Group Limited and Citco Trustees (Cayman) Limited (the " Citco defendants" ) move to strike the Affidavit of Richard L. Tate, dated October 20, 2003 (the " Second Tate Affidavit" ). The Second Tate Affidavit is submitted as a response to the Citco Defendants' motion for summary judgment. However, to the court's best knowledge or that of the Citco

defendants, there never was such a motion. Submission of a reply to a nonexistent motion is clearly inappropriate; furthermore, even if the submission of the affidavit was appropriate, the contents are not. An attorney's affidavit is typically used to present documents to the court and should not be used as counsel's personal vehicle to lobby the court. *Universal Film Exchanges, Inc. v. Walter Reade, Inc.,* 37 F.R.D. 4, 5 (S.D.N.Y.1965) (Levet, J.). In the Second Tate Affidavit, Tate, attorney for the plaintiffs, engages in extensive argumentation and draws numerous conclusions of law. Tate further swears to several matters of which he could have no direct personal knowledge of as an attorney that came upon this matter after the fact. The Second Tate Affidavit is more akin to a memorandum of law than to an attorney's affidavit. The motion to strike the Second Tate Affidavit in its entirety is granted.

### V COOTES DRIVE'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT

In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc .,* 477 U.S. 242, 249 (1986). A party is entitled to summary judgment when " the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), F.R. Civ. P.

#### 1. Counterclaim Three: The Convertible Preferred Stock Purchase Agreement

After several months of negotiations, on or about May 11, 2000, Cootes Drive [FN3] and INL entered into the Convertible Preferred Stock Agreement (the " agreement" ). Under the agreement, INL agreed to sell Cootes Drive shares of INL's 5% Series A Convertible Preferred Stock, which could be redeemed for INL common stock at Cootes Drive's request. Cootes Drive's motion for summary judgment on their third counterclaim is based on the failure of INL to honor one of these redemption requests.

> FN3. Plaintiffs allege that Cootes Drive was inserted into the agreement at the eleventh hour as a substitute for Southridge and is in fact little more than a " straw man" created to insulate Southridge from liability.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

To prevail on a claim for breach of contract under New York law, a party must show: 1) the existence of an agreement between the parties; 2) adequate performance of the contract; 3) breach of the contract; and 4) damages resulting from the breach.[FN4] The parties admit that the agreement exists, Pls. Statement Pursuant to Local Rule 56.1 (" Pls.Statement") at ¶ 1, and that the defendants performed. *Id.* at ¶ 6. INL admits that they did not honor Cootes Drive's redemption request. *Id.* at ¶ 14-15. Finally, defendants are able to show damages based upon the position it would have been in had INL performed under the agreement. Defs. Reply Mem. at 3. Cootes Drive has therefore met the requirements of their claim for breach against INL.

> FN4. *Internet Law I,* 223 F.Supp.2d at 490 *citing Harsco Corp.,* 91 F.3d at 348; *See also Bridgeway Corp. v. Citibank, N.A.,* 132 F.Supp.2d 297, 305 (S.D.N.Y.2001) (Chin, J.).

**\*4** While INL does not contest that they failed to honor the redemption request, they defend their failure to redeem the stock on the grounds that defendants, among other things,[FN5] fraudulently induced them into entering the agreement and materially breached the agreement. As is the case here, " [o]ne who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense." *Frankel v. ICD Holdings S.A.,* 930 F.Supp. 54, 65 (S.D.N.Y.1996) (Kaplan, J.). The non-moving party must come forward with " specific facts showing that there is a genuine issue for trial." *SHL Imaging, Inc. v. Artisan House, Inc.* 117 F.Supp.2d 301, 304 (S.D.N.Y.2000) (Pauley, J.). Within this framework the court will examine INL's defenses to Cootes Drive's counterclaims.

> FN5. Plaintiff INL also raises a defense of " manipulation" . This is not a recognized defense to breach of contract.

Plaintiffs contend that they relied upon a number of false statements made by the defendants outside of the agreement. Before deciding the underlying question of the merits of the fraudulent inducement claims, the court must first determine whether plaintiffs will be allowed to offer evidence pertaining to their claim.

Under New York law, if a contract contains a merger clause, parol evidence is not admissible to " vary, or permit escape from the terms of an integrated contract." [FN6] However, a general merger clause will not preclude a party from introducing parol evidence that they were induced into entering a contract by means of fraud,[FN7] and a party may escape liability by establishing proof of such fraud.[FN8] The exception to this rule is that if the contract contains a disclaimer of certain representations, the relying party cannot claim that they were defrauded as to those specific representations.[FN9]

> FN6. *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 315 (2d Cir1993) *citing Fogelson v. Rackfay Construction Co.,* 300 N.Y. 334, 340, 90 N.E.2d 881, 884 (1950)

> FN7. *Sabo v. Delman,* 3 N.Y.2d 155, 161-62, 164 N.Y.S.2d 714, 717-19 (1957); *Bridger v. Goldsmith,* 143 N.Y. 424, 428, 38 N.E. 458, 459 (1894) (" fraud [in the inducement] vitiates every transaction" )

> FN8. *See Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 320, 157 N.E.2d 597, 598, 184 N.Y.S.2d 599, 601 (1959)(contract provided that " all understandings and agreements heretofore had between the parties hereto are merged in this contract ... neither party [is] relying upon any statement or representation not embodied in the is contract" ).

> FN9. *Citibank v. Plapinger,* 66 N.Y.2d 90, 94, 495 N.Y.S.2d 309, 312 (1985) (provision in multimillion dollar agreement stating that all guarantees are " absolute and unconditional" precluded defense of fraud)

The agreement between the parties contains both a merger clause[FN10] and a disclaimer of reliance.[FN11] Plaintiffs defend against these facts by asserting that the disclaimer is general and not specific.[FN12] In New York, no particular words are needed to make a disclaimer specific.[FN13] However, a specific disclaimer must " contain explicit disclaimers of the particular representations that form the basis of the fraud in the inducement ... the touchstone is specificity." [FN14] The disclaimer in question appears at the end of warranties and representations section of the agreement and reiterates that no warranties or representations shall be made other than those in the immediately preceding section.[FN15] This is, by nature, a general disclaimer; it lacks the specificity to meet the

Not Reported in F.Supp.2d                                                                                                  Page 5

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

standard the Second Circuit has applied under New York law. New York law requires more than a " generalized boilerplate exclusion [clause]," [FN16] a disclaimer must speak directly to the matter at issue in order to preclude a claim of fraud in the inducement.[FN17] The court therefore finds that plaintiffs are not barred from introducing evidence of fraud in the inducement.

> FN10. " The Transaction Documents ... contain the entire understanding of the parties with respect to the subject matter hereof and supersede all prior agreements and understandings, oral or written, with respect to such matters ..." agreement § 4.2.

> FN11. " The Company acknowledges and agrees that no Purchaser makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in this Section 2.2" agreement § 2.2.

> FN12. " [A] general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract ..." *Danann Realty* at 320.

> FN13. *Wells Fargo Bank Northwest, N.A. v. Taca Intern. Airlines, S .A,* 247 F.Supp.2d 352, 368 (S.D.N.Y.,2002) (Lynch, J.) quoting *Lucas v. Oxigene, Inc.,* No. 94 Civ. 1691, 1995 WL 520752 at *5 (S.D.N.Y.1995) (Mukasey, J.)

> FN14. *Yanakas,* 7 F.3d 310, 316 citing *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729 (2d Cir.1984)

> FN15. § 2.2 includes representations by the purchasers regarding their organization and authority to enter into the agreement, investment intent, " accredited investor" status, financial experience, ability to bear risk of the investment, access to information and other securities related matters.

> FN16. *Yanakas,* 7 F.3d 310, 317.

> FN17. *DiFilippo v. Hidden Ponds Associates,* 146 A.D.2d 737, 738; 537 N.Y.S.2d 222, 224 (N.Y.A.D. 2 Dept.1989) (" [because the [disclaimer] provision does not specifically disclaim reliance on any oral representation

concerning the particular matter as to which plaintiff now claims he was defrauded, it does not foreclose him from offering evidence of the defendants' oral representations to the contrary." )

**\*5** The court now examines the claims of fraud to determine if there is a genuine dispute as to a material fact. Under New York law, a claim of fraudulent inducement requires proof (1) that the defendants made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendants, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury. FN18 Plaintiffs list nine misrepresentations that it claims the defendants made to them. Pls. Statement at ¶ 59. Although their claim has been plead with specificity,[FN19] plaintiffs have failed to prove reliance on each of the statements for one or more of the following reasons. Where the defendants' alleged misrepresentations are contradicted or subsumed by material in the agreement, for example, that INL's stock would be acquired for investment purposes and not for distribution or resale, we find that the plaintiffs' claims are unreasonable as a matter of law.FN20 The court finds plaintiffs' reliance on other statements to be simply unreasonable. " Reliance means reasonable reliance." *M.H. Segan Ltd. Partnership v. Hasbro, Inc.* 924 F.Supp. 512, 526 (S.D.N.Y.1996) (Cote, J.) (internal quotations and citations omitted). After analysis of the material provided by the parties, the court concludes that alleged representations such as " [t]hey would not manipulate stock in order to depress its price" , Pls. Statement at ¶ 59, are so important to the functioning of a publicly traded company that no reasonable businessperson would have relied on them without putting them in writing after first discussing them at length.[FN21] Other misrepresentations, for example, that other companies funded by defendants experienced increases in their stock prices, Pls. Statement at ¶ 59, would have been easily verifiable. FN22 The remaining statements are uncontroverted or without consequence. Holding, as we do, that INL cannot satisfy the reliance element of their affirmative defense of fraudulent inducement we need not look into the remaining elements of the claim. INL's affirmative defense of fraudulent inducement as to Cootes Drive is hereby struck insofar as it pertains to the third counterclaim.

> FN18. *Computerized Radiological Servs. v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir.1986)

Not Reported in F.Supp.2d                                                                                                    Page 6

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

*quoting Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 193 (1980).

**FN19.** In the court's previous decision, the fraud claims were examined under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, passed pursuant to § 10(b). The court held that because the plaintiff satisfied the elements for pleading a claim under the statutes, they had satisfied the nearly identical common law fraud requirements as well. *Internet Law I,* 223 F.Supp.2d 489-90.

**FN20.** *See Brown v. E.F. Hutton Group, Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993) (district court correct in granting summary judgment after holding reliance unreasonable as a matter of law where alleged misrepresentations were contradicted by offering materials); *Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 196 (2d Cir.2003) (plaintiff's failure to insist that a representation be included in a stock purchase agreement " precludes as a matter of law a finding of reasonable reliance" ); *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 170-71 (S.D.N.Y.1988) (Kram, J.) (dismissal appropriate where plaintiffs relied on statements " directly contradicted by the clear language of the offering memorandum" ); *M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 527 (S.D.N.Y.1996) (Cote, J.) (party failed to establish reasonable reliance as a matter of law where misrepresentations were " directly contradicted" by written waiver agreement).

**FN21.** " Sophisticated business entities, when put on notice of the existence of material facts which have not been documented, assume the business risk that the facts may not be as represented because a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament." 247 F.Supp.2d 352, 369 *quoting Lazard Freres & Co. v. Protective Life Ins.,* 108 F.3d 1531, 1543 (2d Cir.1997).

**FN22.** " Where sophisticated businessmen engaged in major transactions enjoy access to

critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.* 748 F.2d 729, 737 (2d Cir.1984).

The court held previously that plaintiffs have successfully pleaded claims to meet the elements of an action for breach of contract. *Internet Law I,* 223 F. Supp at 490. The court now searches the record to see if there is sufficient evidence to prove these allegations. What is in dispute is whether Cootes Drive's breach, namely, selling shares short in violation of the agreement, was material.[FN23] If Cootes Drive's breach was material, plaintiffs argue, plaintiffs were excused from performance. As discussed above, Cootes Drive has proven its claim and the burden is upon plaintiffs to produce evidence that would " permit judgment for the [plaintiffs] on the basis of [their] defense." [FN24]

**FN23.** " Under New York law, for a breach of a contract to be material, it must go to the root of the agreement between the parties. A party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Associates, Ltd. v. Austin Drugs, Inc.,* 111 F.3d 284, 289 (2d Cir.1997) (internal quotations and citations omitted); *Wechsler v. Hunt Health Systems, Ltd.,* 186 F.Supp.2d 402, 413 (S.D.N.Y.2002) (" Under New York law [materiality of a breach] is a question of law for the Court to decide." )

**FN24.** *Frankel v. ICD Holdings S.A.,* 930 F.Supp. 54 (S.D.N.Y.1996) (Kaplan, J.) (holding that custom crafted disclaimer language in notes negotiated between sophisticated parties waived a defense of fraud in the inducement)

**\*6** Plaintiffs make grand allegations but actually prove very little. Construing the facts in the light most favorable to them, but without taking any untoward leaps of faith, plaintiffs have shown that defendant Cootes Drive sold 64,346 shares " short" [FN25] prior to receiving a waiver [FN26] from INL that enabled them to sell shares in this manner. During the 93 trading days before the waiver, defendant Cootes Drive maintained short positions on only 7 days. Pls.

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

Statement at ¶ 24. The shorted sales make up a very small minority of the shares traded by Cootes Drive and a minute percentage of the overall total shares traded during the period. The court finds that, in light of the peculiarities of this case, this small amount of trading is merely a technical violation of the agreement; it does not go to the root of the agreement between the parties and is therefore not is enough to constitute a material breach and excuse INL from performance.[FN27]

> FN25. § 3.13 of the agreement defines short sales as a sale where there was not an equivalent offsetting long position including shares due under a notice of conversion.

> FN26. Plaintiffs do not contest the authenticity of the waiver but allege the waiver was given as a result of the underlying fraudulent inducement. Holding, as we do, that plaintiffs' claims of fraudulent inducement are without merit, we find the parties validly entered into the waiver.

> FN27. " The right of a party to enforce a contract will not be forfeited or lost by reason of technical, inadvertent, or unimportant omissions or defects." *Cablevision Systems Corp. v. Town of East Hampton,* 862 F.Supp. 875, 885 (E.D.N.Y.1994), *aff'd* 57 F.3d 1062 (2d Cir.1995) (unpublished table decision), *quoting Miller v. Benjamin,* 142 N.Y. 613, 617, 37 N.E. 631 (1894).

The one piece of evidence that plaintiffs produced which tends to mitigate in their favor are the trading records showing that Thomas Kernaghan, an agent and broker for Cootes Drive, was shorting INL stock. However, these trades begin well before the agreement and plaintiffs do not show that the trades were done at the behest of Cootes Drive. Plaintiffs have requested additional discovery to flesh out these particular weaknesses in their defense of breach. Plaintiffs have been given ample time for discovery. In light of this and plaintiffs' conduct during such discovery, no additional discovery will be granted.[FN28]

> FN28. *See Internet Law II,* 2003 WL 21537782 (S.D.N.Y.2003) (Carter, J.)

