10QSB 1 v076249_10qsb.htm

**FORM 10-QSB**

———————

SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

(Mark One)
☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

**For the quarterly period ended March 31, 2007**

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period

from _____ to_____

Commission File Number 0-31949

**INNOFONE.COM, INCORPORATED**
(Exact name of registrant as specified in its charter)

| Nevada | 98-0202313 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 1431 Ocean Avenue, Suite 1100, Santa Monica, CA | 90401 |
|---|---|
| (Address of principal executive office) | (Zip Code) |

(310) 458-3233
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934) Yes ☐ No ☒

The number of shares outstanding of each of Issuer's classes of common equity as of May 18, 2007:

| Common Stock at Par Value $0.001 | 74,977,715 |
|---|---|
| Title of Class | Number of Shares |

Transitional Small Business Disclosure format (check one): Yes ☐ No ☒

**INNOFONE.COM, INCORPORATED**

**TABLE OF CONTENTS**

**Part I**

Item 1    Financial Statements

   Consolidated Balance Sheet  (Unaudited)                                           3

   Consolidated Statements of Operations  (Unaudited)                               4

   Consolidated Statement of Stockholders' Equity  (Unaudited)                      5

   Consolidated Statements of Cash Flows  (Unaudited)                               6

   Notes to Consolidated Financial Statements  (Unaudited)                          7

Item 2    Management's Discussion and Analysis                                        16

Item 3    Controls and Procedures                                                     22

**Part II**

Items 1-6.   Other Information                                                        24

   Signatures                                                                    27

INNOFONE.COM, INCORPORATED
CONSOLIDATED BALANCE SHEET
AS OF MARCH 31, 2007
(UNAUDITED)

### ASSETS

| | | |
|---|---|---:|
| Current assets | | |
| Cash | $ | 204,719 |
| Accounts receivable | | 239,719 |
| Prepaid expenses and other assets | | 270,742 |
| Total current assets | | 715,180 |
| | | |
| Fixed assets, net | | 170,103 |
| Investment in U.S. Treasury Bonds - restricted | | 50,089,378 |
| Unamortized debt discount and finance cost | | 880,904 |
| Goodwill | | 1,611,260 |
| Other assets | | 56,997 |
| | | |
| Total assets | $ | 53,523,822 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---:|
| Current liabilities | | |
| Accounts payable and accrued liabilities | $ | 2,622,191 |
| Deferred revenue | | 114,090 |
| Due to related party | | 700,000 |
| Notes payable - short term | | 2,995,000 |
| Total current liabilities | | 6,431,281 |
| | | |
| Long-term liabilities | | |
| Liability on equity swap agreement | | 32,824,941 |
| Total liabilities | | 39,256,222 |
| | | |
| Minority interest | | (17,406) |
| | | |
| Stockholders' equity | | |
| Preferred stock; $0.01 par value; 4,815,000 shares authorized, issued and outstanding | | 48,150 |
| Common stock; $0.001 par value; 950,000,000 shares authorized, 74,945,828 issued and outstanding | | 74,946 |
| Additional paid-in capital | | 71,513,792 |
| Unamortized investment and loan fees paid with common stock and warrants | | (2,762,938) |
| Stock receivable related to legal settlement | | (2,782,608) |
| Related party stock payable for 800,000 shares of common stock | | 544,000 |

| | |
|---|---:|
| Other comprehensive income (loss) | 90,807 |
| Accumulated deficit | (52,441,143) |
|    Total stockholders' equity | 14,285,006 |
| | |
| Total liabilities and stockholders' equity | $   53,523,822 |

See Accompanying Notes to Consolidated Financial Statements

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENTS OF OPERATIONS
FOR THE THREE AND NINE MONTHS ENDED MARCH 31, 2007 AND 2006
(UNAUDITED)

|  | Three Months Ended March 31, | | Nine Months Ended March 31, | |
| --- | --- | --- | --- | --- |
|  | 2007 | 2006 | 2007 | 2006 |
| Revenues | $ 287,646 | $ 63,003 | $ 391,705 | $ 467,693 |
| Cost of revenues | 93,538 | 8,634 | 130,147 | 85,592 |
| Gross profit | 194,108 | 54,369 | 261,558 | 382,101 |
| Operating expenses |  |  |  |  |
| Selling, general and administrative | 1,392,567 | 947,848 | 4,338,025 | 2,476,764 |
| Total operating expenses | 1,392,567 | 947,848 | 4,338,025 | 2,476,764 |
| Income (loss) from operations | (1,198,459) | (893,479) | (4,076,467) | (2,094,663) |
| Other income (expense) |  |  |  |  |
| Interest income | 1,501 | 8,092 | 8,245 | 19,940 |
| Interest expense and finance cost | (388,031) | (1,655,883) | (3,616,125) | (1,626,422) |
| Gain on Legal Settlement (Note 9) | 4,882,608 | — | 4,882,608 | — |
| Unrealized loss on equity swap agreement | (18,999,809) | (4,245,479) | (29,355,718) | (5,065,905) |
| Other income (expense) | (1,454,244) | (10,414) | (1,443,918) | (21,542) |
| Total other income (expense) | (15,957,975) | (5,903,684) | (29,524,908) | (6,693,929) |
| Net income (loss) before provision for income taxes | (17,156,434) | (6,797,163) | (33,601,375) | (8,788,592) |
| Provision for income taxes | — | — | — | — |
| Net income (loss) before minority interest | (17,156,434) | (6,797,163) | (33,601,375) | (8,788,592) |
| Loss applicable to minority interest | — | — | 22,721 | — |
| Net income (loss) | $ (17,156,434) | $ (6,797,163) | $ (33,624,096) | $ (8,788,592) |
| Net income (loss) per common share - basic and diluted | $ (0.23) | $ (0.11) | $ (0.45) | $ (0.16) |
| Weighted average common shares outstanding - basic and diluted | 74,776,867 | 60,848,622 | 74,351,365 | 56,193,242 |

See Accompanying Notes to Consolidated Financial Statements

4

# INNOFONE.COM, INCORPORATED
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
## FOR THE NINE MONTHS ENDED MARCH 31, 2007
## (UNAUDITED)

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital ($) | Unamortized Investment and Loan Fee ($) | Stock Receivable Related to Legal Settlement ($) | Stock Payable ($) | Related Party Stock Payable ($) | Other Comprehensive Income ($) | Accumulated Deficit ($) | Total Stockholders' Equity ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount ($) | Shares | Amount ($) | | | | | | | | |
| Balance, June 30, 2006 | 4,815,000 | 48,150 | 72,858,345 | 72,858 | 62,944,096 | — | — | 58,395 | 544,000 | — | (18,817,047) | 44,850,452 |
| Issuance of common stock related to acquisition of Mobile Technology Group, Inc. net of $101,020 net liabilities acquired | — | — | 1,441,441 | 1,441 | 1,497,539 | — | — | — | — | — | — | 1,498,980 |
| Issuance of common stock for services | — | — | 390,042 | 391 | 289,284 | — | — | — | — | — | — | 289,675 |
| Issuance of common stock related to stock payable | — | — | 71,000 | 71 | 58,324 | — | — | (58,395) | — | — | — | — |
| Issuance of warrants for 5,000,000 shares of common stock related to debt with 55 South Investments totaling $1,000,000 | — | — | — | — | 5,481,314 | (5,481,314) | — | — | — | — | — | — |
| Issuance of warrants for 602,500 shares of common stock related to various debts totaling $415,000 | — | — | — | — | 503,047 | (503,047) | — | — | — | — | — | — |
| Issuance of 185,000 common stock related to amended promissory notes totaling $205,000 | — | — | 185,000 | 185 | 73,815 | (74,000) | — | — | — | — | — | — |
| 825,000 common shares contributed by the Company's President to secure $1,000,000 promissory note valued at $617,925 | — | — | — | — | 617,925 | — | — | — | — | — | — | 617,925 |
| Receivable for the return of 3,478,260 shares of common stock related to a legal settlement (Note 9) | — | — | — | — | — | — | (2,782,608) | — | — | — | — | (2,782,608) |
| Amortization of investment and loan fee paid with common stock and warrants | — | — | — | — | — | 3,295,423 | — | — | — | — | — | 3,295,423 |
| Vesting of employee stock options | — | — | — | — | 38,417 | — | — | — | — | — | — | 38,417 |
| Minority interest | — | — | — | — | 10,031 | — | — | — | — | — | — | 10,031 |
| Unrealized gain on US Treasury Bonds | — | — | — | — | — | — | — | — | — | 90,807 | — | 90,807 |
| Net income (loss) | — | — | — | — | — | — | — | — | — | — | (33,624,096) | (33,624,096) |
| Balance, March 31, 2007 | 4,815,000 | $ 48,150 | 74,945,828 | $ 74,946 | $71,513,792 | $ (2,762,938) | $(2,782,608) | — | $ 544,000 | $ 90,807 | $(52,441,143) | $ 14,285,006 |

See Accompanying Notes to Consolidated Financial Statements

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENTS OF CASH FLOWS
FOR THE NINE MONTHS ENDED MARCH 31, 2007 AND 2006
(UNAUDITED)

| | Nine Months Ended March 31, | |
| --- | ---: | ---: |
| | 2007 | 2006 |
| Cash flows from operating activities: | | |
| Net income (loss) | $ (33,624,096) | $ (8,788,592) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation | 19,881 | 4,400 |
| Amortization of debt discount and finance cost | 3,932,222 | 229,306 |
| Gain on Legal Settlement | (4,782,608) | — |
| Unrealized loss on equity swap agreement | 29,355,718 | — |
| Stock based expenses | 294,107 | 281,523 |
| Changes in operating assets and liabilities: | | |
| Change in accounts receivable | (183,966) | (11,019) |
| Change in prepaid expenses | (58,901) | (92,822) |
| Change in other assets | 9,758 | — |
| Change in accounts payable and accrued liabilities | 1,260,221 | 207,496 |
| Change in deferred revenue | 114,090 | — |
| Change in due to related parties | — | (264,532) |
| Change in stock payable | 48,960 | — |
| Change in minority interest | 29,540 | — |
| Net cash used in operating activities | (3,585,074) | (8,434,240) |
| | | |
| Cash flows from investing activities: | | |
| Purchase of fixed assets | (151,618) | (3,285) |
| Purchased goodwill | (3,760) | — |
| Cash acquired through purchase of Digital Presence, Inc. | 300,000 | — |
| Return of deposit related to unsuccessful acquisition | 80,000 | — |
| Net cash used in investing activities | 224,621 | (3,285) |
| | | |
| Cash flows from financing activities: | | |
| Proceeds from notes payable | 4,175,000 | 3,000,000 |
| Payments on notes payable | (610,000) | — |
| Payments on related party notes payable | (100,000) | — |
| Net cash provided by (used in) financing activities | 3,465,000 | 3,000,000 |
| | | |
| Net change in cash | 104,547 | (5,437,525) |
| Cash, beginning of period | 100,172 | 17,840 |
| | | |
| Cash, end of period | $ 204,719 | $ (5,419,685) |

See Accompanying Notes to Consolidated Financial Statements

6

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

1. BASIS OF PRESENTATION AND DESCRIPTION OF BUSINESS

Basis of presentation - The accompanying unaudited consolidated financial statements have been prepared in accordance with Securities and Exchange Commission requirements for interim financial statements. Therefore, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States for complete financial statements. The financial statements should be read in conjunction with the Form 10-KSB/A for the year ended June 30, 2006 of Innofone.com, Incorporated (the "Company").

