10QSB 1 v056708.htm

FORM 10-QSB

———

SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

(Mark One)

☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2006

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period

from_____ to_____

Commission File Number 0-31949

INNOFONE.COM, INCORPORATED

———

(Exact name of registrant as specified in its charter)

| Nevada | 98-0202313 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 1431 Ocean Avenue, Suite 1100, Santa Monica, CA | 90401 |
|---|---|
| (Address of principal executive office) | (Zip Code) |

(310) 458-3233
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Securities Exchange Act of 1934) Yes ☐ No ☒

The number of shares outstanding of each of Issuer's classes of common equity as of November 1, 2006

| Common Stock at Par Value $0.001 | 74,435,328 |
|---|---|
| Title of Class | Number of Shares |

Transitional Small Business Disclosure format (check one): Yes ☐ No ☒

INNOFONE.COM, INCORPORATED
TABLE OF CONTENTS

Part I

Item 1    Financial Statements

Consolidated Balance Sheet  (Unaudited)                                          3

Consolidated Statements of Operations  (Unaudited)                              4

Consolidated Statement of Stockholders' Equity  (Unaudited)                     5

Consolidated Statements of Cash Flows  (Unaudited)                             6

Notes to Consolidated Financial Statements  (Unaudited)                        7


Item 2    Management's Discussion and Analysis                                 15


Part II

Items 1-6.   Other Information                                                 25

Signatures                                                                     26

INNOFONE.COM, INCORPORATED
CONSOLIDATED BALANCE SHEET
(UNAUDITED)

ASSETS

|  |  | September 30, 2006 |
|---|---|---:|
| Current assets |  |  |
| Cash | $ | 1,851,158 |
| Accounts receivable |  | 43,753 |
| Prepaid expenses and other assets |  | 248,040 |
| Total current assets |  | 2,142,951 |
|  |  |  |
| Fixed assets, net |  | 38,366 |
| Investment in U.S. Treasury Bonds - restricted |  | 50,142,086 |
| Unamortized debt discount and finance cost |  | 2,038,740 |
| Deposits for pending acquisitions |  | 80,000 |
| Goodwill |  | 1,607,500 |
| Other assets |  | 65,905 |
|  |  |  |
| Total assets | $ | 56,115,548 |

LIABILITIES AND STOCKHOLDERS' EQUITY

| Current liabilities |  |  |
|---|---|---:|
| Accounts payable and accrued liabilities | $ | 1,658,437 |
| Deferred revenue |  | 5,000 |
| Due to related party |  | 800,000 |
| Notes payable - short term |  | 3,105,000 |
| Total current liabilities |  | 5,568,437 |
|  |  |  |
| Long-term liabilities |  |  |
| Notes payable - long term |  | 1,000,000 |
| Liability on equity swap agreement |  | 13,246,887 |
| Total liabilities |  | 19,815,324 |
|  |  |  |
| Minority interest |  | (46,947) |
|  |  |  |
| Stockholders' equity |  |  |
| Preferred stock; $0.01 par value; 4,815,000 shares authorized, issued and outstanding |  | 48,150 |
| Common stock; $0.001 par value; 950,000,000 shares authorized, 74,435,328 issued and outstanding |  | 74,435 |
| Additional paid-in capital |  | 70,520,138 |
| Unamortized investment and loan fees paid with common stock and warrants |  | (11,850,400) |

| | |
|---|---:|
| Stock payable for 71,000 shares of common stock | - |
| Related party stock payable for 800,000 shares of common stock | 544,000 |
| Other comprehensive income | 143,515 |
| Accumulated deficit | (23,132,667) |
| Total stockholders' equity | 36,347,171 |
| | |
| Total liabilities and stockholders' equity | $    56,115,548 |

See accompanying notes to consolidated financial statements.

3

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENTS OF OPERATIONS
(UNAUDITED)

| | Three Months Ended September 30, | |
| --- | --- | --- |
| | 2006 | 2005 |
| Revenues | $ 26,547 | $ 50,020 |
| Cost of revenues | 24,793 | 914 |
| Gross profit | 1,754 | 49,106 |
| Operating expenses | | |
| Selling, general and administrative | 1,272,848 | 640,866 |
| Total operating expenses | 1,272,848 | 640,866 |
| Income (loss) from operations | (1,271,094) | (591,760) |
| Other income (expense) | | |
| Interest income | 2,221 | 2,274 |
| Interest expense and finance cost | (2,230,675) | -- |
| Unrealized loss on equity swap agreement | (9,123,261) | -- |
| Amortization expense of fee associated with equity swap agreement | (654,403) | -- |
| Other income (expense) | 11,265 | -- |
| Total other income (expense) | (11,994,853) | 2,274 |
| Net income (loss) before provision for income taxes | (13,265,947) | (589,486) |
| Provision for income taxes | -- | -- |
| Net income (loss) before minority interest | (13,265,947) | (589,486) |
| Loss applicable to minority interest | 6,819 | -- |
| Net income (loss) | $ (13,259,128) | $ (589,486) |
| Net income (loss) per common share - basic and diluted | $ (0.18) | $ (0.01) |
| Weighted average common shares outstanding - basic and diluted | 73,851,151 | 68,602,695 |

See accompanying notes to consolidated financial statements.

4

## INNOFONE.COM, INCORPORATED
## CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY
### (UNAUDITED)

| | Preferred Stock | | Common Stock | | Additional Paid-in l Capital | Unamortized Investment and Loan Fee | Stock Payable | Related Party Stock Payable | Other Comprehensive Income | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | | | |
| Balance, June 30, 2006 | 4,815,000 | $ 48,150 | 72,858,345 | $ 72,858 | $62,944,096 | $ (7,500,698) | $ 58,395 | $544,000 | $ -- | $ (9,873,539) | $ 46,293,262 |
| Issuance of common stock related to acquisition of Mobile Technology Group, Inc. net of $101,020 net liabilities acquired | -- | -- | 1,441,441 | 1,441 | 1,497,539 | -- | -- | -- | -- | -- | 1,498,980 |
| Issuance of common stock for services | -- | -- | 64,542 | 65 | 71,935 | -- | -- | -- | -- | -- | 72,000 |
| Issuance of common stock related to stock payable | -- | -- | 71,000 | 71 | 58,324 | -- | (58,395) | -- | -- | -- | -- |
| Issuance of warrants for 5,000,000 shares of common stock related to debt with 55 South Investments totaling $1,000,000 | -- | -- | -- | -- | 5,481,314 | (5,481,314) | -- | -- | -- | -- | -- |
| Issuance of warrants for 562,500 shares of common stock related to various debts totaling $375,000 | -- | -- | -- | -- | 448,145 | (448,145) | -- | -- | -- | -- | -- |
| Amortization of investment and loan fee paid with | | | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| common stock and warrants | -- | -- | -- | -- | -- | 1,579,757 | -- | -- | -- | -- | 1,579,757 |
| Vesting of employee stock options | -- | -- | -- | -- | 8,754 | -- | -- | -- | -- | -- | 8,754 |
| Minority interest | -- | -- | -- | -- | 10,031 | -- | -- | -- | -- | -- | 10,031 |
| Unrealized gain on US Treasury Bonds | -- | -- | -- | -- | -- | -- | -- | -- | 143,515 | -- | 143,515 |
| Net income (loss) | -- | -- | -- | -- | -- | -- | -- | -- | -- | (13,259,128) | (13,259,128) |
| Balance, September 30, 2006 | 4,815,000 | $ 48,150 | 74,435,328 | $ 74,435 | $70,520,138 | $ (11,850,400) | $ -- | $544,000 | $ 143,515 | $ (23,132,667) | $ 36,347,171 |

See accompanying notes to consolidated financial statements.