INL's defense of breach is hereby struck as it pertains to the third counterclaim. Plaintiffs have also included in their pleadings an everything-but-the-kitchen-sink list of affirmative defenses that they do not even attempt to support.[FN29] Like their affirmative defenses of fraud and breach, we find these defenses to be without merit as they pertain to Cootes Drive's Third Counterclaim. We hereby award summary judgment in favor of Cootes Drive on their Third Counterclaim. INL is required to pay damages and interest to Cootes Drive for breach of the agreement.

> FN29. Reply to Counterclaims at 17-19.

2. Counterclaim Four: The Promissory Note

Cootes Drive's fourth counterclaim for breach of contract is for failure to repay a promissory note. In New York, proof of a promissory note, demand and nonpayment establishes a prima facie case for recovery.[FN30] A prima facie case entitles the promisee to judgment as a matter of law.[FN31] In the instant matter, plaintiffs concede that " Cootes Drive agreed to loan INL $500,000 ... [as] memorialized by a promissory note dated December 5, 2000" (the " note" ). Pls. Statement at ¶ 29-30. Plaintiffs further concede that Cootes Drive provided the funds; demanded payment on March 1, 2001; and that " [INL] has not paid the Note" *Id.* at 32-33. Based upon plaintiffs' admissions alone, Cootes Drive has squarely met the burden of proving a prima facie case.

> FN30. *See First Federal Sav. Bank v. Tazzia,* 696 F.Supp. 904, 906 (S.D.N.Y.1988) (Sweet, J.); *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Fremont,* 760 F.Supp. 334, 336 (S.D.N.Y.1991) (Stanton, J.); *Citicorp Intern. Trading Co., Inc. v. Western Oil & Refining Co., Inc.,* 790 F.Supp 428 (S.D.N.Y.1992) (Sweet, J .).

> FN31. *Gross v. Fruchter,* 230 A.D.2d 710, 711, 646 N.Y.S.2d 53, 54 (N.Y.A.D. 2 Dept.1996) (promisee established entitlement to judgment as a matter of law by producing note and demonstrating that maker failed to redeem when requested).

**\*7** Once the promisee has demonstrated a prima facie case for recovery on a note, in order to avoid judgment, it is up to the maker to produce evidence showing a triable issue fact establishing a bona fide defense. *Grasso v. John I. Shutts Agency, Inc.,* 517 N.Y.S.2d 113, 132 A.D.2d 768 (N.Y.App.Div.1987). To this end, mere conclusory allegations will not suffice; a genuine and substantial issue rebutting holder's entitlement to payment must be shown. *National*

Not Reported in F.Supp.2d                                                                                      Page 8

Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

**(Cite as: Not Reported in F.Supp.2d)**

*Union Fire Ins. Co. of Pittsburgh, Pa. v. Fremont,* 760 F.Supp. 334, 336 (S.D.N.Y.1991) (Stanton, J.). Without being explicit, plaintiffs seem to posit the same defenses to the payment of the note as the agreement, specifically that the note is a result of underlying fraud and that the defendants breached the note in some manner. Although, plaintiffs' fraud defense is invalid for the reasons described above, it is worth noting that it would not be applicable to the note because the plaintiff specifically waived his right to protest payment of the note. Note § 6 (" [a]ll payments of principal and interest shall be made without setoff, deduction or counterclaim." ) Under New York law, such a waiver among sophisticated parties is effective to overcome virtually any defense to enforcement.[FN32]

> FN32. *Citicorp Intern. Trading Co., Inc.,* 790 F.Supp at 434; *Thornock v. Kinderhill Corp.,* 749 F.Supp. 513 (S.D.N.Y.1990) (Sweet, J.) (granting summary judgment in favor of promisee despite maker's defense of fraudulent inducement because such defense was not based upon misrepresentations concerning terms or conditions of loan itself); *Bank of Suffolk County v. Kite,* 49 N.Y.2d 827, 427 N.Y.S.2d 782 (1980) (Bank entitled to judgment on note despite alleged oral understanding that maker would not be liable where the unexpressed condition was inconsistent with the expressed terms of the note).

Plaintiffs offer no theories as to how Cootes Drive has breached the conditions of the note. Plaintiffs merely allege that after entering the agreement, their position with creditors had become so poor that they had no one else to turn to for money. Even assuming this is an attempt to contrive a non-frivolous economic duress defense, the court finds no merit in it. Plaintiffs were not " forced to agree to [the note] by means of a wrongful threat precluding the exercise of his free will." [FN33] INL's defenses to enforcement of the note fail. Summary judgment is awarded to Cootes Drive on their fourth counterclaim. INL must repay the principal and accrued interest on the note.

> FN33. *Signet Corp. v. Interbank Financial Services, Inc.,* 755 F.Supp. 103, 105 (S.D.N.Y.1991) (Eidelstein, J.) *quoting Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 25 (1971).

CONCLUSION

Plaintiffs' request for the court to reconsider the judgment entered July 8, 2005 is DENIED. Plaintiffs' motion to dismiss Cootes Drive's counterclaims is DENIED. Both of plaintiffs' motions to supplement the record are DENIED. Cootes Drive's motions to strike the Carr Affidavit and First Tate Affidavit are DENIED. The Citco defendants' motion to strike the Second Tate Affidavit is GRANTED. Partial summary judgment in favor of Cootes Drive on its third and fourth counterclaims is GRANTED.

IT IS SO ORDERED

S.D.N.Y.,2005.
Internet Law Library, Inc. v. Southridge Capital Management, LLC
Not Reported in F.Supp.2d, 2005 WL 3370542 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Slip Copy                                                                Page 1
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Kirton v. Northwestern Mut. Life Ins. Co.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Lawrence KIRTON, Plaintiff,
v.
NORTHWESTERN MUTUAL LIFE INSURANCE
CO., Defendant.
**No. 00-CV-7646 (JS)(AKT).**

Oct. 24, 2006.

Lawrence Kirton, pro se, Westbury, NY, for Plaintiff.
Jeanne O. Marino, Esq., White & Williams LLP, New
York, NY, for Defendant.

*MEMORANDUM AND ORDER*
SEYBERT, District Judge.

### INTRODUCTION

**\*1** Pending before this Court are Magistrate Judge
James Orenstein's Report and Recommendation, dated
January 17, 2006 ("Report"), and objections to the
Report, filed pursuant to FED. R. CIV. P. 72. For the
reasons below, the Court ADOPTS the Report in its
entirety.

### LEGAL STANDARD

A district court reviews a magistrate judge's report
under the standards established in 28 U.S.C. §
636(b)(1) and Federal Rule of Civil Procedure 72(b).
The district judge makes a *de novo* determination of
those parts of the Report to which a timely written
objection has been made by any party but may adopt
the uncontested portions of the Report unless they
show clear error. *See Thomas v. Arn, 474 U.S. 140,
151-52, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985);
Grassia v. Scully, 892 F.2d 16, 19 (2d Cir.1989);
Tapia-Garcia v. United States, 53 F.Supp.2d 370, 373
(S.D. N. Y.1999).* Such *de novo* review does not
entirely replace the Report.

### BACKGROUND

The facts of this case are stated in this Court's order,

dated August 11, 2004, partially granting Defendant's
summary judgment motion ("August 2004 Order").
The Magistrate also summarized the relevant facts in
his Report. (Report at 1-3.) To the extent that Plaintiff
Lawrence Kirton ("Plaintiff") objects to matters
already decided in the August 2004 Order, this Court
rejects such objections as improperly brought at this
time. Furthermore, the Court considered Plaintiff's
arguments regarding the factual background three
times and has rejected them three times: first, in the
August 2004 Order, again in this Court's Order, dated
October 27, 2004, denying Plaintiff's motion for
reconsideration, and a third time in this Court's Order,
dated April 28, 2005, denying Plaintiff's Rule 60
motion.

### DISCUSSION

In his Report, the Magistrate recommended that the
Court enter judgment in favor of Defendant
Northwestern Mutual Life Insurance Company
("Defendant") and against Plaintiff in the amount of
$135,403.24. The Magistrate found that Defendant
was entitled to a judgment of rescission, which would
restore the parties to the position they were in prior to
the transaction that gave rise to this legal dispute.
(Report at 4.)

The Magistrate found that Defendant was entitled to a
judgment for the total amount of $135,403.24. The
principal amount due Defendant is $90,242.39. The
Magistrate arrived at this figure by subtracting
$14,096.87-the amount Plaintiff paid in premiums to
Defendant-from $104,339.26-the amount Defendant
paid to Plaintiff in benefits. The interest amount due
Defendant is $45,160.85. The Magistrate arrived at
this number by subtracting $5,640.12-the interest on
premiums Plaintiff paid Defendant-from
$50,800.97-the interest on benefits Defendant paid to
Plaintiff. (Report at 7-16.)

Plaintiff first objects to the amount of the principal the
Magistrate recommended. Plaintiff, however, appears
confused. Plaintiff argues that Defendant "should only
be entitled to a judgment reflecting $104,339.26 in
benefits paid. The premiums paid by [Plaintiff] should
not decrease the principal amount of the award since
there are issues based on the ... replacement policy."
(Pl.'s Objections at 4.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 2
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

**\*2** If this Court agreed with Plaintiff, then the principal amount would be ***greater*** than the recommended principal amount of $90,242.39. Because it appears to the Court that Plaintiff's objection is not in his best interest, the Court rejects it. As for Plaintiff's objection that the principal amount should reflect premiums Plaintiff paid to Defendant up until April 1, 2006, the Court rejects this as unsupported and unsubstantiated by the Plaintiff.

Plaintiff also objects to the way in which the Magistrate arrived at the amount of interest. Plaintiff suggests that an interest rate between 4.1-4.3 percent replace the rate of 9 percent. The Magistrate, however, expressed his concern that the statutory default interest rate of 9 percent was unfairly high. (Report at 14 .) The Magistrate instead recommended a 6 percent interest rate. (Report at 15.)

Plaintiff claims that an interest rate of 4.1-4.3 percent "reflects the average rate over the entire period of fourteen years at issue in this case...." (Pl.'s Objections at 4.) However, Plaintiff does not demonstrate how he arrived at this number nor how it is accurate. The only rationale Plaintiff provides for such an interest rate is that the award financially impacts Plaintiff greater than Defendant, which is a multi-billion dollar insurer. Plaintiff argues that he only receives disability income. The Court rejects this rationale. The fact that Defendant may be a multi-billion dollar insurer is no reason to deny Defendant the right to money it never had to pay Plaintiff in benefits. Accordingly, the Court rejects this argument.

### CONCLUSION

The Court ADOPTS the Magistrate's Report in its entirety. The Court awards Defendant a judgment in the amount of $135,403.24, which is comprised of a principal amount of $90,242.39 and interest in the amount of $45,160.85. The Clerk of the Court is ordered to enter a judgment in the amount of $135,403.24.

SO ORDERED.
JAMES ORENSTEIN, Magistrate Judge.

### REPORT AND RECOMMENDATION

On August 11, 2004, the court granted summary judgment in favor of defendant NorthWestern Mutual Life Insurance Company ("Northwestern") and found that plaintiff Lawrence Kirton ("Kirton") had made a fraudulent misrepresentation on his application for the

insurance policy at issue. *See* Docket Entry ("DE") 101. After denying Kirton's motion for reconsideration of that decision, DE 111, the Honorable Joanna Seybert, United States District Judge, referred the matter to me for a report and recommendation as to the amount of judgment to be awarded Northwestern on its counterclaim against Kirton. DE 112. While that referral was pending, Kirton sought relief pursuant to Rule 60 of the Federal Rules of Civil Procedure. Judge Seybert denied that request on April 28, 2005, and renewed the referral to me. DE 126. I now make that report and, for the reasons set forth below, respectfully recommend that the court enter judgment in favor of Northwestern and against Kirton in the amount of $135,403.24.

### I. *Background*

**\*3** I assume the reader's familiarity with Judge Seybert's previous orders in this case, which set forth much of the relevant background. *See* DE 101 (containing a thorough chronicle of the procedural history and factual background of the instant matter from the time of Kirton's initial complaint through the summary judgment motion decided in Northwestern's favor); DE 126 (updating the procedural history through the filing of Kirton's Rule 60 motion). As a matter of convenience, I summarize the following facts and procedural history relevant to the matter now before me.

On July 5, 1991, Northwestern issued Disability Insurance Policy number D834252 (the "Policy"), which provided for Kirton to receive benefits in the amount of $2,100 per month should he become totally disabled. On October 6, 1995, Kirton fell on a wet stairwell landing and sustained serious injuries. Kirton was examined, diagnosed with a variety of ailments, and ultimately found to be "severely disabled." Kirton applied for and received disability benefits under the Policy. Northwestern continued making those payments until November 1999, when it determined that Kirton was no longer even partially disabled and closed his case. On December 28, 2000, Kirton filed a complaint in this court seeking declaratory relief on the ground that Northwestern's termination of benefit payments breached the Policy's terms. DE 101 at 1-7.

On April 8, 2002, Kirton amended his complaint to add additional grounds for seeking declaratory relief and an allegation that Northwestern breached the implied covenant of good faith and fair dealing. On October 29, 2002, Northwestern filed a counterclaim alleging that Kirton made a fraudulent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 3
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

misrepresentation on his insurance application, breached the covenant of good faith and fair dealings, and was unjustly enriched. On May 21, 2003, Northwestern moved for partial summary judgment on Kirton's claims. On November 12, 2003, Northwestern moved for partial summary judgment on its Counterclaim. *Id.* at 1-2.

Judge Seybert granted Northwestern's motion for partial summary judgment in an order entered on August 11, 2004. *Id.* at 18. In particular, Judge Seybert found that the record dispositively demonstrated that Kirton had made a fraudulent misrepresentation on his insurance application when he reported that he had never been treated for or had symptoms of a spinal disorder-a statement proved false by Kirton's deposition testimony that he had been diagnosed with a herniated disk in 1985. *Id.* at 18.

Kirton sought reconsideration of the latter decision pursuant to Local Civil Rule 6.3. Judge Seybert denied that application in an order entered on October 27, 2004. DE 126 at 1-2. On November 8, 2004, Judge Seybert first referred the matter to me for a Report and Recommendation on the amount of judgment to be issued against Kirton. DE 112. Before I had made a report, however, Judge Seybert granted Kirton permission to file a motion for reconsideration of the summary judgment decision pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. DE 118. On January 5, 2005, I issued an order holding in abeyance my Report and Recommendation until after Judge Seybert ruled on Kirton's motion. DE 121. On April 28, 2005, Judge Seybert denied that motion and renewed her prior referral to me of the issue of the amount of judgment to be issued against Kirton. *See* DE 126 at 5.

**\*4** In his submissions on the matter that has been referred to me, Kirton continues to deny his liability. *See e.g.,* DE 136. Notwithstanding his apparent unwillingness to accept the judgment of the tribunal that he selected for the resolution of his claim against Northwestern-a recalcitrance he would undoubtedly find intolerable were his position and Northwestern's reversed-I have no reason to revisit the issue of liability that Judge Seybert has now thrice decided against Kirton. *See* DE 101; DE 111; DE 126. I therefore address only the merits of the issue relating to the amount of judgment, and Kirton's liability on the counterclaim as given.