The interim financial statements present the balance sheet, statements of operations, stockholders' equity and cash flows of Innofone.com, Incorporated. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States.

The interim financial information is unaudited. In the opinion of management, all adjustments necessary to present fairly the financial position as of March 31, 2007 and the results of operations, stockholders' equity and cash flows presented herein have been included in the financial statements. All such adjustments are the normal and recurring nature. Interim results are not necessarily indicative of results of operations for the full year.

Description of business - Innofone.com, Incorporated was incorporated on December 19, 1995. On August 19, 2005, the Company consummated a Stock Purchase Agreement (the "Agreement") with Alexander Lightman to acquire 100% of the outstanding capital stock of IPv6 Summit, Inc. ("IPv6"). The fundamental terms of the purchase agreement provide for the Company to deliver a promissory note in the sum of $1,000,000 as partial consideration of the purchase price and to issue 33,333,000 shares of restricted common stock of the Company to satisfy the balance of the purchase price in full (the "IPv6 Transaction"). As a result, IPv6 has become a wholly owned subsidiary of the Company. Prior to the IPv6 Transaction, the Company was non-operating public company with no operations or assets; 28,005,270 shares of common stock issued and outstanding; and IPv6 was a privately held operating company. The IPv6 Transaction is considered to be a capital transaction in substance, rather than a business combination. Inasmuch, the IPv6 Transaction is equivalent to the issuance of shares by a private company (IPv6) for the non-monetary assets of a non-operational public company, accompanied by a recapitalization. The accounting for IPv6 Transaction is similar to that resulting from a reverse acquisition, except goodwill is not recorded. Accordingly, the historical financial information of the accompanying financial statements are that of IPv6 which the 33,333,000 shares issued by the Company are considered the historical outstanding shares of IPv6 for accounting purposes. The partial consideration of $1,000,000 promissory note has been accounted for as a distribution as if IPv6 had returned capital to its previous sole shareholder in the form of a distribution. The Company's operating activities are conducted through its wholly owned subsidiary, IPv6 Summit, Inc.

IPv6 Summit, Inc., a Nevada corporation located in Santa Monica, California was incorporated on July 9, 2003. The Company is among the leading organizers of IPv6 conference events in the world. IPv6 stands for Internet Protocol version 6 and is the successor protocol to the current Internet, Internet Protocol version 4, which was introduced in June 1973 and turned 33 years old last summer. IPv4 is a 32-bit protocol, while IPv6 is a 128-bit protocol allowing for 3.4 x 10 to the 38th power new IP addresses, and thus allowing for a vast increase in connecting people, places, and things to the Internet.

The Company derives revenue from Sponsorships, Conference Attendee Fees, Training Fees, and Consulting to Governments.

<u>Liquidity and capital resources</u> - As of March 31, 2007, the Company had total current assets of $715,180 and total current liabilities of $6,431,281 resulting in a working capital deficit of $5,716,101. As of March 31, 2007, the Company had cash totaling $204,719. Our cash flow from operating activities for the nine months ended March 31, 2007 resulted in a deficit of $3,585,074. Our cash flow from investing activities resulted in a surplus of $224,621. Our cash flows from financing activities resulted in a surplus of $3,465,000. Overall, the Company's cash flows for the nine months ended March 31, 2007, netted a surplus of $104,547. The Company is currently negotiating in obtaining additional funding sources which it believes will be successful in securing. The Company believes its current cash balance, cash flow from current operating activities, and potential additional funding sources will be sufficient to provide necessary capital for the Company's operations for the next twelve months.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

2. SIGNIFICANT ACCOUNTING POLICIES

Use of estimates - The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Principles of consolidation - The accompanying consolidated financial statements include the accounts of Innofone.com, Incorporated and its subsidiaries, IPv6 Summit, Inc. Mobile Technology Group, Inc., Digital Presence, Inc. and Innofone Philippines, Inc. The accompanying consolidated financial statements have been prepared in accordance accounting principles generally accepted in the United States. All material inter-company accounts and transactions have been eliminated in consolidation.

Revenue and expense recognition - The Company recognizes revenue from services provided once all of the following criteria for revenue recognition have been met: 1) pervasive evidence of an agreement exists, 2) the services have been delivered, 3) the price is fixed and determinable and not subject to refund or adjustment and 4) collection of the amounts due is reasonably. Overhead and administrative costs are recognized when incurred and direct event costs and expenses are recognized during the period in which the event they are associated with occurs.

Goodwill and intangible asset - In July 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141, "Business Combinations" and No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires all business combinations initiated after June 30, 2001 to be accounted for using the purchase method. Under SFAS No. 142, goodwill and intangible assets with indefinite lives are no longer amortized but are reviewed annually (or more frequently if impairment indicators arise) for impairment.

According to this statement, goodwill and intangible assets with indefinite lives are no longer subject to amortization, but rather an annual assessment of impairment by applying a fair-value based test. Fair value for goodwill is based on discounted cash flows, market multiples and/or appraised values as appropriate. Under SFAS No. 142, the carrying value of assets are calculated at the lowest level for which there are identifiable cash flows.

The Company has goodwill totaling $1,611,260 as of March 31, 2007, which in the opinion of management, no impairment is deemed necessary.

SFAS 142 requires the Company to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than its carrying value.

Stock based compensation - On January 1, 2006, the Company adopted SFAS No. 123 (R) "Share-Based Payment" which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors including employee stock options and employee stock purchases related to a Employee Stock Purchase Plan based on the estimated fair values.

The Company adopted SFAS No. 123(R) using the modified prospective transition method, which required the application of the accounting standard as of January 1, 2006. The accompanying consolidated financial statements up through December 31, 2006 reflect the impact of SFAS No. 123(R). In accordance with the modified prospective transition method, the Company's accompanying consolidated financial statements for the prior periods have not been restated, and do not include the impact of SFAS No. 123(R). Stock based compensation expense recognized under SFAS No. 123(R) for the nine months ended March 31, 2007 totaled $324,492. Pro forma stock based compensation from July 1, 2005 through December 31, 2005 totaled $-0-. Stock based compensation expense recognized under SFAS No. 123 (R) from January 1, 2006 through March 31, 2006 totaled $281,523.

8

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

Earnings (loss) per share - The Company reports earnings (loss) per share in accordance with SFAS No. 128, "Earnings per Share." Basic earnings (loss) per share is computed by dividing income (loss) available to common shareholders by the weighted average number of common shares available. Diluted earnings (loss) per share is computed similar to basic earnings (loss) per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares were dilutive. Diluted earnings (loss) per share has not been presented since the effect of the assumed exercise of options and warrants to purchase common shares would have an anti-dilutive effect.

3. UNAMORTIZED DEBT DISCOUNT AND FINANCE COST

As of March 31, 2007, unamortized debt discount and finance cost totaling $880,904 consist of the following:

| | |
|---|---:|
| Debt discount related to Lakewood Group LLC notes payable, see Note 7 | $ 613,444 |
| Debt discount related to 55 South Investment notes payable, see Note 7 | 108,758 |
| Debt discount related to NIR Group notes payable, see Note 7 | 136,031 |
| Debt discount related to Alex Lightman note payable see Note 6 | 22,670 |
| | $ 880,904 |

Unamortized debt discount and finance cost are being amortized over the term of the related agreements.

4. UNAMORTIZED INVESTMENT AND LOAN FEES PAID WITH COMMON STOCK AND WARRANTS

As of March 31, 2007, unamortized investment and loan fees paid with common stock and warrants totaling $2,762,938 consist of the following:

| | |
|---|---:|
| Debt discount related to 55 South Investment notes payable, see Note 7 | $ 2,579,442 |
| Debt discount related to various notes payable see Note 7 | 183,496 |
| | $ 2,762,938 |

Unamortized investment and loan fees are being amortized over the term of the related agreements.

5. BUSINESS ACQUISITIONS COMPLETED

On March 7, 2006, the Company entered into a Common Stock Purchase Agreement to purchase a total of 66.67% of the

outstanding common stock of Digital Presence, Inc. ("Digital") in consideration of cash totaling $300,000 made in installment payments. The payment terms for the purchase are as follow: (a) $50,000 which was due on the initial closing on March 7, 2006; (b) $125,000 due on second closing of May 15, 2006; and (c) $125,000 due on third closing of June 15, 2006. As of September 10, 2006, the Company made all the required payments and completed the acquisition. The Company has accounted for this acquisition under purchase accounting and have allocated the entire purchase price towards the assets acquired which principally consists of cash. Accordingly, there was no goodwill recognized in this acquisition. The 33.33% of the outstanding common stock of Digital which was not acquired has been accounted for as minority interest on the accompanying balance sheet.