5

INNOFONE.COM, INCORPORATED
CONSOLIDATED STATEMENTS OF CASH FLOWS
(UNAUDITED)

|  | Three Months Ended September 30, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Cash flows from operating activities: | | |
| Net income (loss) | $ (13,259,128) | $ (589,486) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation | -- | 43,258 |
| Amortization of debt discount and finance cost | 1,698,580 | -- |
| Unrealized loss on equity swap agreement | 9,777,664 | -- |
| Stock based expenses | 80,754 | 191,503 |
| Changes in operating assets and liabilities: | | |
| Change in accounts receivable | 12,000 | 38,980 |
| Change in prepaid expenses | (36,200) | (39,348) |
| Change in other assets | 850 | -- |
| Change in accounts payable and accrued liabilities | 296,466 | 22,438 |
| Change in deferred revenue | 5,000 | 9,318 |
| Change in due to related parties | -- | 36,139 |
| Change in stock payable | -- | -- |
| Net cash used in operating activities | (1,424,014) | (287,198) |
| Cash flows from investing activities: | | |
| Purchase of fixed assets | - | (3,285) |
| Cash acquired through purchase of Digital Presence, Inc. | 300,000 | -- |
| Net cash used in investing activities | 300,000 | (3,285) |
| Cash flows from financing activities: | | |
| Proceeds from notes payable | 3,375,000 | 1,500,000 |
| Payments on notes payable | (500,000) | -- |
| Payments on related party notes payable | -- | -- |
| Net cash provided by (used in) financing activities | 2,875,000 | 1,500,000 |
| Net change in cash | 1,750,986 | 1,209,517 |
| Cash, beginning of period | 100,172 | 17,840 |
| Cash, end of period | $ 1,851,158 | $ 1,227,357 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid for interest | $ -- | $ -- |

See accompanying notes to consolidated financial statements

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

1.    BASIS OF PRESENTATION AND DESCRIPTION OF BUSINESS

Basis of presentation - The accompanying unaudited consolidated financial statements have been prepared in accordance with Securities and Exchange Commission requirements for interim financial statements. Therefore, they do not include all of the information and footnotes required by accounting principles generally accepted in the United States for complete financial statements. The financial statements should be read in conjunction with the Form 10-KSB/A for the year ended June 30, 2006 of Innofone.com, Incorporated (the "Company").

The interim financial statements present the balance sheet, statements of operations, stockholders' equity and cash flows of Innofone.com, Incorporated. The financial statements have been prepared in accordance with accounting principles generally accepted in the United States.

The interim financial information is unaudited. In the opinion of management, all adjustments necessary to present fairly the financial position as of September 30, 2006 and the results of operations, stockholders' equity and cash flows presented herein have been included in the financial statements. All such adjustments are the normal and recurring nature. Interim results are not necessarily indicative of results of operations for the full year.

Description of business - Innofone.com, Incorporated was incorporated on December 19, 1995. On August 19, 2005, the Company consummated a Stock Purchase Agreement (the "Agreement") with Alexander Lightman to acquire 100% of the outstanding capital stock of IPv6 Summit, Inc. ("IPv6"). The fundamental terms of the purchase agreement provide for the Company to deliver a promissory note in the sum of $1,000,000 as partial consideration of the purchase price and to issue 33,333,000 shares of restricted common stock of the Company to satisfy the balance of the purchase price in full (the "IPv6 Transaction"). As a result, IPv6 has become a wholly owned subsidiary of the Company. Prior to the IPv6 Transaction, the Company was non-operating public company with no operations or assets; 28,005,270 shares of common stock issued and outstanding; and IPv6 was a privately held operating company. The IPv6 Transaction is considered to be a capital transaction in substance, rather than a business combination. Inasmuch, the IPv6 Transaction is equivalent to the issuance of shares by a private company (IPv6) for the non-monetary assets of a non-operational public company, accompanied by a recapitalization. The accounting for IPv6 Transaction is similar to that resulting from a reverse acquisition, except goodwill is not recorded. Accordingly, the historical financial information of the accompany financial statements are that of IPv6 which the 33,333,000 shares issued by the Company are considered the historical outstanding shares of IPv6 for accounting purposes. The partial consideration of $1,000,000 promissory note has been accounted for as a distribution as if IPv6 had returned capital to its previous sole shareholder in the form of a distribution. The Company's operating activities are conducted through its wholly owned subsidiary, IPv6 Summit, Inc.

IPv6 Summit, Inc., a Nevada corporation located in Santa Monica, California was incorporated on July 9, 2003. The Company is among the leading organizers of IPv6 conference events in the world. IPv6 stands for Internet Protocol version 6 and is the successor protocol to the current Internet, Internet Protocol version 4, which was introduced in June 1973 and turned 33 years old last summer. IPv4 is a 32-bit protocol, while IPv6 is a 128-bit protocol allowing for 3.4 x 10 to the 38th power new IP addresses, and thus allowing for a vast increase in connecting people, places, and things to the Internet.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

The Company derives revenue from Sponsorships, Conference Attendee Fees, Training Fees, and Consulting to Governments.

Liquidity and capital resources - As of September 30, 2006, the Company had total current assets of $2,142,951 and total current liabilities of $5,568,437 resulting in a working capital deficit of $3,425,486. As of September 30, 2006, the Company had cash totaling $1,851,158. Our cash flow from operating activities for the three months ended September 30, 2006 resulted in a deficit of $1,424,014. Our cash flow from investing activities resulted in a surplus of $300,000. Our cash flows from financing activities resulted in a surplus of $2,875,000. Overall, the Company's cash flows for the three months ended September 30, 2006, netted a surplus of $1,750,986. The Company believes its current cash balance along with the cash flow from current operating activities will be sufficient to provide necessary capital for the Company's operations for the next twelve months. Additionally, the Equity Swap agreement, as more fully described in Note 8, should provide funds to the Company within the next twelve months.


2.    SIGNIFICANT ACCOUNTING POLICIES

Use of estimates - The preparation of consolidated financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Principles of consolidation - The accompanying consolidated financial statements include the accounts of Innofone.com, Incorporated and its subsidiaries, IPv6 Summit, Inc. Mobile Technology Group, Inc. and Digital Presence, Inc. The accompanying consolidated financial statements have been prepared in accordance accounting principles generally accepted in the United States. All material inter-company accounts and transactions have been eliminated in consolidation.

Revenue and expense recognition - The Company recognizes revenue from services provided once all of the following criteria for revenue recognition have been met: 1) pervasive evidence of an agreement exists, 2) the services have been delivered, 3) the price is fixed and determinable and not subject to refund or adjustment and 4) collection of the amounts due is reasonably. Overhead and administrative costs are recognized when incurred and direct event costs and expenses are recognized during the period in which the event they are associated with occurs.

Goodwill and intangible asset - In July 2001, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 141, "Business Combinations" and No. 142, "Goodwill and Other Intangible Assets." SFAS No. 141 requires all business combinations initiated after June 30, 2001 to be accounted for using the purchase method. Under SFAS No. 142, goodwill and intangible assets with indefinite lives are no longer amortized but are reviewed annually (or more frequently if impairment indicators arise) for impairment.

According to this statement, goodwill and intangible assets with indefinite lives are no longer subject to amortization, but rather an annual assessment of impairment by applying a fair-value based test. Fair value for goodwill is based on discounted cash flows, market multiples and/or appraised values as appropriate. Under SFAS No. 142, the carrying value of assets are calculated at the lowest level for which there are identifiable cash flows.