II. *Discussion*

A. *Northwestern Is Entitled To A Judgment Of*

*Rescission*

The Policy specified that Northwestern could "rescind the policy or deny a claim due to a misstatement in the application" with the qualification that after two years only a "fraudulent misrepresentation ... may be used to rescind the policy." DE 101 at 15. Judge Seybert found as a matter of law that Kirton's failure to disclose the herniated disc on his insurance application constituted a fraudulent misrepresentation. *Id.* at 20.

This dispute arises under the law of New York. *See* DE 101 at 17. That law provides that even an innocent misrepresentation, if material, suffices " 'to allow the insurer to avoid the contract of insurance or defeat recovery thereunder.' " *Mutual Ben. Life Ins. Co. v. JMR Electronics Corp.,* 848 F.2d 30, 32 (2d Cir.1988). Rescission of the insurance contract is the proper remedy where an applicant has committed a material misrepresentation. *Id. at 32, 34* (affirming the district court's rescission of a life insurance policy based on the applicant's misrepresentation that he was a non-smoker). Judge Seybert expressly held that Kirton's misstatement was material: "[T]his court finds that the evidence of materiality is 'clear and substantially uncontradicted.' " DE 101 at 20. Northwestern is therefore entitled to rescind the disability contract it issued to Kirton based on his misrepresentation about his medical history.

Rescission is a remedy that endeavors to return parties "to the status that existed before the transaction was executed." *See* *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1212 (S.D.N.Y.1994). To accomplish this result in the present case I must enter a judgment that returns the parties to the status that existed in July 1991 before they entered into the insurance contract at issue. This is best achieved by returning to Northwestern the interest-adjusted amount of benefits it paid to Kirton under the contract minus the interest-adjusted amount of premiums Kirton paid to Northwestern. This task is rendered considerably easier by the fact that, as discussed below, the relevant sums are not in dispute.

Northwestern first filed an application for judgment on November 19, 2004. DE 114 ("Nov.2004 Application"). In that application, and in several subsequent submissions, Northwestern has consistently sought judgment for an amount that reflects the benefits it paid under the vitiated disability contract ($104,339.26) minus the premiums paid by Kirton ($14,096.87), plus interest. *See* Nov. 2004

Application; DE 127; DE 135. In support of the judgment sought, Northwestern has submitted the testimony of a certified public accountant and payment records covering the entire duration of the Policy. *See* Nov. 2004 Application (Affidavit of Tom Mattocks in Support of Motion for Judgment) ("Mattocks Aff. I"); DE 135 (Supplemental Affidavit of Tom Mattocks in Support of Motion for Judgment and payment records) ("Mattocks Aff. II"). Northwestern has twice modified the judgment it seeks so as to include additional pre-judgment interest. *See* DE 127; DE 135. On May 5, 2005 and again on November 9, 2005 Northwestern revised its initial application to include prejudgment interest through those respective dates. *Id.*

**\*5** Kirton has never challenged Northwestern's figures regarding the amount of benefits or premiums paid. Kirton has, however, continued to challenge the judgment Northwestern seeks on substantive grounds. In his initial opposition to Northwestern's application for a judgment Kirton argued that Northwestern's fraudulent misrepresentation counterclaim was time-barred. *See* DE 119 (Affirmation of Lawrence Kirton) ¶ 9. That issue was definitively resolved by Judge Seybert's order of April 28, 2005: "[T]o the extent that the Court has not directly rejected Plaintiff's statue of limitations position, it does so now." DE 126 at 4.

Kirton's second argument, raised in three separate submissions, is that he is entitled to a credit for payments due him under a hypothetical replacement policy. *See* DE 131 ("Kirton Opp.") at 1-3; DE 134; DE 136. In essence, Kirton argues that even if he had disclosed his earlier spinal problem on his application, Northwestern would still have issued him a disability insurance policy (albeit one with an appropriate rider) that would have been essentially identical to the Policy at issue here. As a result, Kirton asserts he is entitled to the insurance benefits he would have received under the policy for which he never applied and that was never issued. *See* Kirton Opp. ¶¶ 5, 6. The argument appears to have significant flaws as a matter of both law and logic. Not least among those problems is the fact that New York law does not allow the "anomalous result" of allowing a misrepresenting party the benefit of "the coverage that he might have contracted for had the necessary information been accurately disclosed at the outset." *Mutual Ben. Life Ins. Co. v. JMR Electronics Corp.,* 848 F.2d at 34.

The substantive shortcomings of Kirton's theory, however, are of considerably less concern to me than is that theory's total irrelevance to my assigned task:

namely, determining the contours of a judgment that will return the parties to their respective positions before they entered into the actual disability contract which Northwestern is now entitled to rescind as a result of Kirton's fraudulent misstatement. Kirton has had ample opportunity to litigate the merits of this case and, at least in this court, his window of opportunity for raising additional arguments is now shut.

### B. *The Amount Of The Award: Principal*

With regard to the judgment for the actual contract that he was found to have fraudulently induced, Kirton appears to concur with the calculations offered by Northwestern as to the amount owed to it for benefits paid to him and the amount owed to him by Northwestern for premiums paid. *See* Kirton Opp. ¶¶ 1, 8. The parties thus agree that Northwestern paid $104,339.26 in benefits and Kirton paid $14,096.87 in premiums. *See* Mattocks Aff. II at 3; Kirton Opp. ¶¶ 1, 8. I have independently reviewed 71 pages of payment records covering the entire duration of the rescinded policy that corroborate these figures. *See* DE 135, Affirmation of Anthony Lucas, Exhibit A (benefit payment history); Mattocks Aff. II, Exhibit A (premium payment history). Having paid more benefits under the contract than it received in premiums from Kirton, Northwestern is entitled to a judgment in its favor reflecting the $90,242.39 difference between the two amounts.

### C. *The Amount Of The Award: Interest*

**\*6** The figure of $90,242.39 is the principal amount of the judgment that the court should award Northwestern as a consequence of the rescission of the Policy to which it is entitled. To receive the benefit of that rescission, however, Northwestern should also be awarded interest on the principal amount-or more precisely, its total award should represent the interest adjusted total of benefits paid minus the interest-adjusted total of premiums received. I next address the proper method for calculating such interest.

### 1. *Because Northwestern Seeks The Equitable Remedy Of Rescission, The Statutory Rate Of Nine Percent Is Not Mandatory*

Northwestern asserts that under the relevant provisions of New York law, it is entitled to

prejudgment interest at the rate of nine percent per annum. *See* Mattocks Aff. I ¶ 3. Northwestern's starts from a correct premise: unless a different rate is mandated or authorized by another statute, New York law does mandate the award of prejudgment interest at the nine percent rate on any sum awarded for a contract breach or for the deprivation or interference with property. *See* N.Y. C.P.L.R. § § 5001(a), 5004 (McKinney 2005). I disagree, however, that that provision ends the analysis because the law also provides that in an action seeking equitable relief, "interest and the rate and date from which it shall be computed shall be in the court's discretion." N.Y. C.P.L.R. § 5001(c); *see Valle Joint Plumbing Industry Board,* 623 F.2d 196, 206-207 (2d Cir.1980); *Shubert v. Lawrence,* 27 A.D.2d 292, 297-298 (N.Y.App.Div.1967). The question is thus whether the court should apply the statutory rate of nine percent or some other rate based on the exercise of its discretion.

A district court has no discretion to deviate from the mandatory rate and computation rules of § 5001(a) if a case is not clearly and predominantly equitable in nature, *see Action S.A. v. Mark Rich & Co., Inc.,* 951 F.2d 504, 508 (2d Cir.1991) (admonishing courts not to use the "equity clause" of § 5001(a) as an end-run around the statute where the relief sought is limited to damages); *Spector v. Marmelstein,* 485 F.2d 474, 482 (2d Cir.1973) (reversing the district court's denial of prejudgment interest where the action sought "no traditional form of equitable relief"). As explained below, this case is indeed clearly and predominantly equitable in nature-or, more precisely, it has become so.

This case unquestionably began as a breach of contract action, in that it was initiated by Kirton's claim for declaratory relief under the Policy. *See* DE 1 (Complaint). It retained its contractual nature when Northwestern asserted a counterclaim that initially sought compensatory damages as a consequence of Kirton's alleged breach of the implied covenant of good faith and fair dealing. *See* DE 48 (Counterclaim) at 7. However, neither Kirton's claim nor Northwestern's contract-based counterclaim is the basis for the judgment at issue; instead, the only legal claim for which judgment is to be entered is Northwestern's fraudulent misrepresentation counterclaim, for which Northwestern seeks only the remedies of rescission and restitution. *See* DE 48; DE 101; Nov.2004 Application.

**\*7** Northwestern is entitled to judgment only on an affirmative counterclaim that seeks rescission-a remedy that effectively treats the Policy as if it had never existed and returns the parties to the positions they occupied before they purported to enter that contract. The law is clear that such a remedy is equitable in nature. *See Alden Auto Parts Warehouse, Inc. v. Dolphin Equipment Leasing Corp.,* 682 F.2d 330, 333 (2d Cir.1982) (citing *Abner M. Harper, Inc. v. City of Newburgh,* 159 A.D. 695, 699-700 (N.Y.App.Div.1913)); *U.S. Postal Service v. Phelps Dodge Refining Corp.,* 950 F.Supp. 504, 517-519 (E.D.N.Y.1997).

As a result, the matter that has been referred to me falls squarely within the New York remedial statute's equity clause. *See Bank of St. Louis v. Morrissey,* 597 F.2d 1131, 1138 (8th Cir.1979) (holding that a case was within the equity clause of § 5001(a) despite the fact that it was initiated as a breach of contract claim because the sole remedy imposed was equitable). The court must therefore exercise its discretion in calculating interest and must also document its reasoning sufficiently to justify the outcome. *See Valle v. Joint Plumbing Industry Bd.,* 623 F.2d 196, 206-207 (2d Cir.1980) (remanding a case for the district court to specify "whether, at what rate, and from what date to award prejudgment interest" where the judgment was based on equitable principles and the court without explanation awarded interest at the rate of nine percent).

### 2. *Determining An Equitable Interest Award*

Having determined that the award of interest is within the court's discretion, I must next recommend what award of interest, if any, is equitable on the particular facts of this case. *See Shubert v. Lawrence,* 27 A.D.2d. 292, 297 (App.Div.1967). As a preliminary matter, I note that the rationale of awarding prejudgment interest-compensating a party for the deprivation of the use of its money-is particularly apt in this case. *See U.S. Postal Service v. Phelps Dodge Refining Corp.,* 950 F.Supp. 504, 517-519 (E.D.N.Y.1997) (citations omitted). Northwestern has been deprived for several years of funds that it paid Kirton to which he was not entitled. Further, "public policy favors the award of interest in equity actions." *Id.* at 518. I therefore conclude that some award of interest is appropriate and turn next to recommendations as to the date from which such interest should be calculated and an appropriate rate, both of which are matters within the court's discretion.

### a. *The Date From Which To Calculate Interest*

Where interest is mandated, § 5001(a) dictates that interest is to be computed "from the earliest ascertainable date" that the cause of action existed. N.Y. C.P.L.R. § 5001(b). Where damages are incurred on various dates, interest can be itemized or awarded from "a single reasonable intermediate date." *Id.* Northwestern's application seeks a judgment that includes interest on each payment from the date the payment was made through November 2005, the date of its last application. *See* Mattocks Aff. II. I infer that it does so because all of the payments at issue occurred after the cause of action accrued on July 5, 1991 when the Policy was issued. I agree than an award of interest from the date of payment is the appropriate way to restore the status quo ante. This is not a case in which the prevailing party has been dilatory in pursuing relief to which it has long been entitled. *See Phelps Dodge,* 950 F.Supp. at 519 (awarding interest from the date the lawsuit was commenced rather than the payment date on the basis of the rescinding party's nearly six years of inactivity with regard to the claim at issue). Northwestern only became aware of Kirton's misrepresentation after Kirton initiated the instant suit and admitted in deposition testimony that he had lied on his insurance application. Furthermore, the record indicates that Northwestern diligently reviewed Kirton's claim and promptly closed his case when presented with evidence that he was no longer disabled. *See* DE 101 at 5-6. Finally, I note that Judge Seybert rejected Kirton's claim that Northwestern was on notice of Kirton's pre-existing spinal condition. *See* DE 126 at 4.

### b. *The Rate At Which To Calculate Interest*

**\*8** It has been relatively easy to determine that the court should exercise its discretion rather than automatically embrace an interest rate prescribed by an inapposite statutory provision. It has proved considerably more difficult to come up with a recommendation as to how the court should exercise the discretion I believe it has. My survey (or more precisely, my law clerk's survey) of the uneven landscape of discretionary pre-judgment interest awards reveals many possibilities but offers little guidance. For the reasons that follow, after considering several benchmark interest rates I have concluded that it would be most appropriate to award Northwestern interest at the rate of six percent per year.

### i. *Benchmarks From New York Cases And Statutes*

The statutory command under § 5001(a) to award interest in a manner equitable to the specific facts has, not surprisingly, produced a wide array of results. Some courts have denied interest altogether. *See Carvel v. Davis,* 255 A.D.2d 315, 315-316 (N.Y.App.Div.1998) (affirming the denial of prejudgment interest on the award of unpaid commissions to a trustee); *Bank of St. Louis v. Morrisey,* 597 F.2d 1131, 1138 (8th Cir.1979). Others have, as a matter of discretion, awarded interest at the nine percent rate mandated by § 5001(a) for non-equitable actions. *See, e.g., Phelps Dodge,* 950 F.Supp. at 519 (noting that the rate was justified by the circumstances of the case and "general conditions of fairness"). Still other courts have awarded interest below the statutory default rate based on general notions of fairness and pragmatic factors like market trends. *See Arnold Herstand & Co. v. Gallery: Gertrude Stein, Inc., N.Y.L.J.,* January 21, 1993 at 25 (N.Y.Sup.Ct. Jan. 21, 1993) (noting that the statutory rate of nine percent would amount to "a charge for the use of money"); *Shubert v. Lawrence,* 27 A.D.2d 292, 298 (N.Y.App.Div.1967). On the other hand, some courts have exercised their discretion to awarded interest at a rate *higher* than the nine percent default rate where the relevant interest rate exceeded that amount. *See Matter of Dissolution of Gift Pax, Inc.,* 123 Misc.2d 830, 837 (N.Y .Sup.1984) (awarding interest at the rate of twelve percent on a minority share purchase).

Moreover, the statute that sets the nine percent rate as the default for non-equitable remedies is not the only statutory interest rate: other statutes set other benchmarks. New York state's usury law, for example, provides a default rate of six percent and a maximum rate of sixteen percent. *See* N.Y. Gen. Oblig. Law § 5-501(1); N.Y. Banking Law § 14-a(1).