9

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

On April 21, 2006, the Company entered into a Non-binding term sheet to acquire all the outstanding capital of Mobile Technology Group, LLC in consideration of $7,500 in cash payable on execution and shares of the Company's common stock equal in value of $1,600,000. The Company completed its acquisition of Mobile Technology Group, LLC in August 4, 2006. The Company has accounted for this acquisition under purchase accounting and have allocated the entire purchase price $1,607,500 towards goodwill since the purchase price exceeded the fair value of assets and liabilities acquired.

6. DUE TO RELATED PARTY

Due to related party as of March 31, 2007 are comprised of the following transactions with Alex Lightman, the Company's Chief Executive Officer, President and shareholder:

| | | |
|---|---|---|
| Note payable to Alex Lightman related to Stock Purchase Agreement(see Note 1 for detailed discussion), interest rate at 4%, payable in monthly installment payments of $83,333 (principal only) for each successive month starting on the date of execution of the note contingent upon certain conditions having been met, and ending October 17, 2006 which any unpaid principal and interest would be due at that date | $ | 200,000 |
| Note payable to Alex Lightman, interest rate at 5%, unsecured and principal and interest due at maturity on April 17, 2007 | | 500,000 |
| | $ | 700,000 |

7. NOTES PAYABLE

On May 25, 2006, the Company entered into a Letter Agreement the NIR Group for the repayment of convertible notes and warrants issued on or about August 31, 2005 and October 15, 2005 pursuant to a Securities Purchase Agreement by and between the Company and AJW Partners, LLC, New Millennium Capital Partners II, LLC, AJW Offshore, Ltd. and AJW Qualified Partners, LLC (collectively, the "NIR Group"). The repayment was applied to the outstanding principal and interest owing under the convertible notes and as consideration for the cancellation of the associated warrants for 1,000,000 shares of common stock issued to the NIR Group, and the termination of any and all Uniform Commercial Code filings in favor of the NIR Group. In connection with the repayment, the Company and the NIR Group executed and delivered the Letter Agreement, a new promissory note ("new notes"), a new stock purchase warrant ("new warrants"), and new registration rights agreement ("new registration agreement").

The terms of the repayment, as provided in the Letter Agreement are as follows: (a) upon signing of the Letter Agreement, the Company made a cash payment to the NIR Group in the amount of $2,635,400 which was applied to the repayment of all amounts of principal and interest owing and outstanding under previous convertible note balances; (b) the issuance of new notes in the aggregate amount totaling $1,200,000. The new notes are self-amortizing over a one year period commencing on July 1, 2006, with each installment payment due on the twelve consecutive monthly anniversaries beginning July 1, 2006. Further , pursuant to the new notes, the Company will pay to the NIR Group an aggregate of $100,000 per month. Additionally, the Company issued to the NIR Group new warrants for 750,000 shares

of common stock with an exercise price of $1.79 and a term of five years. The new warrants may be exercised on a cashless basis only in the event that there is no effective registration statement covering the shares underlying the warrants. The Company may buy back all the new warrants from the NIR Group for an aggregate of $100,000 at any time prior to the new warrants being exercised. The fair value of the new warrants totaled $476,121 was determined using Black-Scholes option pricing model based on the following assumptions: term of 2 years, volatility rate of 229%, risk free interest rate of 3.5% and dividend yield of 0%. The fair value of the new warrants totaling $476,121 have been accounted for as debt discount which have been capitalized and amortized over the term the new notes on a straight line basis. During the nine months ended March 31, 2007, the Company had made principal payments totaling $800,000 towards this loan. As of March 31, 2007, the remaining balance on these notes totaled $400,000 and unamortized debt discount balance totaled $136,031. We are currently delinquent on our monthly installment payments. Although we have not received any official notice of default under the repayment agreement with the NIR Group of funds, such notice can be anticipated should we be unable to re-establish payment under our agreed payment schedule shortly.

10

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

In July 2006, the Company issued two promissory notes (the "Notes") to 55 South Investments ("Holder") totaling $1,000,000, with interest at 12% per annum. The Maturity Date shall be the earlier of: (a) one (1) year from the commencement of that certain Equity Swap transaction, as discussed in Note 7, whereby 30 days have expired thereafter the date in which the Company is granted effectiveness by the Securities and Exchange Commission on a registration statement filed pursuant to certain agreements made in connection with an equity swap made by and between the Company and Cogent Capital Group, LLC and its affiliates as of June 2, 2006 (defined herein as the "Swap Start Date"); or (b) December 1, 2007, whichever is earlier. Repayment of the principal amounts of the Notes by the Company shall commence within ten (10) days of the Swap Start Date and shall continue thereafter in equal pro rata monthly installments on the same date of each subsequent month thereafter for the successive eleven (11) months thereafter the Swap Start Date and continue until all principal payments are paid in full. The principal shall be repaid in full no later than the maturity date. Should the Swap Start Date not occur prior to the maturity date, then the entirety of principal shall be due and payable on the maturity date. Further the Company may, at its option, prepay all amounts owing under the Notes prior to the maturity date, in whole or in part, without payment of any premium or penalty, after giving written notice thereof to the Holder at least one (1) day prior to the date selected for prepayment. In connection with the Notes, the Company issued (i) a five-year warrants to 55 South Investments for the right to purchase up to 4,000,000 shares of common stock at $1.00 per share; and (ii) a five year warrants to Millennium Investment Services, Inc., an affiliate of 55 South, for the right to purchase 1,000,000 shares of common stock at $1.00 per share. The Company has the right to redeem 1,400,000 of such warrants for $250,000 until July 13, 2007. The note is secured with approximately $4,000,000 worth of the Company's restricted common stock and $4,000,000 worth of restricted common stock owned by Alex Lightman, the Company's Chief Executive Officer and President. Further, the Company has agreed to pay to 55 South approximately $40,000 representing an origination fee and a due diligence fee. The fair value of the warrants totaled $5,481,314 using the Black-Scholes option pricing model which will be capitalized and amortized on a straight line basis over the term of the Notes. Additionally, the Company agreed to a pay 4% loan fee and 4% due diligence totaling $80,000 which has been capitalized as loan fees and amortized over the life of the loans. On March 1, 2007, the repayment terms for the Notes were amended with regards to principal payments. Fees were assessed for amending the repayment terms amounting to 8% of the total principal balance for a total of $80,000 which will be capitalized and amortized over the life of the Notes. For the nine months ended March 31, 2007, the Company amortized 2,953,114 as finance cost with a remaining unamortized balance of $2,688,200 as of March 31, 2007.

During the nine months ended March 31, 2007, the Company borrowed a total of $415,000 from eleven individuals through various promissory notes. These promissory notes have interest rates ranging from 10% to 12%, maturities from March, 2007 through September 2007, all secured by shares of the Company's common stock collectively totaling $1,560,000 with principal and unpaid interest due at maturity. The Company also issued warrants to these promissory note holders for shares of the Company's common stock collectively totaling 562,500 shares. The value of these warrants totaled $448,145 under the Black Scholes options pricing model using the following assumptions: exercise price of $1.00; closing stock price on date of grant; life of 3 years; volatility rate ranging from 237% to 241%, no dividend yield rate; and discount rate of 3.5%. The value of the warrants totaling $503,047 have been accounted for as loan fees and have been capitalized which will be amortized over the life of the loans.

11

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

Throughout the period of March 16, 2007 through March 30, 2007, promissory notes totaling $205,000 with six of such individuals were extended for an additional twelve months and the respective interest rate of each such note for such 6 individuals was increased to 15%. Fees in the form of 185,000 shares of common stock were assessed for extending these promissory notes totaling $74,000 which will be capitalized and amortized over the life of these promissory notes. For the nine months ended March 31, 2007, the Company amortized $393,551 as finance cost. The unamortized loan fees as March 31, 2007 totaled $183,496.

On January 16, 2007, the Company issued a promissory note to Lakewood Group LLC ("Lakewood") in the principal amount of $1,000,000 for the purchase price of $800,000 (the "Note") which the difference of $200,000 is considered a premium. The Maturity Date of the Note is September 16, 2007. Cash amortizing payments of the outstanding principal amount of the Note commence on the fifth month anniversary date of the Note and on the same day of each month thereafter (each a "Repayment Date") until the principal amount has been repaid in full. On each Repayment Date, the Company shall make payments to Lakewood in the amount of twenty-five percent (25%) of the principal amount, and any other amounts. In the event of default by the Company, the Company will be required to pay interest on the principal amount equal to fifteen percent (15%) per annum (calculated on a 360 day year). The Company has the option to prepay the Note in an amount equal to 110% of the purchase price, no sooner than thirty (30) days from the Note issuance date. Further, in the event that the Company raises funds from the sale of debt instruments, equity instruments or instruments convertible into equity in excess of $2,500,000 of gross proceeds ("Excess Proceeds"), then the Maturity Date of the Note with respect to an amount of principal amount equal to the Excess Proceeds shall be automatically accelerated to the fifth business day after the date the Company receives the actual or beneficial Excess Proceeds and the Company must use such Excess Proceeds to pay amounts payable under this Note. The $200,000 premium will be amortized over the life of the Note.

In connection with the issuance of the Lakewood Note, Mr. Alex Lightman, the Company's President and Chief Executive Officer: (i) pledged, pursuant to a Stock Pledge Agreement, 4,000,000 shares of his common stock to Lakewood as security for the Company's obligation under the Note; and (ii) guaranteed, pursuant to a Guaranty, all obligations under the Note and Subscription Agreement.

Further, Mr. Lightman entered into a Stock Purchase Agreement with the Company and Lakewood providing for the sale of 825,000 shares of Mr. Lightman's common stock to Lakewood pursuant to the terms and conditions of that agreement at $0.001 per share for a total of $825. The fair value of the shares sold by Mr. Lightman to Lakewood totaled $617,925 or $0.75 per share. The difference between the fair value of the 825,000 shares and the sale price will be accounted for as a loan fee which will be amortized over the life of the Note. For the nine months ended March 31, 2007, the Company amortized both the premium and loan fee totaling $204,482 and the remaining unamortized balance totaled $613,444 as of March 31, 2007.