8

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

The Company has goodwill totaling $1,507,500 as of September 30, 2006, which in the opinion of management, no impairment is deemed necessary.

SFAS 142 requires the Company to compare the fair value of the reporting unit to its carrying amount on an annual basis to determine if there is potential impairment. If the fair value of the reporting unit is less than its carrying value, an impairment loss is recorded to the extent that the fair value of the goodwill within the reporting unit is less than its carrying value.

Stock based compensation - On January 1, 2006, the Company adopted SFAS No. 123 (R) "Share-Based Payment" which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors including employee stock options and employee stock purchases related to a Employee Stock Purchase Plan based on the estimated fair values.

The Company adopted SFAS No. 123(R) using the modified prospective transition method, which required the application of the accounting standard as of January 1, 2006. The accompanying consolidated financial statements as of and for the year ended June 30, 2006 reflect the impact of SFAS No. 123(R). In accordance with the modified prospective transition method, the Company's accompanying consolidated financial statements for the prior periods have not been restated, and do not include the impact of SFAS No. 123(R). Stock based compensation expense recognized under SFAS No. 123(R) for the three months ended September 30, 2006 totaled $8,574. Pro forma stock based compensation for the three months ended September 30, 2005 totaled $-0-.

Earnings (loss) per share - The Company reports earnings (loss) per share in accordance with SFAS No. 128, "Earnings per Share." Basic earnings (loss) per share is computed by dividing income (loss) available to common shareholders by the weighted average number of common shares available. Diluted earnings (loss) per share is computed similar to basic earnings (loss) per share except that the denominator is increased to include the number of additional common shares that would have been outstanding if the potential common shares had been issued and if the additional common shares were dilutive. Diluted earnings (loss) per share has not been presented since the effect of the assumed exercise of options and warrants to purchase common shares would have an anti-dilutive effect.

3.  UNAMORTIZED DEBT DISCOUNT AND FINANCE COST

As of September 30, 2006, unamortized debt discount and finance cost totaling $2,038,740 consist of the following:

| | |
|---|---:|
| Debt discount related to 55 South Investment notes payable, see Note 7 | $      65,882 |
| Investment fee related to equity swap agreement, see note 8 | 1,338,105 |
| Debt discount related to NIR Group notes payable, see Note 7 | 340,085 |
| Debt discount related to Alex Lightman note payable see Note 6 | 294,668 |
| | $ 2,038,740 |

Unamortized debt discount and finance cost are being amortized over the term of the related agreements on a straight line basis.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

4.   UNAMORTIZED INVESTMENT AND LOAN FEES PAID WITH COMMON STOCK AND WARRANTS

As of September 30, 2006, unamortized investment and loan fees paid with common stock and warrants totaling $11,850,400 consist of the following:

| | |
|---|---:|
| Debt discount related to 55 South Investment notes payable, see Note 7 | $  4,514,023 |
| Investment fee related to equity swap agreement, see note 8 | 6,951,000 |
| Debt discount related to various notes payable see Note 7 | 385,377 |
| | $  11,850,400 |

Unamortized investment and loan fees are being amortized over the term of the related agreements on a straight line basis.

5.   BUSINESS ACQUISITIONS COMPLETED

On March 7, 2006, the Company entered into a Common Stock Purchase Agreement to purchase a total of 66.67% of the outstanding common stock of Digital Presence, Inc. ("Digital") in consideration of cash totaling $300,000 made in installment payments. The payment terms for the purchase are as follow: (a) $50,000 which was due on the initial closing on March 7, 2006; (b) $125,000 due on second closing of May 15, 2006; and (c) $125,000 due on third closing of June 15, 2006. As of September 10, 2006, the Company made all the required payments and completed the acquisition. The Company has accounted for this acquisition under purchase accounting and have allocated the entire purchase price towards the assets acquired which principally consists of cash. Accordingly, there was no goodwill recognized in this acquisition. The 33.33% of the outstanding common stock of Digital which was not acquired has been accounted for as minority interest on the accompanying balance sheet.

On April 21, 2006, the Company entered into a Non-binding term sheet to acquire all the outstanding capital of Mobile Technology Group, LLC in consideration of $7,500 in cash payable on execution and shares of the Company's common stock equal in value of $1,600,000. The Company completed its acquisition of Mobile Technology Group, LLC in August 4, 2006. The Company has accounted for this acquisition under purchase accounting and have allocated the entire purchase price $1,607,500 towards goodwill since the purchase price exceeded the fair value of assets and liabilities acquired.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

6.    DUE TO RELATED PARTY

Due to related party as of September 30, 2006 are comprised of the following transactions with Alex Lightman, the Company's Chief Executive Officer, President and shareholder:

| | | |
|---|---|---:|
| Note payable to Alex Lightman related to Stock Purchase Agreement(see Note 1 for detailed discussion), interest rate at 4%, payable in monthly installment payments of $83,333 (principal only) for each successive month starting on the date of execution of the note contingent upon certain conditions having been met, and ending October 17, 2006 which any unpaid principal and interest would be due at that date | $ | 400,000 |
| Note payable to Alex Lightman, interest rate at 5%, unsecured and principal and interest due at maturity on April 17, 2007 | | 400,000 |
| | $ | 800,000 |

7.    NOTES PAYABLE

On May 25, 2006, the Company entered into a Letter Agreement the NIR Group for the repayment of convertible notes and warrants issued on or about August 31, 2005 and October 31, 2005 pursuant to a Securities Purchase Agreement by and between the Company and AJW Partners, LLC, New Millennium Capital Partners II, LLC, AJW Offshore, Ltd. and AJW Qualified Partners, LLC (collectively, the "NIR Group"). The repayment was applied to the outstanding principal and interest owing under the convertible notes and as consideration for the cancellation of the associated warrants for 1,000,000 shares of common stock issued to the NIR Group, and the termination of any and all Uniform Commercial Code filings in favor of the NIR Group. In connection with the repayment, the Company and the NIR Group executed and delivered the Letter Agreement, a new promissory note ("new notes"), a new stock purchase warrant ("new warrants"), and new registration rights agreement ("new registration agreement").

The terms of the repayment, as provided in the Letter Agreement are as follows: (a) upon signing of the Letter Agreement, the Company made a cash payment to the NIR Group in the amount of $2,635,400 which was applied to the repayment of all amounts of principal and interest owing and outstanding under previous convertible note balances; (b) the issuance of new notes in the aggregate amount totaling $1,200,000. The new notes are self-amortizing over a one year period commencing on July 1, 2006, with each installment payment due on the twelve consecutive monthly anniversaries beginning July 1, 2006. Further , pursuant to the new notes, the Company will pay to the NIR Group an aggregate of $100,000 per month. Additionally, the Company issued to the NIR Group new warrants for 750,000 shares of common stock with an exercise price of $1.79 and a term of five years. The new warrants may be exercised on a cashless basis only in the event that there is no effective registration statement covering the shares underlying the warrants. The Company may buy back all the new warrants from the NIR Group for an aggregate of $100,000 at any time prior to the new warrants being exercised. The fair value of the new warrants totaled $476,121 was determined using Black-Scholes option pricing model based on the following assumptions: term of 2 years, volatility rate of 229%, risk free interest rate of 3.5% and dividend yield of 0%. The fair value of the new warrants totaling $476,121 have been accounted for as debt discount which have been capitalized and amortized over the term the new notes on a straight line basis. During the three months ended September 30, 2006, the Company had made principal payments totaling $500,000 towards this loan. As of September 30, 2006, the remaining balance on these notes totaled $700,000 and unamortized

debt discount balance totaled $340,085.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