### ii. *Benchmarks From Federal Cases And Statutes*

Federal law on prejudgment interest is similar to the equity provision of § 5001(a). Where permitted, the award and rate of prejudgment interest is within the discretion of the district court. *See Commercial Union Assur. Co. v. Milken,* 17 F.3d 608, 613 (2d Cir.1994). By contrast, the award and rate of postjudgment interest is statutorily prescribed. *See* 28 U.S.C. § 1961 (requiring that interest be awarded at the rate of the "weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar weekend preceding [judgment]"). District courts in this circuit frequently use this rate in prejudgment interest awards,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and the Second Circuit has expressed its approval of that practice. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 314 F.Supp.2d 201, 203 (S.D.N.Y.2003) (citing the unreported decision *Jones v. UNUM Life Ins. Co.,* 14 Fed. Appx. 44, 46 (2d Cir.2001)).

**\*9** The rationale for using a rate adopted by Congress is self-evident: "it is reasonable to accept the considered judgment of Congress as to a fair interest rate." *Id.* Most significantly, the interest rates on short-term, risk free obligations such as treasury bills are considered an inherently reasonable measure of the value of the use of money. *See New York Marine & General Ins. Co. v. Tradeline,* 266 F.3d 112, 131 (2d Cir.2001) (citations omitted). On the other hand, there is an important difference between the federal law discussed here and the potentially relevant provisions of New York law discussed above: u but the prejudgment interest awarded under federal law is compounded. *See Epstein v. Kalvin-Miller Intern., Inc.,* 139 F.Supp.2d 469, 486 (S.D.N.Y.2001); *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 145 (2d Cir.1993).

Notwithstanding the obvious difference between simple and compound interest, it is useful to determine the actual rates that would be relevant under the federal practice. For the fourteen years at issue in this case, this interest rate ranged from a low of 1.2 percent in 1991 to a high of 5.9 percent in 1991 and 1995. The average rate over the entire period was 4.3 percent. *See* Federal Reserve Statistical Release, Selected Interest Rates ("Federal Reserve Statistics") (available at http:// www.federalreserve.gov/releases/h15/data.htm). Another commonly used proxy for the market rate, the use of which has been approved by the Second Circuit, is the adjusted prime rate established by the Secretary of the Treasury. *See, e.g., E.E.O. C. v. County of Erie,* 751 F.2d 79, 82 (2d Cir.1984). For the period relevant to this case, as set forth in the Federal Reserve Statistics, this rate ranged from a low of 4.1 percent to a high of 9.2 percent and had an average of 7.1 percent.

### iii. *Simple Interest At The Rate Of Six Percent Is Equitable*

Given the preceding review of various benchmark interest rates, the statutory default rate of nine percent appears unfairly high. That rate was last modified in 1981, when interest rates were at record highs. *See* N.Y. C.P.L.R. § 5004. Of significance to my

assessment of the fairness of the state default rate in comparison to other benchmarks is that fact that when the nine percent rate was fixed in the statute in 1981, it was set quite a bit *lower* than other benchmarks: the short-term T-bill rate at that time was 14.8 percent and the Adjusted Prime Rate was 18.9 percent. *See* Federal Reserve Statistics. By contrast, during the period for which interest must be calculated in this case, the statutory nine percent rate was rather *higher* than the short-term T-bill rate, and somewhat comparable to (though generally higher than) the Adjusted Prime Rate. That fact-even accounting for the difference between simple and compound interest-strongly suggests that a rate of nine percent is higher than necessary to achieve a result comparable to that intended by the legislature in achieving a just remedy in non-equitable cases.

**\*10** Based on the preceding considerations, I recommend an award of simple interest at the rate of six percent per year. Such a rate takes advantage of the comparative ease of calculation associated with simple rather than compound interest, and produces a result that (compared to other benchmark rates) is very roughly similar to what a litigant entitled to the statutory rate of nine percent might have received when that standard was enacted in 1981. More importantly, a six percent simple interest rate seems well calibrated to the goal of restoring the status quo ante without getting bogged down in further litigation.

Applying this rate of interest to the benefits and premiums paid under the Policy from the date of payment through January 2006 is a relatively simple matter. My calculations are based on those submitted by Northwestern in its most recent application, DE 135. I have determined that in that submission, Northwestern accurately calculated simple annual interest at the rate of nine percent. Because it proposed a simple interest rate, replacing that rate with a simple interest rate of six percent requires nothing more than reducing the result of Northwestern's calculations by one-third. The only other alteration that is appropriate is to account for the fact that two months have passed since Northwestern submitted its calculation of interest through November, 2005. Reducing the proposed amount by one-third to reflect the six percent rate I believe to be appropriate, and adding an additional two months of interest at the latter rate results in a total recommended award of interest in the amount of $5,640.12 on the premiums that Kirton paid and $50,800.97 on the benefits that Northwestern paid. The difference between these amounts is $45,160.85, representing the total amount of prejudgment interest to which I believe Northwestern is entitled.

Slip Copy                                                                                          Page 8
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)
**(Cite as: Slip Copy)**

III. *Recommendation*

For the reasons set forth above, I respectfully recommend that the Court enter judgment awarding defendant Northwestern a total of **$135,403.24.** That total represents the following:

| | |
|---|---|
| Benefits paid by Northwestern to Kirton: | $104,339.26 |
| Interest on benefits paid by Northwestern to Kirton: | $50,800.97 |
| Premiums paid by Kirton to Northwestern: | ($14,096.87) |
| Interest on premiums paid by Kirton to Northwestern: | ($5,640.12) |
| Total: | $135,403.24 |

IV. *Objections*

This Report and Recommendation will be electronically filed on the court's ECF system. Counsel for defendant Northwestern is directed to serve a copy of this Report and Recommendation on plaintiff Kirton by certified mail, and to file proof of service with the court. Any objection to this Report and Recommendation must be filed with the Clerk of the Court within 10 days of service. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beverly v. Walker,* 118 F.3d 900 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996).

**\*11 SO ORDERED.**

E.D.N.Y.,2006.
Kirton v. Northwestern Mut. Life Ins. Co.
Slip Copy, 2006 WL 3051772 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

LEXSEE 2003 U.S. DIST. LEXIS 5913



Caution
As of: Jun 14, 2007

**EMILE B. MAALOUF, individually d/b/a CHICAGO INTERNATIONAL NETWORK, Plaintiff, - against - SALOMON SMITH BARNEY, INC., Defendant.**

**02 Civ. 4770 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2003 U.S. Dist. LEXIS 5913*

**April 9, 2003, Decided
April 10, 2003, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by, in part *Maalouf v. Salomon Smith Barney, 2004 U.S. Dist. LEXIS 17873 (S.D.N.Y., Sept. 7, 2004)*

**DISPOSITION:** [*1] . Defendant's motion to dismiss was granted in part and denied in part.

**COUNSEL:** Plaintiff, Pro se, Marshall, Virginia.

For Defendant: Thomas J. Moloney, Esq., Boaz S. Morag, Esq., Cleary, Gottlieb, Steen & Hamilton, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION:**

### OPINION AND ORDER

### SHIRA A. SCHEINDLIN, U.S.D.J.:

Emile B. Maalouf, doing business as Chicago International Network ("CIN") and appearing pro se, is suing Salomon Smith Barney, Inc. ("Smith Barney") for, *inter alia,* breach of contract. In addition to breach of contract, Maalouf brings the following claims: negligent misrepresentation; breach of fiduciary duty; tortious interference with prospective business transactions; unjust enrichment; breach of the covenant of good faith and fair dealing; and tortious interference with a business relationship. Smith Barney is moving to dismiss all claims other than the breach of contract claim. For the following reasons, defendant's motion is granted in part and denied in part.

## I. THE COMPLAINT

The following allegations, as pled in Maalouf's Second Amended Complaint ("Complaint") are assumed to be true for purposes of this motion. [*2]

### A. Introduction

CIN was established to develop opportunities in emerging markets, especially those in the countries of the former Soviet Union. *See* Complaint PP 7-8. Recognizing that large amounts of capital would be needed to develop these markets, CIN approached Smith Barney with a proposition intended to improve the overseas position of Smith Barney's investment banking division. *See id.* PP 9, 11-12. In other words, CIN acted as an intermediary between Smith Barney and certain Russian companies. CIN would introduce Smith Barney to these companies and, in return, would receive fees in the form of cash and equity ownership once a deal was consummated. The rights and obligations of the parties were memorialized in the following two letter agreements.

### B. May 1995 Agreement

On May 10, 1995, CIN and Smith Barney entered into a Non-Disclosure and Non-Circumvention Agreement (the "May 1995 Agreement") whereby CIN was to act as representative for three Russian companies, referred to as "Listed Parties" in the Addendum attached to the May 1995 Agreement. n1 *See* Addendum to May 1995

2003 U.S. Dist. LEXIS 5913, *

Agreement, Ex. A to Complaint. Pursuant to the May 1995 Agreement, CIN agreed to [*3] provide Smith Barney with certain "Confidential Information" relating to the Listed Parties who, according to CIN, were "seeking advice and assistance with regard to the potential sale of their securities in the United States and elsewhere." May 1995 Agreement at 1. The May 1995 Agreement provided that Smith Barney would not disclose the Confidential Information provided by CIN to any outside party. *See id.* at 2. In addition, Smith Barney agreed not to make any separate contract or deal, or enter into any transaction, with the Listed Parties or their affiliates without CIN's express written permission. *See id.* The May 1995 Agreement did not include any provisions relating to CIN's compensation; the only duties it imposed on Smith Barney were to maintain the confidentiality of information provided by CIN and to obtain CIN's written consent before dealing with the Listed Parties. Compensation was addressed in a subsequent agreement. n2

> n1 The three companies were Rosneft Joint-Stock Company ("Rosneft"), Almazy Yakutii Joint-Stock Company ("Yakutii") and Almazy Rossii-Sakha Joint-Stock Company ("Rossii-Sakha"). *See* Addendum to May 1995 Agreement.

[*4]

> n2 Maalouf annexed an "Agreement on the Implementation of a Capital Market Strategy," dated December 1, 1995, to his Complaint. *See* Ex. A1 to Complaint. Although this agreement contains provisions regarding the payment of compensation to CIN, it is not signed by either party and therefore not a contract.

## C. June 24, 1996 Agreement

On June 24, 1996, the parties entered into a supplemental agreement (the "June 1996 Agreement") which sets forth specific terms and conditions governing CIN's arrangement with Smith Barney. *See* Ex. B to Complaint. The June 1996 Agreement describes the scope of services to be provided by CIN to Smith Barney as follows:

> The Company [CIN] agrees to provide consulting services to Smith Barney on an exclusive basis with regard to business opportunities, including the potential offering of securities in the United States (collectively, "Business Opportunities") for the Russian companies identified as

"Listed Parties" in a letter agreement between the Company and Smith Barney, dated May 10, 1995.

June 1996 Agreement at 1.

With regard to compensation, [*5] the June 1996 Agreement provides for the payment of a $ 25,000 consulting fee, payable in two installments of $ 12,500 -- the first upon execution of the June 1996 Agreement and the second upon its expiration. This consultation fee was not intended to be CIN's only compensation as the 1996 Agreement states:

> The parties acknowledge that the compensation described in the preceding paragraph shall not constitute compensation for closing any transaction with one or more Listed Parties, and the parties agree to negotiate a reasonable compensation to be paid by Smith Barney to [CIN] in the event such a transaction is completed on terms customary for Smith Barney for similar services (unless otherwise agreed to in writing by both parties).

June 1996 Agreement at 2. The June 1996 Agreement further provides that CIN is to function as an independent contractor with regard to the above services, not as an employee or agent of Smith Barney. *See id.* In addition, the June 1996 Agreement "does not create a partnership or joint venture between [CIN] and Smith Barney." *Id.* Nor does the June 1996 Agreement constitute CIN's "'express written permission,' as detailed in the [*6] letter agreement dated May 10, 1995, between [CIN] and Smith Barney, to make a separate contract with or enter into a transaction with any of the Listed Parties, and that Smith Barney shall continue to require [CIN's] express written permission to consummate such a transaction with any of the Listed Parties or their affiliates." *Id.*

## D. The Alleged Breaches

Maalouf alleges that Smith Barney and its affiliates made repetitive contacts, dealings and transactions with Listed Parties without the express written permission of CIN. *See* Complaint P 25. For example, Smith Barney allegedly breached the May 1995 Agreement by concluding a $ 62 million transaction with Rossii-Sakha in mid 1996. *See id.* P 26. Maalouf also alleges that Smith Barney dealt directly with Gazprom, an affiliate of Rosneft, without CIN's express permission. *See id.* PP 31, 33 and 40. Smith Barney allegedly consummated three Eurobond transactions in 2002 with Gazprom, two for $

2003 U.S. Dist. LEXIS 5913, *

500 million and one for $ 200 million, without paying CIN any fees. *See id.* PP 45-47. For this and other conduct, plaintiff seeks, *inter alia,* damages in the amount of $ 30 million.

## II. MOTION TO DISMISS  [*7]  STANDARD

"Given the Federal Rules' simplified standard for pleading, 'a court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations.'" *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002)* (emphasis added) (quoting *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)).* A complaint need not state the legal theory, facts, or elements underlying the claim, except in certain instances. *Compare Fed. R. Civ. P. 8 with Fed. R. Civ. P. 9.* n3 Pursuant to the simplified pleading standard of *Rule 8(a),* a complaint need only include "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" n4 *Swierkiewicz, 534 U.S. at 512* (quoting *Rule 8(a)(2)).* A plaintiff need not, in other words, plead the elements of a claim. *See In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281, 323 (S.D.N.Y. 2003)* ("*Rule 8(a)* does not require plaintiffs to plead the legal theory, facts or elements underlying their claim.").

> n3 The heightened pleading standard of *Rule 9(b)* requires that in claims of fraud or mistake "the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b).*

[*8]

> n4 Although New York substantive law governs the claims in issue here, federal procedural law is applied. *See generally Hanna v. Plumer, 380 U.S. 460, 14 L. Ed. 2d 8, 85 S. Ct. 1136 (1965)* (explaining that procedural requirements in federal court are governed by federal, not state, procedural law). A federal court may not impose a heightened pleading standard -- under any circumstance -- unless that heightened standard is embodied in the Rules or enacted by Congress. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168-69, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993).*

When deciding a motion to dismiss pursuant to *Rule 12(b)(6),* a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).* Courts may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. [*9] *See id. at 152-53.*

At the motion to dismiss stage, the issue "'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Phelps v. Kapnolas, 308 F.3d 180, 184-85 (2d Cir. 2002)* (per curiam) (quoting *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)).* Therefore, the task of the court in ruling on a *Rule 12(b)(6)* motion is "'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Pierce v. Marano, No. 01 Civ. 3410, 2002 U.S. Dist. LEXIS 14870, 2002 WL 1858772, at *3 (S.D.N.Y. Aug. 13, 2002)* (quoting *Saunders v. Coughlin, No. 92 Civ. 4289, 1994 U.S. Dist. LEXIS 3015, 1994 WL 98108, at *2 (S.D.N.Y. Mar. 15, 1994)).*

## III. DISCUSSION

### A. Negligent Misrepresentation

In his second cause of action, Maalouf claims that Smith Barney made negligent misrepresentations upon which CIN relied. Examples of such misrepresentations include statements by Smith Barney that it would [*10] engage in multi-billion dollar transactions with Listed Parties through CIN, *see* Complaint P 50, and that Smith Barney was able and ready to raise capital for Rosneft through debt financing on the international market, *see id.* P 51.