On February 6, 2006, the Company obtained a revolving line-of-credit from a banking institution for a total of $150,000 with a term of thirteen months (automatic renewal for an additional twelve months based upon annual review and approval by the banking institution), variable interest rate based on lender's prime rate plus a 3% (initial rate of 11.25%), and secured by all assets of the Company. As of March 31, 2007, the Company had drawn on the full amount of the line-of-credit totaling $150,000.

8. EQUITY SWAP AGREEMENT

On June 2, 2006, the Company entered into a securities purchase agreement with Cogent Capital Investments LLC ("CCI") for the sale of 1,850,000 shares of common stock ("Common Stock") and 4,815,000 shares of Series A Convertible Preferred Stock ("Preferred Stock") for an aggregate purchase price of $50,000,000, which was paid in the form of U.S. Treasury Bonds. The Preferred Stock issued to CCI has no voting rights, no dividend rights and each share of Preferred Stock is convertible into ten (10) shares of common stock.

12

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
MARCH 31, 2007
(UNAUDITED)

Concurrently with the consummation of the securities purchase agreement, the Company entered into an equity swap agreement ("Equity Swap") with Cogent Capital Financial LLC ("CCF") an affiliate of CCI which such transaction is considered to be a derivative. The Equity Swap is a fixed versus floating price swap with respect to a notional stock amount of 37,500,000 shares of common stock , with Cogent being the floating equity payor and the Company being the fixed equity price payor. The fixed price under the Equity Swap is $1.333 per share. The Equity Swap has a maturity date of December 2, 2010, through certain conditions this date can be extended, and provides for periodic settlements and reductions of the notional amount of the Equity Swap over a 30 month period beginning one month after the Trigger Date, provided that the Company has satisfied certain conditions. The Trigger Date is the first date as of which the Resale Condition has been satisfied with respect to at least 10,000,000 shares. The Resale Condition shall be deemed satisfied as of any day with respect to the number of equity shares that, as of such day, are then subject to an effective resale registration statement under the Securities Act of 1933, as amended, with the holders of such shares being named therein as selling shareholders or fully eleigible for resale under Rule 144 adopted under the Securities Act of 1933. The Company agreed to pay CCF an amount equal to the decrease in value of the notional stock amount of 37,500,000 below $1.333 per share at each settlement date during the 30 month period beginning one month after the Trigger Date. Under the terms of the Equity Swap, the Company agreed to pay CCF an amount equal to in interest on $50,000,000, at Libor plus 1.45%, up through the Trigger Date then decreasing for the next 30 months based upon the decrease value in the notional stock amount. Among these conditions is a requirement that the Company maintain an effective registration statement with respect to specified portions of the Common Stock purchased by CCI and the Common Stock into which the Preferred Stock purchased is convertible. To secure the Company's performance of the Equity Swap, the Company has pledged to CCF, and deposited in a collateral account subject to a lien in favor of CCF, the $50,000,000 in U.S. Treasury Bonds. As the notional amount of the Equity Swap is reduced, corresponding portion of the pledged U.S. Treasury Bonds are to be released to the Company, subject to any partial settlement of the Equity Swap resulting from the reduction in the notional amount. In the event the Company is required pay an amount equal to the decrease in value of the notional stock during each settlement date, it would do so through the liquidation of the U.S. Treasury Bonds which would then be recorded within the statement of operations as part earnings (loss).

In connection with and as consideration to CCF under the Equity Swap as its fee, the Company paid to CCF an amount consisting of: (i) $1,375,000 (which $568,750 was paid at closing); (ii) 5,000,000 shares of common stock and (iii) warrant for 5,000,000 shares of common stock with an exercise price of $1.20 and term of 5 year. The fair value of the common stock and warrant given as consideration totaled $7,683,641. In addition, the Company paid CCI $103,000 as an initial fee. Collectively, the value of cash, common stock and warrant totaled $9,161,641. The Company has accounted for the fee to CCF as an initial investment fee. The fair value of the warrants has been determined using Black-Scholes based on the following assumptions: stock price based on the date of grant; term of 3 years; volatility rate of 229%; discount rate of 3.5% and no dividends.

Since the Equity Swap is considered to be a derivative transaction, the Equity Swap is recorded at fair value at the end of each reporting period. Effective changes in fair value of the Equity Swap is recorded within the statement of operations as part earnings (loss). As of March 31, 2007, the Company recorded a liability related to the equity swap agreement of $32,824,941 which resulted in an unrealized loss on equity swap agreement during the nine months ended March 31, 2007 totaling $29,355,718 reflected within the statement of operations. The fair value of the Equity Swap is determined using Black-Scholes based on the following assumptions: stock price of $0.35 based upon the date of this reporting period; term based upon the settlement period; volatility rate of 255%; discount rate of 3.5% and no dividends.

9. GAIN ON LEGAL SETTLEMENT

Legal Settlement with InfoWeapons, Inc., InfoWeapons Corporation and Lawrence Hughes

*Background*

On August 16, 2006, Innofone.com, Incorporated's ("Innofone" or the "Company") entered into an Agreement and Plan of Merger (the "Agreement") with InfoWeapons Acquisition Corp. ("IAC"), a wholly-owned subsidiary, InfoWeapons, Inc. ("InfoWeapons"), a Georgia corporation and the shareholders of InfoWeapons. Under the terms of the Agreement, we acquired InfoWeapons and its assets (including but not limited to InfoWeapons' subsidiary InfoWeapons Corp.) with the only non-administrative outstanding item subsequent to execution being the delivery by InfoWeapons of its financial statements in accordance with US Generally Accepted Accounting Principles (GAAP). Despite and repeated requests, InfoWeapons had failed to deliver its US GAAP financial statements as required by the Agreement.

13

**INNOFONE.COM, INCORPORATED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2007**
**(UNAUDITED)**

*Lawsuits*

As previously disclosed, on October 4, 2006, we filed a complaint in the United States District Court, Central District of California, (the "Complaint") against InfoWeapons and Mr. Hughes (collectively, the "Defendants") alleging that InfoWeapons and Mr. Hughes failed to perform their obligations under the Agreement and that each had wrongfully misappropriated trade secrets of our Company. On November 16, 2006, the Company amended its Complaint to add two causes of action for: (i) promissory estoppel on that certain promissory note issued to Mr. Hughes in the face amount of $2 million (the "Note") and (ii) declaratory relief on the Note. These claims were asserted because Defendants had taken the position that the Note was payable despite Mr. Hughes written notification to the Company on September 15, 2006 that such payment was to be extended indefinitely and the Company had accepted this extension in writing. On November 22, 2006, Mr. Hughes reacted to the California litigation seeking specific performance of the Agreement he had signed by filing a Complaint against Innofone and Mr. Alex Lightman, the Company's President and Chief Executive Officer (service of process occurred on November 30, 2006 against Lightman and occurred separately on December 1, 2006 on Innofone), in the State Court of Fulton County, state of Georgia (Case No. 2006ev001457d) (together with the Complaint, the "Complaints").

*Settlement*

On January 10, 2007, the Company reached a binding and immediately enforceable settlement with InfoWeapons, Inc., InfoWeapons Corporation and Lawrence Hughes (collectively the "InfoWeapons Parties"), whereby the Company, InfoWeapons Acquisition Corporation, Alex Lightman (collectively the "Innofone Parties") and the InfoWeapons Parties agreed to the following material terms memorialized before the Honorable Margaret A. Nagle, United States Magistrate Judge for the Central District of California, and to be followed in writing hereafter: (i) unconditional cancellation and termination of the Merger Agreement in all respects; (ii) dismissal with prejudice of both Complaints against one another, with all parties to both Complaints including InfoWeapons Corporation granting full and complete general and mutual releases to the broadest extent permitted by law; (iii) Mr. Hughes is to return to the Company the 3,478,260 shares of the Company's Common Stock that he purchased for $4 million on April 27, 2006; (iv) Mr. Hughes is to cancel and terminate and forever forgive that certain promissory note issued to him by the Company on September 7, 2006 in the principal amount of $2 million; (v) the InfoWeapons Parties to pay the Company the sum of $180,000 on or before February 12, 2007 ($80,000 had already been reflected as a receivable by the Company); (vi) the termination of all agreements, contracts and obligations whatsoever between the Innofone Parties and the InfoWeapons Parties; and (vii) the mutual non-disparagement and non-solicitation of employees by and between the Innofone Parties and the InfoWeapons Parties; and (viii) certain other provisions that were read into the record at the conclusion of the settlement conference before Judge Nagle on January 10, 2007.

10. <u>LITIGATION</u>

On March 19, 2007, the Company filed a complaint in the United States District Court, Central District of California, against Cogent Capital Financial, LLC, Cogent Capital Investments, LLC, Cogent Capital Group, LLC, Gregory L. Kofford, Mark W. Holden (collectively, the "Cogent Defendants"), and Investors Bank & Trust Company (the "Escrow Agent") to rescind a $50 million equity swap financing transaction (the "Swap Transaction") dated as of June 2, 2006, and related agreements and amendments (the "Swap Transaction Documents") as discussed in Note 8.

**INNOFONE.COM, INCORPORATED**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**MARCH 31, 2007**
**(UNAUDITED)**

The Company filed a lawsuit against the Cogent Defendants in the United States District Court for the Central District of California ("California Complaint") for: (i) violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, (ii) rescission of the Swap Transaction Documents based on illegality, (iii) rescission of the Swap Transaction Documents based on fraud or mistake, (iv) negligent misrepresentation, and (v) declaratory relief on the Swap Transaction and Swap Transaction Documents. The Company is suing the Escrow Agent solely in order to obtain complete relief in the action because the Escrow Agent is holding stocks, bonds, and cash which the Company and Cogent Defendants deposited with it pursuant to an escrow agreement underlying the Swap Transaction. The Swap Transaction was premised on the Securities and Exchange Commission (the "Commission") approving an effective registration statement for the Company's stock. The complaint alleges that during the negotiations of the Swap Transaction, the Cogent Defendants emphatically assured the Company that the Commission had approved these types of transactions before, that they had the experience to structure this transaction so that the Commission would approve the registration of the shares, and that they had been successful on prior occasions. As of the date of the Company's complaint, however, the Commission has repeatedly refused to approve the registration of the Swap Transaction securities, as a result of the existence of serious questions about what the Commission views as the fundamentally flawed structure and substance of the transaction. Despite the Company's recent and repeated requests to the Cogent Defendants to accept the Commission's position on the Swap Transaction and rescind the transaction, the Cogent Defendants have refused to reasonably engage in a plan to do so, and insist on the Company continuing to pay interest and fees on bonds it can never access in the manner contemplated by the Swap Transaction. The Company filed its complaint against the Cogent Defendants alleging the above claims.