In July 2006, the Company issued two promissory notes (the "Notes") to 55 South Investments ("Holder") totaling $1,000,000, with interest at 12% per annum. The Maturity Date shall be the earlier of: (a) one (1) year from the commencement of that certain Equity Swap transaction, as discussed in Note 7, whereby 30 days have expired thereafter the date in which the Company is granted effectiveness by the Securities and Exchange Commission on a registration statement filed pursuant to certain agreements made in connection with an equity swap made by and between the Company and Cogent Capital Group, LLC and its affiliates as of June 2, 2006 (defined herein as the "Swap Start Date"); or (b) December 1, 2007, whichever is earlier. Repayment of the principal amounts of the Notes by the Company shall commence within ten (10) days of the Swap Start Date and shall continue thereafter in equal pro rata monthly installments on the same date of each subsequent month thereafter for the successive eleven (11) months thereafter the Swap Start Date and continue until all principal payments are paid in full. The principal shall be repaid in full no later than the maturity date. Should the Swap Start Date not occur prior to the maturity date, then the entirety of principal shall be due and payable on the maturity date. Further the Company may, at its option, prepay all amounts owing under the Notes prior to the maturity date, in whole or in part, without payment of any premium or penalty, after giving written notice thereof to the Holder at least one (1) day prior to the date selected for prepayment. In connection with the Notes, the Company issued (i) a five-year warrants to 55 South Investments for the right to purchase up to 4,000,000 shares of common stock at $1.00 per share; and (ii) a five year warrants to Millennium Investment Services, Inc., an affiliate of 55 South, for the right to purchase 1,000,000 shares of common stock at $1.00 per share. The Company has the right to redeem 1,400,000 of such warrants for $250,000 until July 13, 2007. The note is secured with approximately $4,000,000 worth of the Company's restricted common stock and $4,000,000 worth of restricted common stock owned by Alex Lightman, the Company's Chief Executive Officer and President. Further, the Company has agreed to pay to 55 South approximately $40,000 representing an origination fee and a due diligence fee. The fair value of the warrants totaled $5,481,314 using the Black-Scholes option pricing model which will be capitalized and amortized on a straight line basis over the term of the Notes. Additionally, the Company agreed to a pay 4% loan fee and 4% due diligence totaling $80,000 which has been capitalized as loan fees and amortized over the life of the loans. For the three months ended September 30, 2006, the Company amortized 981,408 as finance cost.

In September 2006, the Company received a loan from a shareholder totaling $2,000,000. The loan is secured with the Company's assets, annual interest rate of LIBOR plus 1%, maturing November 7, 2006 with both principal and interest due at maturity.

During the three months ended September 30, 2006, the Company borrowed a total of $375,000 from eleven individuals through various promissory notes. These promissory notes have interest rates ranging from 10% to 12%, maturities from March, 2007 through September 2007, all secured by shares of the Company's common stock collectively totaling $1,400,000 with principal and unpaid interest due at maturity. The Company also issued warrants to these promissory note holders for shares of the Company's common stock collectively totaling 562,500 shares. The value of these warrants totaled $448,145 under the Black Scholes options pricing model using the following assumptions: exercise price of $1.00; closing stock price on date of grant; life of 3 years; volatility rate ranging from 237% to 241%, no dividend yield rate; and discount rate of 3.5%. The value of the warrants totaling $448,145 have been accounted for as loan fees and have been capitalized which will be amortized over the life of the loans. For the three months ended September 30, 2006, the Company amortized $62,768 as finance cost. The unamortized loan fees as September 30, 2006 totaled $385,377.

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

8.  EQUITY SWAP AGREEMENT

On June 2, 2006, the entered into a securities purchase agreement with Cogent Capital Investments LLC ("CCI") for the sale of 1,850,000 shares of common stock ("Common Stock") and 4,815,000 shares of Series A Convertible Preferred Stock ("Preferred Stock") for an aggregate purchase price of $50,000,000, which was paid in the form of U.S. Treasury Bonds. The Preferred Stock issued to CCI has no voting rights, no dividend rights and each share of Preferred Stock is convertible into ten (10) shares of common stock.

Concurrently with the consummation of the securities purchase agreement, the Company entered into an equity swap agreement ("Equity Swap") with Cogent Capital Financial LLC ("CCF") an affiliate of CCI which such transaction is considered to be a derivative. The Equity Swap is a fixed versus floating price swap with respect to a notional stock amount of 37,500,000 shares of common stock , with Cogent being the floating equity payor and the Company being the fixed equity price payor. The fixed price under the Equity Swap is $1.333 per share. The Equity Swap has a maturity date of December 2, 2010, through certain conditions this date can be extended, and provides for periodic settlements and reductions of the notional amount of the Equity Swap over a 30 month period beginning one month after the Trigger Date, provided that the Company has satisfied certain conditions. The Trigger Date is the first date as of which the Resale Condition has been satisfied with respect to at least 10,000,000 shares. The Resale Condition shall be deemed satisfied as of any day with respect to the number of equity shares that, as of such day, are then subject to an effective resale registration statement under the Securities Act of 1933, as amended, with the holders of such shares being named therein as selling shareholders or fully eleigible for resale under Rule 144 adopted under the Securities Act of 1933. The Company agreed to pay CCF an amount equal to the decrease in value of the notional stock amount of 37,500,000 below $1.333 per share at each settlement date during the 30 month period beginning one month after the Trigger Date. Under the terms of the Equity Swap, the Company agreed to pay CCF an amount equal to in interest on $50,000,000, at Libor plus 1.45%, up through the Trigger Date then decreasing for the next 30 months based upon the decrease value in the notional stock amount. Among these conditions is a requirement that the Company maintain an effective registration statement with respect to specified portions of the Common Stock purchased by CCI and the Common Stock into which the Preferred Stock purchased is convertible. To secure the Company's performance of the Equity Swap, the Company has pledged to CCF, and deposited in a collateral account subject to a lien in favor of CCF, the $50,000,000 in U.S. Treasury Bonds. As the notional amount of the Equity Swap is reduced, corresponding portion of the pledged U.S. Treasury Bonds are to be released to the Company, subject to any partial settlement of the Equity Swap resulting from the reduction in the notional amount. In the event the Company is required pay an amount equal to the decrease in value of the notional stock during each settlement date, it would do so through the liquidation of the U.S. Treasury Bonds which would then be recorded within the statement of operations as part earnings (loss).

13

INNOFONE.COM, INCORPORATED
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
SEPTEMBER 30, 2006
(UNAUDITED)

Since the Equity Swap is considered to be a derivative transaction, the Equity Swap is recorded at fair value at the end of each reporting period. Effective changes in fair value of the Equity Swap is recorded within the statement of operations as part earnings (loss). As of September 30, 2006, the Company recorded a liability on equity swap agreement of $13,246,887 and recorded an unrealized loss on equity swap agreement of $9,123,261 for the three months ended September 30, 2006 reflected within the statements of operations. The fair value of the Equity Swap is determined using Black-Scholes based on the following assumptions: stock price of $0.89 based upon the date of this reporting period; term based upon the settlement period; volatility rate of 241%; discount rate of 3.5% and no dividends.