Smith Barney seeks to dismiss plaintiff's negligent misrepresentation claim as "'so broad and conclusory as to be meaningless.'" Memorandum of Law in Support of Defendant's Motion to Dismiss the Second Through Seventh Causes of Action in the Second Amended Complaint at 8 ("Def. Mem.") (quoting *In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001)).* Smith Barney also seeks dismissal of this claim on the ground that Maalouf failed to plead the required elements of a negligent misrepresentation claim. n5

> n5 These elements are as follows: (1) defendant had a duty, by virtue of a special relationship with plaintiff, to give plaintiff correct information; (2) defendant made a false representation that it should have known was incorrect; (3) defendant knew that plaintiff desired the information supplied in the representation for a serious purpose; (4) plaintiff intended to rely and act upon such in-

formation; and (5) plaintiff reasonably relied on such information to its detriment. *See Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir. 2000).

[*11]

Negligent misrepresentation is a type of fraud and, as such, is subject to *Rule 9(b)*'s heightened pleading standard. *See Simon v. Castello,* 172 F.R.D. 103, 105 (S.D.N.Y. 1997)* ("The particularity requirements of *Rule 9(b)* have also been found to apply to claims for negligent misrepresentation."). Nonetheless, it does not necessarily follow that a plaintiff must plead all elements of a negligent misrepresentation claim with particularity. *Rule 9(b)* merely states that "the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. P. 9(b)*. Accordingly, *Rule 9(b)*'s particularity requirement demands that the complaint contain specific factual allegations demonstrating that a statement was false or misleading when made. *See In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.)* ("The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."), *cert. denied sub nom., Scholastic Corp. v. Truncellito,* 534 U.S. 1071, 151 L. Ed. 2d 590, 122 S. Ct. 678 (2001).

Here, plaintiff's [*12] generalized averments of negligent misrepresentations allegedly made by Smith Barney do not meet the particularity requirements of *Rule 9*. To do so, Maalouf would have to identify, at a minimum, the allegedly false representations made by Smith Barney, who at Smith Barney made them, where and when were they made, and why they are considered fraudulent. n6 For example, Maalouf claims that Smith Barney made representations "that it was able and ready to raise capital on the International market for the oil company Rosneft through debt financing guaranteed by [Rosneft's] oil reserves and assets ...." Complaint P 51. Such a vague and generic allegation does not satisfy *Rule 9(b)* because it does not put the defendant on sufficient notice of the claim, *i.e.,* the who, what, why, where and when. *See In re Scholastic Corp.,* 252 F.3d at 69-70. Having failed to provide this level of detail, plaintiff's negligent misrepresentation claim is dismissed without prejudice.

n6 In the context of securities fraud case, the Second Circuit has interpreted *Rule 9(b)* as follows:

To pass muster under *rule 9(b)*, the complaint must allege the time, place, speaker, and sometimes

even the content of the alleged misrepresentation. Although scienter need not be alleged with great specificity, there must be some factual basis for conclusory allegations of intent.

*Ouaknine v. MacFarlane,* 897 F.2d 75, 79-80 (2d Cir. 1990)* (citations omitted).

[*13]

**B. Breach of Fiduciary Duty**

Maalouf's third claim against Smith Barney is for breach of fiduciary duty. Maalouf alleges that Smith Barney owed a duty to CIN not to conceal critical and detrimental facts regarding Smith Barney's direct dealings with Rossii-Sakha. *See* Complaint PP 66-67, 70. Specifically, plaintiff claims that "CIN was justified in believing that Smith Barney, Inc., would not act in a manner adverse to CIN's interest. Smith Barney, Inc., was in a dominant position as it possessed knowledge and expertise and Smith Barney's involvement could lead to a contract binding CIN." *Id.* P 65.

In order to pursue a breach of fiduciary duty claim, there must be a fiduciary relationship between the parties. *See Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir. 1986)* (describing the elements of a breach of fiduciary duty claim as: (1) a breach by a fiduciary in its obligations to another; (2) defendant's knowing participation in the breach, and (3) damages as a result of the breach). Requiring Maalouf to plead all of these elements would clearly contradict *Swierkiewicz*. However, dismissal is nonetheless appropriate where a plaintiff has not, [*14] and cannot as a matter of law, plead a fiduciary relationship.

Entering into a conventional business relationship generally does not create a fiduciary relationship. *See Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.,* 893 F. Supp. 285, 289 (S.D.N.Y. 1995)*. *See also In Re Kressner,* 206 B.R. 303, 312 (Bankr. S.D.N.Y. 1997)* ("A substantial factor to be considered in determining the existence of a fiduciary relationship is the intent to create a trust relationship, rather than a contractual relationship."). As stated by the Sixth Circuit,

To make out a claim that a fiduciary relationship existed, the party claiming the fiduciary relationship must first show the relationship existed before the transaction that is the subject of the action. Second, the party claiming a fiduciary relationship

2003 U.S. Dist. LEXIS 5913, *

must show that reliance was not merely subjective. Third, the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary.

*In re Sallee, 286 F.3d 878, 892 (6th Cir.)* (citations omitted), [*15] *cert. denied, 537 U.S. 949, 154 L. Ed. 2d 294, 123 S. Ct. 415 (2002).*

In attempting to plead a fiduciary relationship, Maalouf has alleged that Smith Barney "was in a dominant position as it possessed knowledge and expertise" and that a "relationship of trust and confidence between CIN and Smith Barney Inc" existed. Complaint PP 65-66. However, "the fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *In re Sallee, 286 F.3d at 891.* Moreover, "an arm's length business transaction, even those where one party has superior bargaining power[,] is not enough to give rise to a fiduciary relationship." *Sony Music Entm't Inc. v. Robison, No. 01 Civ. 6415, 2002 U.S. Dist. LEXIS 3100, 2002 WL 272406, at *3 (S.D.N.Y. Feb. 25, 2002)* (quotation marks and citation omitted). Given that Maalouf alleges that CIN and Smith Barney were parties to a garden variety business transaction, there can be no fiduciary relationship between the two parties. Nonetheless, if plaintiff can allege that Smith Barney was a fiduciary with respect to CIN, then his claim might be able to proceed. *See Sony Music, 2002 U.S. Dist. LEXIS 3100, 2002 WL 272406, at *3* [*16] . Accordingly, plaintiff's breach of fiduciary duty claim is dismissed without prejudice.

**C. Tortious Interference with Prospective Business Transactions**

Maalouf's fourth claim against Smith Barney is for tortious interference with prospective business transactions. According to Maalouf, Smith Barney was aware that CIN had "substantial opportunities and prospective advantage" with the Listed Parties. Complaint P 73. Maalouf claims that Smith Barney intentionally interfered with CIN's prospective business opportunities and, as a result, CIN's business was severely damaged as to past, present and future engagements and prospects. *See id.* PP 74, 76. Although it is not entirely clear from the Complaint as to how Smith Barney interfered, Maalouf alleges that CIN "incurred reasonably foreseeable losses as a result of the *omissions and statements* of Smith Barney Inc." *Id.* P 76 (emphasis added).

Smith Barney seeks to dismiss this claim because Maalouf "does not identify the nature of CIN's business opportunities with the Listed Parties, nor does he explain how Smith Barney interfered with those opportunities." Def. Mem. at 12. In addition, defendant argues that plaintiff [*17] has failed to allege that any purported interference was done either with malicious motive or through wrongful means. n7 Defendant's argument may have succeeded before *Swierkiewicz.* However, the Supreme Court has emphatically reiterated that the purpose of pleadings is merely to put the adverse party on notice of the claims against it. *See Swierkiewicz, 534 U.S. at 512* (the "short and plain statement" required by *Rule 8(a)(2)* must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting *Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).* A plaintiff need not plead his claim in exhaustive detail, nor must he plead the elements of a particular claim. *See id.* ("*Rule 8(a)*'s simplified pleading standard applies to all civil actions, with limited exceptions."). Here, the Complaint sufficiently puts Smith Barney on notice of plaintiff's claim for tortious interference with prospective business transactions. The specifics of that claim, as well as defendant's motives and methods, will be explored through discovery. Defendant's motion to dismiss this claim is therefore [*18] denied.

n7 Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) a business relationship between plaintiff and a third party; (2) defendant's knowledge of such relationship; (3) intent to interfere; (4) defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (5) the relationship is injured. *See Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000).* According to Smith Barney, plaintiff's claim fails because he has completely failed to allege malicious motive or wrongful means as required by the fourth element.

**D. Unjust Enrichment**

In his fifth claim against Smith Barney, Maalouf alleges that services rendered by CIN, as well as its disclosure of Confidential Information to Smith Barney, unjustly enriched Smith Barney to CIN's detriment. *See* Complaint P 78. Maalouf goes on to state that Smith Barney has not compensated CIN for its services or "for [*19] damages resulting from its breaches of the specific written Agreements." *Id.* P 79. Smith Barney seeks to dismiss this claim on the ground that a breach of contract claim and a claim for unjust enrichment are mutually exclusive. *See* Def. Mem. at 16.

Unjust enrichment is "an amorphous cause of action, but one which falls under the umbrella of quasi-contract, or contract implied-in-law." *Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc., 14 F. Supp. 2d 331, 338 (S.D.N.Y. 1998), aff'd, 173 F.3d 845 (2d Cir. 1999).* Unjust enrichment is premised on the notion that where principles of contract law are inadequate to compensate an unjustly deprived party, a court should resort to principles of equity. *See Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)* (noting that under New York law, the "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another") (quotation marks and citations omitted). Accordingly, under New York law, the existence of a valid contract generally preempts a quasi-contract claim for unjust enrichment. *See Ohio Players, Inc. v. Polygram Records, Inc., No. 99 Civ. 33, 2000 U.S. Dist. LEXIS 15710, 2000 WL 1616999, [\*20] at \*4 (S.D.N.Y. Oct. 25, 2000)* ("Under New York law, unjust enrichment is a quasicontractual claim that ordinarily can be maintained only in the absence of a valid, enforceable contract.").

"Here, Maalouf does not allege that the CIN Agreements are either unenforceable or that the dispute between CIN and Smith Barney falls outside the scope of those agreements." Def. Mem. at 17. In defense of the action, however, Smith Barney intends to argue that the transactions in dispute: (1) did not involve Smith Barney; (2) occurred after the CIN-Smith Barney Agreements terminated; and/or (3) were with Russian companies not covered under the Agreements. *See id. 2000 U.S. Dist. LEXIS 15710, [WL] at \*2.* It is the second defense that could conceivably re-characterize plaintiff's breach of contract claim into a claim for unjust enrichment. If the services rendered by CIN to Smith Barney are found to be outside the scope of the Agreements, Maalouf's breach of contract claim would necessarily fail. But Maalouf may still have a claim for unjust enrichment in the absence of a governing contract. The fact that Maalouf may only *recover* on one claim, either contract or quasi-contract, certainly does not preclude him from *pleading* [\*21] unjust enrichment in the alternative. n8 *See Fed. R. Civ. P. 8(e)(2); see also MDCM Holdings, Inc. v. Credit Suisse First Boston Corp., 216 F. Supp. 2d 251, 261 (S.D.N.Y. 2002).* Accordingly, Smith Barney's motion to dismiss Maalouf's claim for unjust enrichment is denied.

N8 To plead a claim of unjust enrichment, a plaintiff must merely allege: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001).* Maalouf

has met this minimal burden. *See* Complaint PP 77-83.

## E. Breach of Covenant of Good Faith and Fair Dealing

Maalouf's sixth claim against Smith Barney is for breach of the covenant of good faith and fair dealing. In short, Maalouf argues that Smith Barney's alleged unauthorized communications and direct transactions with [\*22] the Listed Parties constituted breaches of the duty of good faith and fair dealing implicit in the Agreements. *See* Complaint PP 84-90. Smith Barney seeks to dismiss this claim as duplicative of plaintiff's breach of contract claim. *See* Def. Mem. at 18.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance ... This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)* (quotation marks and citations omitted). *See also Renner v. Chase Manhattan Bank, No. 98 Civ. 926, 2000 U.S. Dist. LEXIS 8552, 2000 WL 781081, at \*19 (S.D.N.Y. June 14, 2000)* ("The covenant of good faith arises out of and is inherent in a contract."). Because Maalouf could conceivably recover under a quasi-contract theory, as discussed with respect to his claim of unjust enrichment, his claim for breach of the covenant of good faith and fair dealing cannot be dismissed at this time.

## F. Tortious Interference with a Business Relationship [\*23]

Maalouf's final claim alleges that Smith Barney unlawfully interfered with "existing written agreements for joint ventures, representation and business development" with the Listed Parties and that Smith Barney's "tortious interference with CIN's business relationships caused a detriment to CIN and its contractual relations with Listed Parties." Complaint PP 92, 94. According to Maalouf, "had Smith Barney Inc. honored the terms of the Agreements with CIN[,] CIN would have been compensated for its years of work, and would have realized its planned joint ventures and stock ownership with Listed Parties." *Id.* P 96.

Smith Barney first argues that Maalouf's allegations based on CIN's purported *future* relations with the Listed Parties are virtually identical to those underlying his tortious interference with prospective business transactions claim. Defendant argues that the instant claim should be dismissed for the same reasons. *See* Def. Mem. at 14. These arguments have already been addressed. Secondly, Smith Barney argues that Maalouf has failed to state a

2003 U.S. Dist. LEXIS 5913, *

claim for tortious interference with *existing* business relations as he has failed to assert that Smith Barney induced [*24] any of the Listed Parties to breach any contractual duties owed CIN. n9 *See id.* at 15. Defendant also argues that Maalouf has failed to sufficiently plead Smith Barney's intent to interfere with contracts between CIN and the Listed Parties. *See id.* at 16.

> n9 The elements of a claim for tortious interference with existing business relationships under New York law are as follows: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the breach of that contract; and (4) damages. *See Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 224 (S.D.N.Y. 1997).*

A plaintiff does not need to describe a defendant's motivation at the pleading stage. The question of intent is highly fact-based and often involves sifting through circumstantial evidence. Such evidence generally becomes available through the course of discovery. *See Swierkiewicz, 534 U.S. at 512* ("Before discovery has unearthed relevant facts and [*25] evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case."). However, a plaintiff claiming tortious interference with a business relationship must at least identify the existing third party contract he claims was breached as a result of defendant's conduct. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., No. 96 Civ. 1103, 1996 U.S. Dist. LEXIS 18653, 1996 WL 724734, at *3 (S.D.N.Y. Dec. 17, 1996)* (stating that courts have dismissed claims for tortious interference with contractual relations for failing to identify specific contracts that were breached by a defendant's actions). The instant claim is therefore dismissed without prejudice.