On March 19, 2007 two of the Cogent Defendants, Cogent Capital Financial, LLC and Cogent Capital Investments, LLC (the "Cogent Entities"), filed a Summons With Notice in the Supreme Court of New York, County of New York ("Summons"), giving notice of their claim that the Company breached the Securities Purchase Agreement and ISDA 2002 Master Agreement, as amended, underlying the Swap Transaction. The Cogent Entities, have since filed a formal complaint in such court ("New York Complaint"). The Complaint states that the Cogent Entities take action to seek declaratory relief, interest and monetary damages related to claimed interest payment defaults by Innofone. .

On or about May 14, 2007, the court in the California Complaint ordered that the case be transferred to New York where Cogent has filed the New York Complaint and it is expected that the two cases will be consolidated in the near future.

Although the Company hopes to resolve this matter in an amicable fashion, the Company is demanding pursuant to our complaint that the Cogent Defendants rescind the Swap Transaction Documents, and are seeking in excess of $25,000,000 in damages.

11. <u>SUBSEQUENT EVENT</u>

In April 2007, the Company obtained a revolving line of credit from a bank institution totaling $100,000 with an interest rate of prime plus 5% of which the full amount had been drawn on by the Company.

In April 2007, the Company entered into an employment agreement with its Chief Technology Officer ("CTO") whereby the annual compensation is $150,000. Additionally, the CTO is eligible to be issued an option to purchase 250,000 shares of restricted common stock.

15

## ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Forward-Looking Statements

The information set forth in this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") contains certain "forward-looking statements" including, among others (i) expected changes in the Company's revenues and profitability, (ii) prospective business opportunities and (iii) the Company's strategy for financing its business. Forward-looking statements are statements other than historical information or statements of current condition. Some forward-looking statements may be identified by use of terms such as "believes", "anticipates", "intends" or "expects". These forward-looking statements relate to the plans, objectives and expectations of the Company for future operations. Although the Company believes that its expectations with respect to the forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business and operations, in light of the risks and uncertainties inherent in all future projections, the inclusion of forward-looking statements in this report should not be regarded as a representation by the Company or any other person that the objectives or plans of the Company will be achieved.

### 1. Overview

You should read the following MD&A in conjunction with the Consolidated Financial Statements and Notes thereto, and the other financial data appearing elsewhere in this Quarterly Report on Form 10-QSB.

The Company's revenues and results of operations could differ materially from those projected in the forward-looking statements as a result of numerous factors, including, but not limited to, the following: the risk of significant natural disaster, the inability of the Company to insure against certain risks, inflationary and deflationary conditions and cycles, currency exchange rates, changing government regulations domestically and internationally affecting the Internet which is currently evolving from an IPv4 (Internet Protocol version 4) environment to that of IPv6 (Internet Protocol version 6) ("New Internet"), including various taxing authorities, VAT, OSHA, and general market conditions, competition and pricing, changes in external competitive market factors, termination of certain agreements, protocol, or inability to enter into strategic agreements, inability to satisfy anticipated working capital or other cash shortage requirements, changes in or developments under domestic or foreign laws, regulations, governmental requirements or in the IT industry, changes in the Company's business strategy or an inability to execute its strategy due to unanticipated changes in the market. In light of these risks and uncertainties, there can be no assurance that actual results, performance or achievements of the Company will not differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements.

As previously disclosed, the Company will have to restate certain of its financial statements. The Company concluded that it will have to restate its financial statements and notified the public on December 21, 2006 that certain previously issued financial statements should no longer be relied upon and that the Company will have to amend to restate such financial statements contained in the following periods: (i) Form 10-KSB for the year ended June 30, 2006; and (ii) the following quarterly reports: (a) Form 10-QSB for the quarter ended December 31, 2006; (b) Form 10-QSB for the quarter ended September 30, 2006; (c) Form 10-QSB for the quarter ended March 31, 2006; (d) Form 10-QSB for the quarter ended December 31, 2005; and (e) Form 10-QSB for the quarter ended September 30, 2005 (collectively, the "Financial Statements"). Further, the Company may have to restate the financial statements contained in this Form 10-QSB for the quarter ended March 31, 2007. The determination was made by the Company and following consultation with the Company's senior management, advisors and independent registered public accounting firm. Until such time as the Company files the restated Financial Statements with the Commission to address proper accounting treatment of certain items, the Financial Statements, including the financial statements contained in this Form 10-QSB, should not be relied upon.

The restatements of the Financial Statements relate to the accounting treatment of certain financing transactions; primarily the equity swap transaction between the Company and Cogent Capital Investments, LLC and with respect to the issuance of certain warrants to the AJW affiliates in the NIR transaction which may change the equity swap unrealized losses and

warrant expenses, potentially affecting the net loss currently reflected in the aforementioned Financial Statements. The Company deems these transactions to be both complex and nonrecurring and the Company does not know at this time the exact impact the restatements may have on the Financial Statements.

16

However, the Company expects that the adjustments to the Financial Statements will be non-cash in nature and will not reflect any changes in the underlying performance of the Company's business, including revenues, operating costs and expenses, operating income or loss, operating cash flows or adjusted EBITDA.

The Company continues to review and evaluate its disclosure controls and procedures to ensure that they are compliant with the new Securities Exchange Act Rules 13a-15 and 15d-15. We have made disclosures regarding our internal controls and procedures under Item 3 of Part I of this Report.

Subsidiaries

The Company currently operates two wholly-owned subsidiaries, IPv6 Summit, Inc. and Mobile Tech Acquisition Corp., Inc. (a/k/a Mobile Tech Group ("Mobile Tech")) each of which is a Nevada corporation and supports a majority-owned (66.67%) subsidiary, Digital Presence, Inc., a Delaware corporation as well as an operating consulting division styled as v6 Transition.

IPv6 Summit, Inc., is operated from our Santa Monica, California headquarters and is dedicated to the provision of IPv6-related conferences.

Mobile Tech was acquired by us in August 2006 and is in the business of developing and marketing mobile messaging and ticketing and other transaction services and products from its Las Vegas, Nevada headquarters.

Partially Owned Subsidiaries and Divisions

Our v6 Transition business division has performed a variety of professional services related to IPv6 technology including IPv6 trainings, workshops, and the provision of other consulting services such as the drafting of corporate transition plans and other business plans.

At present, each of v6 Transition and Digital Presence, Inc., are managed by James Bacchus, our Vice President of Consulting. Digital Presence is developing a system for scalable addressable IPv6 identification and registration.

Innofone Philippines, Inc. is a Philippines corporation formed on November 23, 2006 for the purpose of employing Philippino employees dedicated primarily to the development of IPv6 related products and services including but not limited to mobile messaging secure voice over IPv6, mobile prepaid, IPv6 VPN and mobile transaction products as well as custom computer software and Internet technology. Innofone.com, Incorporated owns 40% of Innofone Philippines, Inc.

IPv6-Centered Business Strategy

The Company's business divisions and subsidiaries are focused on exploiting what we anticipate to be a major shift in the way business is done on the Internet given the upgrade of the infrastructure of the Internet-to-Internet Protocol version 6 (IPv6). The Internet as we know it today is based on Internet Protocol version 4, more commonly referred to as IPv4, a 33-year-old protocol. The IPv4 based Internet is beginning to receive a major upgrade, with a new format established in computer operating systems for packets of data called Internet Protocol version 6, or IPv6 (also called the "New Internet" when referring to a fully implemented IPv6 network environment). Simply put, one of the limitations of today's Internet is a shortage of addresses, so that the hardware or software equivalents of "middle men" are put into the system to let many people use one address, not unlike the old telephone party lines, where many people had the same "number," and everyone could listen in. The party line system had the advantage that a lot of people could be connected with few switched lines, but led to problems, such as lack of security. There was no way to assure that one person would be speaking with only one person at the other end. When every phone user received their own address, it led to many great new capabilities - such as enhanced privacy, the ability to deliver new services such as telefax messages to a particular person, and the ability to go mobile with cell phones, and caller ID, which enabled people to screen their calls, accepting only those they wanted to at that

moment.

17

The advantages of IPv6 over the existing IPv4 are significant and can be summarized as that which provides greater security, mobility, and *ad hoc* networking capability which is a temporary network link initiated for a particular purpose. Specifically, IPv6 will give everyone his or her personal address (or thousands of them, as needed), which enables the potential for "end-to-end" connectivity. Each individual can know for certain who the specific receiver at the other end is which in turn allows the system to check for service quality and much easier mobile use and roaming. Furthermore, this connectivity facilitates multiple layers of individual security measures rather than today's firewalls or Network Address Translation, which offer little protection once a hacker has broken through the protective wall.

One new feature of IPv6 is the vast increase of trillions of Internet addresses, resulting in what will seem to be almost unlimited Internet Protocol (IP) address availability and which will enable each customer to have many such addresses for each cell phone, game console, home appliance, consumer electronics and automobiles in the household and/or at the office. Doing this today in the IPv4 environment is difficult and costly.

IPv6 is also more secure for wired and wireless communications in part because greater identity is possible with more addresses and in part because currently there are no known cases of spoofing an IPv6 address as occurs in IPv4. While being more secure, IPv6 will also provide greater access to mobile wireless online service, television and voice over Internet protocol (or "VoIP") given its structure resulting in more mobile online users with greater overall trust in a secure network. Ultimately, even advanced online connections such as smart tags which utilize Radio Frequency Identification (RFID) to enable real-time inventory tracking will be able to be deployed in IPv6 efficiently and broadly. To do so under an IPv4 system would not be practical from a cost perspective.