In connection with and as consideration to CCF under the Equity Swap as its fee, the Company is obligated to pay to CCF an amount consisting of: (i) $1,375,000 (which $568,750 was paid at closing); (ii) 5,000,000 shares of common stock and (iii) warrant for 5,000,000 shares of common stock with an exercise price of $1.20 and term of 5 year. The fair value of the common stock and warrant given as consideration totaled $7,683,641. In addition, the Company paid CCF $103,000 as an initial fee. Collectively, the value of cash, common stock and warrant totaled $9,161,641. The Company has accounted for the fee to CCF as an investment fee which has been capitalized and shall be amortized over the term of the Equity Swap on a straight line basis. As of September 30, 2006, the Company had amortization expense of $654,403 and unamortized fee balance of $8,289,105 which $1,338,105 is included within "unamortized debt discount and finance cost" of $6,938,141 and $6,951,000 is reflected within the stockholders' equity section as "unamortized fee associated with equity swap agreement paid with common stock and warrants". The fair value of the warrants has been determined using Black-Scholes based on the following assumptions: stock price based on the date of grant; term of 3 years; volatility rate of 229%; discount rate of 3.5% and no dividends.

14

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS**

**Forward-Looking Statements**

The information set forth in this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") contains certain "forward-looking statements" including, among others (i) expected changes in the Company's revenues and profitability, (ii) prospective business opportunities and (iii) the Company's strategy for financing its business. Forward-looking statements are statements other than historical information or statements of current condition. Some forward-looking statements may be identified by use of terms such as "believes", "anticipates", "intends" or "expects". These forward-looking statements relate to the plans, objectives and expectations of the Company for future operations. Although the Company believes that its expectations with respect to the forward-looking statements are based upon reasonable assumptions within the bounds of its knowledge of its business and operations, in light of the risks and uncertainties inherent in all future projections, the inclusion of forward-looking statements in this report should not be regarded as a representation by the Company or any other person that the objectives or plans of the Company will be achieved.

**1. Overview**

You should read the following MD&A in conjunction with the Consolidated Financial Statements and Notes thereto, and the other financial data appearing elsewhere in this Quarterly Report on Form 10-QSB.

The Company's revenues and results of operations could differ materially from those projected in the forward-looking statements as a result of numerous factors, including, but not limited to, the following: the risk of significant natural disaster, the inability of the Company to insure against certain risks, inflationary and deflationary conditions and cycles, currency exchange rates, changing government regulations domestically and internationally affecting the New Internet, including various taxing authorities, VAT, OSHA, and general market conditions, competition and pricing, changes in external competitive market factors, termination of certain agreements, protocol, or inability to enter into strategic agreements, inability to satisfy anticipated working capital or other cash shortage requirements, changes in or developments under domestic or foreign laws, regulations, governmental requirements or in the IT industry, changes in the Company's business strategy or an inability to execute its strategy due to unanticipated changes in the market. In light of these risks and uncertainties, there can be no assurance that actual results, performance or achievements of the Company will not differ materially from any future results, performance or achievements expressed or implied by such forward-looking statements.

The Company is currently reviewing and implementing new disclosure controls and procedures to ensure that they fully comply with the new Securities Exchange Act Rules 13a-15 and 15d-15.

The Company currently operates two wholly-owned subsidiaries and supports the management of a majority-owned start-up subsidiary as well as operating a consulting division.

One of our two wholly-owned subsidiaries is IPv6 Summit, Inc., which is operated from our Santa Monica, California headquarters and is dedicated to the provision of IPv6-related conferences.

Our other wholly-owned subsidiary is Mobile Tech Acquisition Corp., Inc. ("Mobile Tech"). Mobile Tech is a recently acquired business completed in August 2006 which is developing and marketing mobile SMS and ticketing and transaction services and products from its Las Vegas, Nevada headquarters.

Through our v6 Transition division, we have performed professional services related to IPv6 including IPv6 trainings, workshops, and the provision of other consulting services such as the drafting of corporate transition plans and other business plans.

We support the management of Digital Presence, Inc., a Delaware corporation in which we purchased approximately 66.67% of the total issued and outstanding common shares for $300,000. Digital Presence, Inc. and our v6 Transition division are both managed by James Bacchus, our Vice President of Consulting. Digital Presence is a start-up corporation, recently formed for the purpose of creating a scalable addressable IPv6 identity registry.

Further to our business of acquiring companies in the IPv6 industry, we entered into a Merger Agreement on or about August 16, 2006 with InfoWeapons, Inc. ("InfoWeapons") in which we agreed to acquire all of InfoWeapons, for $8,500,000 worth of our common stock and other consideration. On October 4, 2006, we filed a complaint in the United States District Court, Central District of California, against InfoWeapons, and Lawrence Hughes ("Hughes"), alleging that InfoWeapons and Hughes have failed to perform their obligations under that certain Agreement and Plan of Merger, dated August 16, 2006 (the "Merger Agreement") and that each had wrongfully misappropriated trade secrets of our Company. Under the terms of the Merger Agreement we acquired InfoWeapons and its assets (including but not limited to InfoWeapons' subsidiary, InfoWeapons Corp.) with the only non-administrative outstanding item subsequent to execution being the delivery by InfoWeapons of its financial statements in accordance with US Generally Accepted Accounting Principles (GAAP). Despite our recent and repeated requests, InfoWeapons has failed to deliver its US GAAP financial statements as required by the Merger Agreement.

The above-mentioned business divisions and subsidiaries are largely focused on exploiting what we anticipate to be a major shift in the way business is done on the Internet given the upgrade of the infrastructure of the Internet to Internet Protocol version 6 (IPv6). The Internet as we know it today is based on Internet Protocol version 4, more commonly referred to as IPv4, a 33-year-old protocol. The IPv4 based Internet is beginning to receive a major upgrade, with a new format established in computer operating systems for packets of data called Internet Protocol version 6, or IPv6 (also called the "New Internet" when referring to a fully implemented IPv6 network environment). Simply put, one of the limitations of today's Internet is a shortage of addresses, so that the hardware or software equivalents of "middle men" are put into the system to let many people use one address, not unlike the old telephone party lines, where many people had the same "number," and everyone could listen in. The party line system had the advantage that a lot of people could be connected with few switched lines, but led to problems, such as lack of security. There was no way to assure that one person would be speaking with only one person at the other end. When every phone user received their own address, it led to many great new capabilities - such as enhanced privacy, the ability to deliver new services such as telefax messages to a particular person, and the ability to go mobile with cell phones, and caller ID, which enabled people to screen their calls, accepting only those they wanted to at that moment.

The advantages of IPv6 over the existing IPv4 are significant and can be summarized as that which provides greater security, mobility, and *ad hoc* networking capability which is a temporary network link initiated for a particular purpose. Specifically, IPv6 will give everyone his or her personal address (or thousands of them, as needed), which enables the potential for "end-to-end" connectivity. Each individual can know for certain who the specific receiver at the other end is which in turn allows the system to check for service quality and much easier mobile use and roaming. Furthermore, this connectivity facilitates multiple layers of individual security measures rather than today's firewalls or Network Address Translation, which offer little protection once a hacker has broken through the protective wall.

One new feature of IPv6 is the vast increase of trillions of Internet addresses, resulting in what will seem to be almost unlimited Internet Protocol (IP) address availability and which will enable each customer to have many such addresses for each cell phone, game console, home appliance, consumer electronics and automobiles in the household and/or at the office. Doing this today in the IPv4 environment is difficult and costly.