## IV. LEAVE TO AMEND

When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend his complaint. *See Fed. R. Civ. P. 15(a)* ("Leave [to amend] shall be freely given when justice so requires."); *see also Foman v. Davis, 371 U.S. 178, 183, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)* (stating that refusal to grant leave to amend without reason is an abuse of discretion and inconsistent with the spirit of the Federal Rules). [*26] Leave to amend is especially appropriate here given plaintiff's pro se status.

Accordingly, plaintiff is hereby given one final opportunity to amend his complaint to properly plead his claims of negligent misrepresentation, n10 breach of fiduciary duty, and tortious interference with a business relationship. Any such amended complaint must be served within thirty (30) days of receipt of this Opinion.

> n10 The policy of granting free leave to amend is especially appropriate in the context of claims dismissed under *Rule 9(b)* because the law favors resolving disputes on their merits. *See Acito v. IMCERA Group, Inc., 47 F.3d 47, 54-55 (2d Cir. 1995); Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986).*

## V. CONCLUSION

For the reasons stated above, defendant's motion is granted in part and denied in part. In sum, Maalouf's claims for negligent misrepresentation, breach of fiduciary duty, and tortious interference with a business relationship are dismissed without prejudice [*27] with possible leave to re-plead. Plaintiff's claims of tortious interference with prospective business transactions, unjust enrichment, and breach of the covenant of good faith and fair dealing remain. A status conference is scheduled for Monday April 14, 2003, at 1:00 p.m. The Clerk of the Court is directed to close this motion.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: April 9, 2003

# TAB 6

Westlaw.

Not Reported in F.Supp.2d                                                                                  Page 1

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612
**(Cite as: Not Reported in F.Supp.2d)**

H

Waxman v. Envipco Pick Up & Processing Services, Inc.
S.D.N.Y.,2003.

United States District Court,S.D. New York.
Henry A. WAXMAN, Plaintiff,
v.
ENVIPCO PICK UP & PROCESSING SERVICES, INC., Environmental Products Corporation, Envipco Holding, N.V., Bhajun Santchurn, and John Does 1-10. Defendants.
**No. 02 Civ. 10132(GEL).**

Oct. 28, 2003.

Principal of target corporation in a corporate purchase agreement sued the acquiring corporation and related corporate entities, asserting claims for violations of the federal securities laws, and for fraud and unjust enrichment under state law. On a defense motion to dismiss, the District Court, Lynch, J., held that: (1) principal failed to plead securities fraud with sufficient particularity, and (2) he failed to state a claim for unjust enrichment.

Motion granted.
West Headnotes
**[1] Securities Regulation 349B ⟜60.53**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.53   k.   Misrepresentation.
Most Cited Cases
Principal of target corporation in a corporate purchase transaction failed to plead securities fraud with sufficient particularity as to his claim that the acquiring corporation's parent holding company and its controlling official made misrepresentations to the principal to induce him to enter into purchase and employment agreements; of six alleged misrepresentations, only one specified the time, place, speaker, and content of the alleged misrepresentations, and he alleged no facts that gave rise to an inference of scienter; many of his allegations did not even clearly allege that the purported misrepresentations were false,

or known to be false, at the time they were made. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Securities Exchange Act of 1934, § 21D(b), as amended, 15 U.S.C.A. § 78u-4(b); 17 C.F.R. § 240.10b-5(b); Fed.R.Civ.P. 9(b).

**[2]  Implied and Constructive Contracts 205H ⟜81**

205H Implied and Constructive Contracts
    205HII Actions
        205HII(B) Pleading
            205Hk81   k.   Declaration, Complaint, or Petition. Most Cited Cases
Principal of target corporation in a corporate purchase transaction failed to state a claim for unjust enrichment in a complaint which appeared to seek money that the defendants " previously agreed" to pay him, despite his claim that he could plead unjust enrichment in the alternative because the validity of purchase and employment agreements had not yet been established; he had not alleged facts that raised a bona fide dispute as to the existence of the purchase and employment agreements, however, and he had abandoned his claim of fraud in the inducement, the sole claim that would have entitled him to seek rescission.

Eugene Killian, Jr., Killian & Salisbury, P.C., Clark, NJ (Tracy E. Makow, Charles A. Stewart, Stewart Occhipinti & Makow, LLP, New York, NY, on the brief), for Plaintiff.
Jeffery W. Herrmann, Ross & Hardies, New York, N.Y. (Christine M. Fecko, on the brief), for Defendants Envipco Pick Up & Processing, Inc., Environmental Products Corporation, and Envipco Holding, N.V.

*OPINION AND ORDER*

LYNCH, J.
**\*1** Defendants Envipco Pick Up & Processing Services, Inc. (" EPPSI" ), Environmental Products Corporation (" EPC" ), and Envipco Holding, N.V. (collectively, " Envipco" ) move to dismiss four of the seven claims alleged in plaintiff Henry A. Waxman's amended complaint. Counts I and IV allege violations of the federal securities laws. Counts II and VII allege fraud and unjust enrichment, respectively, under state law. Envipco argues that these counts fail to state a claim upon which relief can be granted, Fed.R.Civ.P.

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612
**(Cite as: Not Reported in F.Supp.2d)**

12(b)(6), and as to the securities and state-law fraud claims, fail to plead with the particularity required by Fed.R.Civ.P. 9(b) and 15 U.S.C. § 78u-4(b)(1)(B). Envipco's motion to dismiss will be granted.[FN1] The dismissal of Waxman's federal securities claims entails the dismissal of Count III, which seeks to hold defendant Bhajun Santchurn liable as a " controlling person" responsible for the alleged securities violations. *See* 15 U.S.C. § 78t(a).

> FN1. Counts II (state-law fraud claim for rescission) and IV (violation of § 12(2) of the Securities Act of 1933) are dismissed on Waxman's agreement. (P. Br.2.)

*BACKGROUND*

The facts set forth below are drawn from the amended complaint and must be taken as true for purposes of this motion to dismiss. *See Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (1995). About twenty years ago, Waxman founded Metropolitan Mining Company, Inc. (" MetroMining" ), a New York corporation engaged in reclaiming and recycling used beverage containers. (Compl.¶ 10.) Defendant Envipco Holding, a publicly-traded Dutch corporation (*id* . ¶ 4), wholly owns defendants EPPSI and EPC, Delaware corporations,[FN2] and defendant Santchurn holds controlling positions in all three corporations. (*Id.* ¶¶ 4-6.) Envipco's business is similar to that of MetroMining.[FN3] (D.Br.2.)

> FN2. Envipco Holding created EPPSI in 2001 to receive MetroMining's assets. (Compl.¶ 6.)

> FN3. While " EPC manufactures and leases Reverse Vending Machines (' RVMs') to retailers, who are subject to New York State['s] deposit law" (Compl.¶ 11), Waxman developed an alternative, the SortAfter service, which enables retailers to " do the deposit refund transaction manually and collect the [used beverage containers] in bags sorted only by container type." (*Id.* ¶ 15 .)

On October 29, 2001, Waxman, for himself and MetroMining, and Santchurn, for EPPSI, executed an agreement for the sale of MetroMining's assets to EPPSI (" Purchase Agreement" ). (*Id.* ¶ 17.) The Purchase Agreement incorporated an employment agreement between Waxman and EPC (" Employment Agreement" ) (*id.* ¶¶ 17, 21) and required Waxman

and MetroMining to sell MetroMining's assets to EPPSI in exchange for 550,000 depository receipts, which represent shares of Envipco Holding.[FN4] (*Id.* ¶¶ 17, 24.) Under the terms of the Employment Agreement, EPC agreed to hire Waxman as " Manager of New Business Development" for a 180-day period at an annual salary of $90,000. (Compl. ¶ 17, 22; Curtie Cert., Ex. D §§ 1.1, 2.1, 7.1.) In exchange for Waxman's execution of the Employment Agreement, which included a non-compete clause (*id.* § 9.1), EPC agreed to give him 50,000 depository receipts. (Compl.¶¶ 23-24.) Waxman agreed not to sell the depository receipts for a period of two years from the date of the Agreement. (*Id.* ¶ 24; Curtie Cert., Ex. D § 2.2.)

> FN4. According to Envipco, " [s]ince the stock of Envipco Holding trades abroad, only ' Depository Receipts' could be transferred to Waxman, a United States citizen, rather than the actual shares that trade on the stock exchange in Belgium." (D. Br. 3 n. 2.) Depository receipts " are certificates, tradable in the United States, which represent shares of foreign stock." *Schreiber Family Charitable Found. v. First Fin. Acceptance Co.,* 965 F.Supp. 397, 398 (E.D.N.Y.1997).

Waxman did not receive the depository receipts by the contractual deadline of January 29, 2002.[FN5] (Compl.¶ 26.) A principal reason for the delay was that under the relevant foreign laws, Envipco Holding could not transfer the receipts directly to Waxman. (*Id.* ¶ 45; *see also id.* ¶¶ 28, 30.) Waxman inquired about the depository receipts on numerous occasions. (*Id.* ¶ 27.) On March 25, 2002, he received a response from Neil Turpie, a director of Envipco Holding (*id.* ¶ 4), which attached an email from one of his Dutch attorneys. (*Id.* ¶ 29.) That email provided in relevant part:

> FN5. Section 2.2(a) of the Purchase Agreement provides that all 600,000 depository receipts shall be transferred " [a]t Closing (or as soon thereafter as practicable)." Section 2.2 of the Employment Agreement states that Waxman shall receive his 50,000 depository receipts " upon execution of this Agreement." The amended complaint states that " January 29, 2002, was the deadline for the delivery of the depository receipts due to MetroMining and to Waxman." (Compl.¶ 26.) That date, according to Waxman's brief, was the closing date. (P. Br.4.) While the date on which

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

Page 3

**(Cite as: Not Reported in F.Supp.2d)**

Waxman executed the Employment Agreement, October 29, 2001, is not the same as the date of the closing, January 29, 2002, the Court accepts for purposes of this motion the complaint's averment that the latter date represented the deadline for delivery of the depository receipts. MetroMining likewise did not receive its 550,000 depository receipts pursuant to the Purchase Agreement by January 29, 2002, but it is not, at least presently, a party to this action. Nor, so far as the complaint avers, has it assigned its rights Waxman. The Court therefore need not consider its rights and obligations in resolving this motion.

**\*2** Now that the agreement has been signed and the assets have been transferred, we assume the first possibility in our e-mail of September 19, 2001, is no longer an option. We suggest in line with the second possibility that an additional agreement be made between the parties in which the claims of Waxman and Metro[M]ining as referred to in Section 2.2(a) of the agreement are converted into claims in cash on Envipco PUPS. Then, Envipco Holding can issue new shares to Waxman and Metro[M]ining, which shares they can pay up by transferring their claims in cash to Envipco Holding.
(Turpie Cert., Ex. C. at 1; Compl. ¶ 30.) Waxman alleges that this " email demonstrates that Santchurn and the Envipco Parties knew prior to the execution of the Agreement that the transfer of the depository receipts could not occur as specified in the Agreement." (*Id.* ¶ 31.) As of March 18, 2003, the date of Waxman's amended complaint, he still had not received the receipts. (*Id.* ¶ 37.)

From the outset, Waxman found his job with EPC unsatisfactory. Santchurn and Envipco told him that he would be " employed in a ' key man' position with EPC, and in a position to develop new markets for [Envipco] and meaningfully contribute to the enhancement of his investment." (*Id.* ¶ 44(F).) In fact, Envipco " assigned him virtually no job responsibilities at all" (*id.* ¶ 35), barred him from certain EPPSI processing facilities (*id.* ¶ 32-34), and relegated him to a Connecticut office " to do collection work." (*Id.* ¶ 45(D).) In May 2002, he gave notice of his intent to resign, and upon learning this, Santchurn dismissed Waxman. (*Id.* ¶ 35.)

Sometime in October 2002, Waxman learned that Envipco intended to sell or subcontract MetroMining's business. (*Id.* ¶ 38.) He sought a temporary restraining

order with New Jersey Superior Court, Bergen County, which was granted on October 29, 2002. (*Id.* ¶ 39.) But on December 18, 2002, that court dismissed Waxman's state action for lack of personal jurisdiction and therefore lifted the restraining order. (*Id.* ¶ 41.)

Waxman filed the present suit on December 20, 2002, invoking diversity jurisdiction, 28 U.S.C. § 1332, and alleging state-law claims for breach of contract and the duty of good faith and fair dealing, unjust enrichment, and fraud.[FN6] On January 22, 2003, by order to show cause, he sought to enjoin Envipco from selling or transferring MetroMining pending the disposition of his claim for rescission of the Purchase and Employment Agreements. Following oral argument on January 31, 2003, the Court found that Waxman had failed to establish the requisite likelihood of success on the merits and therefore declined to grant this injunction. (Tr. 16.) The parties agreed to hold the disputed depository receipts in escrow pending the outcome of this action. (*Id.* 20.)

> FN6. Waxman filed the amended complaint that is the subject of this motion, adding claims under the federal securities laws, in March 2003. All references and citations to the complaint refer to the amended complaint.

### DISCUSSION

#### I. *Standard on a Motion to Dismiss*

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff, drawing all reasonable inferences in his favor. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The Court will not dismiss a complaint for failure to state a claim " unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Beyond the facts in the complaint, the Court may consider " any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir.1991); *Goldman v. Belden,* 754 F.2d 1059, 1065-66 (2d Cir.1985.) While the Federal Rules of Civil Procedure generally require only notice pleading, where, as here, plaintiff alleges fraud, " the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b); *see*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                            Page 4

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

**(Cite as: Not Reported in F.Supp.2d)**

*Stern v. Gen. Elec. Co.,* 924 F.2d 472, 476 (2d Cir.1991) (" [A]llegations of fraud must be supported by particular statements indicating the factual circumstances on which the theory of fraud is based." ).[FN7]

> FN7. " Rule 9(b) is designed to further three goals: (1) providing a defendant fair notice of plaintiff's claim, to enable preparation of defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the number of strike suits." *DiVittorio v. Equidyne Extractive Indus.,* Inc., 822 F.2d 1242, 1247 (2d Cir.1987).

II. *Federal Securities Fraud Claims*

A. *Section 10(b) Claims*

*3 The Securities Exchange Act protects investors by proscribing,

in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Commission, makes it unlawful " [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b); *see SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 847-48 (2d Cir.1968) (explaining that the SEC " promulgated [Rule 10b-5] pursuant to the grant of authority given the SEC by Congress in Section 10(b) of the Securities Exchange Act of 1934," by which Congress sought " to prevent inequitable and unfair practices and to insure fairness in securities transactions generally, whether conducted face-to-face, over the counter, or on exchanges" ).