We believe that IPv6 will present many new business opportunities in roughly the same manner that the existing Internet did when it first reached the mainstream in the mid-1990s. Our initial goal was to address such business opportunities by initially focusing on training, consulting, conference management and testing all related specifically to IPv6 so as to become on of the known experts in this new field. By developing expertise and leadership in each of these areas, Innofone has gained the credibility required in this newly developing IPv6 environment to allow for our current expansion through the strategic acquisitions we have closed. We are currently filling a void in our areas of expertise related to IPv6 in the United States. There are few domestic competitors providing services to American businesses seeking advice on how to transition from IPv4 to IPv6. There are few competitors which understand the U.S. government's role in supporting IPv6. There are few competitors providing credible testing facilities for IPv6 enabled products. There are few competitors providing training to employees in American businesses on the IPv6 environment and its advantages, product possibilities and/or network solutions. By doing business in these areas with sparse competition and by holding regular summit conferences throughout the country, Innofone intends to take and maintain the lead in all business specifically related to IPv6.

Innofone currently offers and manages these services from three corporate centers: our corporate headquarters offices in Santa Monica, California, our Mobile Tech offices in Las Vegas, Nevada and virtually through our Eastern seaboard based employee, James Bacchus.

## 2. Business Combination

On August 8, 2005, the Innofone.com entered into a stock purchase agreement with Mr. Alex Lightman, our Chief Executive Officer and President, to purchase 100% of the issued and outstanding shares of IPv6 Summit Inc. ("IPv6 Summit"), an entity engaged in providing conference management services related to Internet Protocol version 6 or IPv6. At the time of the Agreement, Mr. Lightman was the President, Treasurer, Director and sole shareholder of IPv6 Summit, and was neither an officer nor a director of the Company. Pursuant to the Agreement, on October 12, 2005, which was amended on October 17, 2005, we issued to Mr. Lightman a promissory note in the principal face amount of $1,000,000 with interest at the rate of 4% per annum. Further, we issued to Mr. Lightman approximately 33,333,000 shares of our restricted common stock. As a result of the stock purchase agreement, IPv6 Summit became a wholly-owned subsidiary of the Company. IPv6 has been accounted for as the accounting acquirer similar to a reverse merger transaction and the historical accounting information of IPv6 is now that of Innofone. As of March 31, 2007, we had made payments against Mr. Lightman's promissory note totaling

$800,000, and accordingly, our current principal owed to him totals $200,000.

**3. Current Business Operations**

Headquarters, Corporate and Conferencing Business

We currently employ nine individuals in our Santa Monica, California headquarters offices located at 1431 Ocean Avenue, Suite 1100, Santa Monica, California 90401. Innofone also operates its wholly owned subsidiary, IPv6 Summit, Inc., from its Santa Monica, California offices. IPv6 Summit, Inc. is currently our primary source of revenue and provides us the ability to maintain leadership in IPv6 knowledge, experience and networking. IPv6 Summit, Inc. organizes and produces conference events related to IPv6 technology and the transition from IPv4 to IPv6. Our next Summit event has not been determined.

18

Innofone corporate management has largely been focused on capital formation and oversight of our subsidiaries and divisions for the past quarter and has searched for and continues to seek certain other strategic acquisitions and investments over the next twelve months in an effort to increase overall operations and grow our platform centered on IPv6. Our ability to execute this goal will be largely effect continued operations and our ability to continue to develop our products and services platforms.

Divisions

Our v6 Transition consulting division is managed by Jim Bacchus and is operated from his Northern Virginia offices. V6 Transition organizes training, testing, workshops and other consulting services related to IPv6 implementation. In 2005, the United States government mandated that all government contractors transition their Internet technology from IPv4 to IPv6. Despite this mandate, government spending has been slower than anticipated. Meanwhile, our competitors have grown in this area with almost every significant company in this field engaging in government solicitations and now offering IPv6-related consulting and training services. As a result, we have focused our efforts in ourv6 Transition division on niche areas with potentially high utility value and greater impact upon its customers including initiatives with governments at the Federal and state level in offering document management, storage and search functionality. Our intention is to provide high utility value for our customers which will in turn separate us from the growing competition. We estimate that revenue from our consulting and training division will be minimal until government spending increases.

Digital Presence has announced a business relationship with the National Notary Association in which the parties intend to together develop new products and services involving IPv6 and electronic notary products for notarization of documents.

Subsidiaries

On September 10, 2006, we completed an investment in Digital Presence, Inc., a Delaware corporation, which was formed for the purpose of creating a scalable addressable IPv6 identity registry. As of December 31, 2006 Digital Presence, Inc. employed two individuals in executive management capacities and has since added one employee. Digital Presence's CEO, Jim Bacchus, also manages our v6 Transition consulting division. Digital Presence is currently in the process of forming a variety of state, federal and private cooperative agreements for the development of registries and other products using IPv6 addresses as a key component to identifying, certifying , storing and searching important documents.

Mobile Tech Acquisition Corp. Inc. ("Mobile Tech") is based in Las Vegas, Nevada and employs three individuals given the Mobile Tech's recent need to reduce expenses. Mobile Tech continues to expand operations through the support of our Innofone Philippines partially owned subsidiary. Mobile Tech is able to utilize highly skilled and efficient labor existing in the Philippines in developing robust, sophisticated mobile messaging and transaction based products and services. Mobile Tech is currently developing and deploying a mobile messaging and ticketing platform with a local transit authority in Las Vegas, Nevada and this platform should be launched by the third calendar quarter of 2007. Mobile Tech is presently in contract negotiations with such transit authority on the subject platform. Mobile Tech also provides current mobile messaging services to several casino operators and hotels in the Las Vegas area. On or about May 10, 2007 our Mobile Tech Group subsidiary received 6 month advance notice pursuant to the notice terms of the Operating Agreement of Swiftpass U.S.A., L.L.C. from Swiftpass Digital Ltd., a United Kingdom company. The notice included Swiftpass Digital's intention to terminate our operating agreement and thereby dissolve our joint venture limited liability company in Nevada styled as Swiftpass U.S.A., L.L.C. Mobile Tech Group is presently negotiating a plan to wind Swiftpass U.S.A.,L.L.C. and deems such event immaterial given Innofone's workaround and strategic development of technology alternative to the Swiftpass Digital, Ltd. mobile scanning technology. Under the terms of the Operating Agreement, either terminating party is required to provide 6 months notice to the other parties to the Operating Agreement.

Innofone Philippines, Inc. was organized on November 23, 2006 and as of December 31, 2006 operated with a single employee. Currently, Innofone Philippines, Inc. is staffed with 30 employees and is based in Manila, Philippines. Presently, Innofone Philippines is largely dedicated to supporting our mobile messaging and ticketing business sourced and contracted

by Mobile Tech. Innofone Philippines is also developing mobile commerce applications, secure voice over IPv6 and mobile commerce applications that compliment our Mobile Tech Group subsidiary offerings. In the future we intend to expand the operations of Innofone Philippines to include other technology training, sophisticated flash animation production and custom IPv6 centered product development.

19

**4. Future Business Operations**

We anticipate that our principal business activities for the coming months will include the refinement of our strategic approach to realizing the potential of the IPv6 industry and as such intend to focus on the following areas of business growth:

1.  Organic growth, via our existing business divisions:

A.          Mobile Messaging, Ticketing and Transaction products and services developed by our Mobile Tech subsidiary and supported by our Innofone Philippines corporation.

B.          Information Assurance products and services as deployed by our Digital Presence subsidiary. Information Assurance products are products which utilize IPv6 as a protocol to further enhance secure transmission and identification of notarized and otherwise identified documents

C.          Consulting, including v6 Transition Plans, Project Plans and other types of IPv6 related consulting engagements.

D.          Training, including one day Federal Chief Information Officer IPv6 Transition Workshops and anticipated five day customized trainings for both technology and business aspects of IPv6.

2. Product Development and developing Organic Growth Areas. Through our Innofone Philippines entity and its employees, Innofone has initiated the development of a highly skilled internal research and development capability that we anticipate will generate new products at regular intervals starting in 2007. We announced the launch of our first product, Jackpot Spy TM, in April of 2007 and intend this product to focus on customers seeking to timely be notified of lottery and other just-in-time gaming threshold events.

3. Strategic Mergers and Acquisitions: Innofone is considering the potential for acquisition of several companies which Management believes could lead to the consummation of certain transactions that could result in the positioning of Innofone for accelerated growth in areas such as secure Internet applications, video-over-IPv6, and mobile phone applications such as mobile TV that will be potentially enhanced by using IPv6. We have started on this path via the acquisitions described hereinabove. This area continues to be an important part of Innofone's growth going forward.

**5. Results of Operations**

On August 8, 2005, Innofone purchased 100% of the issued and outstanding shares of IPv6 Summit, Inc. As a result, IPv6 has been accounted for as the accounting acquirer similar to a reverse merger in that the historical accounting information is that of IPv6. Accordingly, the results of operation discussion for the three and nine months ended March 31, 2007 and 2006 are that of IPv6.

Revenues and Cost of Revenues:

The Company derives revenues primarily from attendance fees of summit conferences held, corporate sponsorships related to such summits, and consulting fees. Attendance fees are recognized when the conference has been held. Cost of revenues primarily relate to summit conference room rentals, food accommodations and advertising. Additional contracts were signed for workshops and consulting engagements. For the three and nine months ended March 31, 2007, the revenues were $287,646 and $391,705 compared to the prior year's same periods of $63,003 and $467,693. Increase in revenues compared to the prior year for the three months ended March 31, 2007 primarily related to the timing of the conferences. The most recent conference was held in late March 2007. This same conference was held later in the year in 2006. The decrease in revenues compared to the prior year for the nine months ended March 31, 2007, is due to a decline in consulting revenue due to a restructuring of the consulting division.

<u>Selling, General and Administrative Expenses</u>:

Selling, general and administrative expenses totaled $1,392,567 and $4,338,025 for the three and nine months ended March 31, 2007, an increase of $444,719 and $1,861,261 compared to the same periods in the prior year. The increase primarily related to costs incurred to secure new debt financing, legal fees associated with the acquisition, increased salaries, and additional costs related to the subsidiaries that were acquired in the last year.

20

<u>Net Loss</u>:

Net loss totaling $17,156,434 and $33,624,096 for the three and nine months ended March 31, 2007, increased by $10,359,271 and $24,835,504 compared to the same periods of the prior year as result of the factors previously mentioned above. Additionally, the increase was due to there being significant expenses associated with the equity swap transaction with Cogent Capital, and an increase in interest expense.