IPv6 is also more secure for wired and wireless communications in part because greater identity is possible with more addresses and in part because currently there are no known cases of spoofing an IPv6 address as occurs in IPv4. While being more secure, IPv6 will also provide greater access to mobile wireless online service, television and voice over Internet protocol (or "VoIP") given its structure resulting in more mobile online users with greater overall trust in a secure network. Ultimately, even advanced online connections such as smart tags which utilize Radio Frequency Identification (RFID) to enable real-time inventory tracking will be able to be deployed in IPv6 efficiently and broadly. To do so under an IPv4 system would not be practical from a cost perspective.

We believe that IPv6 will present many new business opportunities in roughly the same manner that the existing Internet did when it first reached the mainstream in the mid-1990s. Our initial goal was to address such business opportunities by initially focusing on training, consulting, conference management and testing all related specifically to IPv6 so as to become on of the known experts in this new field. By developing expertise and leadership in each of these areas, Innofone has gained the credibility required in this newly developing IPv6 environment to allow for our current expansion through the strategic acquisitions we have closed. We are currently filling a void in our areas of expertise related to IPv6 in the United States. There are few domestic competitors providing services to American businesses seeking advice on how to transition from IPv4 to IPv6. There are few competitors which understand the U.S. government's role in supporting IPv6. There are few competitors providing credible testing facilities for IPv6 enabled products. There are few competitors providing training to employees in American businesses on the IPv6 environment and its advantages, product possibilities and/or network solutions. By doing business in these areas with sparse competition and by holding regular summit conferences throughout the country, Innofone intends to take and maintain the lead in all business specifically related to IPv6.

Innofone currently offers and manages these services from two corporate centers: our corporate headquarters offices in Santa Monica, California and virtually through our Eastern seaboard based employee, James Bacchus.

## 2. Business Combination

On August 8, 2005, Innofone.com, Incorporated entered into a stock purchase agreement with Mr. Alex Lightman, our Chief Executive Officer and President, to purchase 100% of the issued and outstanding shares of IPv6 Summit Inc. ("IPv6 Summit"), an entity engaged in providing conference management services related to Internet Protocol version 6 or IPv6. At the time of the Agreement, Mr. Lightman was the President, Treasurer, Director and sole shareholder of IPv6 Summit, and was neither an officer nor a director of Innofone. Pursuant to the Agreement, on October 12, 2005, which was amended on October 17, 2005, we issued to Mr. Lightman a promissory note in the principal face amount of $1,000,000 with interest at the rate of 4% per annum. Further, we issued to Mr. Lightman approximately 33,333,000 shares of our restricted common stock. As a result of the stock purchase agreement, IPv6 Summit became a wholly-owned subsidiary of Innofone. IPv6 has been accounted for as the accounting acquirer similar to a reverse merger transaction and the historical accounting information of IPv6 is now that of Innofone. As of September 30, 2006, we had made payments against Mr. Lightman's promissory note totaling $600,000 and, accordingly, our current balance owed to him totals $400,000.

**3. Current Business Operations**

 We currently employ nine individuals in our Santa Monica, California headquarters offices located at 1431 Ocean Avenue, Suite 1100, Santa Monica, California 90401 and employ one individual on the Eastern seaboard in and around the Northern Virginia area.

Innofone operates its wholly owned subsidiary, IPv6 Summit, Inc., in Santa Monica, California and its division styled as "v6 Transition" which is based in Clifton, Virginia and is managed by James Bacchus as Vice President of Consulting.

On August 4, 2006, we closed the acquisition of Mobile Technology Group, LLC ("MTG"), a mobile SMS service and ticketing provider based in Las Vegas, Nevada. We intend for MTG to serve as our mobile division and seek growth through acquisitions in being the leading provider of IPv6 based technology for mobile telephony.

Innofone anticipates seeking certain other strategic acquisitions and investments over the next twelve months in an effort to increase overall operations. Our ability to execute this goal will be largely based upon whether we can raise adequate capital to successfully close such acquisitions.

IPv6 Summit, Inc. is currently our primary source of revenue and focus of operations. IPv6 Summit, Inc. organizes and produces conference events related to IPv6 technology and the transition from IPv4 to IPv6.

v6 Transition has begun organizing trainings, workshops, and consulting services related to IPv6. v6 Transition has announced a three-year series of Federal Chief Information Officer IPv6 Workshops with the first event having taken place in Arlington, Virginia on May 17, 2006 and our second event, the Federal IPv6 Summit took place May 17, 2006 through May 19, 2006 in Reston, Virginia. v6 Transition has consulting projects with Juniper Networks.

A final core activity of this quarter was planning and research related to further development of our strategy for potential mergers and acquisitions of technology companies. On September 10, 2006, we completed an investment in Digital Presence, Inc., a Delaware start-up corporation, recently formed for the purpose of creating a scalable addressable IPv6 identity registry. On March 7, 2006, Innofone entered into a Common Stock Purchase Agreement to purchase a total of 66.67% of the outstanding common stock of Digital Presence, Inc. in consideration of cash totaling $300,000 made in installment payments. The payment terms for the purchase are as follow: (a) $50,000 which was due on the initial closing on March 7, 2006; (b) $125,000 due on second closing of May 15, 2006; and (c) $125,000 due on third closing of June 15, 2006 or on such other date as Digital Presence and the Company mutually agree upon. As of June 30, 2006, we had paid the initial and second closing payments totaling $175,000, of which $125,000 was treated as a deposit since the related shares were not received. We made the third and final payment of $125,000 on September 8, 2006.

We executed a Merger Agreement on or about August 16, 2006 ("Merger Agreement") with InfoWeapons, Inc. to acquire all of the issued and outstanding capital stock of InfoWeapons, Inc. ("InfoWeapons") for $8,500,000 of common stock of the Company and other consideration. InfoWeapons is a producer of IPv6 dual-stack servers and routers software, based in the Philippines and Georgia (USA). A shareholder of the Company is also the Chairman of InfoWeapons. On October 4, 2006, we filed a complaint in the United States District Court, Central District of California, against InfoWeapons and Lawrence Hughes ("Hughes") alleging that InfoWeapons and Hughes have failed to perform their obligations under the Merger Agreement and that each had wrongfully misappropriated trade secrets of our Company. Under the terms of the Merger Agreement, we acquired InfoWeapons and its assets (including but not limited to InfoWeapons' subsidiary InfoWeapons Corp.) with the only non-administrative outstanding item subsequent to execution being the delivery by InfoWeapons of its financial statements in accordance with US Generally Accepted Accounting Principles (GAAP). Despite our recent and repeated requests, InfoWeapons has failed to deliver its US GAAP financial statements as required by the Merger Agreement.

Although we hope to resolve this matter in an amicable fashion, we are demanding pursuant to the complaint that InfoWeapons perform its obligations under the Merger Agreement and are seeking approximately $20,000,000 in damages related to our tradesecret misappropriation claim.

**4. Future Business Operations**

We anticipate that our principal business activities for the coming months will include the refinement of our strategic approach to realizing the potential of the IPv6 industry and as such intend to focus on the following areas of business growth:

1.  Organic growth, via our existing business divisions:

A.      Conferences, including the U.S. IPv6 Summit, Coalition Summit for IPv6, as well as anticipated events in Asia starting in 2007.

B.      Training, including the one day Federal Chief Information Officer IPv6 Transition Workshops and anticipated five day and customized trainings for both technology and business aspects of IPv6.

C.      Consulting, including IPv6 Transition Plans, Project Plans and other types of IPv6 related consulting engagements.