B. *Applicable Heightened Pleading Requirements*

For federal securities fraud claims, the Private Securities Litigation Reform Act of 1995 (" PSLRA" ), Pub.L. No. 104-67, 109 Stat. 737, reinforces the heightened pleading standards that apply to all claims of fraud or mistake under Fed.R.Civ.P. 9(b). Under the PSLRA, complaints alleging securities fraud must, first, " specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is based," 15 U.S.C. § 78u-4(b)(1)(B); and second, " with respect to each act or omission alleged ..., state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2); *see* Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir.2001). That state of mind is scienter, which means " intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also* Kalnit, 264 F.3d at 138 (same).

The Second Circuit has made clear, however, that the PSLRA " ' did not change the basic pleading standard for scienter in this circuit." ' *Id.,* quoting *Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000). Both before and after the PSLRA, the law required plaintiffs bringing claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, to allege scienter with particularity. *Id.; compare* Novak, 216 F.3d at 307 (emphasizing that securities fraud allegations must " give rise to a strong inference of fraudulent intent" ), *with* 15 U.S.C. § 78u-4(b)(2) (codifying the PSLRA's requirement that securities fraud complaints " state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]" ).

*4 To summarize, to state a cognizable claim under § 10(b) of the Securities Exchange Act and Rule 10b-5, " the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, ... (4) explain why the statements were fraudulent, *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993); *see also* *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (fraud claims must " specify the time, place, speaker, and content of the alleged misrepresentations" ), and (5) allege facts giving rise to a strong inference of scienter. *Kalnit,* 264 F.3d at 138.

C. *Analysis of Waxman's Section 10(b) Claims*

[1] Waxman alleges that Envipco Holding and Santchurn misrepresented six material facts in order to induce him to enter into the Purchase and Employment Agreements: (A) that Envipco Holding's shares were worth about $2.50 even though their market value was

Not Reported in F.Supp.2d                                                                 Page 5

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

**(Cite as: Not Reported in F.Supp.2d)**

lower; (B) that it stood " ready, willing and able to transfer depository receipts immediately to Waxman" ; (C) that it enjoyed a " sound and healthy financial condition" ; (D) that it operated " on a sound and proper basis" ; and (E) that because of its financial health and sound business operations, there could be " no reasonable possibility that Waxman's investment would result in any financial losses" ; and (F) that EPC would employ Waxman " in a ' key man' position" that would enable him to " contribute to the enhancement of his investment." (Compl.¶ 44.)

The complaint does not plead securities fraud with sufficient particularity. First, except for (A),[FN8] none of the enumerated allegations specify the " time, place, speaker, and content of the alleged misrepresentations." *DiVittorio,* 822 F.2d at 1247; *see also Mills,* 12 F.3d at 1175. Were that the sole defect in Waxman's securities fraud allegations, the Court might well afford Waxman leave to amend to cure these technicalities. *See* Fed.R.Civ.P. 15(a); *Forman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (" It is ... contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere [pleading] technicalities." ); *cf. Caputo v.. Pfizer, Inc.,* 267 F.3d 181, 191 (2d Cir.2001) (holding that the district court abused its discretion in refusing to grant plaintiffs leave to replead where they " failed to plead fraud with the requisite particularity" ).[FN9] But leave to replead may be denied if repleading would be futile. *O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 69 (2d Cir.2002); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995) (While " [l]eave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)," a " good reason to deny leave to amend is when such leave would be futile." ). Because Waxman alleges no facts that give rise to an inference, still less a strong one, of scienter, giving him leave to amend under the circumstances would be futile.

> FN8. Paragraph 44(A) of the complaint states that Santchurn told Waxman " [t]hat the ' underlying value' of the shares of Envipco Holding was $2.50 a share, and was substantially in excess of Envipco's market value."

> FN9. It would, however, be well within the Court's discretion pursuant to Fed.R.Civ.P. 15(a) to deny leave to replead where, as here, the complaint, with a few arguable exceptions, fails entirely to identify the

speaker, time, place or specific content of the alleged misrepresentations. To give each defendant notice " of the nature of his alleged participation in the fraud," *DiVittorio,* 822 F.2d at 1247, is a paramount purpose of the strict pleading requirements applicable to securities fraud claims. That purpose is ill-served by a complaint that identifies alleged misrepresentations only as made by " Santchurn and Envipco Holding, by their conduct, statements, and omissions," (Compl.¶ 44), but nonetheless accuses of wrongdoing ten " John Doe" defendants, presumably officers or other representatives of Envipco who made some of the misrepresentations attributed by Waxman to " Envipco Holding." *See Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F.Supp. 576, 584 (S.D.N.Y.1995) (holding that a securities fraud complaint " may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named ... is entitled to be appraised [sic] of the circumstances surrounding the fraudulent conduct with which he individually stands charged" ). If ten " John Doe" defendants indeed made misrepresentations to Waxman in order to induce him to enter into the Purchase and Employment Agreements, and he relied on those misrepresentations, it strains credulity that Waxman can provide no further identifying information.

**\*5** The essential defect in Waxman's securities fraud allegations is that none of them " state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2), that is, with scienter. *See Kilnit,* 265 F.3d at 138. Scienter " refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst,* 425 U.S. at 193 n. 12. While the law recognizes that a plaintiff seldom will be able to acquire direct evidence of a defendant's culpable mental state, he or she must plead " ' circumstances that provide at least a minimum factual basis for ... conclusory allegations of scienter.' " *Cohen v. Koenig,* 25 F.3d 1168, 1173 (2d Cir.1994) (quoting *Conn. Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)); *see also Mills,* 12 F.3d at 1176 (" [A]lthough Rule 9(b) allows a pleader to aver intent generally, a 10b-5 complaint nevertheless must allege facts that raise a strong inference of fraudulent intent." ). Scienter can be inferred from factual allegations that establish either (1) " motive and

Not Reported in F.Supp.2d                                                                                    Page 6

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

**(Cite as: Not Reported in F.Supp.2d)**

opportunity to commit fraud" or (2) " strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994); *see also Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999); *San Leandro Emergency Med. Plan v. Phillip Morris Cos., Inc.,* 75 F.3d 801, 813 (2d Cir.1996). Analysis of Waxman's complaint fails to give rise to a strong inference of scienter. In fact, many of its allegations do not even clearly allege that the purported misrepresentations were false, or known to be false, at the time they were made. The Court will analyze each allegation in turn.

First, Waxman alleges, Santchurn and Envipco told him " [t]hat the ' underlying value' of the shares of Envipco Holding was $2.50 a share, and was substantially in excess of Envipco's market value." (Compl.¶ 44(A).) In fact, according to Waxman, the shares were at that time worth " substantially less than $2.50 per share," and their value has since declined further. (*Id.* ¶ 45(A).) This allegation fails to state a claim because Santchurn's personal opinion about the underlying, as opposed to market, value of the shares is not a misrepresentation unless Santchurn knew it to be false. Except for the conclusory allegations that " there was no support whatsoever" (*id.*) for Santchurn's opinion and that " Santchurn and Envipco Holding knowingly concealed and withheld" certain unspecified " material facts" (Compl.¶ 46) about the true value of the shares, the complaint does not allege any concrete facts suggesting that Santchurn knowingly misstated his opinion. *See Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (bare allegations that defendants intentionally concealed or " were reckless in not knowing" certain financial facts held " ' so broad and conclusory as to be meaningless' " ) (quoting *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 119-20 (2d Cir.1982)).

**\*6** Waxman reproduces an excerpt of Santchurn's deposition in an unrelated case, in which Santchurn appears to assert that the market undervalued Envipco Holding's shares. (P. Br.2-3.) Even were it appropriate for the Court to consider this evidence, *see Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000), the deposition excerpt does not support the allegation that Santchurn misrepresented his opinion. In it, Santchurn testifies that he believed the value of the shares to be higher than the market value, and he explains why. (P. Br.2-3.) Santchurn may well have been wrong. But nothing in the deposition gives rise to an inference that he misrepresented what *he* believed to be the true

value of Envipco Holding's shares. *See Leventhal v. Tow,* 48 F.Supp.2d 104, 112-13 (D.Conn.1999) (complaint failed to plead scienter with sufficient particularity where plaintiffs alleged that defendants " (1) made overly positive statements about the company; and (2) failed to disclose ... the real value of the company's assets" ); *see also Shields,* 25 F.3d at 1129 (" [Plaintiff] records statements by defendants predicting a prosperous future and holds them up against the backdrop of what actually transpired.... This technique is sufficient to allege that the defendants were wrong; but misguided optimism is not a cause of action, and does not support an inference of fraud." ). On the contrary, the deposition excerpt tends to show that Santchurn consistently maintained the opinion he allegedly stated to Waxman. Waxman does not allege, either in his complaint or in his brief, any facts indicating that Santchurn's purported reasons for his opinion were inaccurate, let alone that he knew them to be false.

Even assuming *arguendo* that Santchurn, as a principal of Envipco Holding, should have known the inaccuracy of his representations about the genuine value of its shares, ¶ 44(A) fails to state a claim. The complaint contains no facts that give rise to a strong inference that Santchurn intended to deceive Waxman by this alleged misrepresentation. Contrary to Waxman's suggestion, the mere fact that the value of Envipco Holding shares declined *after* Waxman executed the Purchase and Employment Agreements does not, by itself, suggest anything about the value-" underlying" or market-of the shares on the date of those transactions. Waxman thus alleges only in conclusory terms that Santchurn's representations about the value of Envipco's shares were unsupported (*id.* ¶ 45) and that Santchurn concealed " substantially all of the facts" that would have disclosed the falsity of his representation. Waxman provides no details about what these facts were or why they give rise to a strong inference that Santchurn thereby intended to deceive or manipulate him.

Waxman next alleges that Envipco Holding falsely represented that it " was ready, willing and able to transfer depository receipts immediately to Waxman in consideration for the sale of MetroMining." (*Id.* ¶ 44(B)). Again, he does not specify who made this misrepresentation, when or where, except to ascribe it generally to " Santchurn and Envipco Holding, by their conduct, statements, and omissions." (*Id.* ¶ 44.) Because the complaint for these purposes incorporates documents cited in it, *Cortec Indus.,* 949 F.2d at 47, however, and construing the complaint in the light

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

**(Cite as: Not Reported in F.Supp.2d)**

most favorable to Waxman, it is possible to infer that he means to allege that § 2.2 of the Purchase Agreement itself constitutes the relevant misrepresentation. That provisions says that Envipco Holding will transfer the depository receipts " [a]t Closing (or as soon as practicable thereafter)." But if this is Waxman's intended allegation, it does not state a claim for the simple reason that " as soon as practicable thereafter" cannot reasonably be equated with " immediately," and Waxman therefore fails adequately to allege the falsity of this representation. *See Mills,* 12 F.3d at 1175.

*7 On the other hand, if Waxman's intended allegation, as the complaint suggests elsewhere, is that " Santchurn and the Envipco Parties knew prior to the execution of the Agreement that the transfer of the depository receipts could not occur as specified in the Agreement" (*id.* ¶ 31; *see also id.* ¶ 45(B)), the emails upon which he relies to establish this fact fail to provide a basis from which the Court can infer scienter. The first, dated September 19, 2001, from a Dutch lawyer for Envipco Holding. It explains certain requirements of Dutch law pertinent to the contemplated transfer of the depository receipts and two possible ways " to structure th[e] deal." (Turpie Cert., Ex. A at 1 .) It also states that " [t]he representation and warranty under 3.2(c) [providing that title shall pass directly to Waxman and MetroMining upon issuance of the depository receipts] is not in conformity with Dutch law." (*Id.* 2.) The second, dated March 26, 2002, likewise describes requirements of Dutch law necessary to consummate the transfer of the depository receipts. (Turpie Cert., Ex. B.) At most, these emails reveal that Envipco Holding negligently failed to investigate the legal technicalities of the transfer before signing the Purchase and Employment Agreements. They do not imply that anyone knew but deliberately withheld or concealed from Waxman knowledge that foreign legal barriers would prevent Envipco Holding from fulfilling its contractual obligations. To the contrary, to the extent these emails give rise to an inference about Envipco Holding's intent, they appear to show Envipco Holding and its attorneys engaged in good-faith efforts to structure the transfer of the depository receipts in an efficient manner consistent with Dutch law.

Envipco does not dispute that it failed to transfer the depository receipts to Waxman on the date of the closing. (D.Br.3.) That failure may constitute a breach of contract. But no facts give rise to a strong inference of fraudulent intent. In *Mills,* the Second Circuit said

that " failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." 12 F.3d at 1176; *see also In re Int'l Bus. Mach. Corp. Sec. Litig.,* 163 F.3d 102, 107 (2d Cir.1998); *Dovitz v. Rare Medium Group,* 2002 WL 1225540, at *3 (S.D.N.Y. June 4, 2002) (collecting cases). Neither the emails cited by Waxman nor any of the facts averred in his complaint suggest that Envipco Holding " secretly intended not to perform or knew that [it] could not perform." The Court need not inquire into the feasibility of the transfer of depository receipts under Dutch law. At most, Waxman's complaint, together with the emails on which he so heavily relies, alleges that Envipco Holding negligently failed to ensure that its contracts with Waxman would comply with Dutch law. Allegations of negligence do not suffice to sustain a securities fraud allegation. *Ernst & Ernst,* 425 U.S. at 198-99. No facts alleged give rise to a strong inference of an intent to deceive, manipulate or defraud. Paragraph 44(B) therefore fails to state under § 10(b) of the Securities Exchange Act and Rule 10b-5. *See* 15 U.S.C. § 78u-4(b)(2); *Kalnit,* 264 F.3d at 138.

*8 Paragraphs 44(C) and (D) of the complaint allege that Santchurn and Envipco Holding misrepresented Envipco Holding's " financial condition" and the soundness and propriety of its " business operations," respectively. Paragraph 44(E) alleges that Santchurn and Envipco Holding misrepresented to Waxman that " there was no reasonable possibility that [his] investment would result in any financial losses, and that the only reasonable possibility was that [he] would realize profits amounting to many times his investment." These allegations fail to state a claim because they constitute only inactionable " puffery," which " cannot have misled a reasonable investor." *San Leandro,* 75 F.3d at 811; *see also Lasker v. N.Y.S. Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (*per curiam* ) (affirming the district court's dismissal of securities fraud allegations based on similarly general, optimistic projections about the financial health and prospects of the defendant corporation because such " statements consist of precisely the type of ' puffery' that this and other circuits have consistently held to be inactionable" ); *Shields,* 25 F.3d at 1129 (emphasizing that to hold up " statements by defendants predicting a prosperous future ... against the backdrop of what actually transpired" does not furnish " the kind of circumstantial evidence that would indicate conscious fraudulent behavior or recklessness" ).