**6. Liquidity and Capital Resources**

As of March 31, 2007, the Company had total current assets of $715,180 and total current liabilities of $6,431,281 resulting in a working capital deficit of $5,716,101. As of March 31, 2007, the Company had cash totaling $204,719. Our cash flow from operating activities for the nine months ended March 31, 2007 resulted in a deficit of $3,585,074. Our cash flow from investing activities resulted in a surplus of $224,621. Our cash flows from financing activities resulted in a surplus of $3,465,000. Overall, the Company's cash flows for the nine months ended March 31, 2007, netted a surplus of $104,547. The Company is currently negotiating in obtaining additional funding sources which it believes will be successful in securing. The Company believes its current cash balance, cash flow from current operating activities, and potential additional funding sources will be sufficient to provide necessary capital for the Company's operations for the next twelve months.

Our CTO has loaned the Company for the specific use of financing the Innofone.com, Philippines operations a total of $67,017.00 over the period of April 11, 2007 through May 12, 2007. The principal agreed terms of such loan are that the loaned amounts shall be repaid in full upon sufficient receipt by the Company of the first of financing and/or revenues along with interest at the rate of 8.5% per annum, plus the issuance of a flat payment of $680 for related financing costs along with 150,000 shares of common stock of the Company.

**Critical Accounting Policies**

The preparation of our financial statements requires our management to make estimates and assumptions that affect the reported amounts on our financial statements. Management bases its estimates and judgments on historical experience and on various other factors that are believed to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions.

The Notes to the financial statements included in this filing contain a discussion of our significant accounting policies and recent accounting pronouncements applicable to us.

**Recent Accounting Pronouncements**

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections." This statement applies to all voluntary changes in accounting principle and requires retrospective application to prior periods' financial statements of changes in accounting principle, unless this would be impracticable. This statement also makes a distinction between "retrospective application" of an accounting principle and the "restatement" of financial statements to reflect the correction of an error. This statement is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. This statement is not expected to have a material effect on the Company's consolidated financial position or results of operations.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments". SFAS No. 155 amends SFAS No 133, "Accounting for Derivative Instruments and Hedging Activities", and SFAF No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities". SFAS No. 155, permits fair value remeasurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation, clarifies which interest-only strips and principal-only strips are not subject to the requirements of SFAS No. 133,

establishes a requirement to evaluate interest in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation, clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives, and amends SFAS No. 140 to eliminate the prohibition on the qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. This statement is effective for all financial instruments acquired or issued after the beginning of the Company's first fiscal year that begins after September 15, 2006. This statement is not expected to have a material effect on the Company's consolidated financial position or results of operations.

21

In June 2005, the EITF reached consensus on Issue No. 05-6, Determining the Amortization Period for Leasehold Improvements ("EITF 05-6.") EITF 05-6 provides guidance on determining the amortization period for leasehold improvements acquired in a business combination or acquired subsequent to lease inception. The guidance in EITF 05-6 will be applied prospectively and is effective for periods beginning after June 29, 2005. EITF 05-6 is not expected to have a material effect on the Company's consolidated financial position or results of operations.

In September 2006, the FASB issued SFAS No. 157 "Fair Value Measurements". SFAS No. 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosure about fair values. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. Management believes that the adoption of SFAS No. 157 will not have a material impact on the consolidated financial results of the Company.

## ITEM 3. EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

As previously disclosed, the Company will have to restate certain of its financial statements. The Company concluded that it will have to restate its financial statements on December 21, 2006 and notified the public that certain previously issued financial statements should no longer be relied upon and that the Company will have to amend to restate such financial statements contained in the following periods: (i) Form 10-KSB for the year ended June 30, 2006; and (ii) the following quarterly reports: (a) Form 10-QSB for the quarter ended December 31, 2006; (b) Form 10-QSB for the quarter ended September 30, 2006; (c) Form 10-QSB for the quarter ended March 31, 2006; (d) Form 10-QSB for the quarter ended December 31, 2005; and (e) Form 10-QSB for the quarter ended September 30, 2005 (collectively, the "Financial Statements"). Further, the Company may have to restate the financial statements contained in this Form 10-QSB for the quarter ended March 31, 2007. The determination was made by the Company and following consultation with the Company's senior management, advisors and independent registered public accounting firm. Until such time as the Company files the restated Financial Statements with the Commission to address proper accounting treatment of certain items, the Financial Statements, including the financial statements contained in this Form 10-QSB, should not be relied upon.

The restatements of the Financial Statements relate to the accounting treatment of certain financing transactions; primarily the equity swap transaction between the Company and Cogent Capital Investments, LLC and with respect to the issuance of certain warrants to the AJW affiliates in the NIR transaction which may change the equity swap unrealized losses and warrant expenses, potentially affecting the net loss currently reflected in the aforementioned Financial Statements. The Company deems these transactions to be both complex and nonrecurring and the Company does not know at this time the exact impact the restatements may have on the Financial Statements.

However, the Company expects that the adjustments to the Financial Statements will be non-cash in nature and will not reflect any changes in the underlying performance of the Company's business, including revenues, operating costs and expenses, operating income or loss, operating cash flows or adjusted EBITDA.

Based on the foregoing, our Chief Executive Officer and our Chief Financial Officer reviewed and evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. The disclosure controls and procedures we reviewed and evaluated included, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Act is accumulated and communicated to our management, including our principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our Chief Executive Officer and our Chief Financial Officer determined that our disclosure controls and procedures during the period covered by this Report were effective and that the described restatement of prior financial reports arises from the differing interpretation taken by the SEC accounting staff in its review of the accounting guidelines with respect to the Cogent Capital Investments, LLC, AJW and NIR transactions. These transactions are complex, non-

recurring and unique and as such the accounting guidelines are not necessarily specific and are subject to interpretation. Accordingly, we do not believe that the restatement results from a failure of our controls and procedures.

Since the end of the period covered by this report, management has determined to retain the services of independent financial consultants experienced in the requirements of reporting to the SEC to assist management with preparing our reports whenever we undertake a complex, unique transaction where the accounting guidelines are not conclusive and are subject to interpretation. We believe that retaining additional consultants and advisors will assist us in making a more thorough review of all relevant accounting guidelines prior to the publication of our reports whenever we engage in unique, complex transactions.

23

# PART II- OTHER INFORMATION.

## Item 1. Legal Proceedings.

On January 10, 2007, the Company reached a binding and immediately enforceable settlement with InfoWeapons, Inc., InfoWeapons Corporation and Lawrence Hughes (collectively the "InfoWeapons Parties"), whereby the Company, InfoWeapons Acquisition Corporation, Alex Lightman (collectively the "Innofone Parties") and the InfoWeapons Parties agreed to the following material terms memorialized before the Honorable Margaret A. Nagle, United States Magistrate Judge for the Central District of California, and to be followed in writing hereafter: (i) unconditional cancellation and termination of the Merger Agreement in all respects; (ii) dismissal with prejudice of both Complaints against one another, with all parties to both Complaints including InfoWeapons Corporation granting full and complete general and mutual releases to the broadest extent permitted by law; (iii) Mr. Hughes is to return to the Company the 3,478,260 shares of the Company's Common Stock that he purchased for $4 million on April 27, 2007; (iv) Mr. Hughes is to cancel and terminate and forever forgive that certain promissory note issued to him by the Company on September 7, 2007 in the principal amount of $2 million; (v) the InfoWeapons Parties to pay the Company the sum of $180,000 on or before February 12, 2007; (vi) the termination of all agreements, contracts and obligations whatsoever between the Innofone Parties and the InfoWeapons Parties; and (vii) the mutual non-disparagement and non-solicitation of employees by and between the Innofone Parties and the InfoWeapons Parties; and (viii) certain other provisions that were read into the record at the conclusion of the settlement conference before Judge Nagle on January 10, 2007. Each of the material performance requirements of the settlement agreement with the InfoWeapons Parties has been satisfied.

On March 19, 2007, the Company filed a complaint in the United States District Court, Central District of California, ("California Complaint") against Cogent Capital Financial, LLC, Cogent Capital Investments, LLC, Cogent Capital Group, LLC, Gregory L. Kofford, Mark W. Holden (collectively, the "Cogent Defendants"), and Investors Bank & Trust Company (the "Escrow Agent") to rescind a $50 million equity swap financing transaction (the "Swap Transaction") dated as of June 2, 2006, and related agreements and amendments (the "Swap Transaction Documents"). The Swap Transaction was disclosed in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on June 8, 2006. The Company is suing the Cogent Defendants for: (i) violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, (ii) rescission of the Swap Transaction Documents based on illegality, (iii) rescission of the Swap Transaction Documents based on fraud or mistake, (iv) negligent misrepresentation, and (v) declaratory relief on the Swap Transaction and Swap Transaction Documents. The Company is suing the Escrow Agent solely in order to obtain complete relief in the action because the Escrow Agent is holding stocks, bonds, and cash which the Company and Cogent Defendants deposited with it pursuant to an escrow agreement underlying the Swap Transaction. The Swap Transaction was premised on the Securities and Exchange Commission (the "Commission") approving an effective registration statement for the Company's stock. The complaint alleges that during the negotiations of the Swap Transaction, the Cogent Defendants emphatically assured the Company that the Commission had approved these types of transactions before, that they had the experience to structure this transaction so that the Commission would approve the registration of the shares, and that they had been successful on prior occasions. As of the date of the Company's complaint, however, the Commission has repeatedly refused to approve the registration of the Swap Transaction securities, as a result of the existence of serious questions about what the Commission views as the fundamentally flawed structure and substance of the transaction. Despite our recent and repeated requests to the Cogent Defendants to accept the Commission's position on the Swap Transaction and rescind the transaction, the Cogent Defendants have refused to reasonably engage in a plan to do so, and insist on the Company continuing to pay interest and fees on bonds it can never access in the manner contemplated by the Swap Transaction. The Company filed its complaint against the Cogent Defendants alleging the above claims.