D.      Testing, including the proposed establishment of what could become the first for-profit IPv6 test business in the US, in association with a leading test equipment manufacturer. This is dependent on the success of our Teaming Agreement with Spirent Federal which has recently sent us notice of its intent to terminate our Teaming Arrangement. We are in discussions with Spirent Federal in the hopes of continuing this relationship with a goal to launch a test center by December 31, 2006. There is no assurance we will be successful in reaching this goal.

2. Product Development and new Organic Growth Areas. Innofone has initiated the development of an internal research and development capability that we anticipate will generate a new products at regular intervals starting in the near future. Innofone also intends to develop new centers for revenue in 2007 related to IPv6 for mobile applications and Internet applications.

19

3. Strategic Mergers and Acquisitions: Innofone is considering the potential for acquisition of several companies which Management believes could lead to the consummation of certain transactions that could result in the positioning of Innofone for accelerated growth in areas such as secure Internet applications, video-over-IPv6, and mobile phone applications such as mobile TV that will be potentially enhanced by using IPv6. We have started on this path via the acquisition described hereinabove.

## 5. Results of Operations

On August 8, 2005, Innofone purchased 100% of the issued and outstanding shares of IPv6 Summit, Inc. As a result, IPv6 has been accounted for as the accounting acquirer similar to a reverse merger in that the historical accounting information is that of IPv6. Accordingly, the results of operation discussion for the years ended June 30, 2006 and 2005 are that of IPv6.

### For the Quarters Ended September 30, 2006 and 2005

Revenues and Cost of Revenues

Innofone derives revenues primarily from attendance fees of summit conferences held, corporate sponsorships related to such summits, consulting fees, and fees for mobile technology services. Attendance fees are recognized when the conference has been held. Cost of revenues primarily relate to summit conference room rentals, food accommodations, advertising, and fees for access to mobile telephone lines. For the quarters ended September 30, 2006 and 2005, the revenues were $26,547 and $50,020, respectively The decrease in revenues compared to the prior year of $23,473 primarily related to the decrease in consulting revenues of $50,000, offset by the addition of the revenues from the new subsidiary. There were no conferences held in the first quarters of 2006 or 2005.

We currently have two conferences scheduled over the next 12 months: (i) Asia IPv6 Summit booked for February 19-21, 2007 at the Makati Shangri-la Hotel with projected attendees of 500 people; and (ii) US IPv6 Summit booked for March 27-29, 2007at the Hyatt Reston in Virginia with projected attendees of 700 people. We are in the process of re-organizing our Consulting division.

Selling, General and Administrative Expenses

Selling, general and administrative expenses totaled $1,272,848 and $640,866 for the quarters ended September 30, 2006 and 2005, respectively. The increase of $631,982 primarily related to an increase in payroll expenses by approximately $300,000 and increase in professional fees such as legal and accounting by $300,000. The increase in payroll expense primarily related to the hiring of certain company officers which were not present in the previous year. The increase in professional fees primarily related to costs associated with filings with the Securities and Exchange Commission. The Company anticipates such level of expenses for payroll and professional fees to continue for the next twelve months.

Net Loss

Net losses totaling $13,259,128 and $589,486 for the quarters ended September 30, 2006 and 2005, respectively, increased by $12,669,642 as result of the factors previously mentioned above, and costs related to the various debt agreements entered into by the company.

## 6. Liquidity and Capital Resources

As of September 30, 2006, the Company had total current assets of $2,142,951 and total current liabilities of $5,568,437 resulting in a working capital deficit of $3,425,486. As of September 30, 2006, the Company had cash totaling $1,851,158. Our cash flow from operating activities for the quarter ended September 30, 2006 resulted in a deficit of $1,424,014. Our

cash flow from investing activities resulted in a surplus of $300,000. Our cash flows from financing activities resulted in a surplus of $2,875,000. Overall, the Company's cash flows for the quarter ended September 30, 2006 netted a surplus of $1,750,986.

The Company believes the cash flow from current operating activities for the next twelve months will be sufficient to provided necessary capital for the Company's operations for the next twelve months. Additionally, the Equity Swap (as described below) agreement should provide funds to the Company within the next twelve months.

On June 2, 2006, we entered into an equity swap arrangement ("Swap Transaction") with Cogent Capital Investments LLC and Cogent Capital Financial LLC (collectively, "Cogent") pursuant to which Innofone issued (i) 1,850,000 shares of common stock ("Common Stock"); and (ii) 4,815,000 shares of Innofone's Series A Convertible Preferred Stock ("Preferred Stock") for an aggregate purchase price of $50,000,000 in the form of U.S. Treasury Bonds. The initial price per share is $1.333333 per share, subject to certain adjustments. The Common Stock, Preferred Stock and Bonds are to be delivered pursuant to that certain escrow agreement between Innofone and Cogent. Partial settlements of the equity swap and related collateral releases (together the "Swap Settlements") commence 30 days subsequent to the effective date of this registration statement. Through the Swap Settlements, we may sell a fixed percentage of the Treasury Bonds against a fixed reference price for our common stock shares at any time thereafter, and use any cash proceeds from such sales for working capital purposes. Further, in connection with the Swap Transaction, we issued to Cogent 5,000,000 shares of our Common Stock ("Exchange Shares") and a warrant to purchase 5,000,000 shares of Common Stock ("Warrant Shares"). The Swap Transaction closed on June 5, 2006.

On May 25, 2006, we entered into a Letter Agreement ("Agreement") with the NIR Group for the repayment (the "Repayment") of certain notes ("Notes") and cancellation of certain warrants ("Warrants") issued on or about August 31, 2005 and October 31, 2005 pursuant to that certain Securities Purchase Agreement (the "SPA") by and between Innofone and AJW Partners, LLC ("Partners"), New Millennium Capital Partners, II, LLC ("Millennium"), AJW Offshore, Ltd. ("Offshore") and AJW Qualified Partners, LLC ("Qualified, with Partners, Millennium and Offshore, collectively, the "NIR Group"). The Repayment was applied to the outstanding principal and interest owing under the Notes and as consideration for the cancellation of the Warrants issued to the NIR Group, and the termination of any and all UCC-1s filed in favor of NIR. Further, in connection with the SPA, Notes and Warrants, the following ancillary documents were executed and/or filed: (1) Guaranty and Pledge Agreement, dated August 31, 2005, by and between Innofone, Mr. Alex Lightman, Innofone's President and Chief Executive Officer, and NIR ("Pledge Agreement"); (2) Security Agreement by and between Innofone and NIR, dated August 31, 2005 ("Security Agreement"); and (3) UCC-1 Financing Statements ("UCC-1s") filed by NIR in Nevada (the Notes, SPA, Warrants, Pledge Agreement and Security Agreement are referred to collectively as "Original Documents").

In connection with the Repayment, Innofone and NIR executed and delivered the Agreement, a new promissory note (the "New Notes"), a new stock purchase warrant (the "New Warrants"), and a new registration rights agreement ("New Registration Agreement") (the Agreement, New Notes, New Warrants and New Registration Agreement and the UCC-3s shall be referred to collectively as the "New Documents", each of which is filed herewith as an Exhibit). Further, NIR is required to file UCC-3 Termination Statements ("UCC-3s") necessary to terminate any perfected security interest they had obtained pursuant to the Security Agreement.