Not Reported in F.Supp.2d                                                                                          Page 8

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612
**(Cite as: Not Reported in F.Supp.2d)**

Waxman argues that the misrepresentations alleged in ¶¶ 44(C) through (E), suffice to state a claim because, in fact, " Santchurn made specific representations to Waxman regarding the soundness of the Envipco entities that induced [him] to sell the company he spent twenty years to develop." (P. Br.18.) But there is nothing specific about these allegations. All that Waxman in fact claims is that Santchurn broadly claimed that the company was well managed and in good financial condition. Waxman had every opportunity either to investigate the actual management practices and financial soundness of Envipco, or at least to make inquiries that would elicit more specific representations about particular matters. But the complaint makes no reference to any concrete misrepresentations of fact by Santchurn or by anyone else. Despite the various alleged acts of corporate malfeasance and misfeasance that Waxman subsequently enumerates to substantiate his general claim that " [t]he Envipco Parties were in fact being operated in a shoddy, inefficient and grossly negligent manner" (Compl.¶ 45(C)), Waxman never alleges that any of these allegedly inept practices contradicted any specific statement that had been made to him. [FN10]

> [FN10.] One arguable exception is found in ¶ 45(C)(1), in which Waxman alleges that he received (without specifying when or from whom) " assurances ... that the core of MetroMining's employees would be retained" but that most of them were improperly terminated, resulting in costly NLRB proceedings. But nothing in this allegation suggests that Santchurn or Envipco misrepresented Envipco Holding's financial health or the status of its business operations, still less that either did so with an intent to deceive or defraud Waxman. Paragraph 45(C)(1) states a prediction, or at most a promise, of what Envipco Holding would do in the future. It is not a statement about Envipco Holding's financial health or the soundness or propriety of its business operations. An allegation of a broken promise states a claim, if at all, for breach of contract; absent scienter, it is not actionable under § 10(b). *See Mills,* 12 F.3d at 1176. That Envipco broke the promise, if it did, does not without more indicate (and Waxman does not even allege) that it had no intention of fulfilling the promise when it was made, and the fact that Envipco made a business

mistake, if it did, in firing workers after the transaction says nothing about whether the company was being conducted " on a sound and proper basis" (Compl.¶ 44(D)) when the representations were allegedly made.

Nor does Waxman's list of alleged poor business practices (*see* Compl. ¶¶ 45(C)(1)-(13)) suggest the falsity of these generalized assertions. For the most part, these allegations fall into two categories: (1) abstract allegations about the business procedures or management of Envipco, for example, that " no procedures were in place to ensure compliance with legal requirements" (*id.* ¶ 45(C)(1)) and that Envipco " had an inadequate or limited understanding of ... the recycling business in the New York metropolitan market" (*id.* ¶ 45(C)(5)); and (2) concrete allegations about events that happened after Waxman entered into the Purchase and Employment Agreements, for example, that " when Goutam Persaud left Envipco in 2002, he went to Waste Management and began to ' siphon' clients." (*Id.* 45(C)(3).) [FN11]

> [FN11.] The only allegation that appears to refer to misstatements about the company's financial condition, as opposed to its operating practices, is the allegation in ¶ 45(C)(2) that " Santchurn recalled a ' certified audit' of Envipco Holding prepared in early 2002, stating that it contained a ' minor,' unspecified error." But the allegedly erroneous audit occurred after the transaction and so could not have induced Waxman to sell MetroMining's assets for Envipco Holding securities. The fact that the audit was recalled and " has never been reissued" (Compl.¶ 45(C)(2)) does not give rise to an inference that Envipco Holding misrepresented its finances, particularly as Waxman does not allege that Santchurn's statement that the error was " minor" was false.

**\*9** As a general principle, allegations of corporate mismanagement do not state a violation of § 10(b). See *Acito,* 47 F.3d at 53; *Decker v. Massey-Ferguson,* 681 F.2d 111, 115 (2d Cir.1982) (" [S]ection 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception." ). To the extent that the complaint can be taken to allege that Santchurn or Envipco Holding knew of, but deliberately concealed, Envipco's poor financial condition and business practices, such as the lack of or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 9

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

**(Cite as: Not Reported in F.Supp.2d)**

inadequate procedures " to ensure compliance with legal requirements," to " develop[ ] restrictive employment agreements," to keep proper books, and " to prevent the loss of important business" (Compl.¶¶ 45(C)(1)-(4), (6)), it also suffers from at least two fatal flaws.

First, Waxman refers to procedures only at the most abstract level. Envipco, he claims, had " inadequate," " sloppy," or simply " no" procedures in place to carry out a host of important business functions. He does not allege with particularity the nature of those procedures or that anyone misrepresented their existence. These allegations are articulated at a level of generality " so broad and conclusory as to be meaningless." *Decker,* 681 F.2d at 119-20. Even if Santchurn or another principal of Envipco told Waxman that Envipco operated according to " adequate" procedures, that would not constitute the kind of material representation upon which a reasonable investor would rely-or can be legally entitled to rely. *See San Leandro,* 75 F.3d at 811; *Shields,* 25 F.3d at 1129. In this regard Waxman's complaint exemplifies the rationale for disallowing securities fraud claims based on " puffery" or alleged corporate mismanagement. No reasonable investor relies on a corporation's representation that, in the words of Waxman's complaint, it is operated " on a sound and proper basis." (Compl.¶ 44(D).) Equally, when a corporation tells an investor that its business is likely to be profitable, the investor cannot later point to evidence of losses or adverse events in the life of the business to allege fraud. *See Shields,* 25 F.3d at 1129 (" We have rejected the legitimacy of ' alleging fraud by hindsight.' ") (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)). To allege that Santchurn and Envipco misrepresented that Envipco was being operated " on a sound and proper basis" (*id.* ¶ 44(D)) is therefore vacuous and fails to state a claim for securities fraud.

Second, even if Waxman did provide details about the procedures to which he refers, this would suffice only to allege what procedures *he* believes to be necessary or proper for the sound operation of a business like that of Envipco. It would not be an allegation about what Santchurn or another principal of Envipco knew, but deliberately concealed, from Waxman. Doubtless few corporate officers think that their businesses lack adequate procedures or operate in " a shoddy, inefficient and grossly negligent manner." (Compl.¶ 45(C).) It is therefore hardly surprisingly that no facts alleged by Waxman give rise to a strong inference that Santchurn and Envipco Holding *themselves* thought

Envipco to be operated in a " grossly negligent manner," but concealed this corporate dereliction in an effort to induce Waxman to sell MetroMining's assets.

**\*10** To the extent the complaint provides details, they concern events that took place after the sale was accomplished, which Waxman regards as evidence of corporate mismanagement. Even if allegations of corporate mismanagement stated a claim, *see Acito,* 47 F.3d at 53, none of these events suggest that anyone made knowingly or recklessly false representations to Waxman. What " actually transpired" after the transactions at issue in this case would give rise to an inference of scienter only if the defendants made " specific representations" to Waxman that they knew, or should have known, to be false in order to induce him to purchase the depository receipts. *Shields,* 25 F.3d at 1129. The allegations in paragraph 44, subparagraphs (C), (D), and (E), in sum, either do not give rise to that inference, consist of no more than inactionable claims based on alleged " puffery," or both.

Finally, in paragraph 44(F), Waxman alleges that " Santchurn and Envipco Holding, by their conduct, statements and omissions" misrepresented that Waxman, who would become the single largest independent shareholder of Envipco Holding, would also be employed in a ' key man' position with EPC, and would be in a position to develop new markets for the Envipco Parties and meaningfully contribute to the enhancement of his investment.

(Compl.¶ 44(F).) In fact, according to Waxman, " [t]he Envipco parties and Santchurn had no intention of allowing Waxman to use his expertise to develop new markets and business." (*Id.* ¶ 45(D).) As indicia of their intent, Waxman alleges that Envipco immediately sent him to an " office in Connecticut to do collection work," failed to provide him with a job description, and after he stopped working for Envipco,[FN12] eliminated his position entirely. (*Id.*)

> [FN12.] Waxman alleges that his employment with EPC " was terminated." (Compl.¶ 45(D).) But he explains earlier in the complaint that he tendered his resignation, giving EPC thirty-days notice, in May 2002 because Santchurn had not given him a " proper job description" or satisfactory " job responsibilities." (*Id.* ¶ 35.)

This allegation, too, fails to state a claim for securities

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612
(Cite as: Not Reported in F.Supp.2d)

Page 10

fraud. First, here again, Waxman does not identify who told him, when or where, that he would employed in a " key man" position that would enable him to develop new markets and foster his investment. *DiVittorio,* 822 F.2d at 1247; *see also Mills,* 12 F.3d at 1175. Second, because the Employment Agreement contains a merger clause (Turpie Cert., Ex. D. § 14.1), Waxman's reliance upon alleged oral representations contrary to or not found in that Agreement cannot be deemed reasonable. *See Harsco Corp. v. Segui,* 91 F.3d 337, 342 (2d Cir.1996) (emphasizing " [t]he general rule that reasonable reliance must be proved as an element of a securities fraud claim" and collecting cases). Where, as here, a valid contract exists and the plaintiff is a sophisticated businessman represented by counsel, he cannot repair to oral representations to allege federal securities fraud because the existence of the contract makes his reliance upon those representations unreasonable. *See Emergent Capital Inv. Mgmt. v. Stonepath Group,* 165 F.Supp.2d 615, 622-23 (S.D.N.Y.2001); *Chavin v. McKelvey,* 25 F.Supp.2d 231, 235-37 (S.D.N.Y.1998); *Consol. Edison, Inc. v. N.E. Util.,* 249 F.Supp.2d 387, 402 (S.D.N.Y.2003).[FN13] Finally, even were it appropriate to consider the oral representations in this context, no facts alleged elsewhere in the complaint give rise to an inference that those alleged representations were made with scienter. If Envipco promised Waxman that he would be employed in a " key man" position that would enable him to develop new markets and foster his investment, but then relegated him to " collection work" (Compl.¶ 45(D)), he may assert a claim for breach of contract. But that promise does not " constitute fraud unless, when [it] was made, the defendant secretly intended not to perform or knew that he could not perform." *Mills,* 12 F.3d at 1176; *see also Dovitz,* 2002 WL 1225540, at *3.

FN13. The Employment Agreement states that EPC is a Delaware corporation with its offices in Connecticut (Turpie Cert., Ex. D, pmbl.), that Waxman " shall be employed as Manager of New Business Development" for EPC (*id.* § 1.1), that he shall receive a salary of $90,000 per annum (*id.* § 2.1), and that his term of employment shall be 180 days (*id.* § 7.1). Except for Envipco's failure to transfer the 50,000 depository receipts (*see id.* § 2.2), Waxman does not allege that the defendants violated the Employment Agreement and can hardly allege that its terms constituted misrepresentations. It is unclear, for example, how the allegation that Envipco sent him " to an office in Connecticut" (Compl.¶ 45(D)) discloses any intention not to carry out the Employment Agreement. That is where EPC's offices are located.

*11 Because none of the factual allegations in the complaint suffice to plead securities fraud with the required particularity, or to give rise to a strong inference of scienter, the complaint fails to state a claim under § 10(b) of the Securities Exchange Act and Rule 10b-5. *See DiVittorio,* 822 F.2d at 1247; *Kalnit,* 264 F.3d at 138; *see also* 15 U.S.C. § 78u-4(b).

D. *Section 20(a) Claims*

Section 20(a) of the Securities Exchange Act makes liable any person " who, directly or indirectly, controls any person liable" for a predicate securities-law violation. 15 U.S.C. § 78t(a). A plaintiff therefore cannot state a claim under § 20(b) in the absence of a predicate securities-law violation by the " primary" culprit. *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 401 (S.D.N.Y.1988). While Envipco does not request dismissal of Waxman's § 20(b) claim against Santchurn as the " controlling person," (Compl.¶ 61), the Court may *sua sponte* dismiss a frivolous claim. *See Fitzgerald v. First E. Seventh St. Tenants Corp.,* 221 F.3d 362, 364 (2d Cir.2000) (*per curiam*). A claim " is frivolous where it lacks an arguable basis either in law or in fact." *Nietzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Absent a predicate securities-law violation, Waxman's § 20(b) claim against Santchurn lacks a factual basis. The claim must therefore be dismissed.

III. *Unjust Enrichment*

[2] Envipco also moves to dismiss Waxman's unjust enrichment claim. (D.Br.20-21.) The complaint alleges that the " [d]efendants refuse to pay plaintiff the compensation they previously agreed upon for the asset sold to them and for the services rendered by [p]laintiff and from which [d]efendants received the benefits." (Compl.¶ 71.) This allegation, on its face, appears to seek money that the defendants " previously agreed" to pay Waxman. To that extent it states a claim for breach of contract, not unjust enrichment. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 328, 388 (1987) ( " The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery

Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

**(Cite as: Not Reported in F.Supp.2d)**

in quasi contract for events arising out of the same subject matter." ); *see also Bradkin v. Leventon,* 26 N.Y.2d 192, 196, 309 N.Y.S.2d 192, 257 N.E.2d 643 (1970) (" [A] quasi-contractual obligation is one imposed by law where there has been no agreement or expression of assent, by word or act, on the part of either party involved." ).

Waxman argues, however, that because the validity of the Purchase and Employment Agreements has not yet been established, he may plead unjust enrichment in the alternative. (P. Br.23-24.) *See* Fed.R.Civ.P. 8(e)(2) (pleading in the alternative); *Rule v. Brine, Inc. .,* 85 F.3d 1002, 1011 (2d Cir.1996) (noting that under New York law, where " there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between" contractual and quasi-contractual theories of recovery); *accord Old Salem Dev. Group v. Town of Fishkill,* 301 A.D.2d 639, 754 N.Y.S.2d 333, 334 (2d Dep't 2003) (" [W]here there is a bona fide dispute as to the existence of a contract or the application of a contract to the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract." ); *Curtis Props. Corp. v. Greif Cos.,* 236 A.D.2d 237, 653 N.Y.S.2d 569, 571 (1st Dep't 1997) (same).

**\*12** Waxman has not alleged facts that raise a " bona fide dispute as to the existence of" the Purchase and Employment Agreements, however, and he has abandoned his claim of fraud in the inducement, the sole claim that would have entitled him to seek rescission. (*See* P. Br. 2.) Even if he had not, the complaint fails to plead a claim of fraud in the inducement with particularity, *see* Fed.R.Civ.P. 9(b); *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 220 n. 8 (S.D.N.Y.2002) (pleading requirements for fraud claims a matter of procedure, not substantive law, and therefore governed by the Federal Rules of Civil Procedure), and for substantially the reasons that condemn Waxman's securities fraud claims, any allegation of fraud in the inducement would fail to state a claim. Waxman's unjust enrichment claim is therefore also dismissed.

*CONCLUSION*

For the reasons stated, the Court dismisses Counts I (violation of § 10(b) of the Securities Exchange Act and Rule 10b-5), II (state-law fraud), III (liability of Santchurn as a " controlling person" within the meaning of § 20(a) of the Securities Exchange Act),

IV (violation of § 12(2) of the Securities Act of 1933), and VII (unjust enrichment) of Waxman's amended complaint. Defendants shall answer the remaining allegations, Counts V (breach of contract) and VI (breach of the duty of good faith and fair dealing), by November 14, 2003.

SO ORDERED.

S.D.N.Y.,2003.
Waxman v. Envipco Pick Up & Processing Services, Inc.
Not Reported in F.Supp.2d, 2003 WL 22439796 (S.D.N.Y.), Fed. Sec. L. Rep. P 92,612

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.