On March 19, 2007 two of the Cogent Defendants, Cogent Capital Financial, LLC and Cogent Capital Investments, LLC (the "Cogent Entities"), filed a Summons With Notice in the Supreme Court of New York, County of New York ("Summons"), giving notice of their claim that the Company breached the Securities Purchase Agreement and ISDA 2002 Master Agreement, as amended, underlying the Swap Transaction. The Cogent Entities thereafter filed a formal complaint against the Company seeking declaratory relief, interest and monetary damages related to an alleged breach by Innofone of its failure

to pay interest and perform under the Swap Transaction ("New York Complaint"). Although we hope to resolve this matter in an amicable fashion, we are demanding pursuant to our complaint that the Cogent Defendants rescind the Swap Transaction Documents, and are seeking in excess of $25,000,000 in damages.

24

On or about May 14, 2007, pursuant to a motion filed by Cogent Entities to remove the California Complaint to New York, the court in the California Complaint action ordered the transfer of the California Complaint and action to the District Court for the Southern District of New York. It is anticipated that the California Complaint and New York Complaint will be consolidated together with the Cogent Parties' New York Complaint action.

## Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.

Please refer to the Company's Current Reports on Form 8-K filed on January 17, 2007, March 16, 2007, March 21, 2007 and March 30, 2007 respectively.

## Item 3. Defaults Upon Senior Securities.

On May 25, 2006, the Company entered into a Letter Agreement the NIR Group for the repayment of convertible notes and warrants issued on or about August 31, 2005 and October 15, 2005 pursuant to a Securities Purchase Agreement by and between the Company and AJW Partners, LLC, New Millennium Capital Partners II, LLC, AJW Offshore, Ltd. and AJW Qualified Partners, LLC (collectively, the "NIR Group"). The repayment was applied to the outstanding principal and interest owing under the convertible notes and as consideration for the cancellation of the associated warrants for 1,000,000 shares of common stock issued to the NIR Group, and the termination of any and all Uniform Commercial Code filings in favor of the NIR Group. In connection with the repayment, the Company and the NIR Group executed and delivered the Letter Agreement, a new promissory note ("new notes"), a new stock purchase warrant ("new warrants"), and new registration rights agreement ("new registration agreement").

The terms of the repayment, as provided in the Letter Agreement are as follows: (a) upon signing of the Letter Agreement, the Company made a cash payment to the NIR Group in the amount of $2,635,400 which was applied to the repayment of all amounts of principal and interest owing and outstanding under previous convertible note balances; (b) the issuance of new notes in the aggregate amount totaling $1,200,000. The new notes are self-amortizing over a one year period commencing on July 1, 2006, with each installment payment due on the twelve consecutive monthly anniversaries beginning July 1, 2006. Further , pursuant to the new notes, the Company will pay to the NIR Group an aggregate of $100,000 per month. Additionally, the Company issued to the NIR Group new warrants for 750,000 shares of common stock with an exercise price of $1.79 and a term of five years. The new warrants may be exercised on a cashless basis only in the event that there is no effective registration statement covering the shares underlying the warrants. The Company may buy back all the new warrants from the NIR Group for an aggregate of $100,000 at any time prior to the new warrants being exercised. The fair value of the new warrants totaled $476,121 was determined using Black-Scholes option pricing model based on the following assumptions: term of 2 years, volatility rate of 229%, risk free interest rate of 3.5% and dividend yield of 0%. The fair value of the new warrants totaling $476,121 have been accounted for as debt discount which have been capitalized and amortized over the term new notes on a straight line basis. During the nine months ended March 31, 2007, the Company had made principal payments totaling $800,000 towards this loan.

As of March 31, 2007, the remaining balance on these notes totaled $400,000 and unamortized debt discount balance totaled $136,031.

We are delinquent on our monthly installment payments. Although we have not received any official notice of default under the repayment agreement with the NIR Group of funds, such notice can be anticipated should we be unable to re-establish payment under our agreed payment schedule shortly.

## Item 4. Submission of Matters to a Vote of Security Holders.

On March 1, 2007, the Company's Board of Directors adopted and approved the Innofone.com, Incorporated 2007 Stock Option Plan (the "Plan"). On March 2, 2007 a total of three (3) stockholders beneficially holding 44,922,903 shares of the

Company's 74,723,328 issued and outstanding shares of common stock entitled to vote on the Plan, approved the Plan by written consent of majority stockholders pursuant to Section 78.320 of the Nevada Revised Statutes and the Company's Bylaws. On or around March 22, 2007, the Company furnished a Schedule 14C information statement to its stockholders to provide them with certain information concerning the action in accordance with the requirements of the Securities Exchange Act of 1934, as amended, and the regulations promulgated thereunder, including Regulation 14C. The Definitive Schedule 14C information statement was filed on March 22, 2007, and is hereby incorporated by reference.

25

**Item 5. Other Information.**

In April 2007, Mr. Alexander Ramia, age 48, was appointed as the Company's Chief Technology Officer. Mr. Ramia will manage all of the Company's technology deployment and work closely with the Comany's subsidiaries to manage the development of new Internet Protocol version 6 (IPv6) products and applications. Mr. Ramia has over 18 years of experience in the telecommunications industry with AT&T and an additional five years of experience in consumer electronics with Panasonic. Mr. Ramia developed and deployed the first digital mapping system for AT&T buried assets in 1986. After his work with AT&T, Mr. Ramia was instrumental in building a multi-million dollar prepaid calling card platform for North American Digicom and United Online. Additionally, Mr. Ramia pioneered the business of white list web surfing, creating a safer Internet experience for children as well as developing several 'safe' children's web browsers. In 2000, Mr. Ramia was Assistant General Manager of KMERL, a division of Panasonic, where he managed a multi-million dollar Panasonic R&D lab focused on voice over Internet protocol, IPv6, network cameras and high definition power line communications. Mr. Ramia represented Panasonic in both the North and South American markets for IPv6 product development and adaptability and was responsible for all industry standard forums and interoperability testing of IPv6 consumer electronic products. Mr. Ramia's responsibilities included managing the test center that performed interoperability testing between Panasonic's internal consumer electronics products. Additional responsibilities included representing Panasonic at the Department of Commerce directly supporting the CTO of Panasonic, lobbying for IPv6 legislation and speaking at events, such as CES, around the world. Mr Ramia acted as Panasonic's liaison to all US-based telecommunication carriers, where he introduced "Powerline" communications consumer electronic devices for IPTV, IP cameras and general CE computing devices.

In connection with the appointment of Mr. Ramia, the Company entered into an employment agreement with Mr. Ramia whereby the annual compensation is $150,000. Additionally, Mr. Ramia is eligible to be issued an option to purchase 250,000 restricted shares of common stock.

There are no transactions, since the beginning of the Company's last fiscal year, or any currently proposed transaction, in which the Company was or is to be a participant and the amount involved exceeds the lesser of $120,000 or one percent of the average of the Company's total assets at year-end for the last three completed fiscal years, and in which Mr. Ambrose had or will have a direct or indirect material interest.

**Item 6.  Exhibits**

The exhibits required to be filed with this Quarterly Report are set forth on the Exhibit Index filed herewith, which immediately precedes such exhibits and is incorporated herein by reference.

SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INNOFONE.COM, INCORPORATED

Date: May 21, 2007                              By: /s/ Alex Lightman
                                                   _____

                                                   Alex Lightman
                                                   President, Chief Executive Officer, Principal
                                                   Financial Officer and Director

27

**EXHIBIT INDEX**

| Exhibit No. | Document | Method of Filing |
|---|---|---|
| 3.1 | Articles of Incorporation of Innofone.com, Incorporated, as amended | Incorporated by reference to Exhibit 3.1 to the Company's Annual Report on Form 10-KSB filed October 14, 2005. |
| 3.2 | Amended and Restated Certificate of Designation of Series A Convertible Preferred Stock of Innofone.com, Incorporated | Incorporated herein by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed June 8, 2006. |
| 3.2 | Bylaws, as amended | Incorporated by reference to Exhibit 3.1 to the Company's Annual Report on Form 10-KSB filed October 14, 2005. |
| 10.1 | Promissory Note issued to Lakewood Group LLC, dated January 16, 2007 | Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed January 17, 2007. |
| 10.2 | Subscription Agreement between Innofone.com, Incorporated and Lakewood Group LLC, dated January 16, 2007 | Incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed January 17, 2007. |
| 10.3 | Stock Purchase Agreement by and between Innofone.com, Incorporated, Alex Lightman and Lakewood Group LLC, dated January 16, 2007 | Incorporated herein by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed January 17, 2007. |
| 10.4 | Amendment to July 10, 2006 Promissory Note Issued to 55 South Investments | Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 6, 2007. |
| 10.5 | Amendment to July 14, 2006 Promissory Note Issued to 55 South Investments | Incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed March 6, 2007. |
| 10.6 | Amendment to August 30, 2006 Promissory Note Issued to Roland Pomfret | Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 16, 2007. |
| 10.7 | Amendment to September 5, 2006 Promissory Note Issued to Marvin Juelson | Incorporated herein by reference to Exhibit 10.2 to the Company's Current Report on Form 8-K filed March 16, 2007. |
| 10.8 | Amendment to September 6, 2006 Promissory Note Issued to David Pomfret | Incorporated herein by reference to Exhibit 10.3 to the Company's Current Report on Form 8-K filed March 16, 2007. |
| 10.9 | Amendment to September 6, 2006 Promissory Note | Incorporated herein by reference to Exhibit 10.4 to the |

Issued to Christopher Pomfret

Company's Current Report on Form 8-K filed March 16, 2007.

| | | |
|---|---|---|
| 10.10 | Amendment to September 6, 2006 Promissory Note Issued to Robert Sherlock and Pamela Pomfret | Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 21, 2007. |
| 10.11 | Amendment to September 6, 2006 Promissory Note Issued to Lloyd Pober | Incorporated herein by reference to Exhibit 10.1 to the Company's Current Report on Form 8-K filed March 30, 2007. |
| 10.12 | Employment Agreement dated April 2, 2007 between the Company and Alexander Ramia | Filed herewith. |
| 31.1 | Certification by the Chief Executive Officer and Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 | Filed herewith. |
| 31.2 | Certification by the Chief Executive Officer and Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith. |