The terms of the Repayment, as provided in the Agreement are as follows: (a) upon signing of Agreement, Innofone made a cash Payment to NIR in the amount of $2,635,400 to be applied to the repayment of all amounts of principal and interest owing and outstanding under the Notes; (b) upon signing of the Agreement, Innofone issued to NIR the New Notes in the aggregate amount of $1,200,000. The New Notes are self-amortizing over a one-year time period commencing on July 1, 2006, with each installment payment due on the twelve consecutive monthly anniversaries beginning July 1, 2006. Further, pursuant to the New Notes, Innofone will pay to NIR an aggregate of $100,000 per month. The New Notes may be prepaid by Innofone at anytime without penalty; (c) upon signing of the Agreement, Innofone shall issued to NIR the New Warrants exercisable into an aggregate of 750,000 shares of Innofone's Common Stock (the "Warrant Shares"). The New Warrants shall have a term of five years and an exercise price equal to $1.79. The New Warrants may be exercised on a cashless basis only in the event that there is no effective registration statement covering the Warrant Shares. NIR may exercise the New Warrants by utilizing any amounts still owing under the New Notes. Innofone may buy back all of the New Warrants from NIR for an aggregate of $100,000 at any time prior to the New Warrants being exercised; (d) upon signing of the Agreement, Innofone and NIR executed and delivered the New Registration Agreement providing for the registration of the Warrant Shares with the Securities and Exchange Commission. The New Registration Agreement provides for one piggyback registration right no sooner than six months from the date of hereof; (e) NIR agrees not to sell Innofone's Common Stock short, either directly or indirectly through its affiliates, principals or advisors; (f) the Original Documents were terminated in all respects, and were rendered null and void and no longer binding NIR or Innofone to any obligations, duties and responsibilities contained therein. Further, NIR and Innofone mutually agree that the New Documents shall supersede the Original Documents in all respects; (g) Innofone filed a Form AW to withdraw the Registration Statement on Form SB-2 currently on file with the Securities and Exchange Commission covering the shares of common stock underlying the Notes and the Warrants; (h) All security interests perfected by NIR on the "Collateral" (as defined in the Security Agreement), pursuant to the Original Documents, including the Security Agreement, shall be terminated. Accordingly, NIR agreed to file within (2) days of the Agreement, UCC-3 Termination Statement.

On April 27, 2006, Innofone entered into a term sheet with Mr. Lawrence Hughes providing for an investment by Mr. Hughes in the aggregate amount of $4,000,000 in exchange for approximately 3,478,260 shares of Innofone's restricted common stock at $1.15 per share. Further, pursuant to the term sheet, Innofone is to issue a warrant to purchase 400,000 shares of Innofone's restricted common stock at an exercise price equal to eighty percent (80%) of the five (5) day trading average close price of Innofone's common stock. Definitive agreements between Innofone and Mr. Hughes will be entered forthwith.

**Critical Accounting Policies**

The preparation of our financial statements requires our management to make estimates and assumptions that affect the reported amounts on our financial statements. Management bases its estimates and judgments on historical experience and on various other factors that are believed to be reasonable under the circumstances. Actual results may differ from these estimates under different assumptions or conditions.

The Notes to the consolidated financial statements included in this filing contain a discussion of our significant accounting policies and recent accounting pronouncements applicable to us.

**8. Recent Accounting Pronouncements**

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections." This statement applies to all voluntary changes in accounting principle and requires retrospective application to prior periods' financial statements of changes in accounting principle, unless this would be impracticable. This statement also makes a distinction between "retrospective application" of an accounting principle and the "restatement" of financial statements to reflect the correction of an error. This statement is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. This statement is not expected to have a material effect on the Company's consolidated financial position or results of operations.

In February 2006, the FASB issued SFAS No. 155, "Accounting for Certain Hybrid Financial Instruments". SFAS No. 155 amends SFAS No 133, "Accounting for Derivative Instruments and Hedging Activities", and SFAF No. 140, "Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities". SFAS No. 155, permits fair value remeasurement for any hybrid financial instrument that contains an embedded derivative that otherwise would require bifurcation, clarifies which interest-only strips and principal-only strips are not subject to the requirements of SFAS No. 133, establishes a requirement to evaluate interest in securitized financial assets to identify interests that are freestanding derivatives or that are hybrid financial instruments that contain an embedded derivative requiring bifurcation, clarifies that concentrations of credit risk in the form of subordination are not embedded derivatives, and amends SFAS No. 140 to eliminate the prohibition on the qualifying special-purpose entity from holding a derivative financial instrument that pertains to a beneficial interest other than another derivative financial instrument. This statement is effective for all financial instruments acquired or issued after the beginning of the Company's first fiscal year that begins after September 15, 2006. This statement is not expected to have a material effect on the Company's consolidated financial position or results of operations.

In June 2005, the EITF reached consensus on Issue No. 05-6, Determining the Amortization Period for Leasehold Improvements ("EITF 05-6.") EITF 05-6 provides guidance on determining the amortization period for leasehold improvements acquired in a business combination or acquired subsequent to lease inception. The guidance in EITF 05-6 will be applied prospectively and is effective for periods beginning after June 29, 2005. EITF 05-6 is not expected to have a material effect on the Company's consolidated financial position or results of operations.

In September 2006, the FASB issued SFAS No. 157 "Fair Value Measurements". SFAS No. 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosure about fair values. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007, and interim periods within those fiscal years. Management believes that the adoption of SFAS No. 157 will not have a material impact on the consolidated financial results of the Company.

**Item 3. Evaluation of Disclosure Controls and Procedures**

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's Exchange Act reports is recorded, processed and summarized and is reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Principal Financial Officer to allow timely decisions regarding required disclosure. In designing and evaluating the disclosure control procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management necessarily was required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As of the end of the period covered by this report, the Company's management carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Exchange Act Rule 13a-14. Based upon the evaluation, the Company's President (principal executive officer) and Principal Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting him to material information required to be included in the Company's periodic SEC filings.

PART II- OTHER INFORMATION.


Item 1. Legal Proceedings.

There are currently no legal proceedings against the Company at this time.

However, on October 4, 2006, we filed a complaint in the United States District Court, Central District of California, against InfoWeapons, Inc. ("InfoWeapons") and Lawrence Hughes ("Hughes") alleging that InfoWeapons and Hughes have failed to perform their obligations under that certain Agreement and Plan of Merger, dated August 16, 2006 (the "Merger Agreement") and that each had wrongfully misappropriated trade secrets of our Company. Under the terms of the Merger Agreement, which was executed on or about August 16, 2006 by the parties, we acquired InfoWeapons and its assets (including but not limited to InfoWeapons' subsidiary InfoWeapons Corp.) with the only non-administrative outstanding item subsequent to execution being the delivery by InfoWeapons of its financial statements in accordance with US Generally Accepted Accounting Principles (GAAP). Despite our recent and repeated requests, InfoWeapons has failed to deliver its US GAAP financial statements as required by the Merger Agreement.

Although we hope to resolve this matter in an amicable fashion, we are demanding pursuant to the complaint that InfoWeapons perform its obligations under the Merger Agreement and are seeking approximately $20,000,000 in damages related to our tradesecret misappropriation claim.


Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.

None.

Item 3. Defaults Upon Senior Securities.

None.

Item 4. Submission of Matters to a Vote of Security Holders.

There were no matters requiring a vote of security holders during this period.

Item 5. Other Information.

None.
Item 6.  Exhibits

     A. Exhibits:

31.1 Certification Pursuant to Section 302 of the Sarbanes-Oxley Act.*

32.1 Certification Pursuant to Section 906 of the Sarbanes-Oxley Act.*
_____
*Filed herewith.

25

SIGNATURES

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

INNOFONE.COM, INCORPORATED

Date:  November 7, 2006                    By:  /s/ Alex Lightman
                                                Alex Lightman
                                                Title Chief Executive Officer, President, Principal
                                                Financial Officer and Director